## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RANDI WEINGARTEN, *in her official capacity as President of the American Federation of Teachers, AFL-CIO*,
    555 New Jersey Avenue N.W.
    Washington, D.C. 20001

AMERICAN FEDERATION OF TEACHERS, AFL-CIO,
    555 New Jersey Avenue N.W.
    Washington, D.C. 20001

CYNTHIA MILLER,
    9305 S. Oakley Avenue
    Chicago, Illinois 60643

CRYSTAL ADAMS,
    2361 Sunnyside Drive
    Arnold, Missouri 63010

CONNIE WAKEFIELD,
    54561 Jack Drive
    Macomb, Michigan 48042

DEBORAH BAKER,
    12330 S. 14th Street
    Jenks, Oklahoma 74037

JANELLE MENZEL,
    14889 Nokay Lake Road
    Brainerd, Minnesota 56401

KELLY FINLAW,
    735 W. 172nd Street #A51
    New York, New York 10032

GLORIA NOLAN,
    4184 Sacramento Avenue
    St. Louis, Missouri 63115

MICHAEL GIAMBONA,
    35 Tiffin Court
    Clayton, California 94517

Case No. _____

Plaintiffs,

v.

ELISABETH DEVOS, *in her official capacity as Secretary of Education*,
    400 Maryland Avenue S.W.
    Washington, D.C. 20202

and

UNITED STATES DEPARTMENT OF EDUCATION,
    400 Maryland Avenue S.W.
    Washington, D.C. 20202

Defendants.

## **COMPLAINT**

Date: July 11, 2019

Mark Richard (D.C. Bar No. 1033699)
PHILLIPS, RICHARD & RIND, P.A.
9360 SW 72 Street, Suite 283
Miami, FL 33173
Telephone: (305) 412-8322
E-mail: mrichard@phillipsrichard.com

*Attorneys for Plaintiffs Weingarten & AFT*

Aaron Ament*
Daniel A. Zibel (D.C. Bar No. 491377)
Robyn K. Bitner (D.C. Bar No. 1617036)
NATIONAL STUDENT LEGAL
DEFENSE NETWORK
1015 15th Street N.W., Suite 600
Washington, D.C. 20005
Telephone: (202) 734-7496
E-mail: aaron@nsldn.org
      dan@nsldn.org
      robyn@nsldn.org

*Attorneys for Plaintiffs Weingarten & AFT*

Faith Gay*
Caitlin Halligan*
Maria Ginzburg*
Yelena Konanova*
Margaret Siller (D.C. Bar No. 230475)
SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 390-9000
E-mail: fgay@selendygay.com
      challigan@selendygay.com
      mginzburg@selendygay.com
      lkonanova@selendygay.com
      msiller@selendygay.com

*Attorneys for Plaintiffs*

*Pro hac vice* forthcoming

# TABLE OF CONTENTS

**Pages**

NATURE OF THE ACTION ...................................................................................... 1

PARTIES ................................................................................................................... 12

    Plaintiffs ............................................................................................................ 12

    Defendants ........................................................................................................ 15

JURISDICTION ....................................................................................................... 16

VENUE ...................................................................................................................... 19

FACTUAL ALLEGATIONS ...................................................................................... 19

ED AND FEDERAL STUDENT LOANS ................................................................. 19

    ED's Mission .................................................................................................... 19

    The Role of Federal Student Loan Servicers .................................................. 22

THE PUBLIC SERVICE LOAN FORGIVENESS PROGRAM ................................ 25

    PSLF Program Requirements ......................................................................... 27

    The Failure of PSLF and the Equally Unsuccessful Temporary Band-
        Aid of TEPSLF ........................................................................................ 33

    ED's Authority to Discharge Student Loans ................................................... 35

ED'S ADMINISTRATIVE PROCESSING ERRORS .............................................. 37

    ED's Documented Failure to Correctly Process PSLF Applications ............... 37

    Administrative Error Plaintiffs ....................................................................... 41

        1.      Cynthia Miller .......................................................................... 41

        2.      Crystal Adams ......................................................................... 51

        3.      Connie Wakefield ..................................................................... 56

ED'S DISREGARD OF SERVICER MISREPRESENTATIONS TO
    BORROWERS REGARDING PSLF ................................................................ 66

    ED's Awareness of Widespread Servicer Misconduct ..................................... 66

i

Servicer Misconduct Plaintiffs ........................................................ 71

    1.    Deborah Baker ........................................................ 71

    2.    Janelle Menzel ........................................................ 79

    3.    Kelly Finlaw ............................................................ 83

    4.    Gloria Nolan ........................................................... 86

    5.    Michael Giambona ................................................. 89

CAUSES OF ACTION ............................................................................ 93

COUNT I – ARBITRARY AND CAPRICIOUS AGENCY ACTION DUE TO
ADMINISTRATIVE PROCESSING ERRORS PURSUANT TO
5 U.S.C. § 706(2)(A) (ADMINISTRATIVE ERROR PLAINTIFFS
AGAINST DEFENDANTS) .................................................................... 93

COUNT II – INADEQUATE NOTICE OF DENIALS PURSUANT TO
5 U.S.C. § 555(e) (ADMINISTRATIVE ERROR PLAINTIFFS
AGAINST DEFENDANTS) .................................................................... 95

COUNT III – VIOLATION OF DUE PROCESS DUE TO ADMINISTRATIVE
PROCESSING ERRORS PURSUANT TO THE FIFTH AMENDMENT
TO THE U.S. CONSTITUTION (ADMINISTRATIVE ERROR
PLAINTIFFS AND AFT AGAINST DEFENDANTS) ..................................... 97

COUNT IV – ARBITRARY AND CAPRICIOUS AGENCY ACTION DUE TO
SERVICER MISCONDUCT PURSUANT TO 5 U.S.C. § 706(2)
(SERVICER MISCONDUCT PLAINTIFFS AGAINST DEFENDANTS) .... 100

COUNT V – VIOLATION OF DUE PROCESS DUE TO SERVICER
MISCONDUCT PURSUANT TO THE FIFTH AMENDMENT TO THE
U.S. CONSTITUTION (SERVICER MISCONDUCT PLAINTIFFS
AND AFT AGAINST DEFENDANTS) ...................................................... 102

PRAYER FOR RELIEF ............................................................................ 104

Plaintiffs Randi Weingarten, in her official capacity as President of the American Federation of Teachers, AFL-CIO, and the American Federation of Teachers, AFL-CIO (collectively, "AFT"); Cynthia Miller, Crystal Adams, and Connie Wakefield (together, the "Administrative Error Plaintiffs"); and Deborah Baker, Janelle Menzel, Kelly Finlaw, Gloria Nolan, and Michael Giambona (together, the "Servicer Misconduct Plaintiffs," and together with Administrative Error Plaintiffs, the "Individual Plaintiffs"), through their attorneys, Selendy & Gay PLLC, Phillips, Richard & Rind, P.A., and the National Student Legal Defense Network, allege the following against Defendants Elisabeth DeVos, in her official capacity as Secretary of Education ("Secretary DeVos"), and the United States Department of Education (the "Department," and collectively with Secretary DeVos, "ED") and assert the following claims under the Administrative Procedure Act ("APA") and the Due Process Clause of the Fifth Amendment to the United States Constitution.

Plaintiffs seek to hold ED accountable for its gross mismanagement of the Public Service Loan Forgiveness ("PSLF") Program and the Temporary Expanded Public Service Loan Forgiveness ("TEPSLF") Program in violation of the APA and the Fifth Amendment's Due Process Clause.  Plaintiffs ask this Court to direct ED to provide PSLF and TEPSLF applicants with a decision-making process that minimizes the risk of erroneous denials, a meaningful opportunity to contest denials, and a written, reasoned explanation for its decisions.  The Individual Plaintiffs also seek loan forgiveness in their specific cases.

## NATURE OF THE ACTION

1.     In 2007, recognizing that the skyrocketing cost of higher education made it nearly impossible for public servants to obtain the degrees required to serve in their professions and pay back their resulting student loans, a bipartisan Congress enacted the PSLF Program.  PSLF's purpose was to relieve the burden of student debt for

teachers, nurses, police officers, firefighters, and others who had made 120 qualifying payments on eligible student loans on a qualifying repayment plan, while working at a qualifying job. Millions of public servants have relied on PSLF in taking out student loans. But ED—the very agency that is supposedly the champion of our nation's education system—has failed to live up to its role in administering this Program.

2.      PSLF is a federal entitlement guaranteed by Congress under 20 U.S.C. § 1087e(m), which mandates that ED "shall cancel the balance of interest and principal due" for qualifying loans held by public servants after 120 payments.

3.      ED has failed to make good on Congress's promise, denying PSLF to applicants on arbitrary and capricious grounds, without any meaningful process to review erroneous decisions or to ensure that Title IV loan servicers[1] provide accurate guidance to borrowers regarding their eligibility for loan forgiveness. According to its reports, as of March 2019, ED had forgiven the loans of **_fewer than 1%_** of the borrowers applying for PSLF.[2] Of the 73,554 unique PSLF applications received since October 2017, ED denied a staggering 71% for purportedly failing to meet eligibility

---

[1] "Title IV loan servicers" service loans issued under Title IV of the Higher Education Act ("HEA"), 20 U.S.C. §§ 1070 *et seq.* They include servicers known as TIVAS (Title IV Additional Servicing) Servicers: (i) Navient Corporation ("Navient") (formerly known as SLM Corporation/Sallie Mae); (ii) Nelnet Servicing, LLC ("Nelnet") (Nelnet acquired Great Lakes Educational Loan Services); and (iii) Pennsylvania Higher Education Assistance Agency a/k/a FedLoan Servicing ("FedLoan Servicing"), as well as various not-for-profit servicers. *See* U.S. Dep't of Educ., Fed. Student Aid, *Loan Servicing Contracts*, https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing (last visited July 9, 2019). Title IV loan servicers have a direct contractual relationship either with the Department, when servicing loans held by the Department, or with non-Departmental commercial lenders and loan holders as part of the Federal Family Education Loan ("FFEL") Program. The Department maintains oversight authority over all Title IV servicers, regardless of whether it directly contracts with them, as explained *infra* ¶¶ 54-59.

[2] U.S. Dep't of Educ., Fed. Student Aid, *March 2019 PSLF Report* (Mar. 31, 2019), https://studentaid.ed.gov/sa/about/data-center/student/loan-forgiveness/pslf-data (hereinafter "FSA, *March 2019 PSLF Report*") (last visited July 9, 2019).

requirements, such as having the correct type of loan or repayment plan or employment in a qualifying job.  Only 518 public servants have received PSLF thus far—a negligible number compared with the estimated 32 million borrowers who, according to the Consumer Financial Protection Bureau ("CFPB"), were making payments on potentially eligible loans at the end of 2016.[3]

4.      In 2018, recognizing the inadequacies of the existing PSLF Program, Congress enacted an extension to PSLF—the Temporary Expanded Public Service Loan Forgiveness ("TEPSLF") Program—to provide a temporary band-aid for some of PSLF's widely recognized failures.  TEPSLF narrowly expands the qualifications for PSLF by allowing borrowers who made 120 payments in certain otherwise non-qualifying payment plans to receive loan forgiveness on a first-come, first-served basis until TEPSLF funds run out.  Like PSLF, TEPSLF mandates that ED forgive loans for those that qualify.  But ED has mismanaged TEPSLF as well:  as of March 2019, only 3.6% of TEPSLF applications have been approved.[4]

5.      Public servants like Plaintiffs Cynthia Miller, Crystal Adams, and Connie Wakefield have borne the brunt of ED's failures:  although each of them made the requisite 120 qualifying payments, ED miscounted the number of payments they made, and every time these Plaintiffs tried to point out the errors, ED provided inconsistent and still incorrect counts.  Not only did ED refuse to correct its mistakes, it closed their files and denied these Plaintiffs loan forgiveness.  To make matters worse, Ms. Miller, Ms. Adams, and Ms. Wakefield never received a clear explanation

---

[3] *Id.*; *see also* Consumer Fin. Prot. Bureau, *Staying On Track While Giving Back: The Cost Of Student Loan Servicing Breakdowns For People Serving Their Communities* 20 n.34 (June 2017) (hereinafter "CFPB, *Staying on Track*"), https://files.consumerfinance.gov/f/documents/201706_cfpb_PSLF-midyear-report.pdf.

[4] FSA, *March 2019 PSLF Report*, *supra* note 2.

of the reasons for their denials, nor did ED have a process through which it could identify and account for its own errors.

- Cynthia Miller, a Chicago Public Schools teacher, submitted a PSLF application in May 2018. ED delayed consideration of her application repeatedly because the servicer of her loans erroneously claimed her application was "incomplete," eventually denied it for failure to make 120 qualifying payments (another error), and then denied Ms. Miller's TEPSLF application. In response to her repeated inquiries about the reason for the denials, Ms. Miller received at least a dozen responses with completely different—and incorrect—counts of her qualifying payments (including one count of 128 payments—eight more than the requisite number). Finally, the servicer mailed her multiple envelopes containing over 160 pages of indecipherable numbers and codes and informed her that her inquiry had been closed.

- ED denied the PSLF and TEPSLF applications of Crystal Adams, a U.S. Department of the Treasury employee, stating that she had only made 113 of the 120 required payments. After Ms. Adams made seven additional payments, ED again denied her application for TEPSLF. When Ms. Adams asked the servicer of her loans why she did not qualify, the servicer gave her a series of conflicting answers with payment counts that fluctuated for unexplained reasons and ultimately told her that it did not know how TEPSLF payments are counted but would check and get back to her. Ms. Adams never received a response. Ms. Adams submitted another application for PSLF and again was denied.

- After making 120 on-time payments on her Direct Loans while on a qualifying repayment plan, public school teacher Connie Wakefield applied for PSLF in October 2017. The servicer of her loans informed her that she had made 120 qualifying payments and was eligible for loan forgiveness under PSLF. ED nonetheless denied Ms. Wakefield's application for PSLF. Ms. Wakefield has applied multiple times after this initial denial, and ED continues to deny her requests for forgiveness. For nearly two years, Ms.

Wakefield has called the servicer asking for an explanation and has received none. Instead, the servicer has only repeated that it would place her account under review. The "reviews" have provided only conflicting, inconsistent, and erroneous payment counts.

6.      ED has also disregarded repeated misrepresentations that the Title IV servicers have made to borrowers about what loans and loan repayment plans qualify for PSLF. Those servicers misinformed Plaintiffs Deborah Baker, Janelle Menzel, Kelly Finlaw, Gloria Nolan, and Michael Giambona that they were "on track" for PSLF and making "qualifying" payments for PSLF, even though they did not actually have qualifying loans or were not in qualifying repayment plans. Only years later, after they had made 120 payments and applied for forgiveness, did these public servants learn for the first time that their payments did not count. Had the loan servicers given these Plaintiffs the correct information, they easily could have consolidated their loans, entered qualifying repayment plans, and been eligible for forgiveness under PSLF.

- Deborah Baker, a Director of Education at an Oklahoma nonprofit organization, was assured by the Title IV servicer of her loans for nine years that she would qualify for PSLF if she made on-time payments on her income-driven repayment plan. That was wrong. Only Direct Loans qualify for PSLF, and Ms. Baker should have converted her Federal Family Education ("FFEL") Loans to Direct Loans to qualify for loan forgiveness. ED subsequently denied Ms. Baker's applications for PSLF and TEPSLF.

- Janelle Menzel, a Minnesota public school teacher, asked the Title IV servicer of her loans how to qualify for PSLF shortly after the program began. The servicer directed her to make payments on her existing plan while working for a qualifying employer and gave her counts of qualifying payments as she continued repayment. That was wrong. Ms. Menzel was not repaying her loans on an eligible repayment plan. The servicer then processed her application for a federal Teacher Loan Forgiveness award but failed to tell Ms. Menzel that it would render four years of her payments

5

ineligible for PSLF.  Years later, only when she reached out
to confirm that her employer qualified for PSLF, did the
Title IV servicer tell her for the first time that she was not
on a qualifying plan and that none of her payments counted
for PSLF.  When Ms. Menzel subsequently applied for
TEPSLF, the servicer told her for the first time that only
payments made after 2011 would count for TEPSLF be-
cause of her Teacher Loan Forgiveness award.  After ED
denied her TEPSLF application, the servicer told Ms. Men-
zel she should simply "give up" on obtaining loan for-
giveness.

- Kelly Finlaw, a New York public school teacher, had both
  FFEL Loans and Direct Loans.  When Ms. Finlaw informed
  the Title IV servicer of her loans that she intended to apply
  for PSLF, the servicer told Ms. Finlaw that she would qual-
  ify for PSLF in October 2017 and should continue making
  payments until she submitted her PSLF application.  That
  was wrong.  Her FFEL Loan did not qualify for PSLF, and
  she would not have made 120 payments on her Direct
  Loans to be eligible for forgiveness by October 2017.  After
  she made 120 payments on her FFEL Loan, the servicer
  still said—erroneously—that she was eligible for PSLF and
  should go into forbearance because her loans would be for-
  given.  After her PSLF application was denied because she
  had the "wrong" loans, the servicer told Ms. Finlaw that
  she should consolidate her FFEL Loans and Direct Loans.
  By doing so, Ms. Finlaw lost almost five years of PSLF-
  qualifying payments on her Direct Loans.

- Gloria Nolan, who works at a nonprofit in Missouri, told
  the Title IV servicer of her loans that she wanted to pursue
  PSLF and asked how to qualify.  The servicer told Ms. No-
  lan that she should simply apply for PSLF once she had
  made 120 payments.  That was wrong.  Ms. Nolan was
  making payments on a graduated repayment plan, which
  does not qualify for PSLF.  After making 120 payments,
  Ms. Nolan applied for PSLF, and ED denied her applica-
  tion; she then applied for TEPSLF and again was denied.
  When Ms. Nolan asked the servicer if she could qualify for
  TEPSLF, the servicer instructed her to make two more
  payments and then reapply for PSLF and TEPSLF.  After
  she did so, ED yet again denied Ms. Nolan loan forgiveness.

- Dr. Michael Giambona, a California public school psycholo-gist, asked the Title IV servicer of his loans how to qualify for PSLF shortly after the Program began. The servicer assured Dr. Giambona multiple times that so long as he continued working for a qualifying employer, he simply needed to continue making payments on his loans and then check back after ten years. In fact, Dr. Giambona had a nonqualifying FFEL loan and should have consolidated that loan into a Direct Loan. ED subsequently denied Dr. Giambona's applications for PSLF and TEPSLF.

7.     Instead of acknowledging the Title IV servicers' misrepresentations and using its loan discharge authority to redress these errors, ED has turned a blind eye to this misconduct, even though it is well-documented, including in government reports.[5]

8.     A September 2018 Report by the Government Accountability Office ("GAO") confirms that ED has identified widespread servicer misconduct but has not taken steps to give the servicers adequate guidance or instructions on how to administer the PSLF Program or ensure that servicers receive consistent loan payment history information from other loan servicers when borrower accounts are transferred. Nor does ED require the servicers to give borrowers accurate information on which payments qualify for PSLF—information that is critical given the long period of repayment required before any borrower can be eligible for loan forgiveness.[6]

---

[5] *See, e.g.*, Alexandra Hegji, Cong. Research Serv., No. R45389, *The Public Service Loan Forgiveness Program: Selected Issues* 23–25 (Oct. 29, 2018), https://fas.org/sgp/crs/misc/R45389.pdf.

[6] U.S. Gov't Accountability Office, GAO-18-547, *Public Service Loan Forgiveness: Education Needs to Provide Better Information for the Loan Servicer and Borrowers* 24 (Sept. 2018) (hereinafter "GAO, *Public Service Loan Forgiveness Report*"), https://www.gao.gov/assets/700/694304.pdf.

9.     ED's Office of Inspector General ("OIG") issued its own report in early 2019, echoing the GAO's conclusions about misconduct by ED and Title IV servicers.[7] In an audit of the Federal Student Aid ("FSA") office—a division of ED—OIG found that "[f]rom January 1, 2015 through September 30, 2017, 61 percent . . . of [the] reports on FSA's oversight activities identified instances of servicer noncompliance with Federal loan servicing requirements."[8]   As a result of these violations, servicers placed borrowers on nonqualifying repayment plans or incorrectly calculated the number of monthly payments borrowers owe on their federal loans.

10.     The OIG also found that while ED is fully aware of these problems, it is doing nothing to remedy them.   According to the OIG, ED rarely, if ever, penalizes servicers for noncompliance, fails to track noncompliance, and refuses to prioritize the interests of borrowers over the interests of servicers.[9]

11.     ED's mismanagement of PSLF has harmed many Americans.   The Individual Plaintiffs are all members of Plaintiff AFT, an organization representing 1.7 million pre-K-through-12th-grade teachers and other public service professionals. AFT is a leader in the fight for public service workers' financial rights, particularly with respect to the rising costs of education.   In a survey of its members, 82% of members who had submitted their PSLF applications were denied, many for failing to meet eligibility requirements due to misinformation provided by their servicer.

---

[7] U.S. Dep't of Educ., Office of Inspector Gen., ED-OIG/A05Q0008, *Federal Student Aid: Additional Actions Needed to Mitigate the Risk of Servicer Noncompliance with Requirements for Servicing Federally Held Student Loans* (Mar. 5, 2019), https://www2.ed.gov/about/offices/list/oig/auditreports/fy2019/a05q0008.pdf   (hereinafter "OIG, *Federal Student Aid*").

[8] *Id.* at 4.

[9] *Id.* at 2, 9-10, 17.

12.     Responsibility for the egregious mishandling of PSLF lies squarely at the feet of ED, which "is responsible for establishing the administrative structure necessary to fulfill the PSLF Program's goal of encouraging individuals to enter and continue in public service employment by providing loan forgiveness to borrowers who meet program requirements."[10]

13.     At her confirmation hearing, Secretary DeVos assured members of the Senate and the American public that under her leadership, the Department would make good on PSLF's promise to America's public servants.

- Secretary DeVos promised that, "if confirmed, [she] look[ed] forward to working with Congress on ways to ensure that borrowers of Federal student loans continue to have manageable repayment options that are simple and easy to understand."[11]

- Secretary DeVos told Senator Orrin Hatch that "the issue of student debt and the amount of student debt . . . is a very serious issue and one which we all have to pay very close attention to and resolve in some way," and further promised that, "[i]f confirmed, I certainly will look forward to working with you and your colleagues on ways to get after this issue."[12]

- Secretary DeVos assured members of the Senate and the public that

---

[10] GAO, *Public Service Loan Forgiveness Report*, *supra* note 6, at 24; *see also* H. Rep. No. 110-210, at 48-49 (2007) ("The Committee believes that through increased Pell Grants, programs for better debt management and loan forgiveness, students are better able to assemble a package of debt relief to ensure a brighter future with less financial burdens. Debt burdens are particularly troublesome for public servants who often earn low salaries for their work. The policies embodied in H.R. 2669 recognize the contributions and challenges of public service, and the Committee hopes to encourage participation in these careers.").

[11] *Nomination of Betsy DeVos to Serve as Secretary of Education: Hearing of the Comm. on Health, Education, Labor, and Pensions*, 115th Cong. 120 (Jan. 17, 2017) (hereinafter "*DeVos Nomination Hearing*"), https://www.govinfo.gov/content/content/pkg/CHRG-115shrg23667/pdf/CHRG-115shrg23667.pdf.

[12] *Id.* at 24.

she would pursue "successful implementation of the law" and "facilitate compliance with the laws that the Department is charged to enforce."[13]

- When asked about her commitment to PSLF, Secretary DeVos testified that, "if confirmed, [she would] faithfully implement the Higher Education Act"[14] and "ensure [ED] is appropriately answering any technical assistance request we receive from entities or individuals interested in learning more about the Public Service Loan Forgiveness program."[15]

14.     Secretary DeVos lived up to none of those promises.  Flouting Congress's mandate, Secretary DeVos and the Department she leads have done nothing to remedy the gross mismanagement of the PSLF (including TEPSLF) Program, despite documented knowledge of these failures.  Indeed, Secretary DeVos has publicly rejected PSLF's very purpose, stating, "[w]e don't think one type of job, one type of role, should be incentivized over another."[16]  Secretary DeVos "propose[d] eliminating Public Service Loan Forgiveness" going forward,[17] and the Trump Administration proposed that appropriations for the PSLF Program be eliminated entirely in the 2020 budget.[18]

---

[13] *Id*. at 98.

[14] *Id*. at 120.  As explained below, the Higher Education Act of 1965 was amended by the College Cost Reduction and Access Act of 2007, which created PSLF.

[15] *Id*. at 177.

[16] *Examining Policies and Priorities of the U.S. Dep't of Educ.: Hearing Before the House Comm. on Educ. and Labor*, 116th Cong. (Apr. 10, 2019) at 04:01:57 (testimony of Betsy DeVos, Secretary of Education), https://www.c-span.org/video/?459644-1/education-policy-hearing-secretary-devos (last visited July 9, 2019).

[17] *Id*.

[18] Annie Nova, *Education Dept. faces 10% funding cut under Trump's 2020 budget proposal*, CNBC (Mar. 11, 2019), https://www.cnbc.com/2019/03/11/trumps-budget-proposal-would-cancel-public-service-loan-forgiveness.html (last visited July 9, 2019).

15. Secretary DeVos, the Department, and the Trump Administration cannot flout the Constitution and federal law by blocking the overwhelming majority of public servants from obtaining the benefits to which they are entitled under PSLF and TEPSLF. They must implement PSLF and TEPSLF in a manner that provides public servants a meaningful chance to secure the benefits made available by Congress. The Due Process Clause of the Fifth Amendment requires ED to provide processes that give PSLF and TEPSLF applicants notice and a meaningful opportunity to be heard on issues affecting their eligibility for this statutorily granted entitlement. And the APA requires ED to engage in reasoned decision-making, to consider all essential facts, and to provide an adequate explanation for its decisions to deny public servants benefits under PSLF and TEPSLF.

16. Instead, ED's administrative process is practically nonexistent. ED consistently makes administrative mistakes on such routine matters as counting the number of qualifying payments, and the Title IV servicers misrepresent PSLF's eligibility requirements when borrowers ask how they can obtain loan forgiveness. ED then fails to consider evidence of these pervasive errors or misrepresentations in making eligibility determinations—and, to make matters worse, its denials provide no meaningful explanation of the reasons for rejection.

17. Borrowers who should qualify for PSLF or TEPSLF, including the Individual Plaintiffs, have not received forgiveness for reasons completely outside their control. ED has eviscerated the statutory promise of loan forgiveness for those who have spent a decade or more in public service dutifully repaying their loans. Plaintiffs bring this action to require ED to fulfill its mandate to lawfully administer the PSLF Program, including TEPSLF.

## PARTIES

### PLAINTIFFS

18.     Plaintiff Randi Weingarten is President of the American Federation of Teachers, AFL-CIO.   Prior to her election as President in 2008, Ms. Weingarten served for 12 years as president of the United Federation of Teachers, AFT Local 2, representing approximately 200,000 educators in the New York City public school system, home childcare providers, and other workers in health, law, and education, and served for 12 years as counsel to the AFT president, taking a lead role in lawsuits to secure adequate school funding and building conditions.[19]   President Weingarten brings this suit solely in her official capacity as President of AFT.

19.     Plaintiff AFT is a membership organization representing 1.7 million pre-K-through-12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals.   AFT's purpose is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families, and communities.[20]

20.     AFT has taken a leading role in fighting for the financial rights of public service workers, particularly when it comes to the cost of education.

21.     A survey of AFT's members showed that eight out of every ten respondents who struggle financially consider student loan debt a "major burden or

---

[19] AFT, *Randi Weingarten*, https://www.aft.org/about/leadership/randi-weingarten (last visited July 7, 2019).

[20] AFT, *Mission*, https://www.aft.org/about/mission (last visited July 7, 2019).

challenge."[21]   Many AFT members report being unable to afford basic household needs, including food, rent, and other necessities, because of the burden of their student loans.[22]   Some members even reported suicidal tendencies related to the crushing weight of student loan debt.

22.     In a follow-up survey, almost all AFT respondents who had submitted PSLF applications reported a denial of forgiveness (82%) because of ineligible FFEL Loans (27%), incorrect repayment plans (27%), or failure to meet some combination of program requirements (40%).   Crucially, two-thirds of AFT respondents who have been denied PSLF said their servicer gave them incorrect information about how to qualify for PSLF (64%).   Yet, even though 43% of those who were denied forgiveness attempted to plead their case to ED or the servicer, not one had their complaints resolved.   More than four out of every five members who then applied for TEPSLF were denied yet again.   Members reported that they had no savings for emergencies, were denied credit, could not buy homes or afford to live on their own, were forced to work multiple jobs to make ends meet, and had to declare bankruptcy—all as a result of ED's failure to grant statutorily mandated loan forgiveness under PSLF (including TEPSLF).

23.     AFT asserts the Fifth Amendment Due Process rights of its members under the doctrine of associational standing and in its own right under the doctrine of organizational standing.

24.     Plaintiff Cynthia Miller is a public school teacher who works and resides in Chicago, Illinois.   Although Ms. Miller has made at least 120 qualifying payments, ED miscounted the number of qualifying payments and denied Ms. Miller PSLF and

---

[21] Hart Research Association, *Effects of Debt on AFT Members Who Struggle Financially* 3 (June 2018), https://www.aft.org/sites/default/files/ppt_aft-member-debt_hart2018.pdf.

[22] *Id*. at 3, 14.

TEPSLF.

25.     Plaintiff Crystal Adams is an employee of the U.S. Department of the Treasury who works and resides in Missouri.  Although Ms. Adams made at least 120 qualifying payments for TEPSLF, ED miscounted that number and denied her TEPSLF.

26.     Plaintiff Connie Wakefield is a public school teacher who works and resides in Michigan.  Although Ms. Wakefield made at least 120 qualifying payments for PSLF, ED miscounted that number and denied her PSLF.  (Plaintiffs Miller, Adams, and Wakefield are referred to as the "Administrative Error Plaintiffs.")

27.     Plaintiff Deborah Baker is the full-time Director of Education at a non-profit organization and works and resides in Oklahoma.  She has made at least 120 payments on her student loans.  The Title IV servicer, Navient, incorrectly told Ms. Baker that her FFEL Loans qualified for PSLF, and ED then denied Ms. Baker PSLF.

28.     Plaintiff Janelle Menzel is a public school teacher who works and resides in Minnesota.  She has made at least 120 payments on her loans.  The Title IV servicer, Nelnet, falsely told Ms. Menzel that her repayment plan qualified for PSLF and processed her request for another loan forgiveness program in 2011 without informing her that she would thereby forfeit over four years of PSLF-qualifying payments.  ED denied Ms. Menzel PSLF and TEPSLF.

29.     Plaintiff Kelly Finlaw is a public school teacher who works and resides in New York.  The Title IV servicer, Nelnet, falsely told Ms. Finlaw that her FFEL Loans qualified for PSLF.  She has made at least 120 payments on her loans.  When Ms. Finlaw applied for PSLF, ED denied her application.  Her servicer then advised her to consolidate all of her loans into a Direct Consolidation Loan, even though Ms. Finlaw had been in repayment on her Direct Loans on a qualifying repayment plan.  After consolidating her FFEL Loans with her Direct Loans, Ms. Finlaw lost years of qualifying payments on her Direct Loans.

14

30.     Plaintiff Gloria Nolan works for a Missouri nonprofit organization that empowers communities to provide resources including childcare, education, healthcare, employment, and financial services.  She has made at least 120 payments on her loans.  The Title IV servicer, EdFinancial, falsely told Ms. Nolan that her loan payments qualified for PSLF, and ED then denied Ms. Nolan PSLF for failing to make 120 payments on a qualifying repayment plan.

31.     Plaintiff Michael Giambona is a public school psychologist providing mental health services to at-risk students in one of the largest school districts in California.  Dr. Giambona has made at least 120 payments on his FFEL Consolidation Loan.  His Title IV servicers, including Sallie Mae and Navient, falsely told Dr. Giambona that his FFEL Consolidation Loan qualified for PSLF.  When Dr. Giambona applied for PSLF and TEPSLF, he was denied because he did not have Direct Loans. (Plaintiffs Baker, Menzel, Finlaw, Nolan, and Giambona are referred to as the "Servicer Misconduct Plaintiffs.")

## DEFENDANTS

32.     Defendant Elisabeth DeVos, in her capacity as Secretary of the Department of Education, is responsible for administering the federal student loan program, including PSLF and TEPSLF.  Secretary DeVos is "authorized to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department."[23]

33.     Secretary DeVos maintains an office at the Department's headquarters, located at 400 Maryland Avenue S.W., Washington, D.C. 20202.

34.     Defendant United States Department of Education is a federal agency headquartered in the District of Columbia.  Its principal office is located at 400

---

[23] 20 U.S.C. § 1221e-3.

Maryland Avenue S.W., Washington, D.C. 20202.

## **JURISDICTION**

35.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a case arising under federal law.

36.    The relief requested herein is authorized by the Administrative Procedure Act, 5 U.S.C. § 702, and the Court's authority to enjoin federal officers from violating the U.S. Constitution and federal law.

37.    Congress has waived sovereign immunity as to the relief requested pursuant to 5 U.S.C. § 702, and sovereign immunity does not bar Plaintiffs from securing relief for the Fifth Amendment Due Process Clause violations alleged herein.

38.    Defendants' actions complained of herein with respect to each Individual Plaintiff constitute final agency actions,[24] and no further exhaustion of remedies is required by 20 U.S.C. § 1087e(m), the Consolidated Appropriations Act of 2018, Pub. L. No. 115-141, § 315, 132 Stat. 348, 752-53, or applicable ED regulations, as each Individual Plaintiff was denied PSLF (including TEPSLF where applicable) when he or she applied.[25]

39.    In addition, exhaustion is not required because it would be futile.[26] As explained below, each Individual Plaintiff has availed himself or herself of any available procedures to cure the denials without success.

40.    Defendants' actions give rise to an actual case or controversy within the

---

[24] *See* 34 C.F.R. § 685.219(e)(3); *Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 19-24 (D.D.C. 2019).

[25] *See* 34 C.F.R. § 685.219(e)(3); *see also Darby v. Cisneros*, 509 U.S. 137, 154 (1993) (exhaustion is a "prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review").

[26] *See Am. Fed'n of Gov't Emps. v. Acree*, 475 F.2d 1289, 1292 (D.C. Cir. 1973) (no requirement to exhaust administrative remedies when doing so would be "an exercise in futility").

meaning of Article III of the U.S. Constitution.

41.     Individual Plaintiffs have Article III standing to assert APA claims and claims under the Due Process Clause of the Fifth Amendment as set forth below:

a. ED's denials of Individual Plaintiffs' applications for PSLF (including TEPSLF) and the deprivation of their property interest in PSLF without due process of law are concrete injuries-in-fact.

b. Individual Plaintiffs have an ongoing need for loan forgiveness because their federal student loan balances remain outstanding.

c. Should they reapply, Individual Plaintiffs are likely to be denied PSLF (including TEPSLF) in the imminent future, without sufficient process.

d. Individual Plaintiffs' concrete injuries-in-fact are fairly traceable to the challenged actions, namely ED's denials of Individual Plaintiffs' applications for PSLF (including TEPSLF).

e. Individual Plaintiffs' concrete injuries are redressable by a decision of this Court:  (i) declaring that ED's PSLF and TEPSLF denials violate the APA and the Due Process Clause; (ii) declaring that ED's PSLF and TEPSLF application processes deprive Plaintiffs of their constitutional right to due process; (iii) vacating ED's PSLF and TEPSLF denials with respect to each of the Individual Plaintiffs; (iv) remanding to ED with directions to approve each of the Individual Plaintiffs' request for forgiveness, or, in the alternative, retaining jurisdiction and remanding to ED for further action consistent with the APA; (v) requiring ED to provide Individual Plaintiffs with a decision-making process that minimizes the risk of erroneous denials and ensures a meaningful opportunity to contest denials; and (vi) requiring ED to issue a written, reasoned decision to Individual Plaintiffs for any denials within a reasonable time thereafter.

42.     AFT has organizational standing to assert claims under the Due Process Clause of the Fifth Amendment in its own right as set forth below:

a. AFT's mission and purpose is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families, and communities, including ensuring access to affordable education for public servants.

b. ED's denials of borrowers' applications for PSLF (including TEPSLF) and the deprivation of borrowers' property interests in PSLF without due process of law directly conflict with AFT's organizational mission.

c. ED's challenged actions have caused AFT to redirect its resources from other projects to assist its members in seeking and obtaining the loan forgiveness to which they are statutorily entitled.

d. In furtherance of its mission and to combat ED's unconstitutional denials, AFT spent over $1 million in the past fiscal year providing debt clinics to counsel AFT members who seek PSLF. AFT also conducts research surveys of its members to identify problems associated with the PSLF Program, and specifically, problems related to ED's failures to properly administer the PSLF Program, resulting in improper denials of forgiveness. AFT has also launched a social enterprise application titled "Summer," which helps student loan borrowers navigate the loan repayment process, including qualifying for PSLF, partnering with colleges and employers to help borrowers track their loans and enroll in the optimal repayment plan.

e. To redress AFT's organizational injuries, AFT seeks an order requiring ED to provide (i) PSLF and TEPSLF applicants with adequate notice of the grounds for their denial, including the specific reasons for the denial, as well as the evidence ED relied upon in denying the application; (ii) a meaningful decision-making process through which applicants may contest their denial and introduce evidence rebutting ED's determination and/or demonstrate that ED should exercise its general discharge authority to issue forgiveness; and (iii) a written and reasoned determination within a reasonable time period.

43.    AFT also has associational standing to assert claims under the Due Process Clause of the Fifth Amendment on behalf of its members as set forth below:

a. AFT's members have standing to bring the Fifth Amendment claim AFT brings in this action;

b. AFT seeks to protect the constitutional rights of its members—namely that their right to loan forgiveness and interest in PSLF (including TEPSLF) not be denied without due process of law. This goal is germane to AFT's purpose, which is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare and public services for students, their families, and

communities;[27]

c.  AFT's Fifth Amendment claim and the requested equitable relief do
    not require the participation of individual members in the lawsuit
    because the prospective relief, if granted, will inure to the benefit of
    all AFT members actually injured; and

d.  AFT's members, including the Individual Plaintiffs, have concrete
    injuries-in-fact that are fairly traceable to the challenged actions and
    are redressable by a decision of this Court for the same reasons
    stated above with respect to the Individual Plaintiffs' Fifth
    Amendment claims.  Moreover, AFT seeks an order, on behalf of its
    members, requiring ED to provide (i) PSLF and TEPSLF applicants
    with adequate notice of the grounds for their denial, including the
    specific reasons for the denial, as well as the evidence ED relied upon
    in denying the application; (ii) a meaningful decision-making process
    through which applicants may contest their denial and introduce
    evidence rebutting ED's determination and/or demonstrate that ED
    should exercise its general discharge authority to issue forgiveness;
    and (iii) a written and reasoned determination within a reasonable
    time period.

44.    Plaintiffs have no adequate remedy at law because they cannot sue ED
for money damages.

## VENUE

45.    Venue is proper in the District Court for the District of Columbia
pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Defendants
reside.

## FACTUAL ALLEGATIONS

## ED AND FEDERAL STUDENT LOANS

### ED's Mission

46.    Congress created the Department as a cabinet-level department in 1979
to oversee federal education programs because education "is too important to be

---

[27] *See* AFT, *Mission, supra* note 20.

mismanaged or denigrated within the federal government structure."[28]   The Department's role includes "guaranteeing equal access to educational opportunities" and "maintaining significant higher education loan and grant programs to open doors for all students desiring to continue their education beyond public school."[29]

47.    The founding purposes of the Department include:

a.    "[T]o strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual;"[30]

b.    "[T]o improve the management and efficiency of Federal education activities, especially with respect to the process, procedures, and administrative structures for the dispersal of Federal funds; . . ."[31] and

c.    "[T]o increase the accountability of Federal education programs to the President, the Congress, and the public."[32]

48.    In signing the Higher Education Act ("HEA") of 1965, which substantially expanded access to educational borrowing, President Johnson pledged that it would "swing open a new door for the young people of America," so that a student "anywhere in this great land of ours can apply to any college or any university in any of the 50 states and not be turned away because his family is poor."[33]

49.    Today, the Department is one of the world's largest lenders, with a

---

[28] S. Rep. No. 96-49 (1979).

[29] *Id.*

[30] 20 U.S.C. § 3402(1).

[31] 20 U.S.C. § 3401(6).

[32] 20 U.S.C. § 3402(7).

[33] President Johnson, *Remarks Upon Signing the Higher Education Act of 1965* (Nov. 8, 1965), https://lbjmuseum.com/higher-education-act-of-1965/ (last visited July 9, 2019).

"consumer loan portfolio . . . larger than [that of] J.P. Morgan and Bank of America."[34] As of 2018, ED's assets totaled $1.328 billion, over 90% of which is student loan receivables under the FFEL and Direct Loan Programs.[35]

50.   ED's Office of Federal Student Aid ("FSA") is a performance-based[36] organization within ED, with a congressional mandate "to improve service to students and other participants in [federal] student financial assistance programs . . . , including making those programs more understandable to students and their parents" and "to increase the accountability of the officials responsible for administering the operational aspects of these programs."[37]   FSA is responsible for administering and overseeing aid programs created by Title IV of the HEA.   Under the HEA, the Secretary maintains "responsibility for the development and promulgation of policy and regulations" relating to the student financial assistance programs.   Secretary DeVos also has statutory authority to direct FSA, as a "discrete management unit" within the Department, to exercise oversight of federal student

---

[34] *Examining Policies and Priorities of the U.S. Dep't of Educ.: Hearing Before the House Comm. on Educ. and Labor*, 116th Cong. 5 (Apr. 10, 2019) (statement by Betsy DeVos, Secretary of Education), https://edlabor.house.gov/imo/media/doc/SecretaryDeVosTestimony041019.pdf.

[35] *See* U.S. Dep't of Educ., *FY2018 Agency Financial Report* 9 (Nov. 15, 2018), https://www2.ed.gov/about/reports/annual/2018report/agency-financial-report.pdf (hereinafter "DOE, *FY2018 Agency Financial Report*").

[36] In the 1990s, the GAO designated FSA as a "high-risk agency with longstanding management problems."   Then in 1998, to improve the efficiency and effectiveness of FSA and to mitigate the mishandling of limited resources moving forward, Congress converted it to a performance-based organization that would have to meet specific objectives under the HEA.   *See Federal Student Aid: Performance-Based Organization Review: Joint Hearing Before the Subcomm. on Gov't Operations of the Comm. on Oversight and Gov't Reform*, 114th Cong. 5 (Nov. 18, 2015) (statement of Hon. Virginia Foxx, Chairwoman of the Subcomm. on Higher Educ. and Workforce Training).

[37] 20 U.S.C. § 1018(a)(2).

loan servicers.[38]

51.     Two federal student financial assistance programs are relevant here—the Federal Family Education Loan Program ("FFEL Program") and the William D. Ford Direct Student Loan Program ("Direct Loan Program").

52.     Until 1993, all federal student loans were FFEL Loans, originated and funded almost exclusively by private lenders, insured by guaranty agencies, and reinsured by the federal government.  In 1993, through the Direct Loan Program, the federal government began originating loans directly to borrowers.  The FFEL and Direct Loan Programs operated in tandem until 2008, at which point the FFEL Program was terminated and the Direct Loan Program expanded.[39]  Although borrowers are still repaying FFEL Loans, no new FFEL Loans have been issued since June 30, 2010.[40]

53.     The standard repayment term for FFEL and Direct Loans is ten years, but there are several available repayment plans with various eligibility requirements and terms, including graduated payment amounts, payments spread over 25 years, and income-driven repayment plans, which tailor repayment obligations to the borrower's income and family size.[41]

## The Role of Federal Student Loan Servicers

54.     The statute establishing the FFEL Program authorizes an eligible lender or guaranty agency to "contract[] with another entity to perform any of the

---

[38] 20 U.S.C. § 1018(a)(1).

[39] Eric M. Fink and Roland Zullo, *Federal Student Loan Servicing: Contract Problems and Public Solutions* 4 (June 25, 2014), http://emfink.net/publications/Student_Loan_Servicing.pdf.

[40] *See* DOE, *FY2018 Agency Financial Report*, *supra* note 35, at 35.

[41] Income-driven repayment plans are available for both FFEL and Direct Loan borrowers.  *See* 34 C.F.R. §§ 682.209, 682.215.

lender's or agency's functions [concerning loan programs], or otherwise delegate[] the performance of such functions to such other entity."[42]   Such delegation does not "relieve the Secretary of responsibility for the administration of such functions."[43]

55.   ED has oversight authority over all Title IV servicers, including servicers of commercially held FFEL Loans.[44]   ED's implementing regulations "apply to [any] third-party servicer that violates any statutory provision governing the FFEL programs or any regulations, special arrangements, agreements, or limitations entered into under the authority of statutes applicable to Title IV of the HEA prescribed under the FFEL programs."[45]

56.   The statute establishing the Direct Loan Program authorizes ED to enter into direct contracts for "the servicing and collection of loans made or purchased."[46]   Currently, ED contracts with nine FFEL and Direct student loan servicers to manage its approximately $1.5 trillion student loan portfolio.[47]   Again, such delegation does not "relieve the Secretary of responsibility for the

---

[42] 20 U.S.C. § 1086(a).

[43] 20 U.S.C. § 3472.

[44] *See* U.S. Dep't of Educ., Fed. Student Aid, *Functional Statement*, https://www2.ed.gov/about/offices/list/om/fs_po/fsa/program.html#fiog (last visited July 9, 2019) (The "Financial Institution Oversight Service Group (FIOSG) is responsible for administering a program of oversight of . . . servicers participating in the [FFEL] Program," "program reviews of . . . servicers," and "monitor[ing of] . . . servicers to obtain early warning and/or confirmation of issues related to program compliance . . . .") (last visited July 7, 2019).

[45] 34 C.F.R. § 682.700(a); *see also* 34 C.F.R. § 682.203(a).

[46] 20 U.S.C. § 1087f(b)(2).

[47] GAO, *Public Service Loan Forgiveness Report*, *supra* note 6, at 3-4; *see also* Post-secondary National Policy Institute, *Issue Primers, Federal Student Loan Servicers* Fig. 7 (Mar. 8, 2019), http://pnpi.org/federal-student-loan-servicing/ (last visited July 7, 2019).

administration of such functions."[48]

57.     According to ED, student loan servicers "are responsible for collecting payments on a loan, advising borrowers on resources and benefits to better manage their federal student loan obligations, responding to customer service inquiries, and performing other administrative tasks associated with maintaining a loan on behalf of [ED]."[49]

58.     ED informs borrowers that they can rely on their servicer to help choose the best loan repayment option for them.  ED's website tells borrowers:  "Before you apply for an income-driven repayment plan, contact your loan servicer if you have any questions.  Your loan servicer will help you decide whether one of these plans is right for you."[50]  ED also informs borrowers that "[t]he loan servicer will work with you on repayment plans and loan consolidation and will assist you with other tasks related to your federal student loan."[51]

59.     ED expressly requires loan servicers to assist with forgiveness programs, including PSLF and TEPSLF:  "All contracted federal student loan servicers are responsible for . . . communicating with borrowers about the general availability of the program and enrolling borrowers in selected repayment plans that may enable them to qualify for PSLF."[52]

---

[48] 20 U.S.C. § 3472.

[49] U.S. Dep't of Educ., Fed. Student Aid, *Loan Servicing Contracts*, https://studen-taid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing (last visited July 7, 2019).

[50] U.S. Dep't of Educ., Fed. Student Aid, *Income-Driven Plans*, https://studen-taid.ed.gov/sa/repay-loans/understand/plans/income-driven (last visited July 7, 2019).

[51] U.S. Dep't of Educ., Fed. Student Aid, *Loan Servicers*, https://studen-taid.ed.gov/sa/repay-loans/understand/servicers (last visited July 7, 2019).

[52] *See, e.g.*, Hegji, *supra* note 5, at 22.

**THE PUBLIC SERVICE LOAN FORGIVENESS PROGRAM**

60.     Congress created the PSLF Program in 2007 to assist students who want "to pursue a career in public service and be able to take those jobs . . . often at lower pay" by "relieving them[] of the huge burden of debt they face."[53]

61.     As Senator Edward Kennedy remarked on the Senate floor when the final bill was approved:

> It is the desire of so many of these young people to be involved in public service and to help respond to the needs in their communities.  They want to be part of the solution, not part of the problem.   So often, because of their indebtedness, they have to choose careers in order to deal with the indebtedness.  So this legislation will open up or help us take advantage of that idealism that is out there. We are giving them a pathway to making a difference in terms of the future of our country, and I think that is enormously important.  That is one of the most important parts of this legislation.[54]

62.     To accomplish this goal, Congress mandated that the Secretary "shall cancel" the remaining balance of all Federal Direct Loans for borrowers who meet the designated PSLF criteria.[55]  The PSLF implementing regulations explain that "[t]he Public Service Loan Forgiveness Program is intended to encourage individuals to enter and continue in full-time public service employment."[56]

63.     Lawmakers of both parties have enthusiastically supported PSLF, recognizing that public servants "work tirelessly and, far too often, for much less pay

---

[53] 153 Cong. Rec. S11,245 (daily ed. Sept. 7, 2007) (statement of Sen. Sherrod Brown).

[54] 153 Cong. Rec. S11,258 (daily ed. Sept. 7, 2007) (statement of Sen. Edward M. Kennedy).

[55] 20 U.S.C. § 1087e(m)(1).

[56] 34 C.F.R. § 685.219(a).

than they deserve."[57]   Members of Congress report that, according to their constituents—including teachers, firefighters, police officers, military veterans, prosecutors, social workers, doctors, nurses, veterinarians, and charitable employees—"PSLF has transformed their workplaces.  It helps recruit and retain top talent, making workforces more efficient . . ." and "provides the financial feasibility [borrowers] need to dedicate their careers to serving our communities in a public service capacity."[58]

64.   Likewise, the Department of Defense reports that "PSLF has been an important recruitment and retention tool for the military."[59]

65.   ED's data shows that low-to-moderate income borrowers should benefit most significantly from PSLF.[60]   In 2016, ED reported that nearly two thirds of borrowers on income-driven repayment plans who intended to pursue PSLF earned less than $50,000 per year.[61]

---

[57] Letter from Tim Kaine (D-VA) and 3 other Democratic lawmakers to the Secretary of Education (June 19, 2018), https://www.kaine.senate.gov/imo/media/doc/Kaine,%20Whitehouse,%20Duckworth,%20Hassan%20Press%20DeVos%20On%20Failure%20To%20Implement%20Public%20Service%20Loan%20Forgiveness%20Fix.pdf.

[58] *See* Letter from Brian Fitzpatrick (R-PA) and 12 other Republican lawmakers to the Chairwoman of the House Committee on Education and the Workforce (Apr. 18, 2018), https://cqrcengage.com/nea/file/NEsIK26WZXb/PSLF-Letter-FINAL.pdf.

[59] *See* U.S. Dep't of Defense, *Information Paper* (Jan. 10, 2018), https://www.insidehighered.com/sites/default/server_files/media/Department-of-Defense-on-PROSPER-Act.pdf.

[60] *See* U.S. Dep't of Educ., *Direct Loan Public Service Loan Forgiveness* 23 (July 2016), http://fsaconferences.ed.gov/conferences/library/2016/NASFAA/2016NASFAADirect-LoanPSLF.pdf.

[61] U.S. Dep't of Educ*., 2016 FSA Training Conference For Financial Aid Professionals* 29 (Nov. 2016), http://fsaconferences.ed.gov/conferences/library/2016/2016FSAConf Session18.ppt.

## PSLF Program Requirements

66.     The College Cost Reduction and Access Act ("CCRAA") outlines the requirements for PSLF.  Section 455 of the CCRAA mandates that "[t]he Secretary shall cancel the balance of interest and principal due . . . on any eligible Federal Direct Loan not in default for a borrower who[:]

(A)     has made 120 monthly payments on the eligible Federal Direct Loan after October 1, 2007, pursuant to [an income-driven repayment plan or the standard repayment plan (or a plan with a monthly payment at least equal to the standard plan)] . . . ; and

(B)     (i)     is employed in a public service job at the time of such forgiveness; and

      (ii)    has been employed in a public service job during the period in which the borrower makes each of the 120 payments described in subparagraph (A)."[62]

67.     ED promulgated regulations implementing the PSLF Program, which establish specific requirements for loan forgiveness that track Section 455(m) of the CCRAA.[63]  Pursuant to these regulations, after 120 monthly qualifying payments, "[t]he Secretary forgives the principal and accrued interest that remains on all eligible loans for which loan forgiveness is requested by the borrower."[64]

68.     In the public notice-and-comment period for these regulations, ED received numerous comments focusing on borrowers' access to loan forgiveness and their ability to track their eligibility status.[65]  In particular, "many commenters asked [ED] to develop a clear and simple method for the borrower, the employer, or both, to

---

[62] CCRAA § 455(m) (codified at 20 U.S.C. § 1087e(m)).

[63] 34 C.F.R. § 685.219.

[64] 34 C.F.R. § 685.219(d).

[65] Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 73 Fed. Reg. 63,232 (Oct. 23, 2008).

determine annually the borrower's eligibility for public service loan forgiveness."[66]   In response, ED stated that it "believes that the way in which borrowers apply for and document their eligibility for the public service loan forgiveness benefit is best handled administratively.   We assure the commenters that we will continue to examine ways to assist borrowers who are interested in, or already employed in public service, to determine and document their eligibility for the loan forgiveness program."[67]

69.     While ED retains ultimate responsibility for administration of the PSLF Program,[68] one way it has attempted to handle these concerns administratively is by designating one servicer, FedLoan Servicing, as the "PSLF servicer."   Importantly, however, only borrowers "declared on-track for PSLF"—as explained in step three below—"will be transferred to the PSLF servicer."[69]   Borrowers who seek loan forgiveness but have not submitted an approved Employment Certification Form ("ECF," discussed at step one below), may have their loans serviced by any of the servicers.[70]   PSLF qualification is supposed to work as follows:

70.     *First*, at the request of the borrower, FedLoan Servicing must provide the borrower with an ECF, an overview of PSLF eligibility requirements, and

---

[66] *Id.*

[67] *Id.* at 63,241.

[68] *See, e.g.*, Compl. at ¶ 67 and Answer at ¶ 67, *Am. Bar Ass'n v. U.S. Dep't of Educ.*, No. 16-2476, Dkt. Nos. 1, 14.   ED underscores its ultimate responsibility in a public document explaining the PSLF Program, noting that FedLoan Servicing is only "responsible for administering the Public Service Loan Forgiveness (PSLF) Program on behalf of ED." U.S. Dep't of Educ., *Public Service Loan Forgiveness: Questions and Answers for Federal Student Loan Borrowers* (Dec. 2015), *Am. Bar Ass'n v. U.S. Dep't of Educ.*, No. 16-2476, Administrative Record (hereinafter "ABA AR"), Dkt. No. 34-1, at 168.

[69] *See infra* note 77.

[70] *See supra* note 47.

instructions for completing the ECF.[71]   Upon receipt of an ECF, ED conducts an

initial review to verify the borrower provided all required information.  If the form is

incomplete, ED will advise the borrower of the necessary steps to complete or correct

the form.[72]

71.   *Second*, ED determines whether the employer is a "qualifying public

service organization" by having FedLoan Servicing confirm that the organization is

listed in ED's database.[73]

72.   If FedLoan Servicing cannot determine whether an employer is

qualifying,[74] it must escalate the decision to ED.[75]

---

[71] U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), ABA AR, Dkt. No. 34-1, at 142, 152-153.

[72] *Id.* at 153; *see also id.* at 143.

[73] Qualifying employers include: (i) government organizations; (ii) not-for-profit organizations that are tax-exempt under Section 501(c)(3) of the Internal Revenue Code; and (iii) other not-for-profit organizations that are not tax-exempt but provide certain types of qualifying public services as their primary function; it excludes (a) labor unions; (b) partisan political organizations; (c) for-profit organizations; and (d) not-for-profit organizations that are not tax-exempt and do not provide a qualifying public service as their primary function.  *See* U.S. Dep't. of Educ., *PSLF*, https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service#qualifying-employment (last visited July 7, 2019).  As an example of ED's ultimate authority as to PSLF, ED has on rare occasions authorized FedLoan Servicing "to override judgment of public service employers, per FSA authorization and on an exception basis, to make them qualifying or not qualifying employers for the Public Service Loan Forgiveness Program."  If FedLoan Servicing does so, it is required to note "the FSA-authorized condition on the borrower account."  U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), ABA AR, Dkt. No. 34-1, at 143-44.

[74] *Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d at 12-13; U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), Appendix B (Instructions for Reviewing a PSLF Employment Certification form (ECF)), ABA AR, Dkt. No. 34-1, at 143, 160.

[75] According to ED's contract with FedLoan Servicing, if an employer is not deemed to be qualifying, "a borrower may request reconsideration."  Although ED's contract with FedLoan Servicing requires it to "[d]escrib[e] the actions the borrower may

73.   *Third*, as required by ED, FedLoan Servicing determines whether the borrower worked the requisite number of hours in a public service job.[76]

74.   If a borrower is on track for PSLF—*i.e.*, is working the requisite number of hours in a public service job—that borrower's loans are transferred to FedLoan Servicing if they are not already serviced by FedLoan Servicing.[77]  Once a borrower's accounts are transferred, FedLoan Servicing is to "process all forms and handle all communications regarding PSLF, as well as perform all non-PSLF related servicing functions on a borrower portfolio, as required of all federal loan servicers."[78]

75.   ED requires FedLoan Servicing to track the number of qualifying payments made by all of the borrowers it services.[79]  Both ED and FedLoan Servicing recommend that ECFs be submitted annually so that the number of qualifying

---

take . . . if the employment cannot be determined to be qualifying, or to dispute a determination, and [t]he outcome of the initial review," there are no publicly available procedures governing this supposed "reconsideration."  Answer at ¶ 64, *Am. Bar Ass'n v. U.S. Dep't of Educ.*, No. 16-2476, Dkt. No. 14; U.S. Dep't of Educ., *PSLF Single Servicer Requirements, Task Order 0005,* (Nov. 15, 2011), Amendment of Solicitation/Modification of Contract, Appendix B (Instructions for Reviewing an Employment Certification Form for PSLF) at 5.

[76] U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), Appendix B (Instructions for Reviewing a PSLF Employment Certification Form (ECF)), ABA AR, Dkt. No. 34-1, at 143, 161.

[77] *Id*. at 142, 144; U.S. Dep't of Educ., Fed. Student Aid, *PSLF*, https://studentaid.ed.gov/sa/node/91#apply (last visited July 7, 2019).  ED modified this process in July 2018 pursuant to a change order to "stop immediately transferring borrowers to FedLoan Servicing once an ECF is submitted and qualifying employment is confirmed," and instead "[l]imit[ing]" "PSLF Transfers" "to at least 96 months of Qualified Employment."  U.S. Dep't of Educ., Amendment of Solicitation/Modification of Contract, No. 0021P00029, (July 23, 2018) at 2-3.

[78] U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), ABA AR, Dkt. No. 34-1, at 149; *see also supra* note 77 (describing 2018 modification to timing of transfer of borrower account to FedLoan Servicing).

[79] U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), ABA AR, Dkt. No. 34-1, at 144.

payments can be updated.[80]  ED instructs borrowers: "Collecting and submitting the Employment Certification form(s) while you are making the required 120 qualifying monthly payments will help you keep track of when you will be eligible to apply for PSLF."[81]

76.  FedLoan Servicing reviews submitted ECF forms and notifies the borrower of "the number of qualifying payments the borrower has made and the remaining number the borrower must make in order to be eligible for PSLF."[82]

77.  *Fourth*, the borrower must make 120 qualifying payments toward Direct Loans to qualify for PSLF.

78.  FFEL Loans must be consolidated into a Direct Consolidation Loan in order for payments to qualify under PSLF.  Any payments made prior to consolidation do not qualify.

79.  To qualify for PSLF, payments on Direct Loans must also meet special requirements.  The payments must have been made after October 1, 2007, under a qualifying repayment plan, for the full amount shown on the invoice, within fifteen days of the due date, and while employed full-time by a qualifying employer.[83]

---

[80] For example, ED advises borrowers that "[a]lthough the form is voluntary, borrowers are strongly encouraged to submit an ECF annually or whenever they change jobs to help track their progress."  U.S. Dep't of Educ., Fed. Student Aid, *PSLF Data*, https://studentaid.ed.gov/sa/about/data-center/student/loan-forgiveness/pslf-data (last visited July 9, 2019).  ED also tells borrowers that submitting ECFs "will help you keep track of when you will be eligible to apply for PSLF."  U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), ABA AR, Dkt. No. 34-1, at 153.

[81] U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), ABA AR, Dkt. No. 34-1, at 152-53.

[82] *Id.* at 153, 144-46.

[83] 34 C.F.R. § 685.219(c)(iii); *see also* U.S. Dep't of Educ., Fed. Student Aid, *PSLF*, https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service#qualify (last visited July 7, 2019).

Additionally, borrowers cannot make qualifying payments while their Direct Loans are in forbearance.

80.     *Fifth*, once the borrower has made 120 qualifying payments, the borrower must complete a PSLF Application for Forgiveness and must be working full-time for a qualifying employer at the time the application is submitted and at the time the remaining balance on the loan is forgiven.[84]

81.     If the borrower meets all of the above requirements, FedLoan Servicing forwards the application to ED for final review.[85]  According to ED's contract with FedLoan Servicing, "[o]nce [ED] determines whether all of the requirements for eligibility have been fulfilled, the balance of principal and interest due on the borrower's eligible Direct Loans shall be forgiven."[86]

82.     Pursuant to the PSLF implementing regulations, "[i]f the Secretary determines that the borrower does not meet the eligibility requirements for loan forgiveness under this section, the Secretary resumes collection of the loan and grants forbearance of payment on both principal and interest for the period in which collection activity was suspended.  The Secretary notifies the borrower that the application has been denied, provides the basis for the denial, and informs the borrower that the Secretary will resume collection of the loan."[87]

83.     ED retains ultimate responsibility for all key steps in the process of determining eligibility.  As ED acknowledges, "the Department has the ultimate

---

[84] Fed Loan Servicing, *PSLF*, https://myfedloan.org/borrowers/special-programs/pslf (last visited July 7, 2019).

[85] *See* Hegji, *supra* note 5, at 6.

[86] U.S. Dep't of Educ., *PSLF Single Servicer Requirements, Task Order 0005,* (Nov. 15, 2011), Amendment of Solicitation/Modification of Contract, Appendix B (Instructions for Reviewing an Employment Certification Form for PSLF) at 1-2.

[87] 34 C.F.R. § 685.219(e)(3).

authority to review FedLoan Servicing's actions under its contract."[88] ED "has never delegated final decision-making authority under the PSLF Program to FedLoan Servicing or any other entity."[89]

84.    Critically, however, ED provides no process for a borrower to challenge or appeal the denial of PSLF, nor does ED have any process by which it reviews and corrects mistakes made by ED or Title IV servicers regarding PSLF.

## The Failure of PSLF and the Equally Unsuccessful Temporary Band-Aid of TEPSLF

85.    The CFPB estimates that approximately one in four U.S. workers is employed in public service[90] and that, "[b]y the end of 2016, more than 32 million borrowers were repaying loans that [we]re potentially eligible for PSLF."[91]

86.    Yet, according to the latest available data, as of March 2019, 73,554 unique borrowers had submitted 86,006 applications for PSLF, and only 864 applications had been approved for forgiveness.  Only 518 borrowers—fewer than 1% of unique borrowers submitting applications—have had their loans forgiven.[92]  These numbers make clear that ED has failed to fulfill its congressional mandate to administer PSLF effectively, to the detriment of the Individual Plaintiffs, AFT members, and countless public servants across the nation.

87.    Recognizing the PSLF Program's failures, in January 2018, a bipartisan group of lawmakers authorized $350 million to be available on a first-come, first-

---

[88] Answer at ¶ 66, *Am. Bar Ass'n v. U.S. Dep't of Educ.*, No. 16-2476, Dkt. No. 14.

[89] Compl. at ¶ 67 and Answer at ¶ 67, *Am. Bar Ass'n v. U.S. Dep't of Educ.*, No. 16-2476, Dkt. Nos. 1, 14.

[90] *See* CFPB, *Staying on Track*, *supra* note 3, at 1.

[91] *See id*. at 20 n.34.

[92] FSA, *March 2019 PSLF Report*, *supra* note 2.

served basis as a temporary expansion of PSLF,[93] which is available to borrowers who hold Direct Loans but made some or all of their 120 payments on a nonqualifying repayment plan, and whose last 12 payments were greater or equal to what they would have paid on an income-driven repayment plan.[94]  This expansion requires forgiveness if the statutory qualifications are met:  The authorizing statute provides that ED "shall develop and make available a simple method for borrowers to apply for loan cancellation under this section within 60 days of enactment of this Act."[95]

88.     FedLoan Servicing and ED instruct borrowers to apply for TEPSLF by "[p]repar[ing] an email to FedLoan Servicing requesting that ED reconsider your eligibility for PSLF."[96]  ED, through FedLoan Servicing, then reviews the application and determines whether to grant TEPSLF.[97]

89.     ED provides no process for a borrower to challenge or appeal the denial of TEPSLF, nor does ED have any process by which it reviews and corrects mistakes made by ED or the Title IV servicers regarding TEPSLF.

90.     Although Congress intended TEPSLF to facilitate the forgiveness of certain public employee loan debt, as of the end of March 2019, only 442 requests out of 12,429 requests considered—3.6%—were approved for TEPSLF, accounting for

---

[93] Consolidated Appropriations Act of 2018, Pub. L. No. 115-141, 132 Stat. 424, Div. H, tit. III, § 315 (2018), 405-06, https://www.congress.gov/115/bills/hr1625/BILLS-115hr1625enr.pdf.

[94] *Id.*

[95] *Id.*  ED implemented TEPSLF through a new information collection under the Paperwork Reduction Act of 1995.  *See* Notice, Agency Information Collection Activities; Comment Request; Temporary Expansion of Public Service Loan Forgiveness (TEPSLF), 83 Fed. Reg. 24,091 (May 24, 2018).

[96] U.S. Dep't of Educ., Fed. Student Aid, *TEPSLF*, https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service/temporary-expanded-public-service-loan-forgiveness (last visited July 7, 2019).

[97] *Id.*

$17,557,594 in debt relief.[98]   ED's administration of TEPSLF is also a failure.

## ED's Authority to Discharge Student Loans

91.     ED possesses what is known as Compromise and Settlement authority, which allows ED to compromise or waive any title or claim.  This power allows ED to settle with student loan borrowers who are not eligible for forgiveness because ED or the Title IV servicers have given the borrower incorrect information about how to qualify.

92.     ED's Compromise and Settlement authority for FFEL Loans is set forth in the HEA, 20 U.S.C. § 1082(a)(6), which allows the Secretary to "enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption."[99]   ED maintains the same authority over the Direct Loan Program.[100]   And under ED's regulations, "the Secretary may compromise a debt in any amount, or suspend or terminate collection of a debt in any amount, if the debt arises under the [FFEL Program or the Direct Loan Program]."[101]

93.     There is little public information about ED's use of its Compromise and

---

[98] FSA, *March 2019 PSLF Report*, *supra* note 2.

[99] Under 20 U.S.C. § 1082(a)(4), the Secretary has the authority to "consent to modification, with respect to rate of interest, time of payment of any installment of principal and interest or any portion thereof, or any other provision of any note or other instrument evidencing a loan which has been insured by the Secretary under this part."

[100] 20 U.S.C. § 1087a(b)(2).

[101] 34 C.F.R. § 30.70(e)(1); *see also* 34 C.F.R. § 30.70(e)(2) ("The Secretary refers a proposed compromise, or suspension or termination of collection, of a debt that exceeds $1,000,000 and that arises under a loan program described in paragraph (e)(1) of this section to the Department of Justice for review. The Secretary does not compromise, or suspend or terminate collection of, a debt referred to the Department of Justice for review until the Department of Justice has provided a response to that request.").

Settlement authority, but ED has provided internal guidelines to the agencies that guaranty FFEL Loans (these agencies are called "guaranty agencies," and include state entities),[102] as well as private collection agencies ("PCAs") charged with collecting defaulted FFEL and Direct Loans.

94.    For instance, ED issued Standard Compromise and Write-Off Procedures in 1993 to the agencies that guarantee FFEL Loans, which allow for a waiver of collection costs and up to 30% of the principal and interest.[103]  And ED's manual of procedures for PCAs makes clear that ED maintains authority to enter into discretionary compromises and cancel any student loan.[104]

---

[102] *See* U.S. Dep't of Educ., Fed. Student Aid, *FFEL Program Lender and Guaranty Agency Reports*, https://studentaid.ed.gov/sa/about/data-center/lender-guaranty (last visited July 9, 2019).

[103] *See* National Consumer Law Center, *No Way Out: Student Loans, Financial Distress, and the Need for Policy Reform* 18 n.40 (June 2006) (hereinafter "NCLC, *No Way Out*"), https://www.studentloanborrowerassistance.org/wp-content/uploads/2013/05/nowayout.pdf (citing Letter from Jean Frohlicher, President of the Council of Higher Education Loan Programs, Inc., re: Compromise and Write-Off Procedures (Nov. 7, 1993), with attached approval by Robert W. Evans, Director, Division of Policy Development (Nov. 24, 1993), and attached Standardized Compromise and Write-Off Procedures).  ED has not publicly indicated whether these guidelines are still in existence or have been modified.  *See* Natalie Korman, *Is it Possible to Settle Student Debt for Less than You Owe?*, The College Investor (May 23, 2019), https://thecollegeinvestor.com/20332/settle-student-debt/ (last visited July 9, 2019); Student Loan Borrower Assistance, *Settlement*, https://www.studentloanborrowerassistance.org/loan-cancellation/settlement/ (last visited July 8, 2019); *see also* NCLC, *No Way Out* at 18.

[104] U.S. Dep't of Educ., Fed. Student Aid, *PCA Procedures Manual* 55 (May 10, 2016), https://www.studentloanborrowerassistance.org/wp-content/uploads/2013/05/pca-manual.pdf; U.S. Dep't of Educ., Fed. Student Aid, *PCA Procedures Manual: 2009 ED Collections Contract* 72 (Sept. 2009), https://www.studentloanborrowerassistance.org/wp-content/uploads/2007/03/2009-pca-procedures.pdf; *see also*   Student Loan Borrower Assistance, *Settlement*, https://www.studentloanborrowerassistance.org/loan-cancellation/settlement/ (last visited July 8, 2019).

## ED'S ADMINISTRATIVE PROCESSING ERRORS

## ED's Documented Failure to Correctly Process PSLF Applications

95.     Even though borrowers must make 120 qualifying payments to be eligible for PSLF, ED has done nothing to ensure that borrowers' payments are correctly counted despite documented knowledge of repeated errors—with disastrous consequences for borrowers.

96.     For example, it took almost five years after PSLF was enacted for ED to introduce the ECF,[105] which allows borrowers to verify that their employer qualifies under the PSLF Program—a crucial step in making sure borrowers are on track to qualify.[106]

97.     According to the GAO, ED "has not provided [FedLoan Servicing] with a comprehensive source of guidance and instructions on how to operate the [PSLF] program, raising the risk that [FedLoan Servicing] may improperly approve or deny borrowers' certification requests and forgiveness applications."[107]   The GAO's investigation concluded that "[ED] has not ensured the PSLF servicer is receiving consistent loan payment history information from other loan servicers, increasing the risk of inaccurate qualifying payment counts."[108]

---

[105] U.S. Dep't of Educ., Fed. Student Aid., *Federal Student Aid Posts Updated Reports to FSA Data Center* (Aug. 22, 2016), https://ifap.ed.gov/eannounce-ments/082216FSAPostsUpdatedReportstoFSADataCenter.html ("Although no bor-rower will be eligible for forgiveness under this program until October 2017, the De-partment introduced a voluntary Employment Certification Form in January 2012 to help borrowers track their progress toward meeting PSLF requirements.").

[106] *See* U.S. Dep't of Educ., Fed. Student Aid, *PSLF Data*, https://studen-taid.ed.gov/sa/about/data-center/student/loan-forgiveness/pslf-data (last visited July 8, 2019); U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), ABA AR, Dkt. No. 34-1, at 142.

[107] GAO, *Public Service Loan Forgiveness Report*, *supra* note 6, at 24.

[108] *Id*. at 25.

98.     The GAO further found that ED has failed to provide FedLoan Servicing and borrowers with sufficient information to determine whether a borrower's employer qualifies as a public service employer, leaving FedLoan Servicing's assessments as to public service employment "vulnerable to inconsistencies" and fostering "uncertainty for borrowers" as to whether they will qualify for PSLF.[109] Specifically, although ED has identified data sources for FedLoan Servicing to consult to determine if an employer is qualifying, the GAO found that "th[os]e sources are not comprehensive," resulting in FedLoan Servicing using other sources "that have significant limitations" and "have not been fully reviewed or assessed for accuracy by ED."[110]

99.     The GAO found similar "inconsistencies in the information used for counting borrowers' qualifying loan payments," "rais[ing] the risk of errors" in the PSLF application review process.[111]   In reviewing PSLF applications, FedLoan Servicing must "examine the borrower's prior loan payment information to determine which prior payments count towards the 120 needed to qualify for loan forgiveness."[112]   If FedLoan Servicing receives the borrower's account from another servicer (as is often the case), the initial servicer must transfer loan payment information to FedLoan Servicing so that the borrower's earlier payments are counted.  The GAO's investigation found that this process of transferring information is replete with errors.  For example, even though ED created standardized templates for servicers to use in transferring loan and prior payment information to FedLoan Servicing, these templates lack "standard definitions and terminology," "resulting in

---

[109] *Id*. at 24.

[110] *Id*. at 18.

[111] *Id*. at 25.

[112] *Id*. at 21.

inconsistencies in the data other loan servicers report" to FedLoan Servicing.[113] When FedLoan Servicing "does not receive consistent and reliable information from other servicers," there are "inconsistencies in borrowers' payment history data,"[114] which "increase[es] the risk of inaccurate qualifying payment counts."[115]

100.    The GAO's findings on inconsistent payment counting mirror those in a 2017 report from the CFPB.  According to the CFPB, borrowers have complained that "their servicer provides inaccurate counts of qualified payments" and that "their previous qualifying payments may not be reflected in the payment histories maintained by [FedLoan Servicing]."[116]

101.    FedLoan Servicing officials have stated "they rely on borrowers to catch any payment counting errors resulting from issues with information provided by other loan servicers."[117]  But the GAO concluded, as outlined in the Figure below, that the risk of an inaccurate count is "compounded by the fact that [ED] does not require [FedLoan Servicing] to provide borrowers with details on which payments qualified and which did not."[118]

---

[113] *Id.*

[114] *Id.* at 21-22.

[115] *Id.* at 25.

[116] *See* CFPB, *Staying on Track*, *supra* note 3, at 39-40.

[117] GAO, *Public Service Loan Forgiveness Report*, *supra* note 6, at 23.

[118] *Id.* at 25.



Figure 7: Hypothetical Example of the PSLF Servicer's Payment Counting Process and Information Shared with Borrowers

Source: GAO analysis of documents from the Department of Education and the Public Service Loan Forgiveness (PSLF) Servicer.  |  GAO-18-547

102.   The CFPB has also found that borrowers "struggle to get their servicer to correct [payment counting] error[s] or explain why payments were not qualified."[119] "This makes it difficult for borrowers to detect erroneous counts that could ultimately affect their eligibility for loan forgiveness."[120]

103.   ED has acknowledged that more work is required to "ensure borrowers receive sufficiently detailed information regarding counts of qualifying payments and their repayment history" and claims that it is "reviewing all PSLF borrower communications to improve content and clarity."[121]   It has failed to do so.

104.   Similar problems plague the TEPSLF application process, as a number of U.S. Senators have noted in a letter to Secretary DeVos.[122]   As members of

---

[119] *See* CFPB, *Staying on Track*, *supra* note 3, at 39.

[120] GAO, *Public Service Loan Forgiveness Report*, *supra* note 6, at 25.

[121] Questions Submitted by Sen. Patty Murray Regarding PSLF Outreach and Compliance with Congressional Directive 8 (undated), https://www.help.senate.gov/imo/media/doc/SenMurrayQFRresponses32819LHHShearing.pdf.

[122] Letter from Tim Kaine (D-VA) and 3 other Democratic lawmakers to the Secretary of Education (June 19, 2018), https://www.kaine.senate.gov/imo/media/doc/Kaine, %20Whitehouse,%20Duckworth,%20Hassan%20Press%20DeVos%20On%20Failure %20To%20Implement%20Public%20Service%20Loan%20Forgiveness%20Fix.pdf.

Congress have admonished Secretary DeVos, ED has not taken "any significant action to make it easier for borrowers who had ended up in the wrong repayment plans to qualify for the loan forgiveness opportunity that was created for them."[123]

105.    As the GAO concluded, this breakdown in ED's assessment of PSLF and TEPSLF applications has caused, and continues to cause, public servants "to make more payments than necessary before receiving loan forgiveness,"[124] if they receive it at all.

106.    ED's processing errors—errors wholly unrelated to the borrower's eligibility and not caused by the borrower's action or inaction—result in numerous qualified borrowers being wrongfully denied their right to PSLF.  The consequences for these borrowers—all public servants saddled with exceedingly burdensome student debt—have been devastating.

### Administrative Error Plaintiffs

107.    The Administrative Error Plaintiffs are just three among many victims of ED's widespread failure in administering PSLF, including TEPSLF.

### 1.    Cynthia Miller

108.    Plaintiff Cynthia Miller works full-time as a teacher for the Chicago Public Schools (a qualifying employer for the PSLF Program) and resides in Chicago, Illinois.

109.    Ms. Miller took out two FFEL Loans in 1995 to pay for her undergraduate degree.  She consolidated her loans in 1998 under the Direct Loan Program.  Ms. Miller then took out two Direct Loans in 2003 to complete her undergraduate degree.

---

[123] Letter from Tim Kaine (D-VA) and Sheldon Whitehouse (D-RI) to the Secretary of Education (Apr. 25, 2019), https://www.kaine.senate.gov/press-releases/kaine-and-whitehouse-call-on-devos-to-fix-missteps-with-implementation-of-tepslf-program (last visited July 9, 2019).

[124] GAO, *Public Service Loan Forgiveness Report*, *supra* note 6, at 25.

110.    On May 7, 2018, after making at least 120 qualifying payments, Ms. Miller submitted a PSLF application by mail to the Title IV servicer, FedLoan Servicing.  On May 29, 2018, Ms. Miller received a letter from FedLoan Servicing stating that Section 3 of her application, which provides employer information, was incomplete.  The letter did not specify what was missing or whether any additional documents were required; it simply stated: "Have your employer contact us."

111.    On May 31, 2018, Ms. Miller's employer faxed an updated version of Section 3 to FedLoan Servicing, and on June 1, 2018, Ms. Miller called FedLoan Servicing to check whether it had been received.  A FedLoan Servicing customer service representative confirmed receipt, informed Ms. Miller that no further information was missing, and told her the application would be approved or denied in ten business days.

112.    Seventeen days later, on June 18, 2018, Ms. Miller called FedLoan Servicing about the status of her application.  A FedLoan Servicing customer service representative again stated that her application was incomplete due to missing information in Section 3.  After Ms. Miller asked the agent to look again, the agent located the additional information sent on May 31, 2018 and informed Ms. Miller that her application was in fact complete and that a decision would be forthcoming in a few days.

113.    After hearing nothing for another two days, Ms. Miller again called FedLoan Servicing about the status of her application on June 20, 2018.  This time, a representative told Ms. Miller that her application had been denied on June 19, 2018, because it was incomplete.  The representative stated that Ms. Miller would need to resubmit Section 1 of her application, which she had already included with her original submission on May 7, 2018.  When Ms. Miller informed the representative that FedLoan Servicing representatives had twice told her that her application was complete, the representative responded that the other representatives had been incorrect.

42

The representative instructed Ms. Miller to resend two pages of her original application, and Ms. Miller did so the same day.

114. ED denied Ms. Miller's PSLF application by letter dated August 14, 2018 on the ground that Ms. Miller had "not yet made the required 120 qualifying payments." The letter stated that Ms. Miller had made one qualifying payment on each of her four Direct Loans, had 119 payments remaining, and that her estimated date of eligibility for loan forgiveness was May 9, 2028.

| Loan Sequence | Disbursement Date | Loan Program | Qualifying Payments (Total) | Outstanding Balance | Qualifying Payments (Remaining) | Estimated Eligibility Date |
|---------------|-------------------|--------------|------------------------------|---------------------|----------------------------------|-----------------------------|
| 0001 | 10/05/1998 | DLSCNS | 1 | $4,119.13 | 119 | 05/09/2028 |
| 0002 | 10/05/1998 | DLUCNS | 1 | $4,940.99 | 119 | 05/09/2028 |
| 0003 | 02/09/2003 | DLSTFD | 1 | $513.78 | 119 | 05/09/2028 |
| 0004 | 02/09/2003 | DLUNST | 1 | $1,056.84 | 119 | 05/09/2028 |

115. On August 22, 2018, Ms. Miller applied for TEPSLF.

116. On September 11, 2018, Ms. Miller received another letter from Fed-Loan Servicing with "information regarding [her] eligibility for public service loan forgiveness." This letter stated that Ms. Miller had made zero qualifying payments on each of her four Direct Loans and that she had 120 payments remaining on each loan to become eligible for loan forgiveness. The letter stated that her estimated date of eligibility for forgiveness was June 8, 2028.

| Loan Sequence | Disbursement Date | Loan Program | Qualifying Payments (Total) | Qualifying Payments (Remaining) | Estimated Eligibility Date |
|---------------|-------------------|--------------|------------------------------|----------------------------------|-----------------------------|
| *0001 | 10/05/1998 | DLSCNS | 0 | 120 | 06/08/2028 |

| Employer Name | | Qualifying Employment Begin Date | Qualifying Employment End Date | Qualifying Payments |
|---------------|--|----------------------------------|--------------------------------|---------------------|
| BOARD OF ED CHICAGO PUBLIC SCHOOLS | | 08/05/2001 | 05/07/2018 | 0 |

117. On October 4, 2018, FedLoan Servicing and ED indicated that Ms. Miller's "previously submitted [PSLF] application is being reviewed for eligibility under the Temporary Expanded Public Service Loan Forgiveness opportunity" and requested additional information regarding her income and family size.

118.    ED denied Ms. Miller forgiveness under TEPSLF in a letter dated December 27, 2018, which stated that she had made zero PSLF qualifying payments, and either 32 or 33 TEPSLF qualifying payments, on each of her four loans.  ED's letter further stated that she would "need to continue making payments on [her] federal student loans," and that she "may qualify for PSLF or TEPSLF in the future."

| Loan Sequence | Loan Program | Disbursement Date | PSLF Qualifying Payment Count | TEPSLF Qualifying Payment Count |
|---|---|---|---|---|
| 1 | DLSCNS | 10/05/1998 | 0 | 33 |
| 2 | DLUCNS | 10/05/1998 | 0 | 33 |
| 3 | DLSTFD | 02/09/2003 | 0 | 33 |
| 4 | DLUNST | 02/09/2003 | 0 | 32 |

119.    In both February and March of 2019, FedLoan Servicing automatically charged Ms. Miller via Direct Debit for each of her four loans.  Both the March and February bills stated that she had made zero qualifying payments on each of her four loans.

120.    After reapplying for PSLF, on March 19, 2019, Ms. Miller contacted FedLoan Servicing by email, inquiring why her PSLF and TEPSLF applications had been denied, given that she had been teaching in the Chicago Public Schools since 2007.

121.    On April 3, 2019, a FedLoan Servicing agent informed her by email that her PSLF application "was denied due to missing information.  It is missing your employment status such as full time or part time."  The email informed her that the "agency received your email to be considered for TEPSLF, however you have not made 120 qualifying payments.  Due to deferment and forbearance periods, you have not been in repayment for ten years."  According to FedLoan Servicing, Ms. Miller had been in forbearance for over ten years from 2003-2013, which was incorrect, as Ms. Miller had only requested a forbearance for a year when she was living in the United Kingdom as a part of the Fulbright Teacher Exchange Program in 2012-2013, and for a few months in late 2016 to early 2017 to take care of her child.

122.   Ms. Miller replied to this email the same day, reiterating that she had already submitted a corrected PSLF application containing her employment information on June 23, 2018, followed by a TEPSLF application on August 22, 2018, and that both had been denied.  Ms. Miller asked that FedLoan Servicing review the message she sent on March 19, 2019.

123.   Ms. Miller received a letter, dated April 6, 2019, with "an update to [her] account regarding [her] progress in the Public Service Loan Forgiveness (PSLF) Program."  It stated that "[a]s a result of a review of [her] account records, an adjustment was made to the number of qualifying payments in our system" resulting in "an overall increase to the number of qualifying payments . . . credited to [her] loan(s)."  The letter stated that she had made one PSLF qualifying payment on each of her two consolidated loans, 33 qualifying payments on her Direct subsidized loan, and 32 qualifying payments on her Direct unsubsidized loan.

| Loan Sequence | Disbursement Date | Loan Program | Qualifying Payments (Total) | Qualifying Payments (Remaining) | Estimated Eligibility Date |
|---|---|---|---|---|---|
| 0001 | 10/05/1998 | DLSCNS | 1 | 119 | 05/09/2028 |
| 0002 | 10/05/1998 | DLUCNS | 1 | 119 | 05/09/2028 |
| 0003 | 02/09/2003 | DLSTFD | 33 | 87 | 01/08/2026 |
| 0004 | 02/09/2003 | DLUNST | 32 | 88 | 02/08/2026 |

124.   On April 12, 2019, FedLoan Servicing and ED sent Ms. Miller a letter indicating that her previous PSLF application was being reviewed for eligibility under the TEPSLF Program and requested income and family size information.

125.   ED denied Ms. Miller TEPSLF for a second time by a letter dated April 17, 2019.  The letter stated that she had "not made 120 qualifying payments" on her loans, making her "ineligible for the TEPSLF opportunity," and that she had made 34 TEPSLF qualifying payments on each of her two consolidated loans, 33 qualifying payments on her Direct subsidized loan, and 32 qualifying payments on her Direct unsubsidized loan.

45

126.   Ms. Miller also received a letter from FedLoan Servicing dated April 17, 2019, stating that her loans had been placed in administrative forbearance.

127.   On April 17, 2019, Ms. Miller called FedLoan Servicing to ask again why her applications for PSLF and TEPSLF had been denied.   Ms. Miller spoke with a customer service representative who said there was "a lot going on" with her loans, that there were over 128 qualifying payments visible on her account, and that her PSLF and TEPSLF applications had been denied due to "too many forbearances," which Ms. Miller contested—and which is factually incorrect.   Ms. Miller asked whether it would assist the review of her application if she uploaded information to her FedLoan Servicing account relating to only those forbearances she had requested. The representative said that it was "worth trying."

128.   On April 22, 2019, Ms. Miller uploaded documentation to her FedLoan Servicing account explaining the circumstances of the prior forbearances she had requested.

129.   On April 24, 2019, Ms. Miller contacted FedLoan Servicing by email to ask if anyone had received this information.   FedLoan Servicing did not respond.

130.   ED denied Ms. Miller PSLF yet again by letter dated April 30, 2019, which stated that she had "not yet made the required 120 qualifying payments necessary to be eligible for PSLF."   The letter further stated that she had made one qualifying payment on each of her two consolidated loans, 38 qualifying payments on her Direct subsidized loan, and 37 qualifying payments on her Direct unsubsidized loan. But Ms. Miller had made *over* 120 qualifying payments.

**PSLF Qualifying Payment Details**

| Loan Sequence | Disbursement Date | Loan Program | Qualifying Payments (Total) | Outstanding Balance | Qualifying Payments (Remaining) | Estimated Eligibility Date |
|---|---|---|---|---|---|---|
| 0001 | 10/05/1998 | DLSCNS | 1 | $3,859.73 | 119 | 05/16/2029 |
| 0002 | 10/05/1998 | DLUCNS | 1 | $4,629.83 | 119 | 05/16/2029 |
| 0003 | 02/09/2003 | DLSTFD | 38 | $339.08 | 82 | 02/22/2026 |
| 0004 | 02/09/2003 | DLUNST | 37 | $698.24 | 83 | 03/22/2026 |

131.    On April 30, 2019, Ms. Miller received an email from FedLoan Servicing in response to her April 24, 2019 email, informing her that her account was two days past due.  On May 1, 2019, Ms. Miller received a notice from FedLoan Servicing stating that her loan payment had posted.

132.    Ms. Miller received a letter from FedLoan Servicing and ED dated May 1, 2019, stating:  "In your recent ECF submission, you included additional employment information that may now enable you to qualify for the TEPSLF opportunity. However, to be reconsidered for the TEPSLF opportunity you must submit a new TEPSLF request."

133.    On May 2, 2019, Ms. Miller submitted a message to FedLoan Servicing through the "Contact Us" function on the FedLoan Servicing website, requesting that it be escalated to a supervisor.  Ms. Miller asked again for confirmation that the documentation she uploaded to her FedLoan Servicing account on April 22, 2019 had been received and requested an update as to her TEPSLF application.  Ms. Miller also asked why she had received notices that her account was overdue, despite having received a previous notice that her loans were in administrative forbearance.

134.    On May 3, 2019, Ms. Miller submitted a complaint to ED through its online FSA Feedback Center.  Once again, Ms. Miller asked for confirmation that the documents she uploaded on April 22, 2019 had been received and asked why she had received overdue payment notices while in forbearance.  Ms. Miller also asked for confirmation of her student loan balance, which had been reported inconsistently in documentation she had received from FedLoan Servicing.  She asked that ED "advise on what documentation" it wanted her to provide.

135.    On May 7, 2019, ED sent Ms. Miller a form email from a FedLoan Servicing email address, thanking her for "reaching out to us through the Federal Student Aid Feedback Center about your student loan account[.]"  The email stated that

47

a letter detailing why she did not qualify for PSLF and TEPSLF had been mailed to her.

136.   ED also sent Ms. Miller an email on May 7, 2019 stating that "a thorough review of [her] account ha[d] been completed," and that "[her] case [wa]s closed."

137.   The same day, Ms. Miller called the ED representative that had sent her the email telling her that her case had been reviewed and closed.  The ED representative told Ms. Miller that her loans did not qualify for PSLF or TEPSLF because they were "standard – grandfathered" and "automatic fixed."  Ms. Miller had never heard those phrases and asked the representative to describe how her loans differed from those that qualify for PSLF or TEPSLF.  The ED representative stated that she could not do so.

138.   A few days later, Ms. Miller received two large envelopes of documents dated May 8, 2019.  As demonstrated by the screenshot below, the envelopes contained over 160 pages of numerical figures, densely printed code, and undefined abbreviations.  The package included a two-sentence cover letter stating, "Why we are contacting you:  To provide you with the documentation you requested," and contained no instructions for how to interpret the included documents.

```
A   8/20/12  1:44:39   C99   L   A000 B000 C000 D000                              EFNDBATCH   SLX0XFK
A   8/20/12  1:44:39   C99   L   LN=1, S&C=11, PMT=28, APD=0, TT=1, DLA=08/20/12.  EFNDBATCH   SLX0XFK
B   8/20/12  1:44:39   C99   L   LN=2, S&C=11, PMT=57, APD=0, TT=1, DLA=08/20/12.  EFNDBATCH   SLX0XFK
C   8/20/12  1:44:39   C99   L   LN=3, S&C=11, PMT=74, APD=0, TT=1, DLA=08/20/12.  EFNDBATCH   SLX0XFK
D   8/20/12  1:44:39   C99   L   LN=4, S&C=11, PMT=89, APD=0, TT=1, DLA=08/20/12.  EFNDBATCH   SLX0XFK
A   9/17/12  2:04:10   C99   L   A000 B000 C000 D000                              EFNDBATCH   SLX0XFK
A   9/17/12  2:04:10   C99   L   LN=1, S&C=11, PMT=28, APD=0, TT=, DLA=09/17/12.   EFNDBATCH   SLX0XFK
B   9/17/12  2:04:10   C99   L   LN=2, S&C=11, PMT=57, APD=0, TT=, DLA=09/17/12.   EFNDBATCH   SLX0XFK
C   9/17/12  2:04:10   C99   L   LN=3, S&C=11, PMT=74, APD=0, TT=, DLA=09/17/12.   EFNDBATCH   SLX0XFK
D   9/17/12  2:04:10   C99   L   LN=4, S&C=11, PMT=89, APD=0, TT=, DLA=09/17/12.   EFNDBATCH   SLX0XFK
A  10/22/12  2:34:59   C99   L   A000 B000 C000 D000                              EFNDBATCH   SLX0XFK
A  10/22/12  2:34:59   C99   L   LN=1, S&C=11, PMT=28, APD=0, TT=, DLA=10/22/12.   EFNDBATCH   SLX0XFK
B  10/22/12  2:34:59   C99   L   LN=2, S&C=11, PMT=57, APD=0, TT=, DLA=10/22/12.   EFNDBATCH   SLX0XFK
C  10/22/12  2:34:59   C99   L   LN=3, S&C=11, PMT=74, APD=0, TT=, DLA=10/22/12.   EFNDBATCH   SLX0XFK
D  10/22/12  2:34:59   C99   L   LN=4, S&C=11, PMT=89, APD=0, TT=, DLA=10/22/12.   EFNDBATCH   SLX0XFK
A  11/19/12  2:06:20   C99   L   A000 B000 C000 D000                              EFNDBATCH   SLX0XFK
A  11/19/12  2:06:20   C99   L   LN=1, S&C=11, PMT=28, APD=0, TT=, DLA=11/19/12.   EFNDBATCH   SLX0XFK
B  11/19/12  2:06:20   C99   L   LN=2, S&C=11, PMT=57, APD=0, TT=, DLA=11/19/12.   EFNDBATCH   SLX0XFK
C  11/19/12  2:06:20   C99   L   LN=3, S&C=11, PMT=74, APD=0, TT=, DLA=11/19/12.   EFNDBATCH   SLX0XFK
D  11/19/12  2:06:20   C99   L   LN=4, S&C=11, PMT=89, APD=0, TT=, DLA=11/19/12.   EFNDBATCH   SLX0XFK
A  12/17/12  2:39:39   C99   L   A000 B000 C000 D000                              EFNDBATCH   SLX0XFK
A  12/17/12  2:39:39   C99   L   LN=1, S&C=11, PMT=28, APD=0, TT=, DLA=12/17/12.   EFNDBATCH   SLX0XFK
B  12/17/12  2:39:39   C99   L   LN=2, S&C=11, PMT=57, APD=0, TT=, DLA=12/17/12.   EFNDBATCH   SLX0XFK
C  12/17/12  2:39:39   C99   L   LN=3, S&C=11, PMT=74, APD=0, TT=, DLA=12/17/12.   EFNDBATCH   SLX0XFK
D  12/17/12  2:39:39   C99   L   LN=4, S&C=11, PMT=89, APD=0, TT=, DLA=12/17/12.   EFNDBATCH   SLX0XFK
```

139.   On May 22, 2019, Ms. Miller sent an email to studentaidfeedback@ed.gov explaining that she did not know how to interpret the 160 pages of data

that she was sent and asking for "some clarification on why I received the large batches of documents and what they are intended for." She also asked when she could expect the letter "detailing the results of [her account's] review," which she had been promised in the May 7, 2019 email from ED.

140.    The same day, Ms. Miller also sent another email to FedLoan Servicing explaining her eligibility for TEPSLF and stating that she had previously provided relevant information to FedLoan Servicing that it had failed to consider in reviewing her application for TEPSLF.

141.    On June 14, 2019, Ms. Miller sent another email to FedLoan Servicing asking for a reply to her inquiry about whether she was still being considered for TEPSLF and when she could expect an outcome.

142.    On June 17, 2019, FedLoan Servicing sent Ms. Miller an email instructing her to "change [her] repayment terms to qualify for PSLF."

143.    That same day, Ms. Miller spoke to a FedLoan Servicing customer service representative who stated that a "special letter was sent to [her] in the mail on June 14, 2019 regarding case resolution" but the representative could not see it, and Ms. Miller would need to speak to a "PSLF specialist."

144.    When Ms. Miller was transferred to a PSLF specialist, she asked for information regarding the June 14, 2019 letter. The PSLF specialist informed her that "I wish they would make this easier to see – I'm sorry – it's not you." The PSLF specialist advised Ms. Miller that she did not need to change her repayment terms to qualify for TEPSLF. Moreover, the PSLF specialist also stated that she could "see 139 payment periods" on Ms. Miller's account and that Ms. Miller should simply "wait it out to see what happens."

145.    On June 20, 2019, FedLoan Servicing requested via email that Ms. Miller provide income and family size documentation to be considered for TEPSLF. Ms. Miller provided that information on the same day.

146.    On June 27, 2019, ED denied Ms. Miller's TEPSLF application claiming that she had made 41 TEPSLF qualifying payments on two of her loans and 38 or 37 TEPSLF qualifying payments on her other two loans.

| Loan Sequence | Loan Program | Disbursement Date | PSLF Qualifying Payment Count | TEPSLF Qualifying Payment Count* |
|---|---|---|---|---|
| 1 | DLSCNS | 10/05/1998 | 1 | 41 |
| 2 | DLUCNS | 10/05/1998 | 1 | 41 |
| 3 | DLSTFD | 02/09/2003 | 38 | 38 |
| 4 | DLUNST | 02/09/2003 | 37 | 37 |

147.    Ms. Miller has reached out to ED and FedLoan Servicing numerous times to ask how her qualifying payments for PSLF and TEPSLF were calculated and why her applications were denied.  Ms. Miller has sought answers to these simple questions through nearly every possible avenue, including telephone calls and emails to ED and FedLoan Servicing, questions submitted via the "Contact Us" form on the FedLoan Servicing website and ED's online FSA Feedback Center, letters to ED and FedLoan Servicing sent via U.S. Postal Service Priority Mail, and documents uploaded to her FedLoan Servicing online account.  ED and FedLoan Servicing either failed to respond directly to these inquiries at all, or, at best, provided Ms. Miller with inconsistent and contradictory answers.

148.    Working as a public school teacher is a passion for Ms. Miller.  Since 2007, Ms. Miller has taught in a low-income public high school with over 98% of the students on free and reduced-price lunch.  Each year, she spends substantially more on her students than the $250 income tax deduction she is permitted to claim.

149.   Ms. Miller has had to put her own goals for a graduate degree on hold, reducing her income potential, due to her student debt and the need to provide for her own children's education.  She had hoped she would be able to pursue those goals after receiving loan forgiveness.  She now believes that the PSLF Program gave her false hopes for greater financial security—security which she cannot attain due to ED's failure to competently administer the PSLF and TEPSLF Programs.

150.   ED failed to institute an adequate process for considering Ms. Miller's application for loan forgiveness that would have ensured that ED identified and accounted for the errors made by ED in determining Ms. Miller's eligibility for loan forgiveness.

151.   ED's denial of Ms. Miller's application for loan forgiveness is arbitrary and capricious in that it fails to take into account its payment counting errors.  Moreover, ED's denial provided no meaningful explanation of the reasons why it did not count her payments as qualifying.

152.   Ms. Miller is eligible for PSLF.

### 2.   Crystal Adams

153.   Plaintiff Crystal Adams is an employee of the U.S. Department of the Treasury who resides in Missouri.

154.   Ms. Adams took out two Direct Loans to finance her undergraduate degree.  On January 22, 2007, Ms. Adams consolidated her loans into one Direct Consolidation Loans and began to make monthly loan payments on a graduated repayment plan.  On July 31, 2013, Ms. Adams began repayment on an income-driven repayment plan.

155.   After making 120 payments, in July 2018, Ms. Adams submitted a PSLF application, along with ECFs, to FedLoan Servicing.  In response, on July 18, 2018, ED denied Ms. Adams's PSLF application because Ms. Adams had purportedly not

made 120 qualifying payments.  Although Ms. Adams had made one payment every month for both of her loans, the denial letter indicated that Ms. Adams had not made the same number of qualifying payments on each of her two loans.

| Loan Sequence | Disbursement Date | Loan Program | Qualifying Payments (Total) | Outstanding Balance | Qualifying Payments (Remaining) | Estimated Eligibility Date |
|---|---|---|---|---|---|---|
| 0001 | 01/22/2007 | DLSCNS | 63 | $21,086.87 | 57 | 03/29/2023 |
| 0002 | 01/22/2007 | DLUCNS | 50 | $21,280.91 | 70 | 04/29/2024 |

156.    Ms. Adams applied for TEPSLF after the denial of her PSLF application.

157.    On October 4, 2018, Ms. Adams received a notice from ED and FedLoan Servicing denying her TEPSLF application.  The notice stated that she had made 64 PSLF qualifying payments and 113 TEPSLF qualifying payments on each of her two loans.

| Loan Sequence | Loan Program | Disbursement Date | PSLF Qualifying Payment Count | TEPSLF Qualifying Payment Count |
|---|---|---|---|---|
| 1 | DLSCNS | 01/22/2007 | 64 | 113 |
| 2 | DLUCNS | 01/22/2007 | 64 | 113 |

158.    Ms. Adams made seven more monthly payments and applied for PSLF and TEPSLF a second time in April 2019.

159.    On April 20, 2019, ED denied Ms. Adams's TEPSLF application, indicating that Ms. Adams had made 70 qualifying payments for PSLF and 115 qualifying payments for TEPSLF.

| Loan Sequence | Loan Program | Disbursement Date | PSLF Qualifying Payment Count | TEPSLF Qualifying Payment Count |
|---|---|---|---|---|
| 1 | DLSCNS | 01/22/2007 | 70 | 115 |
| 2 | DLUCNS | 01/22/2007 | 70 | 115 |

160.    Ms. Adams called FedLoan Servicing to ask why her seven total payments had been counted as two TEPSLF payments and six PSLF payments when all seven payments met the criteria for both Programs.  FedLoan Servicing informed her that ED provides FedLoan Servicing with those calculations, and FedLoan Servicing did not know the basis for ED's determination.

161.   On May 2, 2019, ED denied Ms. Adams's TEPSLF application again with yet another calculation of her PSLF and TEPSLF qualifying payments.  This notice repeated that she had made 70 qualifying PSLF payments but adjusted the number of TEPSLF qualifying payments *downward* to 114.

| Loan Sequence | Loan Program | Disbursement Date | PSLF Qualifying Payment Count | TEPSLF Qualifying Payment Count |
|---|---|---|---|---|
| 1 | DLSCNS | 01/22/2007 | 70 | 114 |
| 2 | DLUCNS | 01/22/2007 | 70 | 114 |

162.   Two days later, on May 4, 2019, FedLoan Servicing and ED sent Ms. Adams a notice stating that she had made 71 qualifying PSLF payments.

| Loan Sequence | Disbursement Date | Loan Program | Qualifying Payments (Total) | Outstanding Balance | Qualifying Payments (Remaining) | Estimated Eligibility Date |
|---|---|---|---|---|---|---|
| 0001 | 01/22/2007 | DLSCNS | 71 | $20,522.77 | 49 | 06/01/2023 |
| 0002 | 01/22/2007 | DLUCNS | 71 | $20,711.61 | 49 | 06/01/2023 |

163.   On May 5, 2019, Ms. Adams wrote to FedLoan Servicing again to ask about the repeated inconsistencies in her payment counts. "Your office told my [sic] I had made 113 qualified TEPSLF payments in October 2018.  I've made 7 additional payments and should now be at 120 and eligible for TEPSLF.  Simply sending me 'Information about your student loan' notices isn't answering my question, and they don't make sense."

164.   On May 8, 2019, FedLoan Servicing responded to Ms. Adams via email that her seven additional payments since October 2018 had in fact been qualifying payments for PSLF and that her total number of payments for both PSLF and TEPSLF should have increased by seven.  FedLoan Servicing also informed Ms. Adams that her request for TEPSLF was received on May 7, 2019 and had been forwarded for processing.

165.   On May 11, 2019, FedLoan Servicing and ED sent a letter to Ms. Adams requesting additional information about her employer in Section 3 of her PSLF application.

166. On the same day, ED denied Ms. Adams's PSLF application.

167. On May 14, 2019, FedLoan Servicing sent a letter to Ms. Adams stating that she had made 70 PSLF qualifying payments.

| Loan Sequence | Disbursement Date | Loan Type | Original Principal Balance | Current Principal Balance | PSLF Qualifying Payments+ |
|---|---|---|---|---|---|
| 1 | 01/22/2007 | Direct Subsidized Consolidation | $23,846.56 | $20,476.29 | 70 |
| 2 | 01/22/2007 | Direct Unsubsidized Consolidation | $23,377.82 | $20,664.70 | 70 |

168. In response to this letter, Ms. Adams called FedLoan Servicing to ask why the number of her TEPSLF qualifying payments had not increased to 120 after she made seven additional payments. A customer service representative responded that FedLoan Servicing would look into the matter.

169. Additionally, in the course of reviewing the records she had submitted to FedLoan Servicing during this process, Ms. Adams discovered that at least five of her payments had not been counted for PSLF because they were made when she was in a forbearance period. FedLoan Servicing stated that it would adjust the forbearance periods retroactively so that those payments would be included in her PSLF qualifying payment count and, on May 15, 2019, sent Ms. Adams notices indicating that it had done so. As a result, Ms. Adams expected that five additional payments would now count for PSLF.

170. As required in order to qualify for TEPSLF, Ms. Adams applied again for PSLF. On June 14, 2019, ED denied Ms. Adams's application for PSLF on the ground that she had not made enough qualifying payments. The notice stated that she had made 71 qualifying payments for PSLF, indicating that the five payments FedLoan Servicing had told Ms. Adams would be counted toward her PSLF eligibility were not being counted. This count also failed to include one of the qualifying payments Ms. Adams made between October 2018 and April 2019, which FedLoan Servicing had informed Ms. Adams would count for PSLF in an email sent on May 8, 2019.

| Loan Sequence | Disbursement Date | Loan Program | Qualifying Payments (Total) | Outstanding Balance | Qualifying Payments (Remaining) | Estimated Eligibility Date |
|---|---|---|---|---|---|---|
| 0001 | 01/22/2007 | DLSCNS | 71 | $20,469.71 | 49 | 06/16/2023 |
| 0002 | 01/22/2007 | DLUCNS | 71 | $20,658.06 | 49 | 06/16/2023 |

171.  On June 27, 2019, Ms. Adams received an update from FedLoan Servicing and ED regarding her qualifying payments.  The notice still stated that she had only made 71 qualifying payments toward PSLF.

172.  On June 29, 2019, ED denied Ms. Adams's TEPSLF application.  The notice stated she had made 71 PSLF qualifying payments and 116 TEPSLF qualifying payments.

| Loan Sequence | Loan Program | Disbursement Date | PSLF Qualifying Payment Count | TEPSLF Qualifying Payment Count* |
|---|---|---|---|---|
| 1 | DLSCNS | 01/22/2007 | 71 | 116 |
| 2 | DLUCNS | 01/22/2007 | 71 | 116 |

173.  As a result of her student debt, Ms. Adams has not been able to buy a reliable car for her family and has limited options for her son's education.  Additionally, she has been forced to take days off from work solely to address ED's miscalculations of her qualifying payments.

174.  ED failed to institute an adequate process for considering Ms. Adams's application for loan forgiveness that would have considered and accounted for its own errors in determining Ms. Adams's eligibility for loan forgiveness.

175.  ED's denial of Ms. Adams's application for loan forgiveness is arbitrary and capricious in that it fails to take into account its payment counting errors.  Moreover, ED's denial provided no meaningful explanation of the reasons why it did not count her payments as qualifying.

176.  Ms. Adams is eligible for TEPSLF.

### 3.  Connie Wakefield

177.  Plaintiff Connie Wakefield is a public school special education teacher in Michigan.

178.  Ms. Wakefield took out Direct Loans to finance her undergraduate and graduate degrees.  Ms. Wakefield consolidated her loans into Direct Consolidation Loans in July 2006 and began repaying them on an income-driven repayment plan on July 20, 2006.  Ms. Wakefield has continuously repaid her loans on a qualifying plan while working in a qualifying position since October 2007.  Her loan payments have been auto-debited from her account since 2006.  She has made at least 120 qualifying payments.

179.  Ms. Wakefield learned about PSLF shortly after the Program was created in October 2007.  She contacted her then-current servicer, Cornerstone (UHEAA), and was told that she should continue making payments for ten years and then apply.

180.  From 2007 until 2017, Ms. Wakefield submitted ECFs four (or possibly five) times.

181.  In October 2017, Ms. Wakefield called her servicer, FedLoan Servicing, and FedLoan Servicing informed her that she had made 120 qualifying payments and was eligible for forgiveness.

182.  Following that conversation, on October 18, 2017, after making 120 on-time payments in full on a qualifying repayment plan, Ms. Wakefield submitted a PSLF application and a completed ECF signed by her employer.  Her ECF stated that she had been working for the school district continuously since 2005.

183.  On October 28, 2017, ED denied Ms. Wakefield's application for PSLF on the ground that she had not made the required number of payments.  ED's notice stated that Ms. Wakefield had only made 66 qualifying payments for PSLF.

184.    Shortly thereafter, Ms. Wakefield called FedLoan Servicing to ask why her application had been denied when she had made 120 payments.  FedLoan Servicing could not explain why her application had been denied and instructed Ms. Wakefield to upload her ECF again to her online FedLoan Servicing account.

185.    As instructed, on November 7, 2017, Ms. Wakefield uploaded her completed ECF again to her online FedLoan Servicing account.

186.    On November 18, 2017, ED informed Ms. Wakefield that her ECF was missing her employer's Federal Employer Identification Number.

187.    On November 20, 2017, Ms. Wakefield uploaded her completed ECF again to her online FedLoan Servicing account.

188.    On November 22, 2017, ED informed Ms. Wakefield that her ECF was missing the name of the employer.

189.    On November 30, 2017, Ms. Wakefield received her monthly direct debit bill from FedLoan Servicing and ED.  The bill indicated that she had made 66 qualifying payments for PSLF.

190.    On December 1, 2017, Ms. Wakefield submitted another completed ECF to her online FedLoan Servicing account.  Again, this ECF stated that she had been working for the same school district continuously since 2005.

191.    On December 9, 2017, Ms. Wakefield received two notices from FedLoan Servicing and ED in response to her ECF.  Even though Ms. Wakefield's ECFs indicated that she had been employed by the same employer since 2005, one notice stated that Ms. Wakefield's qualifying employment dates were between October 20, 2017 and December 1, 2017.  The other notice stated that Ms. Wakefield's qualifying employment dates, for the same employer, were between April 1, 2016 and October 19, 2017.

192.    On December 31, 2017, Ms. Wakefield received her monthly direct debit bill from FedLoan Servicing and ED.  The bill again indicated that Ms. Wakefield had made only 66 qualifying payments for PSLF.

193.    Ms. Wakefield applied for PSLF again in or around December 2017.

194.    On January 23, 2018, ED denied Ms. Wakefield's application for PSLF for failure to make 120 qualifying payments.  The denial notice again indicated that Ms. Wakefield had made only 66 qualifying payments for PSLF.

| Loan Sequence | Disbursement Date | Loan Program | Qualifying Payments (Total) | Outstanding Balance | Qualifying Payments (Remaining) | Estimated Eligibility Date |
|---|---|---|---|---|---|---|
| 0001 | 07/20/2006 | DLSCNS | 66 | $1,577.02 | 54 | 06/01/2022 |
| 0002 | 07/20/2006 | DLUCNS | 66 | $1,916.57 | 54 | 06/01/2022 |

195.    On January 31, 2018—only eight days later—Ms. Wakefield received her monthly direct debit bill from FedLoan Servicing and ED.  This bill indicated that she had made 83 qualifying payments for PSLF.

| Date Disbursed | Loan Program | Original Balance | Current Balance | Outstanding Interest | Interest Rate | PSLF[1] | Monthly Payment | Current Due |
|---|---|---|---|---|---|---|---|---|
| 07/20/2006 | DLSCNS | $10,064.99 | $1,538.75 | $1.89 | 4.500% | 83 | $37.88 | $0.00 |
| 07/20/2006 | DLUCNS | $11,019.30 | $1,870.16 | $2.30 | 4.500% | 83 | $45.94 | $0.00 |

196.    On February 28, 2018, Ms. Wakefield received her monthly direct debit bill from FedLoan Servicing and ED.  Again, the bill indicated that she had made only 83 qualifying payments for PSLF.

197.    Ms. Wakefield continued to make payments.  On March 7, 2018, Ms. Wakefield again called FedLoan Servicing to ask what she needed to do to have her loans forgiven under PSLF.  FedLoan Servicing could not explain why she did not qualify for PSLF, but said it would escalate the issue to ED.

198.    On March 9, 2018, Ms. Wakefield received a letter from FedLoan Servicing and ED.  This notice again stated incorrectly that Ms. Wakefield had made only 83 qualifying payments for PSLF.  The notice listed four periods of qualifying employment, three of which overlapped with one another.  It also showed that Ms.

Wakefield had made zero qualifying payments between April 1, 2016 and October 18, 2017, even though Ms. Wakefield worked for the same qualifying employer and had made payments on auto-debit on the same loans during that time.

| Loan Sequence | Disbursement Date | Loan Program | Qualifying Payments (Total) | Qualifying Payments (Remaining) | Estimated Eligibility Date |
|---|---|---|---|---|---|
| 0001 | 07/20/2006 | DLSCNS | 83 | 37 | 01/01/2021 |
| Employer Name | | | Qualifying Employment Begin Date | Qualifying Employment End Date | Qualifying Payments |
| UTICA COMMUNITY SCHOOLS | | | 08/29/2005 | 10/14/2017 | 17 |
| UTICA COMMUNITY SCHOOLS | | | 08/29/2005 | 03/31/2016 | 66 |
| UTICA COMMUNITY SCHOOLS | | | 04/01/2016 | 10/19/2017 | 0 |
| UTICA COMMUNITY SCHOOLS | | | 10/20/2017 | 12/01/2017 | 0 |

199.    On March 15, 2018, Ms. Wakefield called FedLoan Servicing to ask why she was still not eligible for loan forgiveness.  Again, FedLoan Servicing was unable to explain why Ms. Wakefield's ten years of payments had not counted for PSLF and told her that it was elevating her account "for review."

200.    On March 31, 2018, Ms. Wakefield received her monthly direct debit bill from FedLoan Servicing and ED.  The bill indicated that she had made only 82 qualifying payments for PSLF.

| Date Disbursed | Loan Program | Original Balance | Current Balance | Outstanding Interest | Interest Rate | PSLF* | Monthly Payment | Current Due |
|---|---|---|---|---|---|---|---|---|
| 07/20/2006 | DLSCNS | $10,064.99 | $1,474.05 | $1.81 | 4.500% | 82 | $37.88 | $0.00 |
| 07/20/2006 | DLUCNS | $11,019.30 | $1,791.73 | $2.20 | 4.500% | 82 | $45.94 | $0.00 |

201.    On April 11, 2018, Ms. Wakefield called FedLoan Servicing to ask why she had been denied PSLF.  Again, FedLoan Servicing had no answer.  Ms. Wakefield submitted her ECF once more, including a note requesting that FedLoan Servicing look again at her payments.

202.    On April 30, 2018, Ms. Wakefield received her monthly direct debit bill from FedLoan Servicing and ED, which listed 82 qualifying payments.

203.   On May 25, 2018, ED sent Ms. Wakefield an email indicating that she may be eligible for TEPSLF as her PSLF application had been denied because some of her payments did not qualify.  That was incorrect, as there was nothing in her PSLF denial stating that her payments were made on a nonqualifying repayment plan.

204.   That same day, Ms. Wakefield sent an email to ED, at the TEPSLF address, requesting reconsideration of her application for forgiveness.

205.   On May 31, 2018, Ms. Wakefield received her monthly direct debit bill from FedLoan Servicing and ED, still listing 82 qualifying payments.

206.   On June 5, 2018, Ms. Wakefield called FedLoan Servicing to ask why she had been denied PSLF.  Again, FedLoan Servicing had no answer and told her it was elevating her account "for review."

207.   That same day, ED sent Ms. Wakefield another email indicating that she may be eligible for TEPSLF as her PSLF application had been denied because some of her payments did not qualify.  Once again, that was incorrect as there was nothing in her PSLF denial stating that her payments were made on a nonqualifying repayment plan.

208.   After receiving no information about the review of her account, on September 17, 2018, Ms. Wakefield called FedLoan Servicing again to ask about her PSLF application.  Again, FedLoan Servicing had no answer and informed her that her account was being elevated "for review."

209.   On September 15, 2018, Ms. Wakefield submitted another ECF indicating she has been employed by the same employer continuously from 2005 to the present.

210.   On September 29, 2018, Ms. Wakefield received a letter from FedLoan Servicing and ED stating that it had processed her ECF and counted her qualifying

payments. The letter included a chart showing the same 83 qualifying payments as the notice Ms. Wakefield had received in March of that year.

211. On October 9, 2018, Ms. Wakefield received another letter from FedLoan Servicing and ED stating that she had made 83 qualifying payments.

| Loan Sequence | Disbursement Date | Loan Program | Qualifying Payments (Total) | Qualifying Payments (Remaining) | Estimated Eligibility Date |
|---|---|---|---|---|---|
| 0001 | 07/20/2006 | DLSCNS | 83 | 37 | 10/21/2021 |

| Employer Name | | | Qualifying Employment Begin Date | Qualifying Employment End Date | Qualifying Payments |
|---|---|---|---|---|---|
| UTICA COMMUNITY SCHOOLS | | | 08/29/2005 | 03/31/2016 | 66 |
| UTICA COMMUNITY SCHOOLS | | | 08/29/2005 | 10/14/2017 | 17 |
| UTICA COMMUNITY SCHOOLS | | | 04/01/2016 | 10/19/2017 | 0 |
| UTICA COMMUNITY SCHOOLS | | | 10/20/2017 | 12/01/2017 | 0 |
| UTICA COMMUNITY SCHOOLS | | | 12/02/2017 | 09/21/2018 | 0 |

212. Ms. Wakefield's next two direct debit bills from FedLoan Servicing and ED, dated October 31, 2018 and November 30, 2018, also stated that she had made only 83 qualifying payments, even though she had been making additional payments.

213. On December 5, 2018, Ms. Wakefield called FedLoan Servicing again to ask why she was unable to obtain loan forgiveness under PSLF. Again, FedLoan Servicing was unable to explain why Ms. Wakefield was denied PSLF. FedLoan Servicing instructed Ms. Wakefield to submit yet another PSLF application in order to determine her eligibility.

214. On December 19, 2018, Ms. Wakefield received another letter from Fed-Loan Servicing and ED, stating that it had reviewed her ECF, and her total number of qualifying payments was 92 on one loan and 93 on the other. This notice, like the prior one dated March 9, 2018, also listed multiple overlapping periods of qualifying employment but provided a different payment count for many of the periods of employment than the prior notice, as shown below.

| Loan Sequence | Disbursement Date | Loan Program | Qualifying Payments (Total) | Qualifying Payments (Remaining) | Estimated Eligibility Date |
|---|---|---|---|---|---|
| 0001 | 07/20/2006 | DLSCNS | 92 | 28 | 01/21/2021 |
| Employer Name | | | Qualifying Employment Begin Date | Qualifying Employment End Date | Qualifying Payments |
| UTICA COMMUNITY SCHOOLS | | | 08/29/2005 | 03/31/2016 | 65 |
| UTICA COMMUNITY SCHOOLS | | | 08/29/2005 | 10/14/2017 | 17 |
| UTICA COMMUNITY SCHOOLS | | | 04/01/2016 | 10/19/2017 | 0 |
| UTICA COMMUNITY SCHOOLS | | | 10/20/2017 | 12/01/2017 | 2 |
| UTICA COMMUNITY SCHOOLS | | | 12/02/2017 | 09/21/2018 | 8 |

| Loan Sequence | Disbursement Date | Loan Program | Qualifying Payments (Total) | Qualifying Payments (Remaining) | Estimated Eligibility Date |
|---|---|---|---|---|---|
| 0002 | 07/20/2006 | DLUCNS | 93 | 27 | 12/21/2020 |
| Employer Name | | | Qualifying Employment Begin Date | Qualifying Employment End Date | Qualifying Payments |
| UTICA COMMUNITY SCHOOLS | | | 08/29/2005 | 03/31/2016 | 66 |
| UTICA COMMUNITY SCHOOLS | | | 08/29/2005 | 10/14/2017 | 17 |
| UTICA COMMUNITY SCHOOLS | | | 04/01/2016 | 10/19/2017 | 0 |
| UTICA COMMUNITY SCHOOLS | | | 10/20/2017 | 12/01/2017 | 2 |

| Employer Name | Qualifying Employment Begin Date | Qualifying Employment End Date | Qualifying Payments |
|---|---|---|---|
| UTICA COMMUNITY SCHOOLS | 12/02/2017 | 09/21/2018 | 8 |

215.    On December 21, 2018, ED denied Ms. Wakefield's application for PSLF for failing to make 120 qualifying payments.  The denial letter stated that Ms. Wakefield had made 92 qualifying payments on one of her Direct Consolidation Loans and 93 qualifying payments on the other.

216.    Also on December 21, 2018, ED sent Ms. Wakefield a notice requesting additional information regarding her income and family size so that she could be considered for TEPSLF.  Ms. Wakefield called FedLoan Servicing and explained that she had not applied for TEPSLF and that her payments for PSLF were being miscounted.

217.    On December 28, 2018, Ms. Wakefield submitted a complaint to the CFPB regarding the continued miscounting of her PSLF qualifying payments.

218.   On January 12, 2019, Ms. Wakefield received another email from Fed-Loan Servicing stating that it needed additional information to consider her request under the TEPSLF Program, although Ms. Wakefield had already informed FedLoan Servicing that she had not applied for TEPSLF.

219.   On January 29, 2019, Ms. Wakefield received yet another notice from FedLoan Servicing stating that it had reviewed her employment certification, and she currently had 94 qualifying payments on both loans.  This notice now showed *six* separate periods of qualifying employment, each of which overlapped with at least one other period.

| Loan Sequence | Disbursement Date | Loan Program | Qualifying Payments (Total) | Qualifying Payments (Remaining) | Estimated Eligibility Date |
|---|---|---|---|---|---|
| 0001 | 07/20/2006 | DLSCNS | 94 | 26 | 02/21/2021 |
| Employer Name | | | Qualifying Employment Begin Date | Qualifying Employment End Date | Qualifying Payments |
| UTICA COMMUNITY SCHOOLS | | | 08/28/2005 | 10/14/2017 | 17 |
| UTICA COMMUNITY SCHOOLS | | | 08/28/2005 | 03/31/2016 | 66 |
| UTICA COMMUNITY SCHOOLS | | | 04/01/2016 | 10/19/2017 | 0 |
| UTICA COMMUNITY SCHOOLS | | | 10/15/2017 | 12/06/2018 | 1 |
| UTICA COMMUNITY SCHOOLS | | | 10/20/2017 | 12/01/2017 | 2 |
| UTICA COMMUNITY SCHOOLS | | | 12/02/2017 | 09/21/2018 | 8 |

220.   On February 25, 2019, Ms. Wakefield received a notice from the CFPB that FedLoan Servicing and ED had "performed a thorough review" of Ms. Wakefield's federal student loan account and that her complaint had been "closed with explanation."

221.   In its explanation, FedLoan Servicing's Office of Consumer Advocacy claimed to have reviewed her account but did not explain why her payments did not count.  Instead, the explanation simply repeated the requirements for PSLF, told Ms. Wakefield that she was ineligible because she had only made 94 qualifying payments, and advised her to contact FedLoan Servicing if she had any additional questions about the matter.

222.   Ms. Wakefield replied to the CFPB on March 3, 2019, stating that Fed-Loan Servicing had failed to count the loan payments she made between April 1, 2016 and October 19, 2017.  Ms. Wakefield explained that she had been working for the same qualifying employer and repaying her loans on the same qualifying repayment plan during this time period.

223.   In response, the CFPB stated that the complaint process was complete and that her complaint was now closed.  It noted that it had added her complaint to the CFPB's Consumer Complaint Database and forwarded it to the Federal Trade Commission.

224.   On March 15, 2019, Ms. Wakefield sent an email to ED, at the TEPSLF email address, requesting that it reconsider her eligibility for loan forgiveness.

225.   On March 31, 2019 and April 30, 2019, Ms. Wakefield received a direct debit bill from FedLoan Servicing and ED indicating that she had made 94 qualifying payments.

226.   On May 14, 2019, Ms. Wakefield submitted another PSLF application and ECF to FedLoan Servicing, indicating again that she had been employed by the same qualifying employer continuously since 2005.

227.   On May 31, 2019, Ms. Wakefield received a direct debit bill from Fed-Loan Servicing and ED indicating that she had made 94 qualifying payments.

228.   On June 22, 2019, ED denied Ms. Wakefield's application for PSLF stating that she had only made 98 qualifying payments.  On the same day, ED and Fed-Loan Servicing responded to her ECF and indicated she had made 98 qualifying payments on both loans.

| Loan Sequence | Disbursement Date | Loan Program | Qualifying Payments (Total) | Qualifying Payments (Remaining) | Estimated Eligibility Date |
|---|---|---|---|---|---|
| 0001 | 07/20/2006 | DLSCNS | 98 | 22 | 03/17/2021 |

| Employer Name | | Qualifying Employment Begin Date | Qualifying Employment End Date | Qualifying Payments |
|---|---|---|---|---|
| UTICA COMMUNITY SCHOOLS | | 08/01/2005 | 03/31/2016 | 66 |
| UTICA COMMUNITY SCHOOLS | | 08/01/2005 | 10/14/2017 | 16 |
| UTICA COMMUNITY SCHOOLS | | 04/01/2016 | 10/19/2017 | 0 |
| UTICA COMMUNITY SCHOOLS | | 10/15/2017 | 12/06/2018 | 1 |
| UTICA COMMUNITY SCHOOLS | | 10/20/2017 | 12/01/2017 | 2 |
| UTICA COMMUNITY SCHOOLS | | 12/02/2017 | 09/21/2018 | 9 |
| UTICA COMMUNITY SCHOOLS | | 12/07/2018 | 05/17/2019 | 4 |

229.    On June 30, 2019, Ms. Wakefield received her monthly direct debit bill from FedLoan Servicing and ED indicating that she had made 98 qualifying payments.

230.    Ms. Wakefield continues to make on-time payments under a qualifying repayment plan.

231.    Ms. Wakefield is a high school special education teacher who has spent her own money on classroom supplies and activities for her students.

232.    She relied on PSLF and intended to use the money she would have saved to help pay for her own children's college education.  Now that she has been repeatedly denied forgiveness, she has been forced to work two jobs so that she can save money for her children's education and ensure that they do not have to take on as much debt as she did.

233.    ED failed to institute an adequate process for considering Ms. Wakefield's application for loan forgiveness that would have considered and accounted for its own errors in determining Ms. Wakefield's eligibility for loan forgiveness.

234.    ED's denial of Ms. Wakefield's application for loan forgiveness is arbitrary and capricious in that it fails to take into account its payment counting errors. Moreover, ED's denial provided no meaningful explanation of the reasons why it did not count her payments as qualifying.

235.    Ms. Wakefield is eligible for PSLF.

## ED'S DISREGARD OF SERVICER MISREPRESENTATIONS TO BORROWERS REGARDING PSLF

### ED's Awareness of Widespread Servicer Misconduct

236.    ED knows of—but completely disregards—repeated misrepresentations made by Title IV servicers to borrowers who are attempting to qualify for PSLF or TEPSLF, resulting in unwarranted denials of loan forgiveness.

237.    In a March 2019 report, ED disclosed that two of the most common reasons for denials of PSLF are:  (1) failures to make 120 payments under a qualifying repayment plan (53% of rejections) and (2) noneligible loans (16% of rejections).[125] Both grounds for denial are, in many instances, attributable to erroneous information that Title IV servicers provided to borrowers.

238.    Though ED has decided to delegate much of the day-to-day administration of PSLF to Title IV servicers, including the task of providing information to borrowers regarding the PSLF Program's eligibility requirements, ED retains full responsibility for implementation of PSLF, as Congress made clear.[126]

239.    Thus, ED is responsible for and obligated to address Title IV servicers' misconduct that harms PSLF-seeking borrowers.  For example, as to Title IV servicers under contract with ED, ED's Inspector General testified to Congress, "[ED] must effectively monitor performance to ensure that it receives the correct quantity and quality of products or services for which it is paying."[127]  ED's contracts with

---

[125] FSA, *March 2019 PSLF Report*, *supra* note 2.

[126] 20 U.S.C. § 3472.

[127] *Management Challenges Facing the U.S. Dep't of Educ.: Hearing Before the Subcomm. on Labor, Health, and Human Servs., Educ., and Related Agencies*, 113th Cong. 4 (Mar. 19, 2013) (testimony of Kathleen S. Tighe, Inspector General), https://www2.ed.gov/about/offices/list/oig/auditrpts/testimony03192013.pdf.

those servicers recognize this too, specifying that servicers "shall provide [ED's Office of Federal Student Aid ("FSA")] the ability to monitor phone calls remotely," "shall support quarterly monitoring reviews completed by FSA," and "shall support annual program compliance reviews done by FSA, or by an agent of FSA."[128]  And Secretary DeVos has assured Congress that ED "will continue to monitor the servicers to make sure they are upholding the agreements they have made on behalf of the students."[129]

240.   ED is well aware of the widespread misrepresentations that Title IV servicers are making to borrowers regarding eligibility for PSLF.  As discussed above, both the GAO and OIG have documented not only the existence of rampant servicer misconduct, but also ED's awareness of such misconduct.[130]  And yet, ED has failed to correct the problem or take it into account in administering PSLF.  In the face of this abdication of responsibility, Title IV servicers continue to mislead public servants and the magnitude of the problem continues to worsen.

241.   For instance, the OIG report found that "FSA had not established policies and procedures that provided reasonable assurance that the risk of servicer noncompliance with requirements for servicing federally held student loans was mitigated."[131]  An analysis of nearly 350 FSA monitoring reports revealed that over 60% of them documented instances of servicer noncompliance with federal requirements,

---

[128] U.S. Dep't of Educ., *Additional Servicer—Intermediate Requirements,* Attachment A-2 (June 17, 2009), at 11.

[129] *Examining Policies and Priorities of the U.S. Dep't of Educ.: Hearing Before the H. Comm. on Educ. and Labor*, 116th Cong. (Apr. 10, 2019) at 00:37:38 (testimony of Betsy DeVos, Secretary of Education), https://www.c-span.org/video/?459644-1/education-policy-hearing-secretary-devos (last visited July 9, 2019).

[130] *See generally* GAO, *Public Service Loan Forgiveness Report*, *supra* note 6; OIG, *Federal Student Aid*, *supra* note 7.

[131] OIG, *Federal Student Aid*, *supra* note 7.

"includ[ing] noncompliance with requirements relevant to forbearances, deferments, income-driven repayment, interest rates, due diligence, and consumer protection."[132]

242.  Although "FSA's oversight activities regularly identified instances of servicers not servicing federally held student loans in accordance with Federal requirements, . . . FSA management rarely used available contract accountability provisions to hold servicers accountable for instances of noncompliance."[133]

243.  The OIG further concluded that because ED "rarely hold[s] servicers accountable for instances of noncompliance with Federal loan servicing requirements, FSA is not providing servicers with incentive to take actions to mitigate the risk of continued noncompliance that harms students and their families."[134]  ED's lack of enforcement as to noncompliant loan servicers indicates that ED is failing to carry out Congress's mandate of ensuring that borrowers have access to the PSLF entitlement.

244.  The 2018 GAO Report further revealed ED's glaring failures with respect to ED's administration of PSLF.[135]  The report found ED knew there was a high risk that FedLoan Servicing would improperly approve or deny certification requests and applications for loan forgiveness yet took no action to correct these problems.[136]

245.  The report further found that ED's inaction "makes the PSLF servicer's employer assessments vulnerable to inconsistencies and fosters uncertainty for

---

[132] *Id.* at 4.

[133] *Id.* at 2.

[134] *Id.* at 17.

[135] *See generally* GAO, *Public Service Loan Forgiveness Report*, *supra* note 6.

[136] *Id.* at 24.

borrowers as to whether or not their employment will eventually qualify them for loan forgiveness."[137]

246.    Numerous lawsuits have been filed against Title IV servicers, alleging widespread misconduct.[138]  Rather than addressing the servicer misconduct detailed in those lawsuits, ED has tried to prevent these suits from going forward by arguing—largely unsuccessfully[139]—that "State regulation of the servicing of the FFEL Program is preempted to the extent that it undermines uniform administration of the program," and that, "[t]o the extent that State servicing laws attempt to impose new prohibitions on misrepresentation or the omission of material information, those laws would also run afoul of the express preemption provision in 20 U.S.C. § 1098g."[140]

---

[137] *Id.*

[138] *See, e.g.*, *Hyland v. Navient Corporation*, No. 1:18-cv-09031 (S.D.N.Y.) (filed Oct. 3, 2018); *Lawson-Ross v. Great Lakes Higher Educ. Corp.*, No. 1:17-cv-00253, 2018 WL 5621872 (N.D. Fla. Sept. 20, 2018), *pending appeal*, No. 18-14490 (11th Cir.); *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, No. 3:17-cv-00183, 2017 WL 6501919 (S.D. Ill. Dec. 19, 2017), *vacated and remanded*, No. 18-01531, 2019 WL 2636822 (7th Cir. June 27, 2019); *Davis v. Navient Corp.*, No. 1:17-cv-00992 (W.D.N.Y.) (filed Oct. 30, 2017); *Daniel v. Navient Solutions, LLC*, 8:17-cv-02503 (M.D. Fla.) (filed Oct. 25, 2017); *Pennsylvania v. Navient Corp.*, No. 3:17-cv-01814 (M.D. Pa.) (filed Oct. 5, 2017); *Travis v. Navient Corp.*, No. 2:17-cv-04885 (E.D.N.Y.) (filed Aug. 18, 2017); *Demyanenko-Todd v. Navient Corp.*, No. 3:17-cv-00772 (M.D. Pa.) (filed May 1, 2017); *Consumer Fin. Prot. Bureau v. Navient Corp.*, No. 3:17-cv-00101 (M.D. Pa.) (filed Jan. 18, 2017); *California v. Navient Corp.*, No. 18-567732 (Cal. Super. Ct.) (filed June 29, 2018); *Illinois ex rel. Madigan v. Navient Corp.*, No. 17 CH 00761 (Ill. Cir. Ct., Cook Cty.) (filed Jan. 18, 2017); *Massachusetts v. Pennsylvania Higher Educ. Assistance Agency*, No. 1784-cv-02682-BLS2 (Mass. Super. Ct.) (filed Aug. 23, 2017); *Mississippi v. Navient Corp.*, No. 1:18-cv-00982 (Miss. Chan. 1st Dist. Ct.) (filed July 17, 2018); *Washington v. Navient Corp.*, No. 17-2-01115-1 (Wa. Super. Ct.) (filed Jan. 18, 2017).

[139] *See, e.g.*, *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, __ F.3d __, 2019 WL 2636822 (7th Cir. June 27, 2019).

[140] Federal Preemption and State Regulation of the Dep't of Educ.'s Fed. Student Loan Programs and Fed. Student Loan Servicers, 83 Fed. Reg. 10,619-21 (Mar. 12, 2018).

247.    Moreover, the Department—at the direction of Secretary DeVos—has taken measures to prevent the CFPB—the agency responsible for protecting consumers of financial services—from obtaining information necessary to oversee and police the Title IV servicers.

248.    The CFPB has authority to examine Title IV servicers and ascertain their compliance with federal law.[141]   In a letter to Senator Elizabeth Warren, the head of the CFPB revealed that "[s]ince December 2017, student loan servicers have declined to produce information requested by the Bureau for supervisory examinations related to Direct Loans and [FFEL] [L]oans held by the Department based on

---

[141] The CFPB conducts reviews of student loan servicers pursuant to its statutory function to "collect[], research[], monitor[], and publish[] information relevant to the functioning of markets for consumer financial products and services to identify risks to consumers and the proper functioning of such markets."  12 U.S.C. § 5511(c)(3); *see also* CFPB*, Request for Information Regarding Student Loan Servicing*, 80 Fed. Reg. 29,302 (May 21, 2015) (relying on authority granted by 12 U.S.C. § 5511(c)).  The CFPB is specifically empowered to appoint a student loan ombudsman who may "prepare an annual report" and "make appropriate recommendations" to the Secretary of Education regarding student loans.  12 U.S.C. § 5535.  As relevant here, the CFPB "[d]etermine[s] whether the servicer has procedures, and whether the servicer follows its procedures, for circumstances where the borrower informs the servicer that a borrower is working in public service, including whether phone representatives assess the borrower's current circumstances and disclose the availability of any cancellation or loan forgiveness options reasonably believed to be the most appropriate to the borrower (e.g., PSLF, . . .)" and further "whether the servicer processes requests for borrower benefits, including benefits or protections . . . (e.g., PSLF . . .), in a timely and accurate manner."  Consumer Fin. Prot. Bureau, *Education Loan Examination Procedures* 33 (June 2017), https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/201706_cfpb_Education-Loan-Servicing-Exam-Manual.pdf.    The CFPB has filed suit against one student loan servicer—Navient—pursuant to its statutory authority to enforce federal consumer financial laws.  *See Consumer Fin. Prot. Bureau v. Navient Corp.*, No. 3:17-cv-00101 (M.D. Pa.) (filed Jan. 18, 2017); *see also* 12 U.S.C. §§ 5564(a), (b); 15 U.S.C. §§ 1681s(b)(1)(H), 1692*l*(b)(6).

the Department's guidance."[142]  As reported by National Public Radio, the CFPB asserts that it "is trying to do its job protecting student borrowers and supervising loan servicing companies, but [ED] is getting in the way."[143]

249.   As a number of U.S. Senators recognized in letters sent to federal student loan servicers, this "disturbing news . . . reveals that the Department, under Secretary DeVos, has removed the most potent weapon"—the CFPB's supervisory examination authority—"from the CFPB's arsenal to fight illegal behavior and mistreatment of borrowers by student loan servicers, and that federal student loan servicers, who are paid by the federal government, are ignoring federal regulators' requests for information."[144]

250.   In the face of these widespread errors, ED has refused to exercise its oversight responsibilities, has obstructed attempts by agencies like the CFPB to rein in servicer misconduct, has failed to institute a process that allows borrowers to raise servicer misconduct in their PSLF applications, and has refused to account for Title IV servicers' misrepresentations in the PSLF review process.

### Servicer Misconduct Plaintiffs

#### 1.    Deborah Baker

251.   Plaintiff Deborah Baker is the Director of Education for a musical nonprofit organization in Oklahoma.  Previously, Ms. Baker worked as a public school

---

[142] Letter from Kathleen L. Kraninger to Elizabeth Warren at 2 (Apr. 23, 2019), https://www.warren.senate.gov/imo/media/doc/2019.04.23%20KK%20to%20Warren_student%20loan%20industry.pdf.

[143] Chris Arnold, *CFPB Chief Says Education Department Is Blocking Student Loan Oversight*, National Public Radio (May 16, 2019), https://www.npr.org/2019/05/16/723568597/cfpb-chief-says-education-department-is-blocking-student-loan-oversight (last visited July 9, 2019).

[144] Letters from Senators Warren, Brown, Gillibrand, Durbin, and Whitehouse to Navient Solutions, LLC, Nelnet, Inc., and Pa. Higher Educ. Assistance Agency (May 14, 2019), https://www.npr.org/documents/2019/may/letters-to-servicers.pdf.

teacher for nearly twenty years, and she plans to reenter the classroom this coming school year.

252.   Between 1996 and 1999, Ms. Baker took out student loans under the FFEL Program to finance her undergraduate degree.   After completing her degree, Ms. Baker consolidated her loans into a FFEL Consolidation Loan in 2000, but she was unable to afford the standard student loan payment amount.   When she asked her Title IV servicer, Sallie Mae, about more affordable repayment options, she was incorrectly told there was no option besides forbearance.   Ms. Baker remained in forbearance until 2004.

253.   Throughout this period, Ms. Baker continued to inquire about more affordable payment options and informed Sallie Mae of the payment amount that she would be able to afford.   She also repeatedly informed Sallie Mae that she was a public school teacher and sent documentation of her salary along with her teacher contracts.

254.   Sallie Mae continued to inform her that her only options were to make monthly payments that represented the majority of her income or to take repeated economic hardship forbearances.

255.   In 2004, after consolidating her FFEL Loans again, Ms. Baker started repayment, but again told her servicer, Sallie Mae, that she was concerned about her ability to afford the high monthly payments.   The servicer finally offered a more affordable option where Ms. Baker would pay only the interest on her loans.

256.   In March 2005, Ms. Baker called Sallie Mae again to ask about options for a more affordable monthly payment.   Though Ms. Baker had FFEL Loans, her servicer sent her a booklet about repayment options for Direct Loans.

257.   Later that month, much to her dismay, Ms. Baker received a telephone call at her workplace from an ED employee berating her for taking out student loans when she knew she would be seeking a low-paying job as a public school teacher.

258.    On July 11, 2005, Ms. Baker submitted an income-certification form for income-driven repayment and began paying her loans on an income-driven repayment plan.  Ms. Baker continued to certify her income every year and make on-time payments.  In 2009, she switched to another income-driven repayment plan.

259.    Ms. Baker learned about PSLF in 2007 and called Sallie Mae for details. Sallie Mae informed Ms. Baker that to qualify for PSLF, she would need to be on an income-driven repayment plan and to make ten years of payments.  The servicer did not inform Ms. Baker that none of her loans would qualify for PSLF because they were FFEL Loans.

260.    After that conversation, Ms. Baker discussed her intention to qualify for PSLF on countless occasions with Sallie Mae and with Navient, the successor Title IV servicer.  In virtually every conversation, she stated that she was a public school teacher seeking loan forgiveness under the PSLF Program.  Navient told Ms. Baker to continue making payments on her existing loans, even though Navient knew she had nonqualifying FFEL Loans.

261.    Among the myriad papers, websites, and statements containing information about Ms. Baker's loans, there were multiple indications that she had Direct Loans, and indeed, Ms. Baker believed that she had Direct Loans.

262.    For example, Navient's online portal displaying Ms. Baker's "Loan Details," as shown below, says nothing about FFEL Loans.  Instead, it states that Ms. Baker's loans are "SmartLoan Direct Repay-Adsm" and "Consolidated."



263.   Because she believed that her loans were Direct Loans, Ms. Baker checked the boxes on her income-certification forms for income-driven repayment, indicating that she held Direct Loans (in at least 2013, 2014, and 2015).   Navient processed her request despite this error but never informed her that she had FFEL Loans.

264.   Additional mistakes by both Title IV servicers, Sallie Mae and Navient, led to delays in Ms. Baker's income-certification and caused her to make additional payments that did not qualify.

265.   On June 16, 2009, a Sallie Mae representative told Ms. Baker that she should delay filing her income-recertification form until July 1 due to potential student loan interest rate changes.   That was incorrect, as Ms. Baker's loans had a fixed rate and would not be impacted by interest rate changes.   When Ms. Baker followed this direction and submitted her income-certification form on July 1, she received a notice that her certification had not been received in time and that her income-driven repayment period had ended.

266.   After Ms. Baker submitted her income-certification form in July 2009, Sallie Mae repeatedly sent the incorrect forms to the IRS to obtain Ms. Baker's tax information.   The resulting delay in recertifying Ms. Baker's income caused her monthly payments to revert back to the standard repayment plan.   On multiple phone

calls with Sallie Mae about its mistake, Ms. Baker stated that she was pursuing PSLF.  When Sallie Mae informed Ms. Baker that she had the option of receiving a forbearance and accruing interest while Sallie Mae was sorting out the mistake with her income-driven repayment plan recertification, Ms. Baker responded that she did not want to miss a payment because she wanted to continue qualifying for PSLF.  The Sallie Mae representative told Ms. Baker that she could simply make the same payments she had been making on her prior plan while the forbearance was in effect. That was wrong.  Payments made during a forbearance period do not count for purposes of PSLF.

267.   In August 2013, when Ms. Baker submitted her income-certification forms, Sallie Mae again sent the incorrect forms to the IRS to obtain Ms. Baker's tax information.  In Ms. Baker's conversations with Sallie Mae about these mistakes, she stated multiple times that she was pursuing PSLF and could not miss a payment.

268.   On June 15, 2015, Ms. Baker noticed that her student loan payment, which she had made by check, had posted to her account but then disappeared.  When Ms. Baker called to inquire about the payment, she explained to a Navient representative (Navient now servicing the loans previously serviced by Sallie Mae) that she was trying to qualify for PSLF and wanted to make sure her payment was on time.  The Navient representative told Ms. Baker that she would waive the fee for making the payment over the phone so that it would post the same day.  Again, this representative did not inform Ms. Baker that her payment would not qualify for PSLF because she did not have Direct Loans.

269.   In anticipation of receiving forgiveness in the fall of 2017, Ms. Baker submitted an ECF to FedLoan Servicing on June 21, 2017.  On July 25, 2017, Ms. Baker received a notice from FedLoan Servicing stating that her ECF could not be accepted because she did not have Direct Loans.

270.   The same day, Ms. Baker called FedLoan Servicing to ask for information about why her loans were not "qualifying loans."  FedLoan Servicing told Ms. Baker that it was "unfortunate" that Sallie Mae and Navient had not informed her that her FFEL Loans did not qualify for PSLF.

271.   The same day, Ms. Baker called Navient to request further information as to why she had not been given correct information about qualifying for PSLF.  Navient apologized to Ms. Baker and told her that Navient was unable to help her and was "sorry" that Navient did not give her the right information.

272.   In September 2017, Ms. Baker consolidated her loans into Direct Loans after being told that this was the only way to qualify for PSLF.

273.   On July 26, 2017, Ms. Baker filed a complaint with the CFPB describing the misrepresentations made by Sallie Mae and Navient regarding PSLF and characterizing the documentation and advice she received from them as "intentionally misleading."

274.   On August 2, 2017, Ms. Baker filed a complaint with the Oklahoma Attorney General's Consumer Protection Unit, again describing the years of misinformation she received from Sallie Mae and Navient.  She stated that "[t]he documentation from SLMA/Navient is intentionally misleading and meant to keep borrowers uninformed of rules for loan forgiveness or reduction programs."  Ms. Baker said she "anticipate[d] a public outcry as people around the country learn that their loans don't qualify for this program" and requested that Oklahoma join the fight against Navient's abusive and predatory lending practices.

275.   In response to Ms. Baker's complaint to the Oklahoma Attorney General, Navient stated "[w]e have . . . verified that although Ms. Baker incorrectly selected that she had Direct Loans on the IBR form, it would not be a reason for denial as we were still able to complete the processing with the information she provided."

Thus, Navient acknowledged that it knew Ms. Baker had the wrong type of loans to qualify for PSLF and nevertheless failed to inform her.

276.    Ms. Baker wrote to ED's Ombudsman Group on September 20, 2017 to request assistance.

277.    ED's website explains that the Ombudsman Group is "a neutral, informal, and confidential resource" that is supposed to help resolve disputes about federal student aid.[145]

278.    Ms. Baker's letter detailed the years of mistakes and misinformation from Sallie Mae and Navient—entities tasked by ED with providing Ms. Baker with accurate information and servicing her loans in accordance with applicable laws and regulations.   Ms. Baker explained that despite years of faithfully making on-time payments on her loans and serving her community as a public school teacher, she had been informed that she was not eligible for loan forgiveness.

279.    The Ombudsman Group indicated that it might be able to have some of her payments count toward PSLF if Ms. Baker sent in relevant documentation.  Ms. Baker spent an entire night organizing and sending documents to the Ombudsman Group.  The Ombudsman Group did not cause any of Ms. Baker's payments to be counted for PSLF.

280.    Ms. Baker also sent a letter to her U.S. Senator detailing the misrepresentations she received from Sallie Mae and Navient.  Senator James Lankford's office responded that he "regret[s] that this matter could not be resolved in your favor."

281.    Ms. Baker applied for PSLF on March 28, 2018.

---

[145] U.S. Dep't of Educ., Fed. Student Aid, *Getting Prepared Before Seeking Help*, https://studentaid.ed.gov/sa/repay-loans/disputes/prepare (last visited July 8, 2019).

282.   ED denied Ms. Baker's application for PSLF on April 12, 2018 on the ground that she had not made 120 qualifying payments.  At that point, she had only made five qualifying payments on her Direct Consolidation Loans.

283.   Ms. Baker also wrote a letter to President Donald Trump regarding her concerns.  The White House forwarded the letter to ED, and ED responded on May 2, 2018 that TEPSLF "may provide you an ability to qualify for loan forgiveness if you otherwise meet the requirements for PSLF and meet other, new requirements."  ED failed to acknowledge any of the servicer misconduct Ms. Baker had alleged.

284.   Per ED's instructions, Ms. Baker applied for TEPSLF by emailing ED on May 23, 2018.  ED denied Ms. Baker TEPSLF on August 29, 2018, on the ground that she had not been in repayment for at least ten years on her Direct Consolidation Loans.

285.   Since receiving this notice, Ms. Baker has continued to faithfully make payments every month on her student loans.

286.   Loan forgiveness under PSLF was not something that Ms. Baker merely crossed her fingers and hoped to get, nor was it just an easy way out of a debt.  It was a tangible, achievable result that Ms. Baker sought to earn by diligently following the instructions she was given by the Title IV servicers and was an integral component of her family's financial plans.

287.   For over ten years, Ms. Baker made regular monthly student loan payments so that she could earn loan forgiveness under PSLF.  She stayed in the repayment plan she was advised to be in, certified her income every year, and continued working every day as a public servant in her community.

288.   When Ms. Baker's son became gravely ill and she had to rush him to specialists around the country, she continued to monitor her student loans.  Even when Ms. Baker's son was terminally ill and required around-the-clock care, Ms. Baker still took the time to double-check all of her student loan payments and ensure

that her loan record was free from errors. Ms. Baker felt that she owed it to her family to do everything she could to relieve them of the burden of her student loans.

289.    After Ms. Baker learned that she had spent ten years diligently making payments on the "wrong" type of loan and that she still had to make at least a decade of payments to be eligible for loan forgiveness, she experienced extreme stress that led to repeated hospitalizations for anxiety and heart palpitations.

290.    Today, Ms. Baker continues to pay close attention to each loan payment, even while caring for sick family members and continuing to work full time.

291.    ED failed to institute an adequate process for considering Ms. Baker's application for loan forgiveness that would have allowed ED to identify and take into account the repeated misrepresentations the Title IV servicers made to Ms. Baker.

292.    ED's denial of Ms. Baker's application for loan forgiveness is arbitrary and capricious in that it fails to take into account the Title IV servicers' misrepresentations.

293.    But for the Title IV servicers' misconduct, Ms. Baker would have made 120 payments qualifying for PSLF; ED should therefore use its general discharge authority to grant Ms. Baker loan forgiveness.

## 2.    Janelle Menzel

294.    Plaintiff Janelle Menzel is a public school teacher in Minnesota.

295.    Ms. Menzel took out Direct Loans to finance her undergraduate education. She began repaying her student loans in 2004 after consolidating them into Direct Consolidation Loans.

296.    Ms. Menzel learned about PSLF in February 2008 and planned to apply after ten years of payments. When her loans were transferred to the Title IV servicer, Nelnet, for servicing in 2010, Ms. Menzel confirmed with Nelnet how to qualify for PSLF. Nelnet told Ms. Menzel that she was on track for PSLF.

297.    Ms. Menzel also asked Nelnet in 2010 about the Teacher Loan For-giveness ("TLF") program, which forgives a portion of student loans for teachers working in eligible low-income schools for five years.  Nelnet informed Ms. Menzel that she could not apply for TLF until she had worked in the same school for five years.  That was false.  TLF is available after five years of teaching in qualifying schools, regardless of whether a teacher remains at the same school, and Ms. Menzel could have applied for TLF for years 2004-2009.

298.    Due to this misrepresentation, Ms. Menzel delayed submitting her TLF application and did not receive TLF until September 2011, covering the years 2007-2011.

299.    Nelnet also did not inform Ms. Menzel that any qualifying payments toward TLF could not also qualify for PSLF, and thus, that she would lose payments made between 2006 and 2011 as PSLF-qualifying payments and have to start the 120-payment count anew when she received the TLF award.

300.    Had Nelnet informed Ms. Menzel that she could have submitted her ap-plication for TLF after working in multiple qualifying schools for five years, Ms. Men-zel would have been able to minimize the impact of TLF on her PSLF-qualifying pay-ments by applying earlier and thus avoiding any overlap between TLF-qualifying payments and PSLF-qualifying payments, or she could have chosen to forgo TLF en-tirely in order to qualify for PSLF more quickly.  Instead, Ms. Menzel only learned that Nelnet had misinformed her seven years after she applied for TLF.  By that time, Ms. Menzel had lost years of qualifying PSLF payments due to Nelnet's misrepresen-tations.

301.    After speaking to Nelnet in 2010 about her continued desire to pursue PSLF, Ms. Menzel tracked her progress toward PSLF forgiveness.  Every time Ms.

Menzel logged into her Nelnet account, she saw a link under her "Account Snapshot" that read "View Loan Benefits and Details," as depicted below.[146]



302.    Clicking on this link led Ms. Menzel to a chart titled "Qualifying Payments."  Every month, the number of qualifying payments would increase when Ms. Menzel made a payment.  Based on her conversation with Nelnet and this monthly chart of "Qualifying Payments," Ms. Menzel believed she was making progress towards PSLF with each loan payment she made.

303.    In October 2016, Ms. Menzel submitted an ECF in anticipation of applying for PSLF the following year.

304.    After her employment was certified, Ms. Menzel's loans were transferred to another Title IV servicer, FedLoan Servicing.

305.    Ms. Menzel then waited for months to hear from FedLoan Servicing about the number of qualifying payments she had made.  Ms. Menzel called FedLoan Servicing multiple times to inquire about the status of her ECF and was told each time that a response was forthcoming.

306.    Ms. Menzel applied for PSLF on June 14, 2018.

---

[146] Ms. Menzel has since been transferred to FedLoan Servicing and can no longer access this screen.

307.    On June 27, 2018, ED denied Ms. Menzel PSLF, informing her that despite her years of repayment, she had made zero qualifying payments for PSLF.

308.    Ms. Menzel immediately applied for TEPSLF.

309.    ED also denied Ms. Menzel's TEPSLF application.  Ms. Menzel called FedLoan Servicing to ask why she was not eligible for TEPSLF and was told for the first time that, as a result of her TLF program award in 2011, five years of her payments did not qualify for TEPSLF.  FedLoan Servicing told her that with these years excluded, she should "give up" on TEPSLF because the limited amount of money available for the program would likely be gone by the time she was eligible.

310.    After ED denied her PSLF and TEPSLF, Ms. Menzel continued paying her student loans.  By the time Ms. Menzel will have fully paid off her student loans, she will be preparing to send her eldest child to college.

311.    At points during her career, Ms. Menzel considered a career outside of education that would have paid a higher salary.  She never sought those opportunities, in part because of the promise of loan forgiveness under PSLF.

312.    In fact, Ms. Menzel thought that if she obtained PSLF, she would be able to save for her children's educational expenses so that they could graduate with minimal student loan debt—something her parents were unable to do for her.

313.    Ms. Menzel describes being denied PSLF as a "slap in the face" because now she will not be able to break the cycle of student loan debt in her family and instead will still be paying off her own student loans when her children enter college.

314.    Ms. Menzel has even discouraged her children from pursuing their own dreams of teaching, advising them that the personal and economic cost of public service is too high.  According to Ms. Menzel, "it pains me to discourage [my children] from a career that is so necessary to the fabric of our society[,] but I know that student loan debt on a teacher's salary is a burden that is tough to conquer."

315.    ED has failed to institute any adequate process to consider Ms. Menzel's application for loan forgiveness that identifies and takes into account Nelnet's misrepresentations to Ms. Menzel about qualifying for PSLF.

316.    ED's denial of Ms. Menzel's application for loan forgiveness is arbitrary and capricious in that it fails to take into account the Title IV servicer's misrepresentations.

317.    But for servicer misconduct, Ms. Menzel would have made 120 qualifying payments for PSLF; ED should therefore use its general discharge authority to grant Ms. Menzel loan forgiveness.

### 3.    Kelly Finlaw

318.    Plaintiff Kelly Finlaw is a middle school art teacher in a New York public school.

319.    Ms. Finlaw took out FFEL Loans to finance her undergraduate degree and took out Direct Loans to finance her graduate degree.

320.    Ms. Finlaw consolidated her FFEL Loans into a FFEL Consolidation Loan in February 2007 and began repayment at that time.  Her Title IV loan servicer for her FFEL Consolidation Loan was Nelnet.

321.    Ms. Finlaw began repayment on her Direct Loans in November 2013. Her Title IV servicer for her Direct Loans was Navient.

322.    Ms. Finlaw informed Nelnet that she intended to apply for PSLF.  Nelnet told Ms. Finlaw that she needed to wait until she had made 120 payments on her student loans.  But Nelnet did not inform Ms. Finlaw that even if she made 120 payments on her student loans, she would not be able to obtain PSLF unless she consolidated her FFEL Loan into a Direct Consolidation Loan and made 120 qualifying payments on that loan.

323.   Ms. Finlaw continued paying her loans, unaware that her FFEL Loan was ineligible for PSLF.

324.   In 2016, Ms. Finlaw received a notice from FedLoan Servicing stating that she had loans that would be eligible for PSLF after having made monthly payments for ten years.   Ms. Finlaw immediately contacted Nelnet to ask for details about how to apply for loan forgiveness through PSLF.

325.   Nelnet falsely informed Ms. Finlaw that she would qualify for PSLF in October 2017.  When Ms. Finlaw asked how many qualifying payments she had made, Nelnet advised her that her payment history was available on her online account. Nelnet advised Ms. Finlaw to simply continue repaying her loans and then submit a PSLF application.  That information was wrong.  Ms. Finlaw's FFEL Loan was not eligible for PSLF, and Ms. Finlaw's Direct Loans had not been in repayment long enough to qualify for PSLF.

326.   Nelnet also falsely informed Ms. Finlaw that she should cease paying her loans because she would be "wasting" her money paying her loans back after they were eligible for forgiveness.

327.   This information was also wrong.  As Ms. Finlaw was not eligible for PSLF in October 2017, going into forbearance in fact caused her loans to accrue interest, which was capitalized after her forbearance ended.

328.   In the fall of 2017, Ms. Finlaw submitted an application for PSLF and requested an administrative forbearance pending a decision on her PSLF application.

329.   Several months later, ED denied Ms. Finlaw's PSLF application on the ground that her FFEL Loan did not qualify for PSLF.

330.   After being denied PSLF, Ms. Finlaw contacted Nelnet to request an explanation and to inquire about why she did not qualify for PSLF.

331.   A Nelnet representative told Ms. Finlaw that Nelnet had received many similar calls from borrowers who were led to believe that they qualified for PSLF.

The Nelnet representative referenced news articles regarding the low PSLF acceptance rate and told Ms. Finlaw that PSLF is a faulty program and a "scam." The representative further informed Ms. Finlaw that the only way for her to qualify for PSLF would be to consolidate all of her loans into a Direct Consolidation Loan.

332.    That information was wrong.  Ms. Finlaw had been in repayment on her Direct Loans on a qualifying repayment plan for nearly five years at that point and would have been eligible for forgiveness of those loans after five more years of payments.  The Nelnet representative did not inform Ms. Finlaw that by consolidating all of her loans, Ms. Finlaw would lose the qualifying payments she had already made on her Direct Loans.

333.    Relying on the Nelnet representative's statements, Ms. Finlaw consolidated her loans into a Direct Consolidation Loan in February 2018 in order to qualify for PSLF.  By doing so, Ms. Finlaw lost almost five years of qualifying payments on her existing Direct Loans.

334.    In April 2018, Ms. Finlaw applied for TEPSLF.  ED denied Ms. Finlaw's TEPSLF application, this time due to insufficient payments on her new Direct Consolidation Loan.

335.    Ms. Finlaw is a passionate teacher who has devoted the last 13 years to teaching art to middle school students in one of the poorest neighborhoods in Manhattan.  Her out-of-pocket spending on art supplies for her students greatly exceeds the amount provided by the school district for instructional materials.

336.    Nevertheless, Ms. Finlaw continues to share her love of teaching and her genuine affection for her students with those around her every day and considers it a privilege to help shepherd them through the tumultuous years of middle school.

337.    Despite her unwavering dedication to her career, Ms. Finlaw has been unable to save for the future or to buy a home in the neighborhood she has served for

13 years.  When she found out that she was denied PSLF, she felt "lied to" and "demoralized as a human."

338.   ED failed to institute an adequate process for considering Ms. Finlaw's application for loan forgiveness that would have allowed ED to identify and take into account the Title IV servicer's repeated misrepresentations.

339.   ED's denial of Ms. Finlaw's application for loan forgiveness is arbitrary and capricious in that it fails to take into account the Title IV servicer's misrepresentations.

340.   But for servicer misconduct, Ms. Finlaw would have made 120 qualifying payments for PSLF; therefore, ED should use its general discharge authority to grant Ms. Finlaw loan forgiveness.

### 4.   Gloria Nolan

341.   Plaintiff Gloria Nolan works for a nonprofit organization in Missouri that empowers communities to provide resources including childcare, education, health, employment, and financial services.

342.   Ms. Nolan took out student loans under the Direct Loan Program to finance her undergraduate and graduate degrees.  In September 2005, after graduating with her master's degree, Ms. Nolan consolidated her loans into Direct Consolidation Loans and began repaying her loans on the graduated repayment plan.

343.   Ms. Nolan learned about PSLF in 2007 when the Program was created, and in 2008, she asked her Title IV servicer, EdFinancial, for more information about how to qualify for PSLF.

344.   EdFinancial told Ms. Nolan that in order to qualify for PSLF, she simply needed to continue making payments on her student loans until she had made 120 payments.  The representative indicated that there was no point in discussing PSLF until she had made the necessary number of payments.  That was wrong, because

Ms. Nolan was making payments on the graduated repayment plan, which is not a qualifying repayment plan for PSLF.  In order to qualify for PSLF, Ms. Nolan had to convert her repayment plan to an income-driven plan.

345.   Ms. Nolan continued repaying her loans on the graduated repayment plan and believed that her loan payments were qualifying payments for PSLF because that is what the Title IV servicer had represented.

346.   In 2014, Ms. Nolan called EdFinancial to make sure she was making progress toward qualifying for PSLF.  After speaking to several customer service representatives who could not answer her questions about PSLF, Ms. Nolan finally spoke to a representative who told her, for the first time, that her payments did not qualify because she was not on a qualifying repayment plan.

347.   Ms. Nolan then switched to the REPAYE plan, a qualifying income-driven repayment plan.

348.   In 2017, Ms. Nolan learned that she could submit ECFs prior to applying for PSLF.  Ms. Nolan submitted ECFs for her current and previous employers, all of which were qualifying employers for PSLF.

349.   FedLoan Servicing rejected Ms. Nolan's ECFs multiple times, stating that they were submitted on an outdated form, or were not legible (even though FedLoan Servicing was able to determine that the handwritten date was wrong), before finally accepting them.  Ms. Nolan's loans were then transferred to another Title IV servicer, FedLoan Servicing.

350.   On January 19, 2019, after making over 120 payments on her student loans, Ms. Nolan applied for PSLF.

351.   At or around the same time, Ms. Nolan applied for TEPSLF.

352.   On February 16, 2019, Ms. Nolan received a notice from FedLoan Servicing and ED that her employer had been verified as a qualifying employer for PSLF.

353.   In or around March 2019, ED denied Ms. Nolan's application for PSLF.

354.    On April 11, 2019, she received a notice from FedLoan Servicing that it had received her TEPSLF application and it was under review.

355.    On April 12, 2019, ED denied Ms. Nolan's TEPSLF because her monthly payment amount for the previous 12 months was less than the amount she would have paid on a qualifying repayment plan.

356.    On the same day, Ms. Nolan contacted FedLoan Servicing to ask why her TEPSLF application had been denied.  FedLoan Servicing told Ms. Nolan that in order to qualify for TEPSLF, she simply needed to make one more payment and then reapply.

357.    Relying on this information from FedLoan Servicing, Ms. Nolan made her May loan payment early, on April 26, 2019, and submitted new PSLF and TEPSLF applications that same day.

358.    On May 4, 2019, Ms. Nolan received a notice that her TEPSLF application had been rejected, despite the additional payment Ms. Nolan made at FedLoan Servicing's direction.  FedLoan Servicing and ED have failed to give Ms. Nolan an explanation for this denial.

359.    On June 4, 2019, ED denied Ms. Nolan's PSLF application.

360.    Ms. Nolan has been dedicated to serving her community for her entire career.  When she was six years old, Ms. Nolan's mother went to prison for ten years, which resulted in Ms. Nolan and her brother becoming wards of the state.

361.    When Ms. Nolan graduated from high school, she did not have the ability to pay for college.  Like many others, she had to take out student loans to fund both her undergraduate and graduate degrees.

362.    After graduating with her master's degree, Ms. Nolan worked at a nonprofit whose aim was to find mentors for children whose parents were incarcerated.

363.    She relied on the promise of forgiveness under PSLF with the hope that she would be able to invest in her children's education.  ED's failures have caused the "incredible weight" of student debt to hang over her indefinitely.

364.    ED failed to institute an adequate process for considering Ms. Nolan's application for loan forgiveness that would have allowed ED to identify and take into account the repeated misrepresentations the Title IV servicer made to Ms. Nolan.

365.    ED's denial of Ms. Nolan's application for loan forgiveness is arbitrary and capricious in that it fails to take into account the Title IV servicer's misrepresentations.

366.    But for servicer misconduct, Ms. Nolan would have made 120 qualifying payments for PSLF; ED should therefore use its general discharge authority to grant Ms. Nolan loan forgiveness.

### 5.    Michael Giambona

367.    Plaintiff Michael Giambona works as a school psychologist for a public mental health program in one of the largest school districts in California.  Dr. Giambona provides outpatient mental health services for students with serious emotional, behavioral, and mental health problems that interfere with their ability to learn.

368.    Dr. Giambona took out student loans under the Direct Loan Program to finance his undergraduate and graduate degrees.  In June 2006, Dr. Giambona consolidated his loans into a FFEL Consolidation Loan and began repaying his loan on the graduated repayment plan.

369.    Since 2008, Dr. Giambona has worked full time for a pioneering public mental health program administered jointly by the school system and the county department of public health.  This innovative program has grown from one part-time counselor to an entire staff of public health professionals dedicated to serving at-risk

students.  Dr. Giambona provides critical mental health services to students whose families face extreme difficulty in accessing care.

370.   When Dr. Giambona learned about PSLF in 2008, shortly after the Program was created, he asked the Title IV servicer of his loan for more information about how to qualify for PSLF.

371.   In response to his questions, the Title IV servicer assured him that he would qualify for loan forgiveness in ten years so long as he continued working in public service and making his loan payments in full and on time.  The servicer instructed him to call back in two years when more information about PSLF would be available.

372.   In fact, because Dr. Giambona's Direct Loan had been consolidated into a FFEL Consolidation Loan in 2006, his loan did not qualify for PSLF.  To qualify for PSLF, Dr. Giambona needed to reconsolidate his loan into a Direct Consolidation Loan and enroll in an income-driven repayment plan.  Instead, after being assured by the Title IV servicer that he would qualify after ten years of payments, Dr. Giambona continued making payments and serving his community.

373.   As instructed, Dr. Giambona called his servicer again in 2010 to request further information about PSLF.

374.   The Title IV servicer assured him that since he had federal student loans and worked in a public service position, he would be eligible for loan forgiveness after ten years of payments.  The servicer instructed him to call back again in a few years when he was closer to the ten-year mark in order to obtain information about how to apply.

375.   Having been twice assured by the Title IV servicer that the balance of his loan would be forgiven after ten years of payments and that he need not call back for further information on PSLF until he neared the ten-year mark, Dr. Giambona

made a note to call again in a few years and continued making his payments while serving his community.

376.   For the next six years, Dr. Giambona continued to put thousands of miles on his car providing mental health services to students in the seven cities that make up his school district.  He spent thousands of dollars out of his own pocket on books, games, and clinical trainings.  He earned his doctorate in school psychology while taking on no additional debt.  He did this while making every single payment, on time and in full, believing that his loan would be forgiven.

377.   As instructed, Dr. Giambona called the Title IV servicer of his loan, now Navient, in 2016 to obtain information about PSLF.  Navient viewed his student loan account and payment history and told him that since he had not missed a single payment since PSLF was instituted, he would be eligible for loan forgiveness in 2017 so long as he continued making payments and working for a qualifying employer.  Navient told Dr. Giambona that he should contact Navient or ED to obtain the PSLF application form in late 2017 when he would be eligible for forgiveness.

378.   As instructed, in late 2017, after making 120 payments, Dr. Giambona obtained the PSLF application from ED's website and submitted it to FedLoan Servicing.

379.   In October 2017, ED denied Dr. Giambona's application for PSLF.

380.   Dr. Giambona contacted FedLoan Servicing to ask why his PSLF application had been denied.  FedLoan Servicing did not explain that his FFEL Loan did not qualify for PSLF and instead told Dr. Giambona to change his graduated repayment plan to an income-driven repayment plan.

381.   In 2018, when Dr. Giambona learned that TEPSLF could provide loan forgiveness for public servants who were denied PSLF because their payments were made on a nonqualifying payment plan, he applied immediately.

91

382.    On June 6, 2018, ED denied Dr. Giambona's TEPSLF application for failure to apply for PSLF.

383.    Dr. Giambona sent another PSLF application to ED and received a notice on June 15, 2018 that his application had been received.

384.    Shortly thereafter, ED denied Dr. Giambona's PSLF application.

385.    Dr. Giambona reapplied for TEPSLF on July 6, 2018.

386.    On August 30, 2018, ED denied Dr. Giambona's TEPSLF application because he did not have any Direct Loans.

387.    Dr. Giambona called FedLoan Servicing to ask why his loans were not eligible for TEPSLF.

388.    For the first time, FedLoan Servicing informed Dr. Giambona that his Direct Loans were consolidated into a FFEL Loan in 2006, making them ineligible for PSLF.

389.    This information was a "punch in the gut" to Dr. Giambona, who had planned his and his family's future based on assurances received from the Title IV servicers that his student loan debt would be forgiven after ten years of payments.

390.    Dr. Giambona has dedicated his entire career to serving his community. For eleven years, Dr. Giambona has provided critical mental health services to students who would otherwise be left behind by the medical system. He is passionate about addressing the complex needs of the community he serves. Dr. Giambona is particularly focused on helping the students in his community cope with the trauma they frequently face.

391.    Dr. Giambona's trust in the Title IV servicers has come at great personal cost. Facing overwhelming debt from years of infertility treatments, Dr. Giambona and his wife nearly lost their home and relied on family and friends to get by. Nevertheless, Dr. Giambona never once requested a forbearance and never missed a single loan payment. With nearly $100,000 in federal student debt still hanging over

his head after ten years of misinformation from the Title IV servicers, Dr. Giambona's plans for his family's financial future have been dealt a devastating blow.

392.   ED has failed to institute an adequate process for considering Dr. Giambona's application for loan forgiveness that would have allowed ED to identify and take into account the repeated misrepresentations Title IV servicers made to Dr. Giambona.

393.   ED's denial of Dr. Giambona's application for loan forgiveness is arbitrary and capricious in that it fails to take into account the Title IV servicers' misrepresentations.

394.   But for servicer misconduct, Dr. Giambona would have made 120 qualifying payments for PSLF; ED should therefore use its general discharge authority to grant Dr. Giambona loan forgiveness.

## CAUSES OF ACTION

### COUNT I – ARBITRARY AND CAPRICIOUS AGENCY ACTION DUE TO ADMINISTRATIVE PROCESSING ERRORS PURSUANT TO 5 U.S.C. § 706(2)(A) (ADMINISTRATIVE ERROR PLAINTIFFS AGAINST DEFENDANTS)

395.   Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 394 (and all subparts thereto) as if set forth fully herein.

396.   ED's decisions with respect to the Administrative Error Plaintiffs Cynthia Miller, Crystal Adams, and Connie Wakefield's PSLF (including TEPSLF) applications constituted final agency action.

397.   No further exhaustion is necessary, and in any event, attempts at further exhaustion would be futile.

   a. Ms. Miller has repeatedly contested her qualifying payment count for PSLF (including TEPSLF), and ED continues to fail to acknowledge its payment counting errors.

   b. Ms. Adams has repeatedly contested her qualifying payment count

93

for PSLF (including TEPSLF), and ED continues to fail to acknowledge its payment counting errors.

c. Ms. Wakefield has repeatedly contested her qualifying payment count for PSLF (including TEPSLF), and ED continues to fail to acknowledge its payment counting errors.

398. ED's decisions with respect to the Administrative Error Individual Plaintiffs' PSLF (including TEPSLF) applications were arbitrary and capricious, in that ED failed to consider an important aspect of the problem and made clear errors in judgment.

399. ED's denials of the Administrative Error Plaintiffs' PSLF (including TEPSLF) applications were arbitrary and capricious because those denials involved clear errors in judgment by ED based on arbitrary errors in the processing of Ms. Miller, Ms. Adams, and Ms. Wakefield's applications. Specifically, ED rendered a decision on their applications for PSLF (including TEPSLF) that was contrary to the evidence before it:

a. Ms. Miller has been in repayment since 2007 and has made 120 or more qualifying payments; however, ED incorrectly claims that she was in forbearance for six years of that time period, preventing her from being eligible for PSLF. After several attempts to correct her qualifying payment amount, Ms. Miller has only received inconsistent and incorrect information about her status and no help from ED.

b. Ms. Adams has been in repayment since 2007 and has made 120 or more payments. Although some of her payments were made on a nonqualifying repayment plan, she was eligible for TEPSLF. The servicer informed her that she was only seven payments away from TEPSLF, but after making those seven payments, her TEPSLF qualifying payment amount has continued to go up and down without any explanation.

c. Ms. Wakefield has been in repayment since 2006 and has made 120 or more qualifying payments. All of her payments were made on a qualifying repayment plan while she was working for a qualifying employer and were paid using auto debit. ED nonetheless has continued to deny her applications for PSLF (including TEPSLF).

> After several attempts to correct her qualifying payment amount, Ms. Wakefield has only received inconsistent and incorrect information about her status and no help from ED.

400.    ED's arbitrary and capricious PSLF and TEPSLF determinations violated the APA and unlawfully deprived the Administrative Error Plaintiffs of a federal entitlement.   Accordingly, Plaintiffs request an order vacating the Administrative Error Plaintiffs' PSLF denials and remanding to ED with specific instructions to approve their PSLF applications as required under 20 U.S.C. § 1087e(m) or in the alternative, an order retaining jurisdiction and remanding to ED for further action with respect to each Administrative Error Plaintiff, consistent with the APA.

## COUNT II – INADEQUATE NOTICE OF DENIALS PURSUANT TO 5 U.S.C. § 555(e) (ADMINISTRATIVE ERROR PLAINTIFFS AGAINST DEFENDANTS)

401.    Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 400 (and all subparts thereto) as if set forth fully herein.

402.    ED's decision with respect to the Administrative Error Plaintiffs Cynthia Miller, Crystal Adams, and Connie Wakefield's PSLF (including TEPSLF) applications constituted a final agency action.

403.    No further exhaustion is necessary, and in any event, attempts at further exhaustion would be futile.

a.  Ms. Miller has repeatedly contested her qualifying payment count for PSLF (including TEPSLF), and ED continues to fail to acknowledge its payment counting errors.

b.  Ms. Adams has repeatedly contested her qualifying payment count for PSLF (including TEPSLF), and ED continues to fail to acknowledge its payment counting errors.

c.  Ms. Wakefield has repeatedly contested her qualifying payment count for PSLF (including TEPSLF), and ED continues to fail to acknowledge its payment counting errors.

404.    The APA provides that "[p]rompt notice shall be given of the denial in

whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding." 5 U.S.C. § 555(e). "Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial." *Id.*

405.   ED's denials with respect to the Administrative Error Plaintiffs' PSLF (including TEPSLF) applications violated 5 U.S.C. § 555(e) of the APA, which requires, at a minimum, "a brief statement of the grounds for denial," because ED failed to explain why the Administrative Error Plaintiffs' 120 payments did not qualify for loan forgiveness.

    a. Ms. Miller has been in repayment since 2007 and has made 120 or more qualifying payments, entitling her to PSLF (or TEPSLF). ED denied Ms. Miller PSLF (and TEPSLF) without providing an explanation as to why her payments purportedly were not qualifying.

    b. Ms. Adams has been in repayment since 2007 and has made 120 or more payments. Although some of her payments were made on a nonqualifying repayment plan, her payments were qualifying for purposes of TEPSLF. ED denied Ms. Adams's PSLF and TEPSLF applications without providing an explanation as to why her payments purportedly were not qualifying.

    c. Ms. Wakefield has been in repayment since 2006 and has made 120 or more qualifying payments, entitling her to PSLF. ED repeatedly denied Ms. Wakefield PSLF without providing an explanation as to why her payments purportedly were not qualifying.

406.   ED's PSLF and TEPSLF denials with respect to the Administrative Error Plaintiffs violated the APA by omitting any explanation as to why ED determined that the 120 payments each Administrative Error Plaintiff made were not qualifying, thereby failing to provide a basis upon which to conclude the denials were the product of reasoned decision-making. Accordingly, Plaintiffs request an order vacating the Administrative Error Plaintiffs' PSLF and TEPSLF denials.

**COUNT III – VIOLATION OF DUE PROCESS DUE TO ADMINISTRATIVE
PROCESSING ERRORS PURSUANT TO THE FIFTH AMENDMENT TO
THE U.S. CONSTITUTION (ADMINISTRATIVE ERROR PLAINTIFFS AND
AFT AGAINST DEFENDANTS)**

407.   Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 406 (and all subparts thereto) as if set forth fully herein.

408.   The Fifth Amendment provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law."  Due process requires that, at a minimum, individuals receive notice and an opportunity to be heard before they are deprived of property.

409.   The Administrative Error Plaintiffs Cynthia Miller, Crystal Adams, and Connie Wakefield have constitutionally protected property interests in a government benefit to which they are legitimately entitled, namely their statutory interest in PSLF (including TEPSLF).

410.   Plaintiff AFT has organizational standing to bring this Fifth Amendment claim on its own behalf and associational standing to bring this claim on behalf of its members who have standing to bring the claim, including Plaintiffs Miller, Adams, and Wakefield, and Plaintiff Weingarten has standing to bring this claim in her official capacity as President of AFT.

411.   20 U.S.C. § 1087e(m) contains mandatory language that ED "shall cancel the balance of interest and principal due" for borrowers who qualify for PSLF. Thus, 20 U.S.C. § 1087e(m) creates a cognizable property interest for applicants in PSLF benefits.  By enacting TEPSLF, the Consolidated Appropriations Act of 2018 created an additional statutory pathway to reach the property interest of PSLF benefits.

412.   The Administrative Error Plaintiffs Cynthia Miller, Crystal Adams, and Connie Wakefield were each deprived of a property interest when ED denied their applications for PSLF (including TEPSLF) due to ED's own processing errors.  ED

97

denied these Administrative Error Plaintiffs their right to PSLF (including TEPSLF) without adequate process.

a.  ED has failed to institute an adequate process to identify and account for errors ED and Title IV servicers made in determining Ms. Miller's eligibility for loan forgiveness.  After several attempts to correct her qualifying payment count, Ms. Miller has received inconsistent and incorrect information about the number of qualifying payments she has made.  After ED denied Ms. Miller's PSLF application and she requested additional information as to the reason for the denial, Ms. Miller received only densely printed records in code with no information about how to read them.  Ms. Miller emailed ED to ask about the status of the promised letter detailing the results of FedLoan Servicing's review of her file and to ask for additional information about the documents they had sent her.  ED never responded.

b.  ED has failed to institute an adequate process to identify and account for errors ED and Title IV servicers made in determining Ms. Adams's eligibility for loan forgiveness.  Instead, ED, through FedLoan Servicing, informed her that she was only seven payments away from TEPSLF, but after making those seven payments, her TEPSLF qualifying payment amount has continued to go up and down without any explanation or acknowledgement.

c.  ED has failed to institute an adequate process to identify and account for errors ED and Title IV servicers made in determining Ms. Wakefield's eligibility for loan forgiveness.  After several attempts to correct her qualifying payment amount, Ms. Wakefield has received inconsistent and incorrect information about the number of qualifying payments she has made.

413.   The Due Process Clause requires ED to implement a process that gives applicants for PSLF (including TEPSLF) adequate notice of the reasons for its denials of PSLF and TEPSLF applications and a meaningful process to identify and account for issues related to applicants' eligibility for this statutory entitlement to PSLF (including TEPSLF), including payment counting issues.

414.   ED's current PSLF (including TEPSLF) application processes do not provide applicants with adequate notice of the reasons for their denial, including the

evidence upon which ED relied in reaching its decision.  Nor do ED's current application processes provide applicants a meaningful process to contest the denial, present additional evidence of their eligibility for PSLF (including TEPSLF) and ensure that ED will take account of its errors.

415.   Due process requires ED to adopt PSLF (including TEPSLF) processes to allow applicants to raise issues and be heard as to their eligibility, including allowing them to identify ED's errors.  Such additional process is reasonable in light of the importance of the private interests affected—the PSLF benefit around which millions of borrowers have organized their lives.

416.   Borrowers are at risk of arbitrary and erroneous deprivation absent additional procedural safeguards.  Such process would place only limited additional burden on ED relative to the importance of providing borrowers with the statutory entitlement of PSLF.

417.   To remedy these Due Process violations, the Individual Plaintiffs and AFT, on behalf of itself and its members, request:  (i) an order vacating ED's PSLF and TEPSLF denial action with respect to each Administrative Error Plaintiff; (ii) an order requiring ED to provide (a) PSLF and TEPSLF applicants with adequate notice of the grounds for their denial, including the specific reasons for the denial, including but not limited to, information concerning the months of alleged missed or disqualifying payments and the reason ED did not count those payments, as well as the evidence ED relied upon in denying the application; (b) a meaningful decision-making process that minimizes the risk of erroneous determinations, and includes a meaningful opportunity to identify and account for errors made by ED and/or the Title IV servicers, through which applicants may contest their denial and introduce evidence rebutting ED's determination; and (c) a written and reasoned explanation for its determination within a reasonable time period.

**COUNT IV – ARBITRARY AND CAPRICIOUS AGENCY ACTION DUE TO SERVICER MISCONDUCT PURSUANT TO 5 U.S.C. § 706(2) (SERVICER MISCONDUCT PLAINTIFFS AGAINST DEFENDANTS)**

418.   Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 417 (and all subparts thereto) as if set forth fully herein.

419.   ED's decisions with respect to the Servicer Misconduct Plaintiffs Deborah Baker, Janelle Menzel, Kelly Finlaw, Gloria Nolan, and Michael Giambona's PSLF (including TEPSLF) applications constituted final agency action.

420.   No further exhaustion is necessary and, in any event, attempts at further exhaustion would be futile.

    a.   Because Ms. Baker had FFEL Loans until 2017, while Title IV servicers repeatedly informed her she was on track for PSLF, her further attempts to apply for PSLF at this point would be futile as she has not made 120 qualifying payments on Direct Loans.

    b.   Because Ms. Menzel spent years on the wrong repayment plan while the Title IV servicer informed her she was making progress toward PSLF, her further attempts to apply for PSLF at this point would be futile as she has not made 120 payments on a qualifying repayment plan.

    c.   Because Ms. Finlaw had a FFEL Loan until 2018, while the Title IV servicer informed her she was on track for PSLF, her further attempts to apply for PSLF at this point would be futile as she has not made 120 qualifying payments on Direct Loans.

    d.   Because Ms. Nolan spent years on the wrong repayment plan while the Title IV servicer informed her she was making progress toward PSLF, her further attempts to apply for PSLF at this point would be futile as she has not made 120 payments on a qualifying repayment plan.

    e.   Because Dr. Giambona had a FFEL Loan, while Title IV servicers informed him he was on track for PSLF, his further attempts to apply for PSLF at this point would be futile as he has not made 120 qualifying payments on Direct Loans.

421.   As set forth in paragraphs 240 through 246, ED knows about Title IV servicers' widespread misrepresentations, which preclude borrowers from qualifying

for loan forgiveness, but disregards those misrepresentations in denying PSLF
(including TEPSLF).

422.   With respect to the Servicer Misconduct Plaintiffs, ED's denial of PSLF
(including TEPSLF) was arbitrary and capricious because ED failed to consider that
the Individual Plaintiffs' Title IV servicers engaged in misconduct that precluded
Plaintiffs from satisfying the PSLF (including TEPSLF) requirements.

    a.  ED failed to consider that Title IV servicers told Ms. Baker that she
was on track for PSLF, and that but for those misrepresentations,
Ms. Baker would have consolidated her FFEL Loans into Direct
Loans in 2007 and would have been eligible for PSLF.

    b.  ED failed to consider that the Title IV servicer told Ms. Menzel she
was on track for PSLF and provided Ms. Menzel with a qualifying
payment count on its website every month, and that but for the
servicer's misrepresentations, Ms. Menzel would have switched to a
qualifying repayment plan and would have been eligible for PSLF.

    c.  ED failed to consider that the Title IV servicer advised Ms. Finlaw to
make ten years of payments and then she would be eligible for
forgiveness, and that but for the servicer's misrepresentations, she
would have consolidated her FFEL Loan into a Direct Loan and
would have been eligible for PSLF.

    d.  ED failed to consider that the Title IV servicer told Ms. Nolan that
she was making progress toward PSLF, and that but for the
servicer's misrepresentations, Ms. Nolan would have switched to a
qualifying repayment plan and would have been eligible for PSLF.

    e.  ED failed to consider that Title IV servicers told Dr. Giambona to
make ten years of payments and then he would be eligible for
forgiveness, and that but for the servicers' misrepresentations, he
would have consolidated his FFEL Consolidation Loan into a Direct
Loan and would have been eligible for PSLF.

423.   ED's arbitrary and capricious PSLF and TEPSLF determinations vio-
lated the APA and unlawfully deprived these individuals of a federal entitlement.
Accordingly, Plaintiffs request an order vacating the Servicer Misconduct Plaintiffs'
PSLF (including TEPSLF) denials and remanding to ED with specific instructions to

discharge their student loan debt pursuant to ED's general discharge authority under 20 U.S.C. § 1082(a)(4) and 20 U.S.C. § 1087a(b)(2) or in the alternative, an order retaining jurisdiction and remanding to ED for further action with respect to each Servicer Misconduct Plaintiff named herein, consistent with the APA.

### COUNT V – VIOLATION OF DUE PROCESS DUE TO SERVICER MISCONDUCT PURSUANT TO THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION (SERVICER MISCONDUCT PLAINTIFFS AND AFT AGAINST DEFENDANTS)

424. Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 423 (and all subparts thereto) as if set forth fully herein.

425. The Fifth Amendment provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law." Due process requires that, at a minimum, individuals receive notice and an opportunity to be heard before they are deprived of property.

426. Servicer Misconduct Plaintiffs Deborah Baker, Janelle Menzel, Kelly Finlaw, Gloria Nolan, and Michael Giambona have constitutionally protected property interests in a government benefit to which they are legitimately entitled, namely their statutory interest in PSLF (including TEPSLF).

427. As explained above, Plaintiff AFT has organizational standing to bring this Fifth Amendment claim on its own behalf and associational standing to bring this claim on behalf of its members who have standing to bring the claim, and Plaintiff Weingarten has standing to bring this claim in her official capacity as President of AFT.

428. 20 U.S.C. § 1087e(m) contains mandatory language requiring ED to cancel the balance of interest and principal due from borrowers who qualify for PSLF. Thus, 20 U.S.C. § 1087e(m) creates a cognizable property interest for applicants in PSLF benefits. By enacting TEPSLF, the Consolidated Appropriations Act of 2018 created an additional statutory pathway to reach the property interest of PSLF

benefits.

429.   The Servicer Misconduct Plaintiffs were each deprived of a property interest in PSLF when ED denied their applications for PSLF (including through TEPSLF), even though their ineligibility was due to misrepresentations made by Title IV servicers.   ED denied these Individual Plaintiffs their right to PSLF (including TEPSLF) without adequate process.

   a.   In determining Ms. Baker's eligibility for loan forgiveness, ED failed to institute an adequate process to account for misrepresentations made to Ms. Baker by Title IV servicer(s).

   b.   In determining Ms. Menzel's eligibility for loan forgiveness, ED failed to institute an adequate process to account for misrepresentations made to Ms. Menzel by Title IV servicer(s).

   c.   In determining Ms. Finlaw's eligibility for loan forgiveness, ED failed to institute an adequate process to account for misrepresentations made to Ms. Finlaw by the Title IV servicer(s).

   d.   In determining Ms. Nolan's eligibility for loan forgiveness, ED failed to institute an adequate process to account for misrepresentations made to Ms. Nolan by the Title IV servicer(s).

   e.   In determining Dr. Giambona's eligibility for loan forgiveness, ED failed to institute an adequate process to account for misrepresentations made to Dr. Giambona by the Title IV servicer(s).

430.   The Due Process Clause requires ED to implement a process that gives PSLF (including TEPSLF) applicants adequate notice of the reasons for their denial and a meaningful process to identify and account for issues related to applicants' eligibility for this statutory entitlement to PSLF, including misinformation provided by servicers.

431.   ED's current PSLF (including TEPSLF) application processes do not provide applicants with adequate notice of the reasons for their denial, including the evidence upon which ED relied in reaching its decision.   Nor do ED's current application processes provide applicants a meaningful opportunity to contest the

denial, to present additional evidence of their eligibility for PSLF (including TEPSLF), and to ensure that ED will take account of Title IV servicers' misconduct.

432.   Due process requires ED to adopt PSLF (including TEPSLF) processes that allow applicants to raise issues and be heard as to their eligibility, including allowing them to identify the Title IV servicers' misconduct.  Such additional process is reasonable in light of the importance of the private interests affected—the PSLF (including TEPSLF) benefit around which millions of borrowers have organized their lives.

433.   Borrowers are at risk of erroneous and arbitrary deprivation absent additional procedural safeguards.  Such process would place only limited additional burden on ED relative to the importance of providing borrowers with the statutory entitlement of PSLF (including TEPSLF).

434.   To remedy these Due Process violations, the Servicer Misconduct Plaintiffs and AFT, on behalf of its members, request:  (i) an order vacating ED's PSLF and TEPSLF denial actions with respect to each Servicer Misconduct Plaintiff; (ii) an order requiring ED to provide (a) PSLF and TEPSLF applicants with adequate notice of the grounds for their denial, including the specific reasons for the denial, and including but not limited to, the evidence ED relied upon in denying the application; (b) a meaningful decision-making process to account for misrepresentations made by ED and/or Title IV servicers, through which applicants may contest their denial and introduce evidence rebutting ED's determination and/or demonstrate that ED should exercise its general discharge authority to issue forgiveness; and (c) a written and reasoned determination within a reasonable time period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief as follows:

*First*, a declaration that ED's denials of the Individual Plaintiffs' PSLF (including TEPSLF) applications violate the Administrative Procedure Act and violate the Fifth Amendment's Due Process Clause.

*Second*, a declaration that ED's PSLF (including TEPSLF) application processes deprive Plaintiffs of their constitutional right to due process by depriving them of a protected property right in PSLF.

*Third*, with respect to Counts I, II, and IV, an order vacating ED's PSLF (including TEPSLF) denial actions with respect to each Individual Plaintiff named herein.

*Fourth*, with respect to Counts I and IV, an order remanding to ED with direction for ED to approve each of the Individual Plaintiffs' requests for forgiveness, whether under 20 U.S.C. 1087e(m) or ED's general discharge authority, or in the alternative, an order retaining jurisdiction and remanding to ED for further action with respect to each Individual Plaintiff named herein, consistent with the APA.

*Fifth*, with respect to Counts III and V, an order vacating ED's PSLF (including TEPSLF) denial actions with respect to each Individual Plaintiff named herein.

*Sixth*, with respect to Counts III and V, on behalf of AFT, an order requiring ED to provide notice to any and all applicants denied PSLF (including TEPSLF) relief sufficient to enable the applicant to determine the reason for such denial including, but not limited to, information concerning the months of alleged missed or disqualifying payments and the reasons ED did not count those payments, or any other basis for the denial.

*Seventh*, with respect to Counts III and V, on behalf of AFT, an order requiring ED to provide applicants denied PSLF (including TEPSLF) with a meaningful process to account for errors and misrepresentations made by ED and/or Title IV servicers, through which applicants may contest their denial and introduce evidence rebutting ED's determination and/or demonstrate that ED should exercise its general discharge

authority to issue forgiveness, and a written and reasoned determination within a reasonable time period.

*Eighth*, an order requiring ED to provide the Court with a status report detailing steps taken to comply with this Court's order, including copies of all instructions, guidelines, or other information sent to Title IV servicers.

*Ninth*, on behalf of AFT, an order retaining jurisdiction and enjoining ED from denying PSLF and TEPSLF applications until the Court has approved ED's proposed procedures to alleviate the violations alleged herein.

*Tenth*, such other and further relief as the nature of the case may require or as may be determined proper by this Court.

Dated:  July 11, 2019
       New York, NY

Respectfully submitted,

SELENDY & GAY PLLC

By:  /s/ Margaret M. Siller

Mark Richard (D.C. Bar No. 1033699)
PHILLIPS, RICHARD & RIND, P.A.
9360 SW 72 Street, Suite 283
Miami, FL 33173
Telephone: (305) 412-8322
E-mail: mrichard@phillipsrichard.com

*Attorneys for Plaintiffs Weingarten & AFT*

Aaron Ament*
Daniel A. Zibel (D.C. Bar No. 491377)
Robyn K. Bitner (D.C. Bar No. 1617036)
NATIONAL STUDENT LEGAL
DEFENSE NETWORK
1015 15th Street N.W., Suite 600
Washington, D.C. 20005
Telephone: (202) 734-7496
E-mail: aaron@nsldn.org
      dan@nsldn.org
      robyn@nsldn.org

*Attorneys for Plaintiffs Weingarten & AFT*

Faith Gay*
Caitlin Halligan*
Maria Ginzburg*
Yelena Konanova*
Margaret M. Siller (D.C. Bar No. 230475)
SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 390-9000
E-mail: fgay@selendygay.com
      challigan@selendygay.com
      mginzburg@selendygay.com
      lkonanova@selendygay.com
      msiller@selendygay.com

*Attorneys for Plaintiffs*

*\*Pro hac vice* forthcoming