**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**RANDI WEINGARTEN**, *in her official capacity as President of the American Federation of Teachers, AFL-CIO*,

**AMERICAN FEDERATION OF TEACHERS, AFL-CIO,**

**CYNTHIA MILLER,**

**CRYSTAL ADAMS,**

**CONNIE WAKEFIELD,**

**DEBORAH BAKER,**

**JANELLE MENZEL**

**KELLY FINLAW,**

**GLORIA NOLAN, and**

**MICHAEL GIAMBONA**

        Plaintiffs,

v.

**ELISABETH DEVOS**, *in her official capacity as the Secretary of the United States Department of Education*, and

**UNITED STATES DEPARTMENT OF EDUCATION**

        Defendants.

Civil Action No. 1:19-cv-02056 (DLF)

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' PARTIAL MOTION TO DISMISS COUNTS III, IV, AND V AND TO DISMISS PLAINTIFFS RANDI WEINGARTEN AND AMERICAN FEDERATION OF TEACHERS, AFL-CIO**</u>

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 3

    A.   Statutory and Regulatory Background ................................................ 3

    B.   Mechanics of the PLSF Program ........................................................ 7

    C.   Congressional and Executive Branch Oversight................................. 8

    D.   The Complaint ................................................................................... 11

STANDARD OF REVIEW ............................................................................................... 15

ARGUMENT ................................................................................................................... 16

I.   PLAINTIFFS ARE PRECLUDED FROM RAISING A PROGRAMMATIC
    CHALLENGE TO THE DEPARTMENT'S ADMINISTRATION OF THE
    PSLF/TEPSLF PROGRAMS ................................................................... 16

    A.   Plaintiffs' Artful Pleading of Their Claims under Counts III and V
        as Due Process Violations Should Not Be Countenanced
        Given that Identical Claims Brought under the APA Would Be Foreclosed ....... 17

    B.   Plaintiffs' Programmatic Challenges Should Be Dismissed................................ 18

        1.   *Counts III and V of the Complaint Seek a Court Order*
             *Directing Wholesale  Changes to the PSLF Program* ................................ 18

        2.   *Wholesale Programmatic Changes Are Foreclosed*
             *under Long-Standing Precedent* ................................................................ 19

        3.   *Oversight of and Corrections to the PSLF Program*
             *Are the Responsibility of Congress and the Executive Branch* .................... 23

II.  INELIGIBLE PLAINTIFFS LACK STANDING AND FAIL
    TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED ....................... 25

    A.   Count IV Should Be Dismissed Because
        the Ineligible Plaintiffs Lack Standing to Bring It................................. 26

    B.   Count IV Should Be Dismissed For Failure to State a Claim.............................. 29

III. AFT LACKS BOTH ORGANIZATIONAL AND ASSOCIATION STANDING ......... 30

    A.   AFT Lacks Organizational Standing ................................................. 30

    B.   AFT Lacks Association Standing ...................................................... 32

CONCLUSION................................................................................................................. 34

# TABLE OF AUTHORITIES

## CASES

*Abigail All. For Better Access to Developmental Drugs v. Eschenbach*,
  469 F.3d 129 (D.C. Cir. 2006) ................................................................................. 31

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................ 16

*Bank of Am. NT & SA v. Riley*,
  940 F. Supp. 348 (D.D.C. 1996), *aff'd*, 132 F.3d 1480 (D.C. Cir. 1997) .......... 28, 29

*Barr v. Clinton*,
  370 F.3d 1196 (D.C. Cir. 2004) .............................................................................. 16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................ 16

*Boehm v. Comm'r*,
  326 U.S. 287 (1945) ................................................................................................ 27

*Budik v. Ashley*,
  36 F. Supp. 3d (D.D.C. 2014) ................................................................................. 15

*Busby v. Capital One, N.A.*,
  932 F. Supp. 2d 114 (D.D.C. 2013) ...................................................................... 5, 6

*Chiayu Chang v. U.S. Citizenship & Immigration Servs.*,
  254 F. Supp. 3d 160 (D.D.C. 2017) ........................................................................ 17

*Cigar Ass'n of Am. v. FDA.*,
  323 F.R.D. 54 (D.D.C. 2017).................................................................................... 32

*City of New York v. U.S. Dep't of Def.*,
  913 F.3d 423 (4th Cir. 2019)........................................................................ 20, 23, 25

*Cobell v. Norton*,
  240 F.3d 1081 (D.C. Cir. 2001) .............................................................................. 23

*Cobell v. Norton*,
  392 F.3d 461 (D.C. Cir. 2004) ................................................................................ 21

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. FDIC*,
  No. 14-cv-953, 2016 WL 7376847 (D.D.C. Dec. 19, 2016)............................... 32, 34

*Covad Commc'ns Co. v.Bell Atl. Corp,*
  407 F.3d 1220 (D.C. Cir. 2005) ........................................................................ 6

*\*Del Monte Fresh Produce N.A., Inc. v. United States,*
  706 F. Supp. 2d 116 (D.D.C 2010) ...................................................... 21, 22, 23, 25

*Environmental Working Grp. v. FDA,*
  301 F. Supp. 3d 165, (D.D.C. 2018) .............................................................. 31, 32

*FTC v. Anderson,*
  631 F.2d 741 (D.C. Cir. 1979) ........................................................................ 29

*Fares v. Smith,*
  249 F. Supp. 3d 115 (D.D.C. 2017), *aff'd,* 901 F.3d 315 (D.C. Cir. 2018) ............................ 17

*Fla. Audubon Soc'y v. Bentsen,*
  94 F.3d 658 (D.C. Cir. 1996) ........................................................................ 26

*\*Food & Water Watch, Inc. v. Vilsack,*
  808 F.3d 905 (D.C. Cir. 2015) .............................................................. 30, 31, 32

*Friends for American Free Enter. Ass'n v. Wal-Mart Stores, Inc.,*
  284 F.3d 575 (5th Cir. 2002) ........................................................................ 34

*Friends of Earth, Bluewater Network Div. v. U.S. Dep't of Interior,*
  478 F. Supp. 2d 11 (D.D.C. 2007) .................................................................... 23

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) .................................................................................. 30

*Hegab v. Long,*
  716 F.3d 790 (4th Cir. 2013) ........................................................................ 17

*Herbert v. Nat'l Acad. of Scis.,*
  974 F.2d 192 (D.C. Cir. 1992) ........................................................................ 15

*Hovhannisyan v. Holder,*
  577 F. App'x 748 (9th Cir. 2014) .................................................................... 30

*Judicial Watch, Inc. v. FBI,*
  No. CV 18-2316 (RC), 2019 WL 4194501 (D.D.C. Sept. 4, 2019) ........................................... 5

*\*Kan. Health Care Ass'n v. Kan. Dep't of Social and Rehab. Servs.,*
  958 F.2d 1018 (10th Cir. 1992) ...................................................................... 34

iv

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ...................................................................................... 15

*Kowal v. MCI Commc'ns Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994) ...................................................................... 16

*Ky. Dep't of Corr. v. Thompson*,
    490 U.S. 454 (1989) ...................................................................................... 32

*\*Long Term Care Pharmacy All. v. Leavitt*,
    530 F. Supp. 2d 173 (D.D.C. 2008) ......................................................... 18, 22

*Long Term Care Pharmacy All. v. UnitedHealth Group, Inc.*,
    498 F. Supp. 2d 187 (D.D.C. 2007) ......................................................... 33, 34

*Lozansky v. Obama*,
    841 F.Supp.2d 124 (D.D.C. 2012) ................................................................ 26

*\*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ............................................................................. *passim*

*Lujan v. Defs. Of Wildlife*,
    504 U.S. 555 (1992) ...................................................................................... 26

*Mashiri v. Dep't of Educ.*,
    724 F.3d 1028 (9th Cir. 2013) ...................................................................... 29

*Nat'l Ass'n of Home Builders v. EPA*,
    667 F.3d 6 (D.C. Cir. 2011) .......................................................................... 26

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995) ...................................................................... 32

*\*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) .................................................................... 30

*Newdow v. Roberts*,
    603 F.3d 1002 (D.C. Cir. 2010) .................................................................... 26

*\*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ............................................................................... *passim*

*PETA v. U.S. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015) ............................................................... 30, 31

*Rent Stabilization Ass'n of New York City, Inc. v. Dinkins*,
  805 F. Supp. 159 (S.D.N.Y. 1992), *aff'd*, 5 F.3d 591 (2d Cir. 1993) ...................................... 33

*Roberts v. United States*,
  741 F.3d 152 (D.C. Cir. 2014) ................................................................................................ 32

*Sierra Club v. EPA*,
  754 F.3d 995 (D.C. Cir. 2014) ................................................................................................ 32

*Sierra Club v. Peterson*,
  228 F.3d 559 (5th Cir. 2000).................................................................................................. 22

*Sierra Nev. Forest Prot. Campaign v. Rey*,
  573 F. Supp. 2d 1316 (E.D. Cal. 2008), *aff'd in part, rev'd sub nom.*
  *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161 (9th Cir. 2011)........................................... 23

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ................................................................................................ 26

*Telecomms. Research and Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) .................................................................................................. 23

*Turlock Irrigation Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015) .................................................................................................. 31

*United States v. Oakland Cannabis Buyers' Coop.*,
  532 U.S. 483 (2001) ............................................................................................................... 27

*\*Veterans for Common Sense v. Shinseki*,
  678 F.3d 1013 (9th Cir. 2012)........................................................................................... 20, 21

*\*Viet. Veterans of Am. v. Shinseki*,
  599 F.3d 654 (D.C. Cir. 2010) ................................................................................................ 17

## STATUTES

5 U.S.C. § 706.......................................................................................................................... 25

20 U.S.C. § 1082.......................................................................................................... 14, 26, 28, 29

20 U.S.C. § 1087a............................................................................................................. 14, 26, 28

20 U.S.C. § 1087e................................................................................................................... 3, 4, 5

Pub. L. No. 111-152, 124 Stat. 1029 ........................................................................................... 8

Pub. L. No. 115-141, 132 Stat. 348 ................................................................ 9, 10

Pub. L. No. 115-245, 132 Stat. 2981 ................................................................ 9

**LEGISLATIVE MATERIALS**:

Broken Promises:  Examining the Failed Implementation of the
Public Service Loan Forgiveness Program Before the Subcomm.
on Higher Educ. & Workforce Inv., 116th Cong. (Sept. 19, 2019)............................................. 11

*What Can You Do For Your Country Act*, S. 1203 and H.R. 2441, 116th Cong.(2019) .............. 27

*Nomination of Betsy DeVos to Serve as Secretary of Education:  Hearing of the Comm.
on Health, Education, Labor, and Pensions*, 115th Cong. 120, 177 (2017)................................... 9

**RULES**

Fed. R. Civ. P. 12 ................................................................................................. *passim*

REGULATIONS

34 C.F.R. § 685.219 ............................................................................................. 4, 6

73 Fed. Reg. 37,694 (July 1, 2008)........................................................................ 3

**OTHER AUTHORITIES**:

Alexandra Hegji, Cong. Research Serv., R45389, *The Public Service
Loan Forgiveness Program:  Selected Issues* (2018) ............................................. *passim*

Consumer Fin. Prot. *Bureau*, *Staying on Track While Giving Back:
The Cost of Student Loan Servicing Breakdowns for People
 Serving Their Communities* (2017)...................................................................... *passim*

U.S. Gov't Accountability Office, GAO-15-663, *Federal Student Loans:
Education Could Do More to Help Ensure Borrowers Are Aware of Repayment
 and Forgiveness Options* (2015).......................................................................... 6

U.S. Gov't Accountability Office, GAO-18-547, *Public Service
Loan Forgiveness:  Education Needs to Provide Better Information
for the Loan Servicer and Borrowers* (2018).......................................................... *passim*

U.S. Gov't Accountability Office, GAO-19-595, *Public Service
Loan Forgiveness:  Improving the Temporary Expanded Process
Could Help Reduce Borrower Confusion* (2019) .................................................... 9, 27

U.S. Dep't of Educ., Fed. Student Aid, *March 2019 PSLF Report* (Mar. 31, 2019).................... 12

U.S. Dep't of Educ., Office of Inspector Gen., ED-OIG/A05Q0008, *Federal Student Aid: Additional Actions Needed to Mitigate the Risk of Servicer Noncompliance with Requirements for Servicing Federally Held Student Loans* (Mar. 5, 2008) ........................................................ 12

## INTRODUCTION

This lawsuit is a play in three acts, each of which is centered on alleged problems with the administration of the Public Service Loan Forgiveness ("PSLF") and the Temporary Expanded Public Service Loan Forgiveness ("TEPSLF") Programs by Defendants, the United States Department of Education ("Department") and Elisabeth DeVos, in her official capacity as Secretary of the Department of Education ("Secretary") (collectively, "Education"). *See* Compl., ECF No. 1 (July 11, 2019).

In Act One, three individuals, Cynthia Miller, Crystal Adams, and Connie Wakefield (collectively, "Eligible Plaintiffs"), allege that they are eligible for relief under the PSLF/TEPSLF Programs. They are pursuing their individual claims (Counts I and II) under the Administrative Procedures Act ("APA"). Education is not currently moving against these claims.

In Act Two, a separate set of five individual plaintiffs, Deborah Baker, Janelle Menzel, Kelly Finlaw, Gloria Nolan, and Michael Giambona (collectively, "Ineligible Plaintiffs"), allege that, but for errors in the servicing of their loans, they would be eligible for relief under the PSLF/TEPSLF Programs. The Ineligible Plaintiffs are also pursuing their individual claim (Count IV) under the APA. The Ineligible Plaintiffs lack standing and fail to state a claim upon which relief may be granted because, as they concede, they are currently ineligible for relief under either the PSLF or the TEPSLF Programs. The Court cannot provide redress to the Ineligible Plaintiffs because it cannot order the Secretary to exercise her discretion to make them eligible. Nor were Education's denials of the Ineligible Plaintiffs' PSLF/TEPSLF applications arbitrary and capricious because these borrowers did not meet the Programs' eligibility requirements. Hence, Education moves for, and the Court should grant, the dismissal of Count IV under Federal Rules of Procedure 12(b)(1) and 12(b)(6).

In Act Three, the Eligible and Ineligible Plaintiffs (collectively, "Individual Plaintiffs") are joined by the American Federation of Teachers, AFL-CIO, and its President, Randi Weingarten, in her official capacity (collectively, "AFT"), to raise what is essentially a wholesale programmatic challenge to Education's administration of the PSLF/TEPSLF Programs under the Fifth Amendment's Due Process Clause.  *See* Compl. at Counts III & V.  AFT and the Individual Plaintiffs ask the Court to order and then oversee the institution of processes to "minimize the risk of erroneous determinations," *id*. ¶ 417, and "account for misrepresentations made by [Education] and/or Title IV servicers." *Id*. ¶ 434.  They also seek an order enjoining Education from denying any PSLF/TEPSLF applications "until the Court has approved [Education]'s proposed procedures to alleviate the violations alleged herein."  *Id*. at Prayer for Relief No. 9.

The programmatic challenges raised in Counts III and V should be dismissed.  Under long-standing Supreme Court precedent, particularly *Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ("*SUWA*"), and *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990), the Court has no authority to entertain such a wholesale programmatic challenge, particularly in light of the intensity of congressional and executive branch oversight that has been, and continues to be, focused on Education's administration of the PSLF and TEPSLF Programs.  As the Supreme Court made clear in *Lujan*, a plaintiff "cannot seek wholesale improvement of [a] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made."  497 U.S. at 891.  Nor are courts "empowered to enter general orders compelling compliance with broad statutory mandates," for if they were, "they would necessarily be empowered, as well, to determine whether compliance was achieved[,] . . . injecting the judge into day-to-day agency management."  *Id*. at 66-67.  Accordingly, Education moves to dismiss Counts III and V under either Rules 12(b)(1) or 12(b)(6).

In addition, AFT has no standing to bring Counts III and V under the doctrines of either organizational or association standing.  AFT lacks organizational standing because it fails to allege that its own operations are impeded or that its operational costs are beyond those normally expended.  AFT lacks association standing because the claims it raises require individualized participation of its members.  Accordingly, AFT should be dismissed from this litigation under Rule 12(b)(1).

In sum, and for the reasons set forth below, the Court should grant Education's Partial Motion to Dismiss, should dismiss Counts III, IV, and V of Plaintiffs' Complaint, and should dismiss AFT (i.e., both Randi Weingarten and the American Federation of Teachers, AFL-CIO) as parties to this litigation.

## **BACKGROUND**

### A.  **Statutory and Regulatory Background**

The College Cost Reduction and Access Act of 2007 ("CCRAA") amended the Higher Education Act of 1965 to add a new Public Service Loan Forgiveness Program to the William D. Ford Direct Loan ("Direct Loan") Program.  73 Fed. Reg. 37,694, 37,695 (July 1, 2008).  The Direct Loan Program provides subsidized and unsubsidized loans to students and their parents to pay for the costs of attendance at qualifying institutions of higher education.  20 U.S.C. § 1087c(a).  Signed into law by President George W. Bush, the CCRAA amended 20 U.S.C. § 1087e(m) to include language directing the Secretary of Education to "cancel the balance of interest and principal due . . . on any eligible Federal Direct Loan not in default" for borrowers who meet certain eligibility requirements.  To qualify for loan forgiveness under the PSLF Program, a borrower must:  (1) have made 120 monthly payments on an eligible loan after October 1, 2007 under designated repayment plans; (2) be employed in a public service job at the time of

forgiveness; and (3) be employed in a public service job at the time each of the 120 monthly payments were made, and at the time forgiveness is granted.  20 U.S.C. § 1087e(m)(1)(A), (B).  In 2008, the Department of Education developed implementing regulations that expressed the eligibility requirements as follows:

(1) A borrower may obtain loan forgiveness under this program if he or she—

 (i) Is not in default on the loan for which forgiveness is requested;

 (ii) Is employed full-time by a public service organization or serving in a full-time AmeriCorps or Peace Corps position—

  (A) When the borrower makes the 120 monthly payments described under paragraph (c)(1)(iii) of this section;

  (B) At the time of application for loan forgiveness; and

  (C) At the time the remaining principal and accrued interest are forgiven;

 (iii) Makes 120 monthly payments after October 1, 2007, on eligible Direct loans for which forgiveness is sought. Except as provided in paragraph (c)(2) . . . the borrower must make the monthly payments within 15 days of the scheduled due date for the full scheduled installment amount; and

 (iv) Makes the required 120 separate monthly payments under one or more of the following repayment plans—

  (A) Except for a parent PLUS borrower, an income-based repayment plan, as determined in accordance with § 685.221;

  (B) Except for a parent PLUS borrower, an income-contingent repayment plan, as determined in accordance with § 685.209;

  (C) A standard repayment plan, as determined in accordance with § 685.208(b); or

  (D) Except for the alternative repayment plan, any other repayment plan if the monthly payment amount is not less than what would have been paid under the Direct Loan standard repayment plan described in § 685.208(b).

34 C.F.R. §685.219(c).  *See also* Compl. ¶ 79.

Although these elements may appear relatively simple on their face, the reality—by congressional design—is far more complex.  For example, at the time Congress established the PSLF in 2007, there were two main federal student financial assistance programs through which student borrowers could obtain loans—the Federal Family Education Loan Program ("FFEL Program") and the Direct Loan Program.  Compl. ¶ 51.  FFEL loans were originated and funded primarily by private lenders, whereas through the Direct Loan Program, loans were originated (and still are originated) directly by the federal government.  *Id.* ¶ 52.  In 2007, the majority of borrowers participated in the FFEL Program.  Alexandra Hegji, Cong. Research Serv., R45389, *The Public Service Loan Forgiveness Program:  Selected Issues* 37 & n.149 (2018) ("CRS Rep. R45389"); *see* Federal Student Aid, U.S. Dep't of Educ., *Federal Student Aid Portfolio Summary*, *available at*  https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/PortfolioSummary.xls (last visited Oct. 4, 2019).  However, Congress made PSLF relief available only to those borrowers who received Direct Loans.  *See* 20 U.S.C. § 1087e(m); *see also* U.S. Gov't Accountability Office, GAO-18-547, *Public Service Loan Forgiveness:  Education Needs to Provide Better Information for the Loan Servicer and Borrowers* 1 (2018) ("GAO-18-547"), and CRS Rep. R45389 at 3 & n.14.[1]  Congress made this choice "in part to act as an incentive for borrowers to switch from the

---

[1] GAO-18-547 and CRS Rep. R45389 are two of many public records Defendants cite in this memorandum that are incorporated by reference in the Complaint, *see* Compl. ¶¶ 7-8 & n.5-6. "The court ruling on a Rule 12(b)(6) motion to dismiss 'may consider the facts alleged in the complaint, documents . . . incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the parties.' The court may also take 'judicial notice of facts on the public record.'"  *Judicial Watch, Inc. v. FBI*, No. CV 18-2316 (RC), 2019 WL 4194501, at *5 (D.D.C. Sept. 4, 2019) (quoting *Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 133–34 (D.D.C. 2013) and *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005)).

FFEL program to the Direct Loan Program; such a switch was predicted to result in cost savings to the government." *Id.* at 3 n.14.

A borrower with FFEL Loans may obtain relief under the PSLF program, but only if the borrower consolidates her loans into a Direct Loan. Compl. ¶ 78. Payments made prior to consolidation do not qualify as part of a borrower's 120-payment obligation under the PSLF. *Id.*; *see also* GAO-18-547 at 4 n.5. *See* 34 C.F.R. § 658.219(c)(1)(iii) ("A borrower may obtain loan forgiveness under this program if he or she – (iii) Makes 120 separate monthly payments after October 1, 2007 on eligible Direct loans for which forgiveness is sought."); and *id.* § 658.219(b) (defining "Eligible Direct loan" as including Direct Subsidized Loans, Direct Unsubsidized Loans, Direct PLUS Loans, and Direct Consolidation Loans).

Even if a borrower took out the "right" loan (i.e., a Direct Loan as opposed to a FFEL Loan), or properly consolidated her loan, other statutory and regulatory requirements exist (and have existed since the PSLF program began). For example, not all repayment plans are "qualifying." Only income-driven repayment ("IDR") plans and the 10-year Standard repayment plan (or the equivalent) qualify, GAO-18-547 at 5; graduated and extended repayment plans are not qualifying repayment plans under PSLF even though these plans were more widely used prior to the creation of alternative IDR plans in 2012 and 2015. *See* CRS Rep. R45389 at 37 (noting the limited IDR options available to the initial cohort of borrowers post-enactment of the CCRAA); *see also* U.S. Gov't Accountability Office, GAO-15-663, *Federal Student Loans: Education Could Do More to Help Ensure Borrowers Are Aware of Repayment and Forgiveness Options* 13-18 (2015), *available at* https://www.gao.gov/assets/680/672136.pdf (last visited Oct. 4, 2019). In addition, payments made while loans are in an in-school status, grace period, deferment, or forbearance do not qualify. CRS Rep. R45389 at 20; *see also* Federal Student Aid, U.S. Dep't of

Educ., *What Is a Qualifying Monthly Payment?*, *available at* https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service#qualifying-payment (last visited, Oct. 4, 2019).

### B.     Mechanics of the PSLF Program

The Department of Education administers the federal student financial aid programs under Title IV of the Higher Education Act through the Federal Student Aid office.  Compl. ¶ 50.  Under the Direct Loan Program, the Department issues and oversees the loans while contractors service them.  GAO-18-547 at 3-4.  Since 2011, the Department has contracted with one of its existing loan servicers, FedLoan Servicing, as its sole servicer for borrowers pursuing PSLF relief.  *Id*. at 4; Compl. ¶ 69.  In 2012, the Department established a voluntary process—the submission of an Employment Certification Form ("ECF")—to provide guidance to borrowers about the eligibility of their employment and payments for PSLF (and servicing by FedLoan Servicing).  GAO-18-547 at 5; Compl. ¶¶ 69-74.  In comparison to the 32 million borrowers who were estimated as of 2016 to be repaying loans that are potentially eligible for PSLF relief—*see* Consumer Fin. Prot. Bureau, *Staying on Track While Giving Back: The Cost of Student Loan Servicing Breakdowns for People Serving Their Communities* 20 n.34 (2017) ("CFPB Rep. 2017"); and Compl. ¶¶ 3 & 4 n.3—comparatively few (less than 900,000) have gone through the ECF process.  *See* GAO-18-547 at 10, Fig. 4.

If, after 120 months have passed, a borrower applies for PSLF relief with FedLoan Servicing, the servicer first determines whether the borrower's loans qualify and if the borrower's employment qualifies.  If either do not qualify, the borrower receives a notification that the application is denied.  GAO-18-547 at 8, Fig. 2.  If the borrower qualifies under the first two parameters, the servicer reviews the application to determine whether the applicant has made 120 qualifying payments.  *Id*.  If the borrower has not made 120 qualifying payments, the servicer

notifies the borrower that she has not made 120 qualifying payments and does not qualify for forgiveness yet. *Id.* If the servicer finds that 120 qualifying payments have been made, the application is transferred to the Department for final review and, if the application shows the borrower has met the eligibility requirements, final approval. *Id.* The Department provides several options for disputing payment counts or other eligibility issues, "including contacting the PSLF servicer or filing an official complaint with [the Department of] Education's Federal Student Aid Ombudsman Group or through the Federal Student Aid Feedback System." *Id.* at 23.

### C.    Congressional and Executive Branch Oversight

There is no doubt that since October 1, 2017, when PSLF relief first became available, PSLF application approval rates have been low. GAO-18-547 at 11. Given that each individual borrower's personal circumstances are different, an applicant may face one or more of numerous obstacles to achieving eligibility under the PSLF program. *See* CRS Rep. R45389 at 24-25 (identifying obstacles and citing CFPB Rep. 2017).

Congress has been aware of these issues for quite some time, as it has maintained oversight of the PSLF Program and has worked to address its problems. For instance, in 2010, through the Student Aid and Fiscal Responsibility Act of 2009 ("SAFRA"), Title II of Pub. L. No. 111-152, §§ 2001-303, 1224 Stat. 1029 (2010), Congress terminated making new loans under the FFEL Program as of June 30, 2010, meaning that no borrowers who took out loans after that time will find themselves ineligible after 120 repayments due to having the wrong loan (i.e., an FFEL Loan). This FFEL-free cohort will become eligible for PSLF relief no earlier than July 1, 2020. CRS Rep. R45389 at 4-5. Congress also authorized an additional IDR plan for post-July 1, 2014 borrowers; this new plan made larger numbers of borrowers eligible for IDR plans and thus eligible for PSLF relief. *Id.* at 5.

But by 2017, Congress was aware that the complexities in the PSLF program might cause issues in its early years. At Secretary DeVos's confirmation hearing, Senator Bob Casey noted that the first recipients of the PSLF program would be receiving benefits in late 2017 and that it would "be important to track this first group's progress of how they maintained their payments during these past 10 years and to take steps to address any confusion that may arise when borrowers submit the complex forms required for forgiveness and determine which payments qualified." *Nomination of Betsy DeVos to Serve as Secretary of Education:  Hearing of the Comm. on Health, Education, Labor, and Pensions*, 115th Cong. 120, 177 (2017).

Later in June 2017, just before the first cohort of borrowers became eligible, the Consumer Financial Protection Bureau ("CFPB") issued a report identifying potential problems in the PSLF program and recommending that "[a]s policymakers . . . note how servicing breakdowns can delay or derail progress towards PSLF, those seeking to assist these borrowers should consider whether additional flexibility is necessary to ensure that borrowers who received inaccurate information about program requirements provided by their student loan servicer will still be able to secure these benefits." CFPB Rep. 2017 at 7.

Only a few months after the first cohort of borrowers became eligible for PSLF relief, Congress enacted the TEPSLF Program in March 2018. Pub. L. No. 115-141, § 315, 132 Stat. 348, 752-53 (2018). The TEPSLF Program was intended to help borrowers who would have been eligible for the PSLF Program, except that they were repaying their loans through a repayment plan that is not eligible for PSLF relief. U.S. Gov't Accountability Office, GAO-19-595, *Public Service Loan Forgiveness:  Improving the Temporary Expanded Process Could Help Reduce Borrower Confusion* 1 (2019) ("GAO-19-595"). Congress initially provided $350 million to fund the costs of modifying the PSLF Program (up to $500 million in loan forgiveness benefits), and in

late September 2018, Congress appropriated another $350 million for the same purposes and under

the same terms.  Pub. L. No. 115-245, § 313, 132 Stat. 2981, ___ (2018).  Congress did not impose

any procedural requirements on the Department other than to require that the Department develop

and make available a simple method for borrowers to apply for TEPSLF relief within sixty days

of enactment of the law.  Since Congress capped the total amount of loan forgiveness that could

be granted, it also provided that loan cancellation would be granted on a first-come, first-served

basis up to the statutory cap.   Pub. L. No. 115-141, § 315.  Congress did not amend the PSLF

Program to allow those borrowers with FFEL Loans to be eligible for PSLF relief or allow such

borrowers to obtain relief under the TEPSLF Program.

Just at the time Congress was appropriating an additional $350 million for TEPSLF in late

September 2018, the GAO published a report on the PSLF Program in response to a congressional

request.  The GAO made four recommendations to improve the PSLF Program.  The four

recommendations were, in brief:  (1) "issuing a comprehensive guidance and instructions

document for PSLF servicing"; (2) "provide additional information to the PSLF servicer and

borrowers to enhance their ability to determine which employers qualify for PSLF"; (3)

"standardize the information the PSLF servicer receives from other loan servicers"; and (4) "ensure

that borrowers receive sufficiently detailed information from the PSLF servicer to be able to

identify any errors in the servicer's counts of qualifying payments."  GAO-18-547 at 25.  The

Department agreed with each of the recommendations and identified steps it would take to

implement them.  *Id*. at 26.  In particular, the Department agreed to "review the letters the PSLF

servicer sends to borrowers to determine how to better communicate regarding qualifying payment

counts, program requirements, and employer eligibility."  *Id*.

10

A year later, the GAO, again at Congress's behest, issued a report on the TEPSLF Program.  GAO-19-595.  As the GAO noted, the "eligibility requirements for TEPSLF are largely the same as those of the PSLF program with a few key exceptions."  *Id*. at 5.  Specifically, the TEPSLF Program expanded the number of qualifying plans and allocated money for the Department to use to conduct outreach to borrowers who would qualify for PSLF loan forgiveness except that they have made some or all of their payments through plans that do not qualify.  *Id*. at 6.  The GAO noted the low approval rates for TEPSLF applicants, but blamed the problem largely on the fact that the Department required borrowers to submit PSLF applications before or with their TEPSLF applications.  The GAO report called for the Department to "allow borrowers to request TEPSLF loan forgiveness through an integrated application form."  *Id*. at 10.  The Department agreed with this recommendation and "stated that it will integrate the TEPSLF request into the PSLF application under [the Department's] new online interface for student borrowers." *Id*. at 22.  In response to a separate recommendation by GAO, the Department agreed to "add information for borrowers on the procedures for contesting TEPSLF decisions to FSA's specific TEPSLF website and in relevant TEPSLF denial letters."  *Id*. at 23.

On September 19, 2019, the House Subcommittee on Higher Education and Workforce Investment held a hearing that focused on addressing the PSLF/TEPSLF Programs' problems. Broken Promises:  Examining the Failed Implementation of the Public Service Loan Forgiveness Program Before the Subcomm. on Higher Educ. & Workforce Inv., 116th Cong. (Sept. 19, 2019).

### D.      The Complaint

Plaintiffs filed their Complaint on July 11, 2019 against Education (i.e., Secretary DeVos, in her official capacity, and the Department of Education).   They seek to hold Education "accountable for its [alleged] gross mismanagement of the [PSLF] Program and the [TEPSLF]

Program in violation of the APA and the Fifth Amendment's Due Process Clause." Compl. at 1.

They cite numerous governmental statistics of the PSLF/TEPSLF Programs' alleged deficiencies,

including that "as of March 2019, [Education] had forgiven the loans of fewer than 1% of the

borrowers applying for PSLF," Compl. ¶ 3 (citing U.S. Dep't of Educ., Fed. Student Aid, *March

2019 PSLF Report* (Mar. 31, 2019)) (emphasis omitted); and that "as of March 2019, only 3.6%

of TEPSLF applications have been approved." *Id*. ¶ 4 (citing *March 2019 PSLF Report*).  They

also cite findings from various oversight agency reports, for instance, "that '[Education] has not

ensured the PSLF servicer is receiving consistent loan payment history information from other

loan servicers, increasing the risk of inaccurate qualifying payment counts,'" *id*. ¶ 97 (quoting

GAO-18-547); that Education "has failed to provide FedLoan Servicing and borrowers with

sufficient information to determine whether a borrower's employer qualifies as a public service

employer, . . . fostering 'uncertainty for borrowers' as to whether they will qualify for PSLF," *id*.

¶ 98 (quoting GAO-18-547); that "borrowers 'struggle to get their servicer to correct [payment

counting] error[s] or explain why payments were not qualified,' . . . '[making] it difficult for

borrowers to detect erroneous counts that could ultimately affect their eligibility for loan

forgiveness," *id*. ¶ 102 (quoting CFPB Rep. 2017 at 39 and GAO-18-547 at 25); and that while

"'FSA's oversight activities regularly identified instances of servicers not servicing federally held

student loans in accordance with Federal requirements, . . . [Education] rarely hold[s] servicers

accountable for instances of noncompliance . . . , [and thus] is not providing servicers with

incentive to take actions to mitigate the risk of continued noncompliance.'" *Id*. ¶¶ 242-43 (quoting

U.S. Dep't of Educ., Office of Inspector Gen., ED-OIG/A05Q0008, *Federal Student Aid:

Additional Actions Needed to Mitigate the Risk of Servicer Noncompliance with Requirements for

Servicing Federally Held Student Loans* (Mar. 5, 2008)).

Plaintiffs claim that in allegedly failing to correct these issues, Education "has eviscerated the statutory promise of loan forgiveness for those who have spent a decade or more in public service dutifully repaying their loans." *Id.* ¶ 17.  Plaintiffs "bring this action to require [Education] to fulfill its mandate to lawfully administer the PSLF Program, including TEPSLF." *Id.*

Plaintiffs raise five counts against Education:

In Count I, the Eligible Plaintiffs, Cynthia Miller, Crystal Adams, and Connie Wakefield, allege that they were improperly denied relief under the PSLF/TEPSLF Programs.  Each claims that they were eligible for PSLF and/or TEPSLF relief and that Education arbitrarily and capriciously denied their applications in violation of Section 706(2)(A) of the APA.  Compl. ¶¶ 395-400.  The Complaint details each of the Eligible Plaintiffs' alleged difficulties obtaining relief under the PSLF and TEPSLF Programs.  *See id.* ¶¶ 108-52 (Ms. Miller), ¶¶ 153-176 (Ms. Adams), and ¶¶ 177-235 (Ms. Wakefield).  The Eligible Plaintiffs claim that these difficulties were due to allegedly "arbitrary errors in the processing of Ms. Miller, Ms. Adams, and Ms. Wakefield's applications," which allegedly led to Education's arbitrary denial of their applications.  *Id.* ¶ 399. The Eligible Plaintiffs seek an order vacating their denials and remanding to Education "with specific instructions to approve their PSLF applications," or, in the alternative, retaining jurisdiction and remanding to Education with instructions to take further action "consistent with the APA." *Id.* ¶ 400.  Defendants do not move to dismiss Count I at this time.

In Count II, the Eligible Plaintiffs allege that their denial notices violated Section 555(e) of the APA in that the notices were allegedly bereft of explanation as to why Education determined that each Eligible Plaintiff had failed to make 120 qualifying repayments. *Id.* ¶ 406.  The Eligible Plaintiffs seek an order vacating their denials.  *Id.*  Defendants do not move to dismiss Count II at this time.

13

Skipping over Count III for the moment, in Count IV, the Ineligible Plaintiffs, Deborah Baker, Janelle Menzel, Kelly Finlaw, Gloria Nolan, and Michael Giambona, admit that they are ineligible for PSLF relief at this time, but allege that if they had not been misinformed and misadvised by Education and/or their respective servicers, they would be eligible. *Id*. ¶¶ 418-22. The Complaint details each of the Ineligible Plaintiffs alleged loan histories and inability to obtain relief under either the PSLF or TEPSLF Programs. *See id*. ¶¶ 251-93 (Ms. Baker), ¶¶ 294-317 (Ms. Menzel), ¶¶ 318-40 (Ms. Finlaw), ¶¶ 341-66 (Nolan), and ¶¶ 367-94 (Mr. Giambona). The Ineligible Plaintiffs claim that Education's alleged failure to account for the alleged misinformation and incorrect advice they received render Education's denial of the Ineligible Plaintiffs' PSLF/TEPSLF applications arbitrary and capricious in violation of Section 706(2)(A) of the APA. *Id*. ¶¶ 418-24. The Ineligible Plaintiffs seek an order vacating their denials and "remanding to [Education] with specific instructions to discharge their student loan debt pursuant to [Education's alleged] general discharge authority under 20 U.S.C. § 1082(a)(4) and 20 U.S.C. § 1087a(b)(2)," or, "in the alternative, an order retaining jurisdiction and remanding to [Education] for further action . . . consistent with the APA." *Id*. ¶ 423.

Counts III and V are nearly identical. Count III is brought by the Eligible Plaintiffs and AFT (on behalf of itself and its members) and alleges that Education's alleged "administrative processing errors" violated their right to due process under the Fifth Amendment. *Id*. ¶¶ 407-417. AFT and the Eligible Plaintiffs seek an order vacating Education's denial of the Eligible Plaintiffs' PSLF/TEPSLF applications and an order requiring Education to provide *all* PSLF/TEPSLF applicants with "adequate notice of the grounds for their denial," "a meaningful decision-making process that minimized the risk of erroneous determinations," and "a written and reasoned explanation for [Education's] determination within a reasonable time period." *Id*. ¶ 417. Count V

14

mirrors Count III in the broad relief requested for all PSLF/TEPSLF applicants, except that it is brought by AFT along with the Ineligible Plaintiffs, *see id.* ¶¶ 424-34, and asks for a decision-making process that "account[s] for misrepresentations made by [Education] and/or Title IV servicers, through which applicants may contest their denial and introduce evidence rebutting [Education's] determination and/or demonstrate that [Education] should exercise its general discharge authority to issue forgiveness." *Id.* ¶ 434.

In their Prayer for Relief, Plaintiffs reiterate their requests for declaratory and injunctive relief, and also seek "an order requiring [Education] to provide the Court with a status report detailing steps taken to comply with this Court's order, including copies of all instructions, guidelines, or other information sent to Title IV services," *id.* at Prayer for Relief No. 8, and an order "retaining jurisdiction and enjoining [Education] from denying PSLF and TEPSLF applications until the Court has approved [Education]'s proposed procedures to alleviate the violations alleged herein." *Id.* at Prayer for Relief No. 9.

## STANDARD OF REVIEW

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Under Rule 12(b)(1), "the plaintiff bears the burden of proving by a preponderance of evidence that the Court has subject matter jurisdiction." *Budik v. Ashley*, 36 F. Supp. 3d 132, 138 (D.D.C. 2014) (citation and internal brackets omitted). In reviewing a motion to dismiss for lack of subject matter jurisdiction, the Court may, where necessary, consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

Under Rule 12(b)(6), a court may dismiss all or part of a complaint where it fails to state a claim upon which relief can be granted.  Although a complaint need not contain "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007), it must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).  Dismissal under Rule 12(b)(6) is appropriate "if the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Barr v. Clinton*, 370 F.3d 1196, 1202 (D.C. Cir. 2004) (internal quotation marks omitted).  Plaintiffs must be "grant[ed] ... the benefit of all inferences that can be derived from the facts alleged," but "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

## ARGUMENT

### I.   PLAINTIFFS ARE PRECLUDED FROM RAISING A PROGRAMMATIC CHALLENGE TO THE DEPARTMENT'S ADMINISTRATION OF THE PSLF/TEPSLF PROGRAMS

The Individual Plaintiffs are joined by AFT on only two of the five claims alleged in the Complaint.  *See* Compl. at Counts III and V.  The gravamen of Plaintiffs' claims under Counts III and V is the Department of Education's alleged failure to act to provide administrative mechanisms to solve the processing problems that have allegedly beset the PSLF/TEPSLF Programs.  Such claims are considered "broad programmatic challenges" foreclosed under long-standing Supreme Court precedent.  *See SUWA*, 542 U.S. at 64; and *Lujan*, 497 U.S. at 891.

A.    **Plaintiffs' Artful Pleading of Their Claims under Counts III and V as Due
Process Violations Should Not Be Countenanced Given that Identical Claims
Brought under the APA Would Be Foreclosed**

Plaintiffs attempt to circumvent the prohibition on broad programmatic challenges under
the APA by fashioning their claims as constitutional violations.  Courts have rejected such artful
pleading efforts where the constitutional analysis is identical to the APA analysis.  *See Fares v.
Smith*, 249 F. Supp. 3d 115, 120 (D.D.C. 2017), *aff'd*, 901 F.3d 315 (D.C. Cir. 2018) ("[T]he Court
observes that its resolution of whether Defendants have provided sufficient notice under the Due
Process Clause and the APA would be identical.").  *See also Hegab v. Long*, 716 F.3d 790, 797
(4th Cir. 2013) ("Hegab's constitutional claims are in substance merely creative
recharacterizations of his allegation that the [agency] made the wrong decision and that its decision
was irrational and unsupported by the evidence.").  Courts have also frowned upon attempts by
plaintiffs to use constitutional claims to avoid the strictures Congress imposed on APA litigation.
For example, in *Viet. Veterans of Am. v. Shinseki*, 599 F.3d 654 (D.C. Cir. 2010), the D.C. Circuit
refused to allow plaintiffs to pursue due process claims in district court when, under the APA, the
plaintiffs' identical unreasonable delay claims under Section 706(2) of the APA could have been
raised before the Court of Appeals for Veterans Claims ("CAVC").  *Id*. at 660.  The Court
explained that "APA Section 704 . . . authorizes review only if a party lacks an adequate remedy,"
*id*. at 659, but because plaintiffs had such an adequate remedy (i.e., the CAVC), an APA claim of
unreasonable delay would have been dismissed.  The Court refused to allow the plaintiffs to
circumvent Section 704 of the APA by pursuing constitutional due process claims.  *Id*. at 660.
Likewise, in *Chiayu Chang v. U.S. Citizenship & Immigration Servs.*, 254 F. Supp. 3d 160 (D.D.C.
2017), this Court refused to allow plaintiffs to conduct discovery in support of their constitutional
claim, where discovery was not permitted under their nearly identical APA claims.  *Id*. at 162.

17

Here, the Court should not allow a programmatic challenge to proceed under the Due Process Clause that would otherwise be prohibited if brought as an APA challenge.

       **B.**      **Plaintiffs' Programmatic Challenges Should Be Dismissed**

                *1.*   *Counts III and V of the Complaint Seek a Court Order Directing Wholesale Changes to the PSLF Program*

To understand why Plaintiffs' claims under Counts III and V are the type of broad "programmatic challenges," that are not legally cognizable,[2] one need only look at the relief Plaintiffs seek in the Complaint.  In Count III, Plaintiffs seek an order requiring the Department of Education to provide all "PSLF and TEPSLF applicants with adequate notice of the grounds for their denial," a "meaningful decision-making process that minimizes the risk of erroneous determinations," and "a written and reasoned explanation for its determination within a reasonable time period."  Compl. ¶ 417; *see also id*. at Prayer for Relief Nos. 6 & 7; *see also id*. ¶ 434 (nearly identical to ¶ 417, but seeking a "meaningful decision-making process to account for misrepresentations made by [Education] and/or Title IV services, through which applicants may contest their denial and introduce evidence rebutting [Education]'s determination and/or demonstrate that [Education] should exercise its general discharge authority to issue forgiveness").  Plaintiffs also seek an order "requiring [Education] to provide the Court with a status report detailing steps taken to comply with this Court's order, including copies of all instructions, guidelines, or other information sent to Title IV servicers," *id*. at Prayer for Relief No. 8, and an order "retaining jurisdiction and enjoining [Education] from denying PSLF and TEPSLF

---

[2] Courts have variously addressed this question as an issue of standing and subject matter jurisdiction under Rule 12(b)(1) or as a failure to state a claim under Rule 12(b)(6).  *See Long Term Care Pharmacy All. v. Leavitt*, 530 F. Supp. 2d 173, 187 n.7 (D.D.C. 2008).  The analysis should not change under either ground, but out of an abundance of caution, Defendants move to dismiss Counts III and V under both Rule 12(b)(1) and Rule 12(b)(6).  *See id*. (noting that under either scenario, "the Court's analysis would remain the same").

applications until the Court has approved [Education]'s proposed procedures to alleviate the violations alleged herein." *Id*. at Prayer for Relief No. 9.  In other words, Plaintiffs intend for the Court to oversee a wholesale programmatic change to Education's administration of the PSLF and TEPSLF Programs.

### 2. *Wholesale Programmatic Changes Are Foreclosed By* SUWA & Lujan

The Supreme Court has long warned courts away from accepting such invitations.  In *Lujan*, a group attempted to challenge a number of failures by the Department of the Interior ("Interior") in administering a government program—including the failure to revise land use plans, submit recommendations to Congress, and provide adequate environmental impact statements. *See Lujan*, 497 U.S. at 891.  The Court held the claim was unreviewable under the APA, no matter how often the agency had repeated the failures.  *Id*.  Most pertinent here, the Court held that a plaintiff "cannot seek wholesale improvement of [a] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made."  *Id*.

The Court in *SUWA* reiterated *Lujan*'s rejection of programmatic challenges.  542 U.S. at 64-66.  *SUWA* involved another suit against Interior, specifically regarding its alleged failure to act to protect certain public lands from environmental damage by off-road vehicles ("ORVs").  The plaintiffs in *SUWA* sought to compel Interior to take action to prevent degradation of certain designated wilderness areas, to implement provisions in its land use plans related to ORV use, and to undertake supplemental environmental analyses for areas where ORV use had increased.  *Id*. at 60-61.

The Court held that these claims were not remediable under the APA because they did not involve claims "that an agency failed to take a *discrete* agency action that it [was] *required to*

19

take." *Id*. at 64; *see id*. at 61-62 (analyzing of Sections 702, 704, and 706 of the APA).  The *SUWA* Court held that the APA's limitations were intended "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglements in abstract policy disagreements which courts lack both the expertise and information to resolve." *Id*. at 66.  The Court warned that "[i]f courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved . . ., injecting the judge into day-to-day agency management." *Id*. at 66-67.  The Court concluded that the plaintiffs were pursuing "pervasive oversight," *id*. at 67, and therefore their claims were not cognizable.

More recently, in *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423 (4th Cir. 2019), three municipalities sued the Department of Defense ("DoD") for its allegedly persistent failure to carry out its legal obligation to provide records to the national Instant Criminal Background Check System managed by the Federal Bureau of Investigation.  *Id*. at 426-27.  The DoD "readily admit[ted]" that it had "long struggled to comply with [its] . . . affirmative reporting [obligations]," and the Court noted that the DoD's Inspector General had issued two reports finding that a "substantial percentage of required records were not being submitted to the FBI."  *Id*. at 429. Nevertheless, the Fourth Circuit dismissed the municipalities' claims after concluding that the claims were "generalized grievances" that asked the court "to improve an agency's performance or operations." *Id*. at 431.  The Fourth Circuit held that it was "woefully ill-suited" to do so as that would require the court to "engage in day-to-day oversight of the executive's administrative practices." *Id*.

In *Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1027-30 (9th Cir. 2012) (en banc), two nonprofits representing veterans sued the Department of Veterans Affairs ("VA") to

remedy delays in the provision of mental health care and the adjudication of service-connected disability compensation claims by the VA.  *Id*. at 1015.  Like the DoD, the VA recognized its struggles to provide the services it readily admitted veterans deserved.  *See id*. (citing testimony of the VA's Acting Under Secretary for Benefits).  Nevertheless, while the court acknowledged that review of a delay claim in an individual case might be available, it concluded that such review could not be extended to systemic delay because such an "approach would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action."  *Id*. at 1028 (internal quotation marks omitted).

In *Cobell v. Norton*, 392 F.3d 461 (D.C. Cir. 2004), the D.C. Circuit analyzed the propriety of a district court's order that Interior complete a "detailed plan to fulfill its fiduciary obligations," to beneficiaries of the Individual Indian Money trust accounts set up by Congress over a century ago, identify any potentially problematic portions of the plan, and implement the plan.  *Id*. at 474. The litigation was part of a long-running challenge to what Congress found to be the "hopelessly inept management of the [trust] accounts."  *Id*. at 463. The D.C. Circuit nevertheless found the district court's order requiring Interior to complete its promised detailed plan to be problematic. Not only did it amount to "an order to obey the law in managing the trusts," *id*. at 475, but it also appeared to "suggest[] an intent to take complete charge of the details of whatever plan Interior might submit."  *Id*.  The D.C. Circuit vacated the order as it "seem[ed] a specification . . . of the court's preferred methodology for assuring Interior's fulfillment of [its trust] duties," which "collide[d] with the APA, *Lujan*, and [*SUWA*]."  *Id*.

This Court has also consistently rejected APA suits predicated on aggregated claims that merely highlight an agency's general deficiencies to comply with statutory or regulatory obligations.  For example, in *Del Monte Fresh Produce N.A., Inc. v. United States*, 706 F. Supp.

2d 116 (D.D.C 2010), plaintiffs, an international produce company, sought declaratory and injunctive relief for what they alleged was the U.S. Food and Drug Administration's ("FDA") allegedly unlawful pattern and practice of delay in sampling and inspecting plaintiff's imported produce, which allegedly caused the produce to go bad and become less valuable.  *Id*. at 116, 118. The Court rejected the plaintiff's claim, reasoning that if the Court were to review the claim, it would have to "consider the procedures by which the FDA inspects samples and makes decisions as to their suitability for import.  Such broad review of agency operations is just the sort of 'entanglement' in daily management of the agency's business that the Supreme Court has instructed is inappropriate."  *Id*. at 119.

In *Long Term Care Pharmacy All. v. Leavitt*, 530 F. Supp. 2d 173 (D.D.C. 2008), plaintiffs alleged that the Centers for Medicare and Medicaid Services had failed to provide accurate and timely information regarding the eligibility of Medicare and Medicaid beneficiaries for prescription drug plans as required by law, and that the erroneous eligibility data had caused delays in reimbursements of co-payments for prescription drugs.  *Id*. at 175.  The Court, following *SUWA*, rejected plaintiffs' allegations, characterizing them as "general[] attack[s on] the adequacy (*i.e.*, the accuracy and timeliness) of the eligibility notification process that [the agency] has instituted . . . and the 'systemic data failures' that it has allegedly produced."  *Id*. at 186.  The Court ruled that such attacks are not cognizable under the APA.  *Id*.

Under this well-established precedent, the litany of Education's alleged "flaws" in the administration of PSLF and TEPSLF of which Plaintiffs complain "cannot be laid before th[is] court[ ] for wholesale correction under the APA[.]"  *Sierra Club v. Peterson*, 228 F.3d 559, 567-68 (5th Cir. 2000) (en banc) (citing *Lujan*, 497 U.S. at 892-93).  Although "[c]ourts are well-suited to reviewing specific agency decisions, such as rulemakings, orders, or denials[,]" *City of New*

*York*, 913 F.3d at 431, in the absence of any discrete action, courts risk "embarking on the kind of wholesale, programmatic review of general agency conduct for which courts are ill-suited, and for which they lack authority." *Friends of the Earth v. U.S. Dep't of Interior*, 478 F. Supp. 2d 11, 25 (D.D.C. 2007). In such cases, "courts would be forced either to enter a disfavored 'obey the law' injunction, or to engage in day-to-day oversight of the executive's administrative practices"—"alternatives" which Plaintiffs pursue in this case and which "are foreclosed by the APA, and rightly so." *City of New York*, 913 F.3d at 431 (internal citation omitted); *accord Del Monte*, 706 F. Supp. 2d at 119.

> 3. *Oversight of and Corrections to the PSLF Program Are the Responsibility of Congress and the Executive Branch*

Across-the-board grievances concerning a government program do not belong in a courtroom; rather, they should be directed towards Congress and the Executive Branch, which have experience creating laws and regulations to improve wayward programs. *Lujan*, 497 U.S. at 891. "By leaving programmatic decisions *and relief* to the two political branches of government . . . the appropriate deference to the separation of powers vital to our system of government is properly respected." *Sierra Nev. Forest Prot. Campaign v. Rey*, 573 F. Supp. 2d 1316, 1328 (E.D. Cal. 2008) (emphasis added), *aff'd in part, rev'd sub nom. Sierra Forest Legacy v. Sherman*, 646 F.3d 1161 (9th Cir. 2011). As the D.C. Circuit has explained, "[c]ourts owe substantial deference to agency prerogatives in fulfilling their legal obligations, especially where Congress intervenes to address longstanding problems. . . ." *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001). "For good reason, courts are reluctant to upset existing agency priorities, unless the delay is 'egregious.'" *Id*. (quoting *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984)).

Since its enactment, both Congress and the Executive Branch have maintained oversight over the PSLF and TEPSLF Programs.  Congress, in particular, has long been concerned with the implementation of the PSLF Program, and its oversight and modifications to the Program have often had unintended consequences that Congress alone must fix.  The TEPSLF Program is the perfect example of this.  While Congress generously authorized an additional $700 million for loan forgiveness relief, it largely maintained the same eligibility requirements for the TEPSLF that it required for the PSLF.  Thus, if an individual borrower was denied loan forgiveness under the PSLF because the borrower had failed to consolidate his/her FFEL loan into a Direct Loan, that borrower would still be ineligible for TEPSLF.  Or, if an individual borrower consolidated his/her FFEL loan into a Direct loan, but only did so after several years of repayments under the FFEL program, that borrower still would not be able to count his/her pre-consolidation payments toward the 120-payment count.  Congress easily could have fixed these problems, which predominantly affect individuals who received FFEL loans (before new loans were ended in that program after June 30, 2010), by adding FFEL loans to the list of loans eligible for relief, but it did not.  Bills have been introduced in the House and the Senate to enact such a change, *see What Can You Do For Your Country Act*, S. 1203 and H.R. 2441, 116th Cong. (2019); it is not the Court's role to fix that issue.

Nor does it make sense for the Court to step in to manage the administration of the PSLF/TEPSLF Programs when the GAO has provided in-depth oversight, particularly given that Education has agreed to implement all of GAO's recommendations in its last two reports and has identified the steps it will take, including agreeing to "review the letters the PSLF servicer sends to borrowers to determine how to better communicate regarding qualifying payment counts, program requirements, and employer eligibility," GAO-18-547 at 25-26, and agreeing to add

24

information to TEPSLF denial letters about the four options the Department provides to challenge TEPSLF denials.  GAO-19-595 at 26.

And yet, AFT seeks an order from the Court "retaining jurisdiction and enjoining ED from denying PSLF and TEPSLF applications until the Court has approved ED's proposed procedures to alleviate the violations alleged herein."  Compl. at Prayer for Relief No. 9.  That request seeks exactly the sort of "day-to-day oversight" in which courts are prohibited from engaging.  *City of New York*, 913 F.3d at 431 (internal citation omitted); *accord Del Monte*, 706 F. Supp. 2d at 119. Respectfully, the Court simply does not have the expertise necessary to fix the problems associated with the PSLF/TEPSLF Programs.  For example, the Court is not equipped to design a "decision-making process that minimizes the risk of erroneous determinations," Compl. ¶ 417, or one that "account[s] for misrepresentations made by [Education] and/or Title IV servicers."  *Id.* ¶ 434.

Accordingly, the Court should not allow itself to be dragged into the day-to-day management of the PSLF/TEPSLF Programs and therefore should dismiss Counts III and V as impermissible programmatic challenges consistent with *Lujan* and *SUWA*.

## II.    INELIGIBLE PLAINTIFFS LACK STANDING AND FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

In Count IV, the Ineligible Plaintiffs seek relief that the Court cannot provide and therefore lack standing pursuant to Fed. R. Civ. P. 12(b)(1).  They also fail to state a claim upon which relief may be granted under Fed. R. Civ. P. 12(b)(6).  Each of the Ineligible Plaintiffs allege that the Department violated the APA by arbitrarily and capriciously denying their PSLF applications. Compl. at Count IV (citing 5 U.S.C. § 706(2)).  Specifically, they each allege that they would be eligible for PSLF (and/or TEPSLF) relief if they had not received misinformation from their loan servicers.  *See id.* ¶¶ 422(a)-(e).  They ask the Court to "vacat[e] [their] denials and remand[] to [Education] with specific instructions to discharge their student loan debt pursuant to [Education]'s

general discharge authority under 20 U.S.C. § 1082(a)(4) and 20 U.S.C. § 1087a(b)(2) or, in the alternative, an order retaining jurisdiction and remanding to ED for further action with respect to each. . . ." *Id*. ¶ 423.  The Court has no authority to do so and should dismiss Count IV.

### A.    Count IV Should Be Dismissed Because the Ineligible Plaintiffs Lack Standing to Bring It

"Because Article III limits the constitutional role of the federal judiciary to resolving cases and controversies, a showing of standing 'is an essential and unchanging' predicate to any exercise of [federal] jurisdiction." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (quoting *Lujan*, 504 U.S. 555 (1992)). "'The irreducible constitutional minimum of standing contains three elements: (1) injury-in-fact, (2) causation, and (3) redressability.'" *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) (citation omitted).  "Thus, to establish standing, a litigant must demonstrate a 'personal injury fairly traceable to the [opposing party's] allegedly unlawful conduct [that is] likely to be redressed by the requested relief.'" *Id*. (citation omitted). "The absence of any one of these three elements defeats standing." *Newdow v. Roberts*, 603 F.3d 1002, 1010 (D.C. Cir. 2010).

The Ineligible Plaintiffs have no standing to bring Count IV because the Court cannot provide them the relief they seek.  *See Swan v. Clinton*, 100 F.3d 973, 976 (D.C. Cir. 1996) (indicating that the "'redressability' element of standing" entails the question of "whether a federal court has the power to grant [the plaintiff's requested] relief"); *Lozansky v. Obama*, 841 F.Supp.2d 124, 132 (D.D.C. 2012) ("Plaintiffs . . . lack standing because the Court cannot issue the requested writ of mandamus, and thus cannot redress the [claimed] injury.").  The Ineligible Plaintiffs admittedly do not meet the eligibility requirements for either PSLF or TEPSLF relief, and Congress has not taken any steps to make them eligible.   The Court has no authority to "override Congress' policy choice" by "reject[ing] the balance that Congress has struck in a statute." *United*

*States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497–98 (2001).  This is so even where the statute as framed creates "error and other difficulties" in a program that confront even those "who in good faith tr[y]" to comply with the program's requirements.  *Boehm v. Comm'r*, 326 U.S. 287, 295 (1945).  "Any desired remedy for such a situation, of course, lies with Congress rather than with the courts.  It is beyond the judicial power to distort facts or to disregard legislative intent in order to provide equitable relief in a particular situation."  *Id.*

For example, Ms. Baker admits that she had FFEL Loans until 2017 and has not made 120 qualifying payments on Direct Loans.  Compl. ¶ 420(a).  Ms. Finlaw admits that she had a FFEL Loan until 2018 and has not made 120 qualifying payments on Direct Loans.  *Id.* ¶ 420(c).  And Dr. Giambona also admits that he had a FFEL Loan and has not made 120 qualifying payments on Direct Loans.  *Id.* ¶ 420(e).  Congress made a clear policy decision when it enacted the PSLF program to exclude persons with FFEL Loans from PSLF relief.  CRS Rep. R45389 at 3 n.14.  Prior to the enactment of the CCRAA, some proposed legislation would have allowed the benefit to go to those with FFEL loans, but Congress did not choose that path.  *Id.*  Congress also chose not to make FFEL loans eligible for TEPSLF relief even though it was fully aware that this issue was a problem for many borrowers.  *See* GAO-19-595 at 5; *see also* CFPB Rep. 2017 at 29-30.  Legislation has been introduced in the House and Senate that would allow for relief to those with FFEL loans, *see What Can You Do For Your Country Act*, S. 1203 and H.R. 2441, 116th Cong. (2019), but neither bill has become a law.  This Court cannot effectively legislate where Congress has clearly not.

Ms. Menzel and Ms. Nolan allege that they spent years on the wrong repayment plan and admit that they have not made the 120 qualifying payments necessary to obtain relief under PSLF.  Compl. ¶¶ 420(b) & (d).  Ms. Menzel claims that her participation in another benefit program, the

Teacher Loan Forgiveness ("TLF") program, caused her to lose years of qualifying payments under PSLF.  She alleges that if she had not been misinformed by her servicer, she would have foregone the TLF program in favor of the PSLF program.  *Id.* ¶¶ 297-300.  Ms. Nolan claims her loan servicer failed to tell her how to qualify for PSLF and failed to inform her that she could have converted her graduated repayment plan to an IDR plan.  *Id.* ¶¶ 342-44.

Again, Congress, in enacting TEPSLF could have authorized relief for individuals in situations similar to both Ms. Menzel and Ms. Nolan.  Instead, Congress authorized relief only for borrowers, such as Ms. Nolan, who had graduated repayment plans.  Congress did not authorize relief for those, such as Ms. Menzel, who had participated in the TLF program.  *See* GAO-19-595 at 6 (identifying "the Graduated repayment plan" as eligible under TEPSLF).

Plaintiffs allege that the Court has the authority to order the Secretary to waive such statutory requirements under either 20 U.S.C. § 1082(a)(4) or 20 U.S.C. § 1087a(b)(2).  Compl. ¶ 423.  This is incorrect.  While Section 1082(a)(4) states that the Secretary may, "subject to the specific limitations in this part, consent to modification, with respect to rate of interest, time of payment of any installment of principal and interest or any portion thereof, or any other provision of any note or other instrument evidencing a loan which has been insured by the Secretary under this part," 20 U.S.C. § 1082(a)(4), a separate provision, 20 U.S.C. § 1082(a)(2), prohibits injunctive relief against the Secretary.  *See Bank of Am. NT & SA v. Riley*, 940 F. Supp. 348, 350 (D.D.C. 1996) (noting that an injunction is "precluded by § 432(a)(2) of the Higher Education Act of 1965, which prohibits the issuance of an "'attachment, *injunction*, garnishment, or other similar process . . . against the Secretary or property under the Secretary's control") (quoting 20 U.S.C. § 1082(a)(2)), *aff'd*, 132 F.3d 1480 (D.C. Cir. 1997); *Mashiri v. Dep't of Educ.*, 724 F.3d 1028, 1031

(9th Cir. 2013) (identifying 20 U.S.C. § 1082(a)(2) as "§ 1082(a)(2)'s separate 'anti-injunction clause'").

Section 1087a(b)(2), which states that "[n]otwithstanding any other provision of this part, loans made to borrowers under this part that, except as otherwise specified in this part, have the same terms, conditions, and benefits as loans made to borrowers under section 1078 of this title, shall be known as 'Federal Direct Stafford/Ford Loans,'" does not afford the Court the authority to order the Secretary to discharge the Ineligible Plaintiffs' federal student loan debt, even if the Secretary has such discretion.  Courts do not have the authority to order executive branch officials to exercise their discretion in a particular way.  *See FTC v. Anderson*, 631 F.2d 741, 750 (D.C. Cir. 1979) ("[Although a] citizen may be entitled to a court ruling that an agency exercise its discretion[,] . . . the court cannot say which way the discretion is to be exercised.").

Because the Court cannot order the relief the Ineligible Plaintiffs seek under Count IV, they lack standing to pursue such relief and Count IV should be dismissed.

### B.    Count IV Should Be Dismissed For Failure to State a Claim

Alternatively, even if the Court finds that the Ineligible Plaintiffs have standing, they have failed to state a claim under Rule 12(b)(6).  All five Ineligible Plaintiffs admit that they have not made the necessary 120 qualifying payments and thus are ineligible for PSLF relief.  Compl. ¶¶ 420(a)-(e).  An agency cannot be found to abuse its discretion in finding an applicant ineligible when the applicant has conceded her ineligibility.  Nothing in the statutes authorizing the PSLF or the TEPSLF allow for the Secretary to ignore a borrower's failure to meet the eligibility requirements, nor has the Secretary issued any regulations to that effect.  Thus, as a matter of law, the Department's denials of the Servicer Misconduct Plaintiffs' PSLF and/or TEPSLF applications were not arbitrary and capricious.  *Cf. Hovhannisyan v. Holder*, 577 F. App'x 748, 751 (9th Cir.

2014) ("Adjustment of status is only available to aliens who were 'admitted or paroled' into the United States," and "Hovhannisyan, through counsel, conceded to the charge of being present in the United States without admission. As such, the [the agency's] determination that Hovhannisyan was not eligible for adjustment of status was not 'arbitrary, irrational, or contrary to law.'") (quoting *Zhao v. Holder*, 728 F.3d 1144, 1147 (9th Cir. 2013)).  Therefore, Count IV should be dismissed.

## III.   AFT LACKS BOTH ORGANIZATIONAL AND ASSOCIATION STANDING

Finally, AFT should be dismissed from the litigation because it has neither organizational nor association standing.  *Cf.* Comp. ¶ 23 (claiming both).

### A.   AFT Lacks Organizational Standing

Under the doctrine of organizational standing, an organization may sue on its own behalf to protect against the violation of its own interests.  *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1428-29 (D.C. Cir. 1996).  To demonstrate such standing, a plaintiff has the burden of showing "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision."  *PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).  Here, AFT cannot meet the injury-in-fact prong of the organizational standing analysis.

Under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), a "concrete and demonstrable injury to the organization's activities . . . constitutes far more than simply a setback to the organization's abstract social interests."  *Id.* at 379.  "Making this determination is a two-part inquiry—'we ask, first, whether the agency's action or omission to act injured the [organization's] interest and, second, whether the organization used its resources to counteract that harm."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *PETA*,

797 F.3d at 1094).  To satisfy the first prong—"an injury to its interest"—"'an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services.'"  *Id.* (quoting *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015)). Perceptible impairment occurs when the challenged conduct causes an actual "inhibition of [the organization's] daily operations."  *Id.* (quoting *PETA*, 797 F.3d at 1094).  "The court has distinguished between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised."  *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006).

Here, AFT claims that its purpose "is to promote fairness, democracy, economic opportunity, and high-quality education, healthcare, and public services for students, their families, and communities."  Compl. ¶¶ 19, 42(a).  AFT fails to allege that the alleged problems with the PSLF and TEPSLF Programs impede AFT from engaging in those activities.  *See Environmental Working Group v. FDA*, 301 F. Supp. 3d 165, (D.D.C. 2018) ("It is damage to organizational *activities* that an organization must allege, and the Plaintiffs here only allege that their organizational *goals* have been impeded.").  Although AFT claims that it has had to "redirect its resources from other projects to assist its members in seeking and obtaining the loan forgiveness to which they are statutorily entitled," Compl. ¶ 42(c), AFT critically does not allege that its operational costs have gone beyond those normally expended.  In the absence of such an allegation, AFT fails to plead organizational standing.  *See Food & Water Watch*, 808 F.3d at 920 ("[A]n organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'") (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir.

1995)).  *See also Environmental Working Group*, 301 F. Supp. 3d at 172-73 (same); *Cigar Ass'n of Am. v. F.D.A.*, 323 F.R.D. 54, 63 (D.D.C. 2017) (same).

Because AFT has failed to allege an injury-in-fact to its own operations, it lacks organizational standing to participate in this litigation and should be dismissed for that reason.

### B.    AFT Lacks Association Standing

To establish associational standing, AFT must show that "(1) at least one of [its] members would have standing to sue; (2) the interests [it] seek[s] to protect are germane to the organization['s] purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual members."  *Sierra Club v. EPA*, 754 F.3d 995, 999 (D.C. Cir. 2014). AFT's bid for associational standing fails under the third factor.  It is "evident that significant participation" from AFT's members is required to prove the due process violations alleged by AFT under Counts III and V.  *Community Fin. Servs. Ass'n of Am., Ltd. v. FDIC*, No. 14-cv-953, 2016 WL 7376847, at *4 (D.D.C. Dec. 19, 2016).  "[T]o make out a violation of due process, the plaintiff must show the Government deprived her of a 'liberty or property interest' to which she had a 'legitimate claim of entitlement,' and that 'the procedures attendant upon that deprivation were constitutionally [in]sufficient.'"  *Roberts v. United States*, 741 F.3d 152, 161 (D.C. Cir. 2014) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

Although AFT seeks wide-ranging programmatic relief on behalf of its members, it fails to allege that the relief it seeks will uniformly resolve its members' alleged injuries.  AFT admits that if the Court grants the relief it seeks, such relief only "will inure to the benefit of all AFT members actually injured."  Compl. ¶ 43(c).  *Cf. Long Term Care Pharmacy All. v. UnitedHealth Group, Inc.*, 498 F. Supp. 2d 187, 194 (D.D.C. 2007) (requiring the participation of an association's individual members given that "different procedures and conditions" existed for each

member such that "defendant may have breached its obligations to some . . . but not to others"). Individualized proof is necessary for AFT members to demonstrate that their due process rights were violated, *Rent Stabilization Ass'n of New York City, Inc. v. Dinkins*, 805 F. Supp. 159, 165 (S.D.N.Y. 1992) ("The same individualized proof necessary to determine whether there was a taking is essential in finding a violation of due process"), *aff'd*, 5 F.3d 591 (2d Cir. 1993), which is no doubt why the factual allegations supporting each of the individual plaintiffs' claims span 271 paragraphs. *See* Compl. ¶¶ 107-235 (for the Eligible Plaintiffs), and ¶¶ 251-394 (for the Ineligible Plaintiffs). Each of the Individual Plaintiffs' claims are incredibly fact-specific, as each must demonstrate that the procedures attendant upon their application denials were constitutionally insufficient. As can be seen from the Complaint's allegations, none of the Individual Plaintiffs had the exact same experience as the others. *Compare* Compl. ¶ 147 (alleging that Ms. Miller took advantage of numerous options to challenge her denials, "including telephone calls and emails to [Education] and FedLoan Servicing, questions submitted via the 'Contact Us' form on the FedLoan Servicing website and [Education]'s online FSA Feedback Center, letters to Ed and FedLoan Servicing via U.S. Postal Service Priority Mail, and documents uploaded to her FedLoan Servicing online account"), *with id.* ¶¶ 217-221 (alleging that Ms. Wakefield challenged her denials in part by filing a complaint with the CFPB, which sent her "notice . . . that FedLoan Servicing and [Education] had 'performed a thorough review' of [her] federal student loan account and that her complaint had been closed with explanation").

"[W]here a fact-specific inquiry is necessary to establish a violation, . . . [c]ourts have concluded that member participation is required." *Community Fin. Servs. Ass'n of Am., Ltd.*, 2016 WL 7376847, at *7 (citing *Friends for American Free Enter. Ass'n v. Wal-Mart Stores, Inc.*, 284 F.3d 575, 577 (5th Cir. 2002)); *see also Kans. Health Care Ass'n v. Kans. Dep't of Soc. & Rehab.*

*Servs.*, 958 F.2d 1018, 1023 (10th Cir. 1992) ("[B]ecause proof and resolution of the claims asserted [by plaintiff associations] will unavoidably require individual participation of their members, we hold that the two associations lack standing to sue as representative of their members"); *Long Term Care Pharmacy Alliance*, 498 F. Supp. 2d at 194-95.  The fact that AFT seeks injunctive relief is insufficient to establish that member participation is not required.  *See Community Fin. Servs. Ass'n of Am., Ltd.*, 2016 WL 7376847, at *5-6 (citing *Friends for American Free Enter. Ass'n*, 284 F.3d at 577; and *Kans. Health Care Ass'n*, 958 F.2d at 1023).

Accordingly, AFT should be dismissed from this litigation for lack of standing.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Defendants' Partial Motion to Dismiss, and dismiss Counts III, IV, and V of the Complaint, and should also dismiss AFT (i.e., Plaintiffs Randi Weingarten and the American Federation of Teachers, AFL-CIO) as parties to this litigation.

Dated:  October 4, 2019     Respectfully submitted,


          JOSEPH H. HUNT
          Assistant Attorney General

          MARCIA BERMAN
          Assistant Branch Director, Federal Programs

          */s/ Jonathan D. Kossak*
          Jonathan D. Kossak (D.C. Bar No. 991478)
          Trial Attorney, U. S. Dept. of Justice
          Civil Division, Federal Programs Branch
          1100 L St., NW
          Washington, D.C. 20005
          Tel. (202) 305-0612
          Jonathan.Kossak@usdoj.gov

          *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing Memorandum in Support of Defendants' Partial Motion to Dismiss Counts III, IV, and V and to Dismiss Plaintiffs Randi Weingarten and American Federation of Teachers, AFL-CIO, with the Clerk of the Court via email at dcd_cmecf@dcd.uscourts.gov per the Clerk's advisement that "CM/ECF for the District Court of the District of Columbia will be unavailable from Friday, October 4, at 1:00 pm through Monday, October 7, at 7:00 am while we upgrade to the Next Generation of CM/ECF (NextGen).  If you have a statutory requirement to file during this time frame, you may file your document in PDF format at dcd_cmecf@dcd.uscourts.gov."  I have also served this document via email on Plaintiffs' Counsel as follows:

Mark H. Richard
PHILLIPS, RICHARD & RIND, P.A.
9360 Sw 72 Street Suite 283
Miami , FL  33173
(305) 412-8322
Email:Mrichard@phillipsrichard.Com

Robyn K. Bitner
NATIONAL STUDENT LEGAL DEFENSE NETWORK
1015 15th Street Nw Suite 600
Washington , DC  20005
(202) 734-7495
Email:Robyn@nsldn.Org

Aaron S. Ament
NATIONAL STUDENT LEGAL DEFENSE NETWORK
1015 15th Street Nw Suite 600
Washington , DC  20005
(847) 722-7945
Email:Aaron@nsldn.Org

Caitlin Halligan
SELENDY & GAY, PLLC
1290 Avenue Of The Americas
New York , NY  10104
(212) 390-9013
Email:Challigan@selendygay.Com

Daniel A. Zibel
NATIONAL STUDENT LEGAL DEFENSE NETWORK
1015 15th Street Nw Suite 600
Washington , DC  20005
(202) 734-7495
Email:Dan@nsldn.Org

Faith E. Gay
SELENDY & GAY PLLC
1290 Avenue Of The Americas
New York , NY  10104
(212) 390-9001
Fax: (212) 390-9399
Email:Fgay@selendygay.Com

Maria Ginzburg
SELENDY & GAY, PLLC
1290 Avenue Of The Americas
New York , NY  10104
(212) 390-9006
Email:Mginzburg@selendygay.Com

Yelena Konanova
SELENDY & GAY, PLLC
1290 Avenue Of The Americas
New York , NY  10104
(212) 390-9010
Email:Lkonanova@selendygay.Com

Margaret Marie Siller
SELENDY & GAY, PLLC
1290 Avenue Of The Americas
New York , NY  10104
(212) 390-9000
Email:Msiller@selendygay.Com

/s/ Jonathan D. Kossak
JONATHAN D. KOSSAK
Trial Attorney (DC Bar # 991478)
United States Department of Justice
Civil Division, Federal Programs
Branch