# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RANDI WEINGARTEN, *in her official capacity as President of the American Federation of Teachers, AFL-CIO*, AMERICAN FEDERATION OF TEACHERS, AFL-CIO, CYNTHIA MILLER, CRYSTAL ADAMS, CONNIE WAKEFIELD, DEBORAH BAKER, JANELLE MENZEL, KELLY FINLAW, GLORIA NOLAN, and MICHAEL GIAMBONA,

        Plaintiffs,

   v.

ELISABETH DEVOS, *in her official capacity as the Secretary of the United States Department of Education*, and UNITED STATES DEPARTMENT OF EDUCATION,

        Defendants.

Civil Action No. 1:19-cv-02056 (DLF)

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

# TABLE OF CONTENTS

**Pages**

STATEMENT OF THE CASE.................................................................................1

STATEMENT OF FACTS ..................................................................................5

    A.    Statutory and Regulatory Background ..................................................5

    B.    PSLF and TEPSLF Failures.................................................................8

    C.    Plaintiffs' Claims ..............................................................................10

ARGUMENT ....................................................................................................13

I.    AFT HAS ORGANIZATIONAL AND ASSOCIATIONAL STANDING ....................13

    A.    AFT Has Sufficiently Alleged that It Has Organizational Standing....................13

        1.    ED's Denials of PSLF and TEPSLF Applications Without Due Process Have Injured AFT's Mission and Interest ...................................14

        2.    AFT Has Used Its Resources to Counteract the Harm Caused by Defendants' Unlawful Actions ................................16

    B.    AFT Has Sufficiently Alleged Associational Standing ........................................20

II.    PLAINTIFFS HAVE PLEADED A COGNIZABLE CLAIM UNDER THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT (COUNTS III AND V) ............23

    A.    Plaintiffs Have Pleaded Distinct, Cognizable Due Process Claims Arising Out of ED's Failures to Give Applicants Adequate Notice and a Meaningful Process to Seek Review of PSLF and TEPSLF Denials ...................24

    B.    Plaintiffs' Due Process Claims Do Not Seek Wholesale, Programmatic Relief..............................................28

III.    THE SERVICER MISCONDUCT PLAINTIFFS HAVE STANDING AND HAVE PLAUSIBLY STATED A CLAIM FOR RELIEF UNDER 5 U.S.C. § 706(2) (COUNT IV) ......................................33

    A.    The Servicer Misconduct Plaintiffs Have Stated a Claim for Relief Under the APA.............................34

    B.    The Servicer Misconduct Plaintiffs Have Standing to Bring Their APA Claims ......................................37

CONCLUSION.....................................................................................................42

## TABLE OF AUTHORITIES

**Pages**

**Cases**

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*,
    469 F.3d 129 (D.C. Cir. 2006) ............................................................................ 14, 16, 19

*Am. Bar Ass'n v. U.S. Dep't of Educ.*,
    370 F. Supp. 3d 1 (D.D.C. 2019) ..................................................................................... 24

*Am. Hosp. Ass'n v. Azar*,
    385 F. Supp. 3d 1 (D.D.C. 2019) ..................................................................................... 41

*Armstrong v. Exceptional Child Ctr., Inc.*,
    135 S. Ct. 1378 (2015) ...................................................................................................... 25

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*,
    627 F.3d 547 (5th Cir. 2010) ............................................................................................ 23

*Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Fed. Emergency Mgmt. Agency*,
    463 F. Supp. 2d 26 (D.D.C. 2006) ...................................................................... 21, 22, 23

*Bank of Am. v. Riley*,
    940 F. Supp. 348 (D.D.C. 1996) ............................................................................... 39, 40

*Calixto v. U.S. Dep't of the Army*,
    No. 18-CV-1551 (ESH), 2019 WL 2139755 (D.D.C. May 16, 2019) ....................... 26, 30

*Canterbury Career Sch., Inc. v. Riley*,
    833 F. Supp. 1097 (D.N.J. 1993) ..................................................................................... 39

*Chiayu Chang v. U.S. Citizenship & Immigration Servs.*,
    254 F. Supp. 3d 160 (D.D.C. 2017) ................................................................................. 28

*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*,
    387 F. Supp. 3d 33 (D.D.C. 2019) ................................................................................... 15

*City of New York v. U.S. Dep't of Def.*,
    913 F.3d 423 (4th Cir. 2019) ............................................................................................ 31

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. FDIC*,
    No. 14-CV-953 (GK), 2016 WL 7376847 (D.D.C. Dec. 19, 2016) ................................ 22

*Cmty. Nutrition Inst. v. Block*,
    698 F.2d 1239 (D.C. Cir. 1983) ................................................................................. 41, 42

*Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*,
  365 F.3d 435 (6th Cir. 2004) ............................................................... 38

*Cobell v. Norton*,
  392 F.3d 461 (D.C. Cir. 2004) ............................................................ 31

*Consumer Data Indus. Ass'n v. King*,
  678 F.3d 898 (10th Cir. 2012) ............................................................ 41

*Davis v. Passman*,
  442 U.S. 228 (1979) ............................................................................. 25

*De La Mota v. U.S. Dep't of Educ.*,
  No. 02 CIV. 4276 (LAP), 2003 WL 21919774 (S.D.N.Y. Aug. 12, 2003) ..................... 41

*Del Monte Fresh Produce N.A. v. United States*,
  706 F. Supp. 2d 116 (D.D.C. 2010) ...................................................... 31

*DiNello v. U.S. Dep't of Educ.*,
  No. 06-CV-2763, 2006 WL 3783010 (N.D. Ill. Dec. 21, 2006) ...................... 39

*Envtl. Working Grp. v. U.S. Food & Drug Admin.*,
  301 F. Supp. 3d 165 (D.D.C. 2018) ...................................................... 19

*\*Equal Rights Ctr. v. Post Props., Inc.*,
  633 F.3d 1136 (D.C. Cir. 2011) ..................................................... 14, 17

*Fares v. Smith*,
  249 F. Supp. 3d 115 (D.D.C. 2017) ...................................................... 27

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ...................................................... 18, 19

*Goldberg v. Kelly*,
  397 U.S. 254 (1970) ............................................................................. 30

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ................................................................. 13, 14, 16

*Hegab v. Long*,
  716 F.3d 790 (4th Cir. 2013) ............................................................... 28

*Hensley v. United States*,
  292 F. Supp. 3d 399 (D.D.C. 2018) ...................................................... 42

*High Sierra Hikers Ass'n v. Blackwell*,
  390 F.3d 630 (9th Cir. 2004) ............................................................... 32

*Hovhannisyan v. Holder,*
      577 F. App'x 748 (9th Cir. 2014) ................................................................. 36

*Humane Soc'y of U.S. v. Zinke,*
      865 F.3d 585 (D.C. Cir. 2017) ..................................................................... 35

*Hunt v. Wash. State Apple Advert. Comm'n,*
      432 U.S. 333 (1977) ..................................................................................... 20

*Int'l Dealers Sch., Inc. v. Riley,*
      840 F. Supp. 748 (D. Nev. 1993) ................................................................. 39

*Jicarilla Apache Nation v. U.S. Dep't of Interior,*
      613 F.3d 1112 (D.C. Cir. 2010) ................................................................... 35

*Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.,*
      958 F.2d 1018 (10th Cir. 1992) ................................................................... 22

*\*Kapps v. Wing,*
      404 F.3d 105 (2d Cir. 2005) ........................................................................ 25

*Larson v. Valente,*
      456 U.S. 228 (1982) ..................................................................................... 41

*Long Term Care Pharmacy All. v. Leavitt,*
      530 F. Supp. 2d 173 (D.D.C. 2008) ............................................................ 31

*Long Term Care Pharmacy All. v. UnitedHealth Grp., Inc.,*
      498 F. Supp. 2d 187 (D.D.C. 2007) ............................................................ 22

*Lujan v. Defenders of Wildlife,*
      504 U.S. 555 (1992) ..................................................................................... 37

*\*Lujan v. Nat'l Wildlife Fed'n,*
      497 U.S. 871 (1990) ..................................................................... 26, 28, 29, 30

*Mashiri v. Dep't of Educ.,*
      724 F.3d 1028 (9th Cir. 2013) ..................................................................... 40

*\*Massachusetts v. E.P.A.,*
      549 U.S. 497 (2007) ................................................................................ 35, 42

*McKoy v. Spencer,*
      271 F. Supp. 3d 25 (D.D.C. 2017) .............................................................. 40

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
      463 U.S. 29 (1983) ....................................................................................... 35

iv

*N.B. v. District of Columbia*,
  244 F. Supp. 3d 176 (D.D.C. 2017) .................................................... 25

*\*Nat'l Council of Resistance of Iran v. Dep't of State*,
  251 F.3d 192 (D.C. Cir. 2001) ............................................... 25, 29

*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) ..................................................... 18

*Nat'l Treasury Emps. Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) .................................................... 20

*NB ex rel. Peacock v. D.C.*,
  794 F.3d 31 (D.C. Cir. 2015) ...................................................... 23

*\*Norton v. Southern Utah Wilderness Alliance ("SUWA")*,
  542 U.S. 55 (2004) ............................................................... 29

*OneSimpleLoan v. U.S. Sec'y of Educ.*,
  No. 06 CIV. 2979 (RMB), 2006 WL 1596768 (S.D.N.Y. June 9, 2006) ........ 39

*Parsons v. U.S. Dep't of Justice*,
  801 F.3d 701 (6th Cir. 2015) ..................................................... 26

*Penn. Psychiatric Soc. v. Green Spring Health Servs., Inc.*,
  280 F.3d 278 (3d Cir. 2002) ...................................................... 23

*\*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric. ("PETA")*,
  797 F.3d 1087 (D.C. Cir. 2015) ....................................... 14, 16, 18, 19

*Pub. Citizen Health Research Grp. v. Acosta*,
  363 F. Supp. 3d 1 (D.D.C. 2018) .................................................. 37

*Ramirez v. U.S. Immigration & Customs Enf't*,
  310 F. Supp. 3d 7 (D.D.C. 2018) .................................................. 30

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
  908 F.3d 476, 512 (9th Cir. 2018) ................................................ 26

*Retired Chi. Police Ass'n v. City of Chicago*,
  7 F.3d 584 (7th Cir. 1993) ....................................................... 23

*Robles v. Kerry*,
  74 F. Supp. 3d 254 (D.D.C. 2014) ................................................. 40

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) ............................................................... 37

*Sisseton Wahpeton Oyate of the Lake Traverse Reservation v. Jewell,*
130 F. Supp. 3d 391 (D.D.C. 2015) .................................................................. 32

*Spann v. Colonial Vill., Inc.,*
899 F.2d 24 (D.C. Cir. 1990) ............................................................................ 16

*Stewart v. Azar,*
313 F. Supp. 3d 237 (D.D.C. 2018) .................................................................. 35

*Stewart v. Azar,*
366 F. Supp. 3d 125 (D.D.C. 2019) .................................................................. 35

*\*Student Loan Mktg. Ass'n v. Riley,*
907 F. Supp. 464 (D.D.C. 1995) .................................................................. 39, 40

*Thomas v. Bennett,*
856 F.2d 1165 (8th Cir. 1988) .......................................................................... 39

*Trudeau v. Fed. Trade Comm'n,*
456 F.3d 178 (D.C. Cir. 2006) .......................................................................... 26

*United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.,*
517 U.S. 544 (1996) ..................................................................................... 20, 21

*United States v. Microsoft Corp.,*
253 F.3d 34 (D.C. Cir. 2001) ............................................................................ 38

*Veterans for Common Sense v. Shinseki,*
678 F.3d 1013 (9th Cir. 2012) .......................................................................... 31

*Vietnam Veterans of Am. v. Shinseki,*
599 F.3d 654 (D.C. Cir. 2010) .......................................................................... 27

*Wedgewood Vill. Pharmacy v. D.E.A.,*
509 F.3d 541 (D.C. Cir. 2007) .......................................................................... 35

*Z St., Inc. v. Koskinen,*
44 F. Supp. 3d 48 (D.D.C. 2014) ...................................................................... 40

**Statutes**

20 U.S.C. § 1082 ............................................................................................. passim

20 U.S.C. § 1087 ............................................................................................. passim

43 U.S.C. § 1782 .................................................................................................... 29

5 U.S.C. § 551 ................................................................................................... 26, 28

5 U.S.C. § 555 .................................................................................................... 2

5 U.S.C. § 702 .................................................................................................. 40

5 U.S.C. § 706 ............................................................................................. 2, 38

## Rules

34 C.F.R. § 30.70 ............................................................................................ 36

34 C.F.R. § 685.219 .......................................................................................... 6

## Other Authorities

*Examining Policies and Priorities of the U.S. Dep't of Educ.: Hearing Before the House Comm. on Educ. and Labor*, 116th Cong. (Apr. 10, 2019) (testimony of Betsy DeVos, Secretary of Education), https://www.c-span.org/video/?459644-1/education-policy-hearing-secretary-devos .................................................. 33

Michael Stratford, *Trump Pledge to Forgive Disabled Veterans' Student Loans Delayed – at Education Department*, Politico (Nov. 21, 2019, 6:51 PM), http://www.politico.com/news/2019/11/21/trump-disabled-veterans-student-loans-072750 .......................................................................................................... 37

U.S. Dep't of Educ., Office of Inspector Gen., ED-OIG/A05Q0008, *Federal Student Aid: Additional Actions Needed to Mitigate the Risk of Servicer Noncompliance with Requirements for Servicing Federally Held Student Loans* (Mar. 5, 2019), https://www2.ed.gov/about/offices/list/oig/auditreports/fy2019/a05q0008.pdf .............. 34

U.S. Gov't Accountability Office, GAO-18-547, *Public Service Loan Forgiveness: Education Needs to Provide Better Information for the Loan Servicer and Borrowers* 24 (Sept. 2018), https://www.gao.gov/assets/700/694304.pdf ...................... 34

U.S. Gov't Accountability Office, GAO-19-595, *Public Service Loan Forgiveness: Improving the Temporary Expanded Process Could Help Reduce Borrower Confusion* 1 (Sept. 2019), https://www.gao.gov/assets/710/701157.pdf ......................... 34

## STATEMENT OF THE CASE

The Public Service Loan Forgiveness ("PSLF") Program, enacted by Congress in 2007, was a promise to millions of teachers, prosecutors, nurses, police officers, and other public servants that, in exchange for ten years of public service and qualifying payments on eligible federal student loans, Congress would forgive any remaining student loan debt that they owed back to the federal government. The PSLF statute creates a federal entitlement to loan relief for eligible borrowers, mandating that the United States Department of Education (the "Department") "shall cancel the balance of interest and principal due" for qualifying loans held by public servants after ten years of payments. 20 U.S.C. § 1087e(m).

Unfortunately, despite Congress's clear intent, the Department and the Secretary of Education, Betsy DeVos (the "Secretary") (together, "ED"), have by all accounts utterly failed to implement Congress's directive to discharge the loans of eligible public servants. According to ED's own reports, as of March 2019, it had forgiven the loans of *fewer than one percent* of the borrowers who had applied for PSLF—only 518 of the estimated 32 million borrowers making payments on potentially eligible loans. Compl. ¶ 3. Recognizing that the program had failed to give public servants meaningful debt relief as promised, Congress attempted to expand access to loan forgiveness through the Temporary Expanded Public Service Loan Forgiveness ("TEPSLF") Program. *Id.* ¶ 4. But under ED's management, TEPSLF has also failed to provide borrowers with meaningful debt relief: As of March 2019, only 3.6% of TEPSLF applications had been approved. *Id.*

Plaintiffs Randi Weingarten, in her official capacity as President of the American Federation of Teachers, AFL-CIO, and the American Federation of Teachers, AFL-CIO (collectively, "AFT"); Connie Wakefield, Cynthia Miller, and Crystal Adams (together, the "Administrative Error Plaintiffs"); and Deborah Baker, Janelle Menzel, Kelly Finlaw, Gloria Nolan, and Michael

Giambona (together, the "Servicer Misconduct Plaintiffs," and together with the Administrative Error Plaintiffs, the "Individual Plaintiffs") bring this case to compel ED to address the grievous shortcomings in its implementation of Congress's directive. Each of the Administrative Error Plaintiffs made the requisite 120 qualifying payments on time while working for a qualifying employer and were still—inexplicably—denied loan forgiveness. *Id.* ¶ 5. When each of these Plaintiffs attempted to point out to ED that their PSLF and TEPSLF applications had been improperly denied, ED refused to correct the mistakes and summarily denied loan forgiveness. *Id.* The Servicer Misconduct Plaintiffs fared no better. They were misled by loan servicers with whom ED contracted regarding how to qualify for PSLF, and discovered after ten years that the payments they had made all along did not qualify for PSLF. *Id.* ¶ 6. Had these individuals received accurate information from their servicers, they could have easily consolidated their loans, entered qualifying repayment plans, and been eligible for forgiveness. *Id.*

ED turned a blind eye to these repeated misrepresentations by its servicers and failed to give Plaintiffs adequate notice of the reasons for their denials, much less any mechanism to contest their denials or raise these issues with ED. *Id.* ¶ 7. Plaintiffs allege that ED has violated the Administrative Procedure Act, 5 U.S.C. §§ 555, 706 ("APA"), and the Due Process Clause of the Fifth Amendment by arbitrarily and capriciously denying their applications for PSLF and TEPSLF, failing to provide adequate notice of the reasons for ED's denials, and failing to provide the Individual Plaintiffs with an opportunity to be heard in order to contest ED's decisions regarding their eligibility for PSLF and TEPSLF.

Defendants do not challenge the facts underlying these claims or defend ED's misconduct. Nor do Defendants move to dismiss Plaintiffs' APA claims in Counts I and II, which seek relief for ED's arbitrary and capricious denials of the Administrative Error Plaintiffs' PSLF and TEPSLF

applications, and for ED's failure to provide adequate notice of the reasons for these denials. *See Memorandum of Points and Authorities in Support of Defendants' Partial Motion to Dismiss* ("Defs.' Mot.") at 13. Rather, ED moves to dismiss Plaintiffs' suit only in part, contending that: (1) AFT lacks organizational and associational standing; (2) Plaintiffs' due process claims (Counts III and V) are broad programmatic challenges and are barred by the restrictions on such relief that apply to APA claims; and (3) the Servicer Misconduct Plaintiffs lack standing and fail to state a claim for relief under the APA (Count IV). Each of these challenges should be rejected.

*First*, AFT has adequately alleged organizational and associational standing. As to organizational standing, Defendants claim AFT did not allege that its activities have been sufficiently impaired to establish injury-in-fact. But the Complaint plainly alleges that AFT's organizational mission of ensuring public servants can get affordable post-secondary education has been frustrated by ED's conduct, and that ED's failures have caused AFT to make specific and significant expenditures to counsel its members and guide them through the PSLF quagmire in an attempt to mitigate the harm ED has caused. *See* Compl. ¶ 42. This is more than enough to establish organizational standing. *See infra* § I.A. As for associational standing, ED does not dispute that AFT's members have standing to challenge ED's due process violations in their own right, or that protecting its members' rights to adequate process is germane to AFT's purpose. ED claims only that substantial participation and proof from individual AFT members is required to make out a due process claim. Not so. AFT's allegations that ED's procedures do not give borrowers adequate notice and an opportunity to be heard regarding their eligibility for PSLF and TEPSLF can be established through evidence of ED's own internal procedures, coupled with testimony from various AFT members whose experiences typify the due process violations inherent in ED's

administration of the PSLF program. This minimal individual participation is fully consistent with associational standing. *See infra* § I.B.

*Second*, Defendants cannot sidestep Plaintiffs' due process claims simply by dubbing them artful pleading that would purportedly be foreclosed as a programmatic challenge if brought under the APA. Defs.' Mot. at 13. Plaintiffs are the masters of their complaint and have alleged distinct, cognizable due process claims arising out of ED's failures to give PSLF and TEPSLF applicants adequate notice and a meaningful process to seek review of denials. Even if Plaintiffs had challenged this conduct under the APA, rather than the Due Process Clause, the claims could still proceed.[1] Plaintiffs' due process challenge is a far cry from the kind of wholesale, programmatic attack—wholly divorced from any specific agency action—precluded by Supreme Court precedent in the APA context. Plaintiffs have not asked this Court to rewrite the PSLF and TEPSLF statutes; instead, they seek redress for specific agency actions in denying their PSLF and TEPSLF applications without due process (for example, by asking the Court to require ED to implement constitutionally-mandated procedural safeguards). *See infra* § II.

*Finally*, Defendants' request for dismissal of the Servicer Misconduct Plaintiffs' claims should be denied. These Plaintiffs made 120 payments that their servicers informed them were qualifying only to find out—after ten years of repayment—that they had the wrong loan or were in the wrong repayment program. Contrary to Defendants' insistence that ED can do nothing to remedy the devastating consequences of this pervasive misconduct by its own servicers, the Higher Education Act ("HEA") expressly empowers the Secretary to compromise and settle student loans. Nor are there any other constraints that would preclude this Court from granting the declaratory

---

[1] In fact, Defendants do not even move to dismiss the Administrative Error Plaintiffs' APA claims on this ground. Defs.' Mot. at 1.

relief Plaintiffs seek. A declaration that ED acted arbitrarily and capriciously by denying Plaintiffs' applications without taking into account its servicers' repeated misrepresentations, along with vacatur and remand of those denials, would remedy the harm suffered here. Accordingly, the Servicer Misconduct Plaintiffs' claims are fully redressable. And given that the Servicer Misconduct Plaintiffs' APA claims rest on ED's failure to consider an important aspect of the problem—namely, its servicers' misrepresentations—Plaintiffs' ineligibility resulting from *those very same misrepresentations* cannot bar their claims under Section 706(2)(A) of the APA. *See infra* § III.

The Individual Plaintiffs are public servants who, for over ten years, have made timely payments on their loans, and *should* qualify for PSLF or TEPSLF; yet, each has been denied much-needed forgiveness for reasons outside their control. ED has eviscerated the statutory promise of loan forgiveness for those who have spent a decade or more in public service, all while dutifully repaying their loans. ED does not dispute that the Administrative Error Plaintiffs' APA challenges to ED's denials may move forward, and they offer no valid reason to dismiss the remaining claims either. This Court should allow Plaintiffs' action to proceed in its entirety.

## STATEMENT OF FACTS

### A. Statutory and Regulatory Background

In 2007, Congress enacted the College Cost Reduction and Access Act of 2007 ("CCRAA"), which amended the Higher Education Act of 1965 and created the PSLF program. Pub. L. No. 110-84, § 401, 121 Stat. 784, 800-01 (2007). The PSLF program was "intended to encourage individuals to enter and continue in full-time public service employment" by "relieving them[] of the huge burden of debt they face" after finishing school. Compl. ¶¶ 60, 62. The PSLF program had bipartisan support, and lawmakers on both sides lauded it for providing critical relief to public servants who "work tirelessly and, far too often, for much less pay than they deserve." *Id.* ¶ 63.

The CCRAA amended the William D. Ford Direct Student Loan Program[2] ("Direct Loan Program"), through which the federal government makes loans directly to borrowers, by providing that the Secretary of Education "shall cancel the balance of interest and principal due . . . on any eligible Federal Direct Loan not in default" for borrowers who meet certain eligibility requirements. 20 U.S.C. § 1087e(m). Section 455 of the CCRAA provides that a borrower is eligible for PSLF if she has made 120 monthly payments on an eligible federal Direct Loan after October 1, 2007, pursuant to an income-driven or standard repayment plan, while being employed in a public service job at the time of forgiveness, and while being employed in a public service job during the period when each of the requisite 120 payments were made. Compl. ¶ 66 (citing 20 U.S.C. § 1087e(m)). After 120 payments, the Secretary forgives the principal and accrued interest that remains on all eligible loans for which loan forgiveness is requested by the borrower. *See* 34 C.F.R. § 685.219(d).

While ED retains ultimate responsibility for administering the PSLF program, it has contracted with third-party servicers to service loans for borrowers under both the FFEL and Direct Loan Programs. Compl. ¶¶ 55–56. ED has specifically designated one such servicer—FedLoan Servicing—as the servicer for all borrowers in the PSLF program. *See id.* ¶ 69. These servicers "are responsible for collecting payments on a loan, advising borrowers on resources and benefits to better manage their federal student loan obligations, responding to customer service inquiries, and performing other administrative tasks associated with maintaining a loan on behalf of [ED]."

---

[2] There are two student financial assistance programs relevant to this case: The Federal Family Education Loan Program ("FFEL Program") and the Direct Loan Program. Until 1993, all federal student loans were issued pursuant to the FFEL Program; those loans were originated and funded by private lenders but insured by the federal government. Compl. ¶ 52. In 1993, the federal government began originating loans directly to borrowers through the Direct Loan Program. *Id.* The two programs operated in tandem until 2010, when Congress ended the origination of new FFEL loans. *Id.*

*Id.* ¶ 57.  ED instructs borrowers to rely on their servicer when selecting the optimal loan repayment option, and for assistance in applying for an income-driven repayment plan and loan consolidation.  *Id.* ¶ 58.  ED does not dispute that it has contractual authority to review FedLoan Servicing's actions and has never delegated final decision-making authority over the PSLF program to FedLoan Servicing or any other entity.  *Id.* ¶ 83.

Once a borrower has made 120 qualifying payments, the borrower must complete a PSLF application and continue working full-time for a qualifying employer.  *Id.* ¶ 80.  If the borrower meets all of the eligibility requirements, FedLoan Servicing forwards the application to ED for final review, at which point ED must forgive the balance of principal and interest due on the borrower's eligible Direct Loans.  *Id.* ¶ 81.  If ED determines that a borrower did not meet all of the requirements for loan forgiveness, the Secretary must notify the borrower that the application has been denied, provide the basis for the denial, and inform the borrower that the Secretary will continue collection of the loan.  *Id.* ¶ 82.  ED provides *no* process for a borrower to challenge or appeal the denial of PSLF, or otherwise seek correction of any mistakes made by ED or its loan servicers. *Id.* ¶ 84.

In addition to mandating forgiveness for eligible borrowers under Section 1087e(m), the HEA gives ED "Compromise and Settlement Authority," which allows the Secretary to "enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption" for FFEL or Direct Loans.[3]  Compl. ¶¶ 91–92 (citing 20 U.S.C. § 1082(a)(6)).  This power enables ED to settle with a student loan borrower who

---

[3] ED maintains the same Compromise and Settlement Authority with respect to loans issued under the Direct Loan Program.  *See* 20 U.S.C. § 1087a(b)(2) ("Notwithstanding any other provision of this part, loans made to borrowers under this part that . . . have the same terms, conditions, and benefits as loans made to borrowers under section 1078 of this title, shall be known as 'Federal Direct Stafford/Ford Loans.'").

is unable to meet the requirements for forgiveness for any reason, including because ED or a loan servicer misrepresented the eligibility requirements. *Id.* ¶ 91.

## B.     PSLF and TEPSLF Failures

More than a decade after its enactment, Congress's promise of loan forgiveness through the PSLF program remains almost entirely unrealized. ED's failures in administering the PSLF program have prevented overwhelming numbers of public servants from obtaining the debt relief to which they are entitled. The Consumer Financial Protection Bureau ("CFPB") estimates that approximately one in four U.S. workers is employed in public service and that, "[b]y the end of 2016, more than 32 million borrowers were repaying loans that [we]re potentially eligible for PSLF." *Id.* ¶ 85. But, as of March 2019, only 864 applications for PSLF had been approved for forgiveness, and only 518 borrowers—fewer than one percent of all borrowers submitting applications—have had their loans forgiven. *Id.* ¶ 86.

Recognizing these failures, in January 2018, a bipartisan group of lawmakers reaffirmed Congress's commitment to loan forgiveness for public servants, making $350 million available on a first-come, first-served basis as a temporary expansion of PSLF. *Id.* ¶ 87. This program, known as "TEPSLF," is available to borrowers who hold Direct Loans who made some or all of their 120 payments on a nonqualifying repayment plan, and whose last twelve payments were greater or equal to what they would have paid on an income-driven repayment plan. *Id.*

According to FedLoan Servicing and ED, borrowers can apply for TEPSLF by simply emailing FedLoan Servicing and requesting that ED reconsider their eligibility for PSLF. *Id.* ¶ 88. ED, through FedLoan Servicing, then reviews the application and determines whether to grant TEPSLF. *Id.* There is no process for a borrower to challenge or appeal their denial of TEPSLF, nor does ED have any process by which it reviews and corrects mistakes regarding TEPSLF made by ED or its servicers. *Id.* ¶ 89. Under ED's management, the TEPSLF program has fallen well

short of Congress's intention to expand access to loan forgiveness for public servants: As of March 2019, only 442 requests out of 12,429 requests considered—3.6%—had been approved for loan forgiveness. *Id.* ¶ 90.

ED suggests that failures in the administration of the PSLF and TEPSLF programs stem largely from "complexities in the PSLF program," of which Congress was well aware. *See* Defs.' Mot. at 8–9. But reports from federal watchdog agencies like the Government Accountability Office ("GAO") make clear that ED bears the ultimate responsibility for these problems. For example, in its September 2018 report on the PSLF program, the GAO noted that ED "has not provided [FedLoan Servicing] with a comprehensive source of guidance and instructions on how to operate the [PSLF] program, raising the risk that [FedLoan Servicing] may improperly approve or deny borrowers' certification requests and forgiveness applications." Compl. ¶ 97. The GAO found that "[ED] has not ensured [FedLoan Servicing] is receiving consistent loan payment history information from other loan servicers, increasing the risk of inaccurate qualifying payment counts." *Id.* And the GAO found that ED has failed to provide FedLoan Servicing and borrowers with sufficient information to determine whether a borrower's employer qualifies as a public service employer, rendering FedLoan Servicing's assessments as to public service employment "vulnerable to inconsistencies" and fostering "uncertainty for borrowers" about whether they will qualify for PSLF. *Id.* ¶ 98. Consistent with the GAO's findings, the CFPB observed in 2017 that borrowers were complaining that "their servicer provides inaccurate counts of qualif[ying] payments" and "their previous qualifying payments may not be reflected in the payment histories maintained by [FedLoan Servicing]." *Id.* ¶ 100.

These agencies have also identified gross deficiencies in ED's supervision of the servicers that administer FFEL and Direct Loans. ED's own Office of Inspector General ("OIG") has

concluded that ED "rarely hold[s] servicers accountable for instances of noncompliance with Federal loan servicing requirements," and as a result, servicers have no "incentive to take actions to mitigate the risk of continued noncompliance that harms students and their families." *Id.* ¶ 243. This same report noted that over 60% of Federal Student Aid's[4] monitoring reports document instances of servicer noncompliance with federal requirements. *Id.* ¶ 241. The GAO further concluded that ED *knew* there was a high risk that FedLoan Servicing would improperly process applications for loan forgiveness, and still took no action to correct these errors. *Id.* ¶ 244. What is more, there is no process by which individual borrowers can meaningfully raise issues with ED with respect to their specific, individual denials of PSLF and TEPSLF. *See id.* ¶¶ 291, 315, 338, 364, 392.

## C. Plaintiffs' Claims

Plaintiffs include eight individual public servants, the American Federation of Teachers, and Randi Weingarten, in her official capacity as President of AFT, all of whom seek to hold ED accountable for its failures to administer the PSLF and TEPLSF programs in compliance with statutory and constitutional obligations. The Individual Plaintiffs are all public servants whose family financial planning depended on the promise of loan forgiveness under PSLF; all have been deprived of that promise through no fault of their own.

Administrative Error Plaintiffs Cynthia Miller, Crystal Adams,[5] and Connie Wakefield are all individuals who made the requisite 120 qualifying payments and yet were denied PSLF or

---

[4] Federal Student Aid is an office of the Department.

[5] Crystal Adams recently learned that she has been approved for TEPSLF, demonstrating that ED's prior denials of her PSLF and TEPSLF applications were in fact arbitrary and capricious. *See* Compl. ¶¶ 155–72. Plaintiffs will confer with opposing counsel to voluntarily dismiss Ms. Adams as a plaintiff in this case.

TEPSLF. They seek redress for ED's violations of the APA and the Due Process Clause. *Id.* ¶¶ 400, 406, 417. For example, Plaintiff Connie Wakefield, despite having made the requisite number of qualifying payments since 2007, has been unable to obtain loan forgiveness. *Id.* ¶¶ 5, 178. Ms. Wakefield submitted at least four Employment Certification Forms ("ECFs") between 2007 and 2017 in an attempt to confirm her eligibility for PSLF. *Id.* ¶ 180. Her servicer at one time even acknowledged that she had made the requisite 120 qualifying payments. *Id.* ¶ 181. Nonetheless, ED repeatedly denied Ms. Wakefield's PSLF and TEPSLF applications and refused to provide her with any explanation for its denials. Nor did Ms. Wakefield have any opportunity to contest this erroneous decision. *Id.* ¶¶ 183, 194, 215, 228. ED made similar errors in denying the applications of the other Administrative Error Plaintiffs and likewise gave them no explanation for the denials or an opportunity to contest these erroneous outcomes. *Id.* ¶¶ 403–406, 412–416. ED's actions in denying the Administrative Error Plaintiffs' applications were arbitrary and capricious in violation of the APA (a claim ED does not dispute in its motion), and ED's refusal to provide the Administrative Error Plaintiffs with adequate notice of the reasons for their denials, as well as an opportunity to contest them and provide ED with relevant information demonstrating eligibility, deprived the Administrative Error Plaintiffs of due process. *Id.* ¶¶ 233–34.

Servicer Misconduct Plaintiffs Deborah Baker, Janelle Menzel, Kelly Finlaw, Gloria Nolan, and Michael Giambona similarly seek redress for ED's violations of the APA and the Due Process Clause. *Id.* ¶¶ 429, 434. Each of these individuals repeatedly asked their student loan servicers how to qualify for PSLF and/or TEPSLF and were reassured by their servicers time and again that they were "on track" and making "qualifying" payments for PSLF. *Id.* ¶ 6. In fact, they were not. As it turned out, these Plaintiffs either did not have qualifying loans or were not in qualifying repayment plans. *Id.* Only years later, after the Servicer Misconduct Plaintiffs had

made what they believed were 120 qualifying payments and applied for loan forgiveness did they learn that their payments had not been counted. *Id.* ¶¶ 289, 309, 323–29, 344–46, 377–79. Had the loan servicers given the Servicer Misconduct Plaintiffs the correct information, they could have consolidated their loans if necessary, entered qualifying repayment plans, and been eligible for forgiveness under the PSLF program. *Id.* ED's refusal to consider its servicers' blatant and repeated misrepresentations in determining whether to grant loan forgiveness under the Secretary's Compromise and Settlement Authority is arbitrary and capricious under the APA. Moreover, ED's refusal to provide these Plaintiffs any explanation for the denials or an opportunity to contest them violates their due process rights. *Id.* ¶¶ 429–33.

AFT, led by Plaintiff Randi Weingarten, is an organization representing 1.7 million pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals. *Id.* ¶ 19. AFT's mission is to promote fairness, democracy, and economic opportunity by ensuring, among other things, access to affordable education for public servants. *Id.* ¶¶ 19, 42. ED's improper denials of borrowers' PSLF and TEPSLF applications directly conflicts with AFT's organizational mission and impedes AFT's ability to ensure affordable education for its members. *Id.* ¶ 42. To counteract these harms, AFT has spent over $1 million in the past year providing debt clinics to counsel AFT members on how to obtain PSLF. *Id.* AFT has also invested in and launched a social enterprise application called "Summer," which helps borrowers navigate the repayment and application process to qualify for PSLF. *Id.* AFT sues in its own right, and on behalf of its members, seeking redress for its own organizational injuries and the injuries suffered by its members as a result of ED's failures. *Id.* ¶¶ 42–43.

The Individual Plaintiffs—all public servants whose financial planning rested on Congress's promise of loan forgiveness—sustained devastating financial consequences as a result of ED's abdication of its statutory and constitutional obligations to assess loan forgiveness applications in a reasonable manner and provide Plaintiffs with a reasoned explanation for its decisions and a meaningful opportunity to contest denials. To remedy these harms, Plaintiffs seek: (i) an order vacating ED's PSLF and TEPSLF denial actions with respect to each Individual Plaintiff; (ii) a declaration that ED's actions violated the APA and the Due Process Clause; (iii) an order remanding to ED for actions consistent with the Court's ruling; and (iv) an order requiring ED to provide (a) PSLF and TEPSLF applicants with adequate notice of the grounds for their denial, including the specific reasons for the denial, and including, but not limited to, the evidence ED relied upon in denying the application; (b) a meaningful decision-making process to account for misrepresentations made by ED and/or its servicers, through which applicants may contest their denial and introduce evidence rebutting ED's determination and demonstrate that ED should exercise its general discharge authority to issue forgiveness; and (c) a written and reasoned determination within a reasonable time period. *See* Compl., Prayer for Relief. To ensure that ED implements procedures mandated by the APA and Due Process Clause, Plaintiffs request that this Court retain jurisdiction, require status reports from ED regarding its progress, and enjoin ED from continuing to deny PSLF and TEPSLF applications without the requisite procedures. *Id.*

## ARGUMENT

### I. AFT HAS ORGANIZATIONAL AND ASSOCIATIONAL STANDING

#### A. AFT Has Sufficiently Alleged that It Has Organizational Standing

Standing requires that "the plaintiff allege[] such a personal stake in the outcome of the controversy as to warrant . . . invocation of federal-court jurisdiction." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (citations omitted). To do so, a plaintiff must show it has

suffered "a concrete and particularized injury that is actual or imminent, traceable to the challenged act, and redressable by the court." *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). For an organizational plaintiff, that means demonstrating that (1) "the agency's action or omission to act injured the organization's interest," and (2) "the organization used its resources to counteract that harm." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.* ("*PETA*"), 797 F.3d 1087, 1094 (D.C. Cir. 2015) (citations omitted). Specifically, "if an organization expends resources 'in response to, and to counteract, the effects of the defendants' alleged [unlawful conduct] rather than in anticipation of litigation, it has suffered a 'concrete and demonstrable injury' that suffices for purposes of standing." *Id.* at 1097 (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011) and *Havens Realty Corp.*, 455 U.S. at 379). AFT has sufficiently alleged both requirements of organizational standing.

### 1. ED's Denials of PSLF and TEPSLF Applications Without Due Process Have Injured AFT's Mission and Interest

AFT, along with the Individual Plaintiffs, has challenged ED's failure to provide its members adequate procedural safeguards mandated by the Due Process Clause in assessing their applications for loan forgiveness. Because AFT has alleged that this conduct has injured AFT's organizational mission, it has sufficiently alleged the first prong of organizational standing.

AFT's guiding mission is to promote fairness, democracy, and economic opportunity for its members, who are pre-K through 12th-grade teachers, early childhood educators, other school-related personnel, higher education faculty and staff, government employees, nurses and other health care professionals. Compl. ¶ 19. In furtherance of this mission, AFT has become a national leader in fighting for the financial well-being of public service workers, in particular when it comes to the cost of higher education. *Id.* ¶ 20. A major impediment to AFT's members' financial

14

security is the skyrocketing cost of higher education. AFT members report that student debt is a major burden or challenge for them. *Id.* ¶ 21. Thus, combatting the rising expense of education by supporting programs like PSLF, and encouraging its members to pursue loan forgiveness, is a major component of AFT's operations.

Many of AFT's members relied on Congress's promise of loan forgiveness for public servants in borrowing money to pursue the degrees necessary for their public service positions, just as Congress intended when it enacted the PSLF program. AFT's members now report applying for and being summarily denied forgiveness at a rate of 82%, and being denied TEPSLF at a similar rate. *Id.* ¶ 22. ED's mismanagement of this program has resulted in denials for all but one percent of PSLF applicants overall. *Id.* ¶ 3. These public servants—who took out student loans with the understanding that after ten years, their student loan debt would be forgiven—now report that they "[have] no savings for emergencies, were denied credit, could not buy homes or afford to live on their own, [are] forced to work multiple jobs to make ends meet, and had to declare bankruptcy—all as a result of ED's failure to grant statutorily mandated loan forgiveness under PSLF (including TEPSLF)." *Id.* ¶ 22.

ED's failure to ensure that public servants, who are entitled to loan forgiveness in exchange for ten years of public service, in fact have their debts forgiven as Congress mandated, as well as its failure to provide borrowers with basic procedural protections guaranteed by the APA and the Due Process Clause, compromises the financial security of public servants and directly harms AFT's mission of protecting and advancing the economic interests of teachers and other public service workers. *See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 387 F. Supp. 3d 33, 46 (D.D.C. 2019) (where an organization's goal is to provide legal

representation to immigrants, DHS's failure to create records sufficient to protect the legal rights of those individuals "impairs its ability to pursue that mission").

## 2. AFT Has Used Its Resources to Counteract the Harm Caused by Defendants' Unlawful Actions

ED has satisfied the second prong of organizational standing by alleging that, in light of ED's failures, AFT has been forced to spend significant funds on trying to mitigate the harm caused by ED's actions. *See, e.g.*, Compl. ¶ 42(c)–(d) (alleging that AFT has "redirected its resources" from other projects and spent more than $1 million in the past fiscal year "to combat ED's unconstitutional denials" of PSLF applications).

This element of organizational standing requires an organization to allege the existence of harm that "perceptibly impaired" its programs. *PETA*, 797 F.3d at 1094 (citations omitted). Such harm exists where an organizational plaintiff has "had to devote significant resources to identify and counteract the defendant's" misconduct. *Havens*, 455 U.S. at 379 (citations omitted). One way to demonstrate such impact is to allege that purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action." *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) (citing *Havens*, 455 U.S. at 379). For example, in *Abigail Alliance*, the organizational plaintiff established standing by alleging that it had "divert[ed] significant time and resources" away from its "counseling, referral, advocacy and educational services," in order to help its members navigate the FDA's burdensome requirements on obtaining experimental treatments. 469 F.3d at 132–33 (citations omitted); *see also PETA*, 797 F.3d at 1096–97 (diversion of resources and expenditures made in response to and to counteract agency failures were "concrete and demonstrable injury") (citations omitted).

AFT has sufficiently alleged perceptible impairment of its activities. As the Complaint details, AFT has expended substantial time and financial resources on a number of programs that

are specifically designed to counteract the harm caused by ED's mismanagement of the PSLF and TEPSLF programs. AFT alleged that ED's conduct has "caused AFT to redirect its resources from other projects to assist its members in seeking and obtaining the loan forgiveness to which they are statutorily entitled." Compl. ¶ 42(c). AFT has spent over $1 million providing debt clinics to counsel AFT members who seek PSLF on how to navigate the complicated loan repayment process ED has implemented. *Id.* ¶ 42(d). AFT has also funded and conducted research surveys of its members to identify what has caused the staggering number of denials of loan forgiveness in an effort to understand and remedy the situation. *Id.* ¶¶ 11, 21–22, 42(d). And AFT has funded and launched an online social enterprise application called "Summer," which helps student loan borrowers navigate the loan repayment process, including by assisting them in attempting to qualify for PSLF. *Id.* ¶ 42(d). By funding these activities, AFT supports, counsels, educates, investigates, and provides information to its members in response to and to counteract ED's unconstitutional denials of PSLF. *Id.* ¶ 42(c)–(d). The Complaint's allegations describing AFT's diversion of resources to counteract ED's misconduct are more than sufficient to establish organizational standing.

In challenging AFT's organizational standing, Defendants misstate both the allegations set forth in the Complaint and the applicable law. Focusing on AFT's allegation that it has "diverted resources" to combat ED's actions, Defendants contend that a mere "diversion of resources" is insufficient to show organizational standing. Defs.' Mot. at 31. But the law is clear: a diversion of resources *does* suffice to show organizational standing where the organization "diver[ts] [its] resources to programs designed to counteract the injury to its [organizational] interest." *Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011); *see also id.* ("[D]iversion of resources to programs designed to counteract the injury to its interest . . . could constitute . . .

17

injury" sufficient for standing, regardless of whether organization "redirect[ed]" resources voluntarily or involuntarily). Thus, in *PETA*, the D.C. Circuit found that PETA had organizational standing to challenge the Department of Agriculture's failure to promulgate regulations to protect birds because the inaction "requir[ed] PETA to divert and redirect its limited resources to counteract and offset Defendant's unlawful conduct and omissions." 797 F.3d at 1095 (citations omitted); *see also id.* at 1097–98 ("That an organization 'voluntarily, or willfully . . . diverts its resources . . . does not automatically mean that it cannot suffer an injury sufficient to confer standing.'" (citations omitted)).

Defendants suggestion that AFT's total operational costs must increase in response to the alleged harm, Defs' Mot. at 31, is incorrect. Defendants rely on *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015). In that case, Food & Water Watch ("FWW") had not sufficiently alleged an injury to its mission—the first prong of the organizational standing analysis—but rather only an "abstract injury to its interests" as a result of the Department of Agriculture's new poultry regulations.[6] *Id.* at 920. The court noted that FWW alleged only that it had spent money on advocacy and that, in the future, it would "have to increase the resources that it spends on educating the general public." *Id.* (citations omitted). When the *only* expenses alleged are education- or advocacy-related, the court held, the organization's education and advocacy efforts must "subject[] the organization to 'operational costs beyond those normally expended.'" *Id.* (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)). But *Food & Water Watch* did *not* alter the rule set out in *PETA* that "diversion of resources" can suffice

---

[6] *Food & Water Watch* explicitly declined to address "whether the organization used its resources to counteract" the alleged harm to its interests, but nonetheless extensively relied on *PETA*, in which the Court found a diversion of resources was sufficient to show organizational injury. 808 F.3d at 919–21 (citations omitted).

to show injury for purposes of organizational standing in other circumstances (as evidenced by the Court's citation to *PETA* with approval).  *See generally id.* at 919–20.

Unlike FWW, AFT has alleged more than expenditures for education and advocacy. Among other things, AFT has "spent over $1 million in the past fiscal year" alone on debt clinics to counsel its members and assist them with applications for loan forgiveness.  *Id.* ¶ 42(d).  The Complaint alleges that these expenditures, and the diversion of resources from other projects, were a direct result of ED's misconduct.  *See* Compl. ¶ 42(c) ("ED's challenged actions have caused AFT to redirect its resources . . . ."); *id.* ¶ 42(d) (alleging that "to combat ED's unconstitutional denials, AFT spent [millions of dollars]").  Courts have explicitly held that such expenditures and diversions suffice to show organizational standing.  *See Abigail Alliance*, 469 F.3d at 133 (concluding that organization had alleged the requisite injury "by alleging that it actively engages in counseling, referral, advocacy, and educational services" to counteract the harm caused by FDA's process failures) (citations omitted).  Had ED provided the procedural safeguards to which borrowers are entitled, these individuals would not need to turn to AFT for counseling and assistance in obtaining loan forgiveness, and AFT's expenditures in providing such services would be unnecessary.  *Cf. Envtl. Working Grp. v. U.S. Food & Drug Admin.*, 301 F. Supp. 3d 165, 172 (D.D.C. 2018) (holding that organization lacked standing to sue based on FDA's inaction with regard to organization's petition because its activities (*e.g.*, lobbying, education) all took place regardless of FDA's inaction).

Moreover, the cases on which Defendants rely address allegations of only remote and speculative injuries, rather than the concrete economic harm AFT alleges it has already suffered by devoting resources to counteract ED's actions.  *See Food & Water Watch*, 808 F.3d at 919–21 (holding that the organization failed to show that new poultry inspection regulations that had not

yet gone into effect would result in actual harm to the organization); *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429–30 (D.C. Cir. 1996) (finding that economic harm that *might* occur if President exercised line item veto power was too speculative to show actual organizational injury). These cases do not call into question AFT's standing, given the present harms to AFT's members and AFT's specific expenditures, including information gathering, counseling, education, and other services undertaken to counteract ED's failures with respect to PSLF and TEPSLF. Compl. ¶¶ 19–22, 42.

ED's failures to calculate payments correctly and to account for and address servicer misconduct, along with its refusal to provide applicants with any procedures to bring such issues to ED's attention, have prevented AFT's members from obtaining loan forgiveness. *Id.* ¶ 22. Because of ED's conduct, AFT has expended and continues to expend significant resources to counteract ED's actions, by counseling its members and assisting them in obtaining PSLF and TEPSLF in spite of ED's failures. *Id.* ¶ 42. AFT therefore satisfies both prongs of the organizational standing inquiry.

### B. AFT Has Sufficiently Alleged Associational Standing

AFT has also sufficiently alleged associational standing to challenge ED's failure to provide borrowers with the procedural protections mandated by the Due Process Clause. To demonstrate associational standing, an organization must allege that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The third prong is prudential—a question of "administrative convenience and efficiency"—and not a constitutional requirement of Article III standing. *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996). ED does

not contest the first two prongs, but instead argues that fact-specific inquiries will be necessary to establish that ED violated the Due Process Clause, and that significant participation of individual members will therefore be required.  Def's Mot. at 33–34.  ED is incorrect.

"[T]he Supreme Court has explained that 'individual participation is not normally necessary when an association seeks prospective or injunctive relief for its members,' even though it may be 'required in an action for damages[.]'"  *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Fed. Emergency Mgmt. Agency (FEMA)*, 463 F. Supp. 2d 26, 32 (D.D.C. 2006) (quoting *Brown Grp.*, 517 U.S. at 546).  *ACORN* held that an association had standing to challenge the constitutionality of FEMA's notice procedures for denying hurricane evacuees' benefits because "the declaratory and injunctive relief requested . . . is clearly not of a type that requires the participation of any individual member."  *Id.* at 32–33 (citations omitted); *see also id.* (emphasizing that ACORN's "suit raise[d] questions regarding the constitutionality of FEMA's notice procedures, not the eligibility of individual claimants" (citations omitted)).  Based on the association's claim, the Court ordered the agency to provide "more detailed explanations for the denials of evacuees' eligibility . . . [and] more fulsome instructions as to how each evacuee may . . . cure . . . or . . . appeal," and to "restore" future and past benefits to those found ineligible until the procedures were corrected.  *Id.* at 36–37.

Here, as in *ACORN*, AFT challenges the constitutional adequacy of ED's PSLF and TEPSLF process and seeks declaratory and injunctive relief to implement notice and appeal procedures; it does not seek damages for ED's due process violations.  *See* Compl., Prayer for Relief. Importantly, AFT (unlike the Individual Plaintiffs) is *not* challenging the substantive denial of any PSLF application under the APA—it is challenging ED's failure to give PSLF and TEPSLF applicants due process.  By contrast, the organizational plaintiffs in each of the cases cited by

Defendants, Defs' Mot. at 33–34, sought damages or equitable relief that was in substance a request for damages, *see, e.g.*, *Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.*, 958 F.2d 1018, 1022–23 (10th Cir. 1992) (injunctive relief required a finding that new Medicaid rates were substantively deficient and a facility-specific calculation of detrimental effect); *Long Term Care Pharmacy All. v. UnitedHealth Grp., Inc.*, 498 F. Supp. 2d 187, 193–94 (D.D.C. 2007) (claim for declaratory relief was effectively a claim for damages, where the organization sought a declaration of entitlement to money damages).

As *ACORN* makes clear, individual participation is not required when a "suit raises questions regarding the constitutionality of [an agency's] procedures, not the eligibility of individual . . . claimants." *ACORN*, 463 F. Supp. 2d at 32–33 (citations omitted). Here, the question raised by AFT's due process claim is whether the procedures ED has in place adequately provide borrowers with notice and an opportunity to be heard regarding their eligibility for PSLF and TEPSLF. AFT can prove its claim that ED's procedures violate AFT members' due process rights by offering evidence of ED's own internal procedures, along with evidence from AFT's extensive surveys, investigations of ED's failures in implementing the PSLF program, and testimony from various AFT members—including Individual Plaintiffs who assert their own APA claims in addition to the due process claims set forth in Counts III and V—whose experiences evidence ED's systemic violations of due process rights in administering the PSLF program.[7] Other circuits are

---

[7] Defendants rely on *Community Financial Services Association of America, Ltd. v. FDIC*, No. 14-CV-953 (GK), 2016 WL 7376847 (D.D.C. Dec. 19, 2016) for the proposition that a fact-specific inquiry into due process violations could defeat associational standing. But in that case, the due process analysis required the court to analyze "myriad factors" that could have led to the failure of each member's business, and then apply those unique facts to a stigma-plus-reputational-injury analysis for each member. *Id*. at *5. Here, conversely, there are no complex, factually intensive factors for the Court to consider on an individualized basis. The due process harms suffered by AFT's members all emanate from the same source—ED's failure to grant them adequate notice and a meaningful process to appeal denials of PSLF.

in agreement that individual members may provide stories that illustrate the consequences of an agency's systemic failures without running afoul of *Hunt*'s third prong. *See, e.g.*, *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 552–53 (5th Cir. 2010) (medical association had standing to bring constitutional claims against agency where systemic constitutional violations could be proven "with evidence from the Board's witnesses and files and from a small but significant sample of physicians"); *Penn. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 286–87 (3d Cir. 2002) (where heart of complaint was "systemic policy violations," association had standing because violations could "be established with sample testimony, which may not involve specific, factually intensive, individual medical care determinations"); *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 603 (7th Cir. 1993) (police association had standing where evidence "supplied by the evidentiary submissions of some of the members" might be used to prove the alleged breach). No substantial individual participation of AFT's members is required to prove that ED has violated the Due Process Clause, and accordingly, AFT has sufficiently alleged associational standing. *See ACORN*, 436 F. Supp. 2d at 32–33.

## II. PLAINTIFFS HAVE PLEADED A COGNIZABLE CLAIM UNDER THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT (COUNTS III AND V)

In Counts III and V of the Complaint, Plaintiffs allege that ED has violated the Due Process Clause by failing to institute an adequate process to identify and account for errors in determining Individual Plaintiffs' loan eligibility and informing them about the requirements for forgiveness, failing to provide Individual Plaintiffs with adequate notice of the reasons for their denials, and failing to give Individual Plaintiffs an opportunity to contest their denials. To bring a claim under the Due Process Clause, Plaintiffs must show: "(i) deprivation of a protected liberty or property interest; (ii) by the government; (iii) without the process that is 'due' under the Fifth Amendment." *NB ex rel. Peacock v. D.C.*, 794 F.3d 31, 41 (D.C. Cir. 2015) (citations omitted). ED does not

assert that Plaintiffs have failed to allege each of these elements. Instead, ED claims that Plaintiffs are trying to plead around the restrictions of the APA while seeking broad programmatic relief that this Court cannot provide. Defs.' Mot. at 17–23. ED is wrong on both counts.

Plaintiffs have separately alleged that ED's failures violate the APA and the Due Process Clause. Plaintiffs' due process claims seek distinct relief for distinct wrongs, and ED cannot evade its constitutional obligations by conflating the two claims. Moreover, even if Plaintiffs' due process claims *had* been brought exclusively under the APA, ED's failures have led Plaintiffs to seek an order requiring ED to give applicants adequate notice of the reasons for ED's denial of their loan forgiveness applications, as well as an opportunity to contest their denials by presenting evidence rebutting ED's determination or demonstrating that ED should exercise its Compromise and Settlement Authority to issue forgiveness. Compl., Sixth and Seventh Prayers for Relief. This relief is mandated by the Due Process Clause and is not wholesale programmatic change. Accordingly, ED's motion to dismiss Counts III and V should be denied.

### A. Plaintiffs Have Pleaded Distinct, Cognizable Due Process Claims Arising Out of ED's Failures to Give Applicants Adequate Notice and a Meaningful Process to Seek Review of PSLF and TEPSLF Denials

Defendants contend that Plaintiffs' due process claims in Counts III and V are simply artfully pleaded APA claims. Defs.' Mot. at 17. Not so. These claims seek redress for different wrongs and seek distinct relief from that set forth in Plaintiffs' APA claims. Plaintiffs allege that, in enacting the PSLF and TEPSLF programs, Congress created a protected property interest (which ED does not contest). *See* Compl. ¶¶ 411, 428; *see also* 20 U.S.C. § 1087e(m) ("The Secretary *shall* cancel the balance of interest and principal due" upon satisfaction of PSLF requirements."); *see also Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 37 (D.D.C. 2019) (borrowers entitled to benefits under the PSLF program have a statutorily created property interest). ED must therefore provide PSLF and TEPSLF applicants with the procedural protections accorded by the

Due Process Clause, including adequate notice and an opportunity to be heard. *See Kapps v. Wing*, 404 F.3d 105, 116 (2d Cir. 2005) (recognizing that applicant for federal welfare benefits has a "property interest entitling him, at least, to process sufficient to permit a demonstration of eligibility"); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 205 (D.C. Cir. 2001) (citations omitted) ("[T]hose procedures which have been held to satisfy the Due Process Clause have included notice of the action sought, along with the opportunity to effectively be heard."); *see also N.B. v. District of Columbia*, 244 F. Supp. 3d 176, 180–83 (D.D.C. 2017) (applicants who are denied Medicaid prescription drug coverage must receive a reasoned notice of denial).

Counts III and V of the Complaint allege that ED has failed to comply with these basic obligations by denying PSLF and TEPSLF applications without providing adequate notice of the reasons for its denials, a meaningful process through which applicants can identify and account for issues related to their eligibility, or a written and reasoned explanation for its determinations— all deprivations that fit squarely within the due process framework. Compl. ¶¶ 412–17, 429–34. The relief Plaintiffs seek for these violations is closely tied to the procedural due process rights that ED is abridging: vacating ED's denials of their applications and requiring ED to provide applicants with constitutionally sufficient notice and an opportunity to be heard. *Id.*, Fifth, Sixth, and Seventh Prayers for Relief. Contrary to what ED suggests, these due process claims do not arise under the APA; rather, they rest directly on the Due Process Clause and the Court's power to grant equitable relief to redress constitutional violations. *See Davis v. Passman*, 442 U.S. 228, 242–43 (1979); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015) (recognizing federal courts' power to grant injunctive relief against federal officials violating federal law).

As for ED's attempt to invoke *Lujan*'s prohibition against using the APA to bring program-matic challenges, it has no application to claims that are not brought pursuant to the APA. This constraint stems from the Supreme Court's interpretation of 5 U.S.C. § 551(13), which defines "agency action." *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). Notably, "[t]he D.C. Circuit has rejected the idea that an 'agency action' within the meaning of § 551(13) is re-quired in order to invoke § 702's waiver of sovereign immunity." *Calixto v. U.S. Dep't of the Army*, No. 18-CV-1551 (ESH), 2019 WL 2139755, at *5 n.3 (D.D.C. May 16, 2019) (citing *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 187 (D.C. Cir. 2006)). Thus, the Supreme Court's interpretation in *Lujan* regarding what constitutes "agency action"—and the resulting prohibition on programmatic challenges—applies only to APA claims, *not* to non-APA statutory claims or constitutional claims. *See id.* Indeed, the Court in *Lujan* noted that statutes *other* than the APA "permit broad regulations to serve as the 'agency action,' and thus to be the object of judicial review directly," while claims brought under the APA are subject to more stringent requirements. 497 U.S. at 891. While Plaintiffs' due process claims here invoke Section 702's waiver of sover-eign immunity, they are not APA claims, and thus are not subject to *Lujan*'s ban on programmatic challenges.

Nor is there any prohibition against simultaneously alleging APA and due process claims arising out of the same underlying agency action. *See, e.g.*, *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 512, 516 (9th Cir. 2018) (permitting parallel due process challenge to agency's change in information-sharing policy and APA challenge to agency's rescis-sion of DACA as arbitrary and capricious); *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 712–13 (6th Cir. 2015) (permitting parallel APA and due process challenges to DOJ's identification of musical group's fans as a "hybrid gang"). The cases cited by ED do not hold otherwise.

Defendants cite *Fares v. Smith*, 249 F. Supp. 3d 115 (D.D.C. 2017) to suggest that a due process challenge brought alongside an APA claim is "artful pleading" and subject to the APA's prohibition on programmatic challenges. *See* Defs.' Mot. at 17. But *Fares* neither deals with purported artful pleading nor a programmatic challenge, and the language Defendants quote merely notes that the record before the court on a motion to dismiss was identical to the record before the court on summary judgment. *Fares*, 249 F. Supp. 3d at 120 ("[R]esolution of whether Defendants have provided sufficient notice under the Due Process Clause and the APA would be identical were it instead to proceed on the basis of Defendant's motion to dismiss, *as the record for purposes of that motion would be identical to the one considered for purposes of Plaintiff's motion for summary judgment*." (emphasis added)). What is more, the Court in *Fares* ultimately analyzed the plaintiff's due process and APA claims separately. *Id.* at 122–29.

Defendants' reliance on *Vietnam Veterans of America v. Shinseki*, 599 F.3d 654 (D.C. Cir. 2010) is similarly misplaced. There, the Court rejected plaintiff's due process challenge because it was based on the same facts as an APA claim that challenged the Department of Veterans Affairs' unreasonable delay in processing disability claims and thus fell within the exclusive jurisdiction of the Court of Appeals for Veterans Claims ("CAVC"). *Id.* at 660. Given that the APA claim would be litigated before the CAVC in any event, the Court concluded that the interest in "minimiz[ing] expense and inconvenience to the litigants and conserv[ing] the finite resources of the courts" weighed in favor of litigating the due process claim in the same action. *Id.* (citations omitted). *Vietnam Veterans* does not suggest that a due process claim must be dismissed if it arises out of the same facts as an APA claim. But unlike *Vietnam Veterans*, Plaintiffs' APA claims are being litigated here, not in another forum.

The other cases ED cites are similarly unavailing. In *Hegab v. Long*, 716 F.3d 790 (4th Cir. 2013), the Fourth Circuit held that the plaintiffs' conclusory allegations failed to state a claim for relief under the Due Process Clause where the plaintiff did not allege any independent facts to support his claim of agency bias. *Id.* at 796–97. *Chiayu Chang v. U.S. Citizenship & Immigration Services*, 254 F. Supp. 3d 160 (D.D.C. 2017), stands for the sole proposition that a plaintiff does not necessarily get broader discovery for a due process claim than for an APA claim. *Id.* at 161–63. None of the cases ED relies upon supports the proposition that Plaintiffs' due process claims should be dismissed because they arise out of the same facts as Plaintiffs' APA claims.

### B. Plaintiffs' Due Process Claims Do Not Seek Wholesale, Programmatic Relief

Even if this Court were to analyze Plaintiffs' due process claims as if they were in fact pleaded as APA claims, there would be no basis for dismissing them. Plaintiffs challenge specific agency actions—the denials of their applications for PSLF and TEPSLF—and seek relief targeted at redressing the procedural due process deprivations resulting from that action.

As the cases cited by Defendants instruct, to state a claim for relief under the APA, a plaintiff must identify some specific agency action and demonstrate that she has been adversely affected or aggrieved by that action. *See Lujan*, 497 U.S. at 882–83. This limitation precludes broad programmatic attacks, or generalized grievances that do not identify a specific "rule, order, license, sanction, relief . . . or denial thereof, or failure to act." *Lujan*, 497 U.S. at 882 (quoting 5 U.S.C. § 551(13)). For this reason, in *Lujan*, the Court rejected a challenge to a Bureau of Land Management's ("BLM") land use program on the ground that the group did not identify a "single BLM order or regulation, or even . . . a completed universe of particular BLM orders and regulations." *Id.* at 890. Rather, the lawsuit made a wide-ranging attack on the program, "seek[ing] *wholesale* improvement of this program by court decree," without identifying any particular agency action that caused harm. *Id.* at 891.

Similarly, in *Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55 (2004), the plaintiff complained that the BLM had failed to manage certain wilderness area "in a manner so as not to impair the suitability of such areas for preservation as wilderness," *id.* at 65 (quoting 43 U.S.C. § 1782(c)), but, as in *Lujan*, failed to identify any specific agency action to support their claim, *id.* at 66–67. In rejecting plaintiff's APA claim, the Supreme Court clarified that APA claims must identify "discrete agency action" to be cognizable. *Id.* at 62–63. Challenges to broad swaths of agency programs (or a program in its entirety) that do not specifically identify any discrete agency action by which a plaintiff has been harmed or aggrieved will not lie. *Id.* at 64.

This case is not akin to *Lujan* or *SUWA*. Here, Plaintiffs challenge specific, concrete agency action: ED's denials without due process of the Individual Plaintiffs' applications for forgiveness of their federal loan debt under PSLF and TEPSLF. *See* Compl. ¶ 412 ("The Administrative Error Plaintiffs . . . were each deprived of a property interest when ED denied their applications for PSLF (including TEPSLF) due to ED's own processing errors."); *id.* ¶ 429 ("The Servicer Misconduct Plaintiffs were each deprived of a property interest in PSLF when ED denied their applications for PSLF (including through TEPSLF), even though their eligibility was due to misrepresentations made by Title IV servicers."). Plaintiffs also challenge ED's specific failures to provide PSLF applicants with "adequate notice of reasons for their [PSLF] denial" and a "meaningful process to contest the denial," as required by the Due Process Clause. *Id.* ¶¶ 414, 431. Plaintiffs do not seek to broadly rewrite or restructure the PSLF program, but to require ED to comply with requirements of due process by giving applicants for PSLF and TEPSLF adequate notice of the reasons for ED's denials of their applications and an opportunity to be heard regarding issues related to applicants' eligibility. *Id.* ¶ 412–13, 429–30; *see also Nat'l Council of Resistance of Iran*, 251 F.3d at 209 (holding that plaintiffs had alleged a due process violation and remanding

to the Secretary of State "with instructions that the petitioners be afforded the opportunity to file responses to the . . . evidence against them, to file evidence in support of their allegations that they are not terrorist organizations, and . . . an opportunity to be meaningfully heard . . . upon the relevant findings"). Thus, contrary to Defendants' assertions, Plaintiffs do not seek broad programmatic relief, but rather relief specifically targeted at remedying the deprivation of their procedural due process rights.[8] *See Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970) (holding that, in addition to "the opportunity to be heard . . . at a meaningful time and in a meaningful matter," due process required "timely and adequate notice" (citations omitted)).

Rather than helping ED, *Lujan* actually underscores the availability of relief for Plaintiffs' due process claims. *Lujan* recognized that judicial intervention is appropriate when an individual has been immediately threatened or impaired by specific agency action, even if such intervention "ha[s] the effect of requiring a regulation, a series of regulations, or even a whole 'program' to be revised by the agency in order to avoid the unlawful result that the court discerns." 497 U.S. at 894. Thus, the Court's concern was not the breadth of the relief sought, but whether the plaintiff had identified a specific agency action that had resulted in specific harm. *Id.* Here, there is no obstacle preventing this Court from requiring ED to implement certain procedures, such as "written and reasoned explanation[s] for its determination[s]" and a "meaningful decisionmaking

_____

[8] That Plaintiffs have joined together in one lawsuit to seek redress for their procedural deprivations does not transform their claims into a "broad programmatic attack." *Calixto*, 2019 WL 2139755, at *4 ("[T]he Court can easily reject any assertion that plaintiffs' Second Amended Complaint—which merely attempts to aggregate soldiers' challenges to the discrete discharge orders that each soldier faced—represents a broad programmatic attack."); *see also Ramirez v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 7, 21 (D.D.C. 2018) ("Defendants confuse aggregation of similar, discrete purported injuries—claims that many people were injured in similar ways by the same type of agency action—for a broad programmatic attack.").

process," Defs.' Mot. at 18, given that Plaintiffs have identified the specific agency action that caused them harm—namely, ED's denials of PSLF and TEPSLF applications without those procedures.

The remaining cases cited by Defendants are distinguishable on the same grounds. *See City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 433–34 (4th Cir. 2019) (rejecting municipalities' request for enhanced agency compliance with statute requiring the provision of records to the National Criminal Background Check System where municipalities did not "challenge a discrete agency action," but instead sought "immediate injunctive relief to compel Defendants to repair this broken system"); *Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1027–28 (9th Cir. 2012) (en banc) (rejecting plaintiffs' challenge to Department of Veterans Affairs' delays in handling claims, where plaintiffs did not challenge specific agency action, but instead challenged "average delays"); *Cobell v. Norton*, 392 F.3d 461, 474–75 (D.C. Cir. 2004) (reversing district court order requiring agency to adopt a "Fixing the System" plan to resolve systemic issues, where the remedial plan was entirely divorced from any specific findings that agency had breached its fiduciary duties to plaintiff tribes); *Del Monte Fresh Produce N.A. v. United States*, 706 F. Supp. 2d 116, 119–20 (D.D.C. 2010) (rejecting broad challenge to FDA's "pattern and practice" of delay in inspecting food for import, where plaintiff did not seek "relief from specific instances of unreasonable delay"); *Long Term Care Pharmacy All. v. Leavitt*, 530 F. Supp. 2d 173, 186–87 (D.D.C. 2008) (rejecting challenge to agency's Medicare eligibility notification process because the plaintiffs "generally attack[ed] the adequacy" of the process and were not "challenging a discrete agency action"). In contrast to these cases, Plaintiffs are challenging specific agency action that they ask the Court to remedy: ED's denials of the Individual Plaintiffs' applications for PSLF and TEPSLF without due process. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th

Cir. 2004) (rejecting argument that plaintiffs' claims were programmatic challenges where plaintiffs challenged agency's discrete decisions to issue specific special-use permits); *cf. Sisseton Wahpeton Oyate of the Lake Traverse Reservation v. Jewell*, 130 F. Supp. 3d 391, 395 (D.D.C. 2015) (finding that plaintiffs' claims seeking judicial determination that Department of Interior had not complied with its statutory directives were not prohibited by programmatic challenge bar).

Finally, ED's plea that this mess should be left to Congressional oversight is no reason to dismiss Plaintiffs' due process claims. Defs.' Mot. at 23–24. Plaintiffs are not seeking a revision of the PSLF or TEPSLF statutes, but enforcement of their due process rights. Such relief is well within the purview of this Court and would not encroach on Congress's authority. As Defendants themselves acknowledge, Congress has recognized the failures in the administration of the PSLF program and in 2018, attempted to remedy those failures by enacting TEPSLF. Defs.' Mot. at 24; Compl. ¶ 4. But legislation is not a substitute for remedying ED's failures to comply with its obligations under the Due Process Clause. Nor should ED be permitted to delay further by pointing to its agreement to implement the GAO's recommendations for improving administration of the PSLF and TEPSLF programs. Defs.' Mot. at 24–25. In accepting these recommendations, ED has conceded that its administration of the PSLF program has major flaws, and ED has not argued—nor could it—that its belated agreement to provide much-needed supervision of the servicers with which it contracts to administer the federal loan program has somehow mooted the harms suffered by Plaintiffs here. Moreover, ED's suggestion that it will remedy the defects identified by Plaintiffs on its own is particularly dubious in light of Secretary DeVos's past statements undermining the goals of PSLF.[9]

---

[9] *See Examining Policies and Priorities of the U.S. Dep't of Educ.: Hearing Before the House Comm. on Educ. and Labor*, 116th Cong. (Apr. 10, 2019) at 04:01:57 (testimony of Betsy DeVos,

### III. THE SERVICER MISCONDUCT PLAINTIFFS HAVE STANDING AND HAVE PLAUSIBLY STATED A CLAIM FOR RELIEF UNDER 5 U.S.C. § 706(2) (COUNT IV)

The Servicer Misconduct Plaintiffs allege that Congress gave ED ultimate responsibility for implementing PSLF and TEPSLF; that ED was fully aware of the widespread misrepresentations that its servicers made to borrowers attempting to qualify for PSLF and TEPSLF; that ED nonetheless took no meaningful steps to hold its servicers accountable for this misconduct; and that but for this misconduct—and ED's failure to address it—the Servicer Misconduct Plaintiffs would have qualified for loan forgiveness. Plaintiffs further allege that given ED's complete abdication of its statutory responsibility, ED's denials of their PSLF and TEPSLF applications were arbitrary and capricious in violation of Section 706(2) of the APA. While ED contends that these Plaintiffs fail to state a claim under the APA, ED's refusal to account for a fundamental problem in how it handles PSLF and TEPSLF applications—namely, its servicers' misconduct in misrepresenting Plaintiffs' eligibility for loan forgiveness—is a classic example of arbitrary and capricious agency action. ED also asserts that the Servicer Misconduct Plaintiffs cannot show that their injury can be redressed by this Court and thus lack standing, but that, too, is wrong. At a minimum, this Court could vacate the Secretary's denials of Plaintiffs' loan forgiveness applications and remand to ED, with instructions to conduct further proceedings that consider servicer misconduct and issue a reasoned decision that addresses servicer misconduct specifically. The availability of that remedy more than suffices for purposes of standing. Accordingly, this Court should deny ED's motion to dismiss the Servicer Misconduct Plaintiffs' APA claims.

---

Secretary of Education), https://www.c-span.org/video/?459644-1/education-policy-hearing-secretary-devos ("Our budget proposal is actually fazing [*sic*] out public service loan forgiveness, because we don't think that one type of a job, one type of role, should be incentivized over another.").

### A. The Servicer Misconduct Plaintiffs Have Stated a Claim for Relief Under the APA

The Servicer Misconduct Plaintiffs' APA claims rest on ED's refusal to consider servicers' widespread misrepresentations to borrowers—which in many cases prevented these Plaintiffs from obtaining PSLF—in deciding whether the Servicer Misconduct Plaintiffs' loans would be forgiven. ED's complete disregard of *why* these borrowers could not satisfy PSLF and TEPSLF requirements was arbitrary and capricious in violation of Section 706(2) of the APA, as alleged in the Complaint. ED does not contest—nor could it—that it has repeatedly turned a blind eye to the well-documented failures of loan servicers to give borrowers accurate information about the requirements of the PSLF and TEPSLF programs, or the consequences of that misconduct for the Servicer Misconduct Plaintiffs (along with scores of other public servants). Compl. ¶¶ 6–7. As the Complaint details, for ten years, each of the Servicer Misconduct Plaintiffs diligently repaid their loans and were repeatedly told they were "on track" for loan forgiveness; yet, when they applied for PSLF or TEPSLF, ED found them ineligible and denied their applications. *Id*. at ¶ 6. ED declined to even consider whether to exercise its discretionary authority to forgive those loans, even though both the GAO and ED's Office of Inspector General had laid bare the servicers' systemic misrepresentations. *Id.* at ¶¶ 8–9.[10]

---

[10] *See* U.S. Gov't Accountability Office, GAO-18-547, *Public Service Loan Forgiveness: Education Needs to Provide Better Information for the Loan Servicer and Borrowers* 24 (Sept. 2018), https://www.gao.gov/assets/700/694304.pdf; U.S. Dep't of Educ., Office of Inspector Gen., ED-OIG/A05Q0008, *Federal Student Aid: Additional Actions Needed to Mitigate the Risk of Servicer Noncompliance with Requirements for Servicing Federally Held Student Loans* (Mar. 5, 2019), https://www2.ed.gov/about/offices/list/oig/auditreports/fy2019/a05q0008.pdf; U.S. Gov't Accountability Office, GAO-19-595, *Public Service Loan Forgiveness: Improving the Temporary Expanded Process Could Help Reduce Borrower Confusion* 1 (Sept. 2019), https://www.gao.gov/assets/710/701157.pdf.

It is hornbook law that agency action should be vacated as arbitrary and capricious where the agency has "entirely failed to consider an important aspect of the problem" before it. *See Stewart v. Azar*, 313 F. Supp. 3d 237, 249 (D.D.C. 2018) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)); *see also Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017) (agency's "failure to address an important aspect of the problem," namely, the historical loss of the gray wolf population, rendered agency's removal of that species from federal protection an "unreasoned, arbitrary, and capricious decision[]" (quotation omitted)); *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1118–19 (D.C. Cir. 2010) (remanding denial of natural gas royalty claim as arbitrary and capricious with instructions to vacate where Department of Interior "failed to consider an important aspect of the problem" by retroactively applying a regulation which, on its face, applied only prospectively); *Wedgewood Vill. Pharmacy v. D.E.A*., 509 F.3d 541, 549–53 (D.C. Cir. 2007) (vacating and remanding revocation of pharmacy's registration where Drug Enforcement Administration failed to consider statutory provision addressing pharmacy's dispensing practices and the differences between human and veterinary medicine); *Stewart v. Azar*, 366 F. Supp. 3d 125, 155 (D.D.C. 2019) ("Failure to consider an important aspect of the problem is a 'major shortcoming[]' generally warranting vacatur." (citation omitted)). It is equally clear that agency action must be set aside where the agency has failed to provide an explanation for its decision. *See, e.g.*, *Massachusetts v. E.P.A*., 549 U.S. 497, 534 (2007) (remanding EPA's order denying a petition for rulemaking as arbitrary and capricious where "EPA . . . offered no reasoned explanation for its refusal to decide whether greenhouse gases cause or contribute to climate change").

That is exactly what happened here: ED failed to consider servicer misconduct in denying each of the Servicer Misconduct Plaintiffs' PSLF and/or TEPSLF applications, even though those

misrepresentations were precisely what led to the Plaintiffs' inability to satisfy the PSLF eligibility requirements. ED says that its refusals to account for this misconduct was not arbitrary and capricious because the Servicer Misconduct Plaintiffs did not make the requisite 120 qualifying payments, *see* Defs.' Mot. at 29, but this argument wholly misses the point.[11] Defendants do not dispute that the Secretary is expressly authorized to forgive outstanding loans, notwithstanding the PSLF and TEPSLF statutory eligibility requirements. *See* Compl. ¶ 92; *see also* 20 U.S.C. § 1082(a)(4) (authorizing Secretary to "consent to modification" of FFEL loans); *id.* § 1082(a)(6) (authorizing Secretary to "enforce, pay, compromise, waive, or release any right, title, claim, lien or demand, however acquired"); *id.* § 1087a(b)(2) (confirming that the Secretary's Compromise and Settlement Authority set forth in Part B of the HEA extends to the Direct Loan Program under Part D of the HEA); 34 C.F.R. § 30.70(e)(1) ("[T]he Secretary may compromise a debt in any amount, or suspend or terminate collection of a debt in any amount, if the debt arises under the [FFEL or Direct Loan Program]."). Even though ED knew about the misconduct of its servicers and its impact on these Plaintiffs, the record gives no indication whatsoever that the Secretary took this critical factor into account and considered whether it was appropriate to exercise her Compromise and Settlement Authority to forgive the Servicer Misconduct Plaintiffs' outstanding student loan debt. That failure alone is arbitrary and capricious. ED further failed to provide a reasoned explanation—or *any* explanation for that matter—for its decision not to exercise its Compromise

---

[11] For this reason, Defendants' citation to *Hovhannisyan v. Holder*, 577 F. App'x 748 (9th Cir. 2014) is inapposite. There, the Ninth Circuit affirmed a Board of Immigration Appeals decision declining adjustment of status to an individual who "conceded" she did not meet the statutory requirements. *Id.* at 751. Plaintiffs do not contend that ED was arbitrary and capricious for finding that the Servicer Misconduct Plaintiffs failed to satisfy the PSLF eligibility requirements, but rather that ED violated the APA by failing to consider whether to waive those requirements or to explain why it declined to do so.

and Settlement Authority to forgive these loans. Thus, the Servicer Misconduct Plaintiffs have more than stated a claim under Section 706(2) of the APA.

## B. The Servicer Misconduct Plaintiffs Have Standing to Bring Their APA Claims

Defendants also contend that the Servicer Misconduct Plaintiffs cannot obtain redress from this Court and thus lack standing. ED's effort to avoid any responsibility for the misconduct of their servicers fares no better than its first argument. To establish standing, Plaintiffs must allege injury-in-fact, causation, and redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). With respect to redressability, "the relevant inquiry is whether . . . the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976); *see also Pub. Citizen Health Research Grp. v. Acosta*, 363 F. Supp. 3d 1, 14 (D.D.C. 2018) ("[T]he crux of the redressability analysis is the likelihood that the requested relief will redress the claimed injury. It is not a question of whether an order granting Plaintiffs' requested relief will instantly and unquestionably cure their alleged harm." (citation omitted)).

The injury sustained by the Servicer Misconduct Plaintiffs comfortably clears that bar. Notably, Defendants do not dispute that Congress authorized the Secretary to compromise and settle student loans. Nor could they; as detailed above, ED can compromise or waive any student loan debt incurred under the FFEL or Direct Loan Programs.[12] *See supra* at § III.A; Compl. ¶¶ 91–94. ED instead suggests that this Court cannot issue relief to the Servicer Misconduct Plaintiffs

---

[12] Recent news reports suggest the Department of Education has significant flexibility in pursuing priorities around student loan discharges without Congressional intervention. *See* Michael Stratford, *Trump Pledge to Forgive Disabled Veterans' Student Loans Delayed – at Education Department*, Politico (Nov. 21, 2019, 6:51 PM), http://www.politico.com/news/2019/11/21/trump-disabled-veterans-student-loans-072750.

because they seek a court order requiring the Secretary to exercise her discretion to compromise and waive their loan debts. That misconstrues the Complaint. The Servicer Misconduct Plaintiffs do not simply ask the Court to order the Secretary to exercise her discretion in their favor, but rather to remedy ED's APA violation by declaring that ED's denials of their PSLF and TEPSLF applications violate the APA, vacating ED's denials, and remanding to ED for further action consistent with law or with directions to approve their forgiveness requests under ED's discharge authority. *See* Compl., First, Third and Fourth Prayers for Relief.

There is no question that this Court can, at the very least, grant vacatur of ED's arbitrary and capricious denials of the Servicer Misconduct Plaintiffs' PSLF and TEPSLF applications. A district court has "broad discretion to enter that relief it calculates will best remedy the conduct it has found to be unlawful." *United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001); *see also Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 460 (6th Cir. 2004) ("It is well-established that federal courts possess broad discretion to fashion equitable remedies . . . [and] may craft declaratory . . . relief designed to preclude a federal agency from acting in contravention of its statutory and regulatory authority."). And Congress has expressly given courts the power to review and set aside discretionary agency action that is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A) (stating that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). The relief requested would redress the Servicer Misconduct Plaintiffs' injuries, and they therefore have met the constitutional minima of standing.

Defendants argue that 20 U.S.C. § 1082(a)(2), which bars, *inter alia*, injunctions against the Secretary, precludes relief, but precedent does not support this argument. Several courts, including one in this district, have concluded that Section 1082(a)(2) allows declaratory—and in

some cases even injunctive—relief against the Secretary. *See, e.g.*, *Thomas v. Bennett*, 856 F.2d 1165, 1168 (8th Cir. 1988) (concluding that the district court properly considered claim for declaratory relief notwithstanding Section 1082(a)(2)); *DiNello v. U.S. Dep't of Educ.*, No. 06-CV-2763, 2006 WL 3783010, at *4 (N.D. Ill. Dec. 21, 2006) (allowing claim for declaratory judgment declaring that plaintiff's loans have previously been paid in full); *OneSimpleLoan v. U.S. Sec'y of Educ.*, No. 06 CIV. 2979 (RMB), 2006 WL 1596768, at *6 (S.D.N.Y. June 9, 2006), *aff'd*, 496 F.3d 197 (2d Cir. 2007) (holding that plaintiffs' request for declaratory judgment "does not appear to the Court to be barred by § 1082" and noting that "courts have held that § 1082(a)(2) does not necessarily bar declaratory relief"); *Student Loan Mktg. Ass'n v. Riley*, 907 F. Supp. 464, 474 (D.D.C. 1995) (noting "substantial authority holding that anti-injunction clauses do not preclude consideration of requests for declaratory relief"); *Canterbury Career Sch., Inc. v. Riley*, 833 F. Supp. 1097, 1102–04, 1108 (D.N.J. 1993) (granting injunctive relief where plaintiff presented evidence that the Secretary "exceeded the scope of his authority" by including improperly serviced loans in its cohort default rates); *Int'l Dealers Sch., Inc. v. Riley*, 840 F. Supp. 748, 749, 751 (D. Nev. 1993) (granting injunctive relief on ground that, "if the Department [was] still violating its statutory mandate to exclude improperly serviced or collected loans, it would be acting outside its authority").

The two cases on which Defendants rely do not suggest otherwise. In *Bank of America*, the Court ruled in favor of various banks that sued the Secretary of Education for declaratory relief, alleging that the Secretary's refusal to pay increased interest rates on government-insured student loans was arbitrary and capricious. *Bank of Am. v. Riley*, 940 F. Supp. 348, 349 (D.D.C. 1996). The Secretary claimed that a declaratory judgment "would have essentially the same effect as an injunction and is thus precluded by [Section 1082(a)(2).]" *Id.* at 350. Stressing that declaratory

relief is not precluded by Section 1082(a)(2), the Court rejected that argument and issued a judgment that effectively required the Secretary to make additional interest payments to the banks. *Id.* at 353; *see also id.* at 351 n.5 (noting that declaratory relief would serve a "useful purpose" since the government would likely end up paying the plaintiffs the special allowances they were owed). And although in *Mashiri v. Department of Education*, 724 F.3d 1028 (9th Cir. 2013), the Ninth Circuit concluded that the HEA's anti-injunction provision precluded plaintiff's mandamus petition compelling ED to issue him a Stafford loan, this Court has rejected that overly expansive construction of Section 1082(a)(2). *See Student Loan Marketing Assoc.*, 907 F. Supp. at 474. In any event, even *Mashiri* does not question the availability of relief that is squarely declaratory in nature.

Moreover, construing Section 1082(a)(2) broadly would eviscerate the APA's sovereign immunity waiver, *see* 5 U.S.C. § 702, which as courts have repeatedly recognized, permits plaintiffs to obtain declaratory relief for challenges to agency action. *See McKoy v. Spencer*, 271 F. Supp. 3d 25, 32 (D.D.C. 2017); *Z St., Inc. v. Koskinen,* 44 F. Supp. 3d 48, 63 (D.D.C. 2014), *aff'd*, 791 F.3d 24 (D.C. Cir. 2015); *accord Robles v. Kerry*, 74 F. Supp. 3d 254, 260 (D.D.C. 2014) ("[T]he APA waives sovereign immunity for all claims seeking relief other than money damages. As a general rule, money damages do not include declaratory and injunctive relief." (citation and quotations omitted)). The result would be to render the Secretary's actions essentially unreviewable. For that reason, the APA's sovereign immunity waiver has been construed to permit challenges seeking declaratory relief, notwithstanding the protection provided by Section 1082(a)(2). *See Student Loan Mktg. Ass'n*, 907 F. Supp. at 474 ("Plaintiff's challenge to the Secretary's interpretation is brought under the APA, and courts have held that the anti-injunction clause of § 1082(a)(2) does not preclude relief for APA claims." (footnote omitted)); *see also De La Mota*

*v. U.S. Dep't of Educ.*, No. 02 CIV. 4276 (LAP), 2003 WL 21919774, at *5 (S.D.N.Y. Aug. 12, 2003) (holding, in the context of an APA claim, that Section 1082(a)(2) "waives the Secretary's immunity from suit seeking declaratory relief").

At bottom, ED's redressability argument rests on an assumption that this Court will ulti-mately decline to grant one of Plaintiffs' alternative requests for relief under Count IV—an order providing specific instructions to ED to discharge the Servicer Misconduct Plaintiffs' student loan debt on remand. But "[t]he Supreme Court has rejected interpretations of the [standing] rule that demand complete redressability, stressing that a plaintiff need show only that a favorable decision would redress '*an* injury,' not '*every* injury.'" *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012) (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)); *see also Cmty. Nutrition Inst. v. Block*, 698 F.2d 1239, 1248 (D.C. Cir. 1983), *rev'd on other grounds*, 467 U.S. 340 (1984) ("[A] court should be careful not to require too much from a plaintiff attempting to show redressability, lest it abdicate its responsibility of granting relief to those injured by illegal government action[.]"). Even if the Court concluded that this particular aspect of the requested relief could be characterized as injunctive, and thus was barred by Section 1082(a)(2), that would not preclude Plaintiffs from showing redressability. Should the court ultimately decide that the appropriate remedy for ED's APA violation is a remand for further proceedings, rather than an instruction to reach a particular outcome, the precise remedial contours could be determined at a later point. *See, e.g.*, *Am. Hosp. Ass'n v. Azar*, 385 F. Supp. 3d 1, 11–12, 15 (D.D.C. 2019) (re-jecting plaintiffs' request for injunctive relief but denying defendants' motion to dismiss, remand-ing, and ordering parties to "submit a status report regarding the agency's progress on remand to remedy the issues raised in this litigation"); *Hensley v. United States*, 292 F. Supp. 3d 399, 412

(D.D.C. 2018) (declining to grant plaintiffs' requested relief in full, but vacating arbitrary and capricious agency adjudication and remanding for further proceedings).

The Servicer Misconduct Plaintiffs have amply alleged that a favorable decision would redress the injury caused by ED's arbitrary and capricious denial of their PSLF and TEPSLF applications. Even granting part of the relief these Plaintiffs seek—a remand to ED with an instruction to consider whether to exercise the Secretary's authority to modify or settle the Servicer Misconduct Plaintiffs' student loan debt—would substantially ameliorate their harm, which is enough to show redressability. *See Massachusetts v. E.P.A.*, 549 U.S. at 526 (finding redressability satisfied because the risk of harm "would be reduced to some extent if petitioners received the relief they seek"); *Block*, 698 F.2d at 1248 ("[B]ecause the relevant inquiry is directed to the effect of a future act (the court's grant of the requested relief) it would be unreasonable to require the plaintiff to *prove* that granting the requested relief is *certain* to alleviate his injury.").

## CONCLUSION

When a bipartisan Congress enacted the PSLF program over a decade ago, it entrusted ED with the responsibility to carry out the promise of relieving teachers, nurses, police officers, firefighters, and other public servants of the burden of student loans after ten years of repayment. Instead of implementing Congress's objectives, ED has repeatedly shirked its obligations, depriving millions of borrowers of the promise of PSLF. For the foregoing reasons, the Court should deny Defendants' Partial Motion to Dismiss and allow this case to proceed in its entirety.

Date: November 22, 2019

Mark Richard (D.C. Bar No. 1033699)
PHILLIPS, RICHARD & RIND, P.A.
9360 SW 72 Street, Suite 283
Miami, FL 33173
Telephone: (305) 412-8322
E-mail: mrichard@phillipsrichard.com

*Attorneys for Plaintiffs Weingarten & AFT*

Aaron Ament (*pro hac vice*)
Daniel A. Zibel (D.C. Bar No. 491377)
Robyn K. Bitner (D.C. Bar No. 1617036)
NATIONAL STUDENT LEGAL DEFENSE
NETWORK
1015 15th Street N.W., Suite 600
Washington, D.C. 20005
Telephone: (202) 734-7496
E-mail: aaron@nsldn.org
        dan@nsldn.org
        robyn@nsldn.org

*Attorneys for Plaintiffs Weingarten & AFT*

/s/ Faith Gay
Faith Gay (*pro hac vice*)
Caitlin Halligan (*pro hac vice*)
Maria Ginzburg (*pro hac vice*)
Yelena Konanova (*pro hac vice*)
Margaret Siller (D.C. Bar No. 230475)
Jessica E. Underwood*
Shelby P. Rokito*
SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 390-9000
E-mail: fgay@selendygay.com
        challigan@selendygay.com
        mginzburg@selendygay.com
        lkonanova@selendygay.com
        msiller@selendygay.com
        junderwood@selendygay.com
        srokito@selendygay.com

*Attorneys for Plaintiffs*

*\*Pro hac vice* forthcoming