# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RANDI WEINGARTEN, President, American Federation of Teachers, AFL-CIO, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 19-cv-2056 (DLF) |
| ELISABETH DEVOS, Secretary, United States Department of Education, *et al.*, | |
| *Defendants*. | |

## <u>MEMORANDUM OPINION</u>

In this action, the American Federation of Teachers and its president, Randi Weingarten, (collectively, the "American Federation of Teachers" or "Federation") join six individual plaintiffs to challenge the Department of Education's alleged mismanagement of the Public Service Loan Forgiveness Program and the Temporary Expanded Public Service Loan Forgiveness Program.  The plaintiffs allege violations of the Administrative Procedure Act and the Fifth Amendment's Due Process Clause.  They seek declaratory and injunctive relief ordering the Department to provide "a decision-making process that minimizes the risk of erroneous denials" of loan forgiveness applications, "a meaningful opportunity to contest denials, and a written, reasoned explanation for its decisions."  Compl. at 1, Dkt. 1.  The individual plaintiffs "also seek loan forgiveness in their specific cases."  *Id.*  Before the Court is the Department's Partial Motion to Dismiss the American Federation of Teachers and to dismiss Counts III, IV, and V.  *See* Defs.' Mot. to Dismiss at 1, Dkt. 19.  For the following reasons, the Court will grant in part and deny in part the Department's motion.

## I.      BACKGROUND

### A.      Statutory and Regulatory Background

#### 1.      *Public Service Loan Forgiveness Program*

Congress created the Public Service Loan Forgiveness Program (the "Loan Forgiveness Program") in 2007 with the College Cost Reduction and Access Act.  Compl. ¶¶ 60, 66.  That Act requires that "[t]he Secretary shall cancel the balance of interest and principal due . . . on any eligible Federal Direct Loan not in default for a borrower who" meets three main qualifications.  20 U.S.C. § 1087e(m).  The borrower must have "made 120 monthly payments on [an] eligible Federal Direct Loan after October 1, 2007, pursuant to [an income-driven repayment plan, the standard repayment plan, or a plan with a monthly payment at least equal to the standard plan]." *Id.*  The borrower must be "employed in a public service job at the time of such forgiveness." And the borrower must have "been employed in a public service job during the period in which the borrower makes each of the 120 payments described" above.  *Id.*

Loans must originate under the Direct Loan Program to qualify for forgiveness.  The Direct Loan Program did not exist until 1993.  Compl.¶ 52.  Before then, all federal loans originated under the Federal Family Education Loan Program.  *Id.*  Those loans were privately originated and funded, and the federal government simply acted as a reinsurer to the guaranty agencies that directly insured the loans.  *Id.*  But in 1993, the "federal government began originating loans directly to borrowers" under the Direct Loan Program.  *Id.*  The two programs "operated in tandem until 2008, at which point the [Federal Family Education Loan] Program was terminated and the Direct Loan Program expanded."  *Id.*  Though "borrowers are still repaying [Federal Family Education] Loans, no new [Federal Family Education] Loans have been issued since June 30, 2010."  *Id.*

Though the Department "retains ultimate responsibility" for administering the Public Service Loan Forgiveness Program, it has designated FedLoan Servicing as "the" servicer for the program.  *Id.* ¶ 69.  A borrower who is "declared on track for [forgiveness]—as explained in step three below—will be transferred to" FedLoan Servicing.  *Id.* (internal quotation marks omitted).  Until then, any of the federal loan servicers may service the borrower's loans.  *Id.*

A borrower must clear several hurdles to qualify for forgiveness.  *First*, at the borrower's request, "FedLoan Servicing must provide the borrower with an [Employment Certification Form], an overview of [Public Service Loan Forgiveness Program] eligibility requirements, and instructions for completing the [form]."  *Id.* ¶ 70.  The borrower submits a completed form, and the Department reviews it for errors.  *Id.*

*Second*, FedLoan Servicing confirms that the employer is listed in the Department's database of qualifying public service organizations.  *Id.* ¶ 71.  If FedLoan Servicing cannot so confirm, the Department determines whether the employer qualifies.  *Id.* ¶ 72.

*Third*, FedLoan Servicing "determines whether the borrower worked the requisite number of hours in a public service job" to be considered "on track" for forgiveness.  *Id.* ¶ 73–74.  If so, "that borrower's loans are transferred to FedLoan Servicing," if they are not already there.  *Id.* ¶ 74.  At this point, "FedLoan Servicing is to process all forms and handle all communications regarding [Public Service Loan Forgiveness], as well as perform all non-[Public Service Loan Forgiveness] related servicing functions on a borrower portfolio, as required of all federal loan servicers."  *Id.* (internal quotation marks omitted).  The Department "requires FedLoan Servicing to track the number of qualifying payments made by all of the borrowers it services," and the Department and FedLoan Servicing both "recommend that [Employment Certification Forms] be submitted annually so that the number of qualifying payments can be

updated." *Id.* ¶ 75.  As borrowers submit those forms, FedLoan Servicing reviews them "and notifies the borrower of the number of qualifying payments the borrower has made and the remaining number the borrower must make in order to be eligible for [forgiveness]." *Id.* ¶ 76 (internal quotation marks omitted).

*Fourth*, the borrower then "must make 120 qualifying payments toward Direct Loans to qualify for [forgiveness]." *Id.* ¶ 77.  As mentioned, no Federal Family Education Loans qualify for forgiveness, so the borrower must consolidate them "into a Direct Consolidation Loan," and "[a]ny payments made prior to consolidation do not qualify" toward forgiveness.  *Id.* ¶ 78.  In addition, not all payments made on Direct Loans qualify.  To qualify, they "must have been made after October 1, 2007, under a qualifying repayment plan, for the full amount shown on the invoice, within fifteen days of the due date, and while employed full-time by a qualifying employer." *Id.* ¶ 79.  And "borrowers cannot make qualifying payments while their Direct Loans are in forbearance." *Id.*

*Fifth*, a borrower who "has made 120 qualifying payments" will then "complete a [Public Service Loan] Application for Forgiveness." *Id.* ¶ 80.  The borrower "must be working full-time for a qualifying employer" both "at the time the application is submitted and at the time the remaining balance on the loan is forgiven." *Id.*  FedLoan Servicing reviews the application, and "[i]f the borrower meets all of the above requirements, [it] forwards the application to [the Department] for final review." *Id.* ¶ 81.  If the Department agrees that the borrower has met all requirements, the borrower's remaining principal and interest balance on the loan is forgiven.  *Id.* If the Department does not agree, the Department "notifies the borrower that the application has been denied, provides the basis for the denial, and informs the borrower that [the Department] will resume collection of the loan." *Id.* ¶ 82.

The Department has "what is known as Compromise and Settlement authority, which allows [it] to compromise or waive any title or claim." *Id.* ¶ 91. This authority covers Federal Family Education Loans and Direct Loans alike. *Id.* ¶ 92. The Department can use this authority "to settle with student loan borrowers who are not eligible for forgiveness" on account of "incorrect information" from the Department and its servicers "about how to qualify" for forgiveness. *Id.* ¶ 91.

But the Department "provides no process for a borrower to challenge or appeal the denial of [forgiveness]." *Id.* ¶ 84. Nor does it "have any process by which it reviews and corrects mistakes made by [itself] or [its] servicers regarding [forgiveness]." *Id.*

       2.    *Temporary Expanded Public Service Loan Forgiveness Program*

The Public Service Loan Forgiveness Program has forgiven relatively few loans. There were "more than 32 million borrowers" repaying potentially eligible loans by the end of 2016. *Id.* ¶ 85. But "as of March 2019," just "73,554 unique borrowers had submitted 86,006 applications for [forgiveness], and only 864 applications had been *approved* for forgiveness." *Id.* ¶ 86 (emphasis added). And "[o]nly 518 borrowers—fewer than 1% of unique borrowers submitting applications—have had their loans forgiven." *Id.*

This situation motivated Congress to create the Temporary Expanded Public Service Loan Forgiveness Program (the "Temporary Program") in January 2018. *Id.* ¶ 87. This program "authorized $350 million to be available on a first-come, first-served basis . . . to borrowers who hold Direct Loans but made some or all of their 120 payments on a nonqualifying repayment plan," so long as the borrower's "last 12 payments were greater or equal to what they would have paid on [a qualifying] income-driven repayment plan." *Id.* This "expansion requires forgiveness if the statutory qualifications are met." *Id.* And the authorizing statute directed the Department

to "develop and make available a simple method for borrowers to apply for loan cancellation under this section within 60 days of enactment of this Act." *Id.*

To apply for forgiveness under the Temporary Program, FedLoan Servicing and the Department instruct borrowers to send an email to FedLoan Servicing requesting that the Department reconsider the borrower's Public Service Loan Forgiveness eligibility. *Id.* ¶ 88. The Department, "through FedLoan Servicing, then reviews the application and determines whether to grant [forgiveness under the Temporary Program]." *Id.* The Department has no process for borrowers to challenge or appeal a Temporary Program denial. *Id.* ¶ 89. Nor does it have a process for reviewing or correcting its or its loan servicers' mistakes. *Id.*

Like the Public Service Loan Forgiveness Program, the Temporary Program has forgiven a relatively small amount of debt. By "the end of March 2019, only 442 requests out of 12,429 requests considered—3.6%—were approved for [forgiveness under the Temporary Program]." *Id.* ¶ 90. These approvals totaled about $17.6 million in debt relief. *Id.*

**B.   The Department's Alleged Mishandling of These Programs**

*1.   Administrative Processing Errors*

The Department allegedly "has done nothing to ensure that borrowers' [120 qualifying] payments are correctly counted despite documented knowledge of repeated errors—with disastrous consequences for borrowers." *Id.* ¶ 95. For instance, the Government Accountability Office (GAO) determined that the Department has not ensured that its loan servicers are "receiving consistent loan payment history information from other loan servicers, increasing the risk of inaccurate qualifying payment counts." *Id.* ¶ 97. "The GAO further found that the [Department] has failed to provide FedLoan Servicing and borrowers with sufficient information to determine whether a borrower's employer qualifies as a public service employer." *Id.* ¶ 98. And "[t]he GAO found similar inconsistencies in the information used for counting borrowers'

qualifying loan payments, raising the risk of errors in the [Public Service Loan Forgiveness] application review process." *Id.* ¶ 99 (internal quotation marks omitted) (alteration adopted).

The Consumer Financial Protection Bureau (CFPB) has made related findings.  For instance, the CFPB reported that "borrowers have complained that their servicer provides inaccurate counts of qualified payments and that their previous qualifying payments may not be reflected in the payment histories maintained by FedLoan Servicing." *Id.* ¶ 100 (internal quotation marks omitted) (alteration adopted).  "The CFPB has also found that borrowers struggle to get their servicer to correct payment counting errors or explain why payments were not qualified." *Id.* ¶ 102 (internal quotation marks omitted) (alteration adopted).

These problems, which also "plague the [Temporary Program] application process," *id.* ¶ 104, have caused and continue to cause borrowers "to make more payments than necessary before receiving loan forgiveness," *id.* ¶ 105 (internal quotation marks omitted).  They "result in numerous qualified borrowers being wrongfully denied their right to [forgiveness]." *Id.* ¶ 106.

Plaintiff Cynthia Miller alleges that she is among the "many victims" of such administrative errors.[1] *Id.* ¶ 107; *see id.* ¶¶ 108–152.  Miller is a full-time teacher for the Chicago Public Schools. *Id.* ¶ 108.  She "took out two [Federal Family Education] Loans in 1995 to pay for her undergraduate degree" and "consolidated her loans in 1998 under the Direct Loan Program." *Id.* ¶ 109.  She "then took out two Direct Loans in 2003 to complete her undergraduate degree." *Id.*

Miller alleges that although she has made "at least 120 qualifying payments," *id.* ¶ 110, she has been unable to obtain forgiveness under either program, *id.* ¶ 5.  She claims that the

---

[1] Two other individual plaintiffs, Crystal Adams and Connie Wakefield, alleged similar claims. *See id.* ¶ 5.  Adams and Wakefield have since voluntarily dismissed their claims without prejudice. *See* Notice of Voluntary Dismissal of Pls. Adams and Wakefield at 1, Dkt. 32.

Department "delayed consideration of her . . . application repeatedly because" her loan servicer "erroneously claimed her application was 'incomplete.'"  *Id.* ¶ 5.  The Department "eventually denied [her application] for failure to make 120 qualifying payments" and also "denied [her] [Temporary Program] application."  *Id.*  She made "repeated inquiries about the reason for the denials," and she "received at least a dozen responses with completely different—and incorrect—counts of her qualifying payments (including one count of 128 payments—eight more than the requisite number)."  *Id.*  Her servicer ultimately "mailed her multiple envelopes containing over 160 pages of indecipherable numbers and codes and informed her that her inquiry had been closed."  *Id.*

Miller claims that the Department "failed to institute an adequate process . . . that would have . . . identified and accounted for [its] errors . . . in determining [her] eligibility for loan forgiveness."  *Id.* ¶ 150.  She asserts that her loan forgiveness denial was "arbitrary and capricious" because it ignored the Department's "payment counting errors" and "provided no meaningful explanation of the reasons why [the Department] did not count her payments as qualifying."  *Id.* ¶ 151.

### 2.    *Disregard of Servicer Misconduct*

On top of these alleged administrative processing errors, the Department also allegedly "knows of—but completely disregards—repeated misrepresentations made by [loan] servicers to borrowers who are attempting to qualify for [forgiveness], resulting in unwarranted denials of loan forgiveness."  *Id.* ¶ 236.  In particular, the Department "has refused to exercise its oversight responsibilities, has obstructed attempts by agencies like the [Consumer Financial Protection Bureau] to rein in servicer misconduct, has failed to institute a process that allows borrowers to raise servicer misconduct in their [Public Service Loan Forgiveness] applications, and has

refused to account for [the] servicers' misrepresentations in the [forgiveness] review process."
*Id.* ¶ 250.  And it has done all this despite being "responsible for and obligated to address [loan]
servicers' misconduct that harms [forgiveness]-seeking borrowers."  *Id.* ¶ 239.

Plaintiffs Deborah Baker, Janelle Menzel, Kelly Finlaw, Gloria Nolan, and Michael
Giambona allege they were victims of this uncontrolled servicer misconduct.  *See id.* ¶ 6; *see
also id.* ¶¶ 251–394  Their "servicers misinformed [them] that they were 'on track' for [Public
Service Loan Forgiveness] and making 'qualifying' payments for [forgiveness], even though
they did not actually have qualifying loans or were not in qualifying repayment plans."  *Id.* ¶ 6.
Not until "years later, after they had made 120 payments and applied for forgiveness, did [they]
learn for the first time that their payments" were not qualifying payments and thus "did not
count."  *Id.*  They allege that "[h]ad the loan servicers given [them] the correct information, they
easily could have consolidated their loans, entered qualifying repayment plans, and been eligible
for forgiveness under [the Public Service Loan Forgiveness Program]."  *Id.*  And they claim that
rather than "acknowledging the [loan] servicers' misrepresentations and using its loan discharge
authority to redress these errors," the Department "has turned a blind eye to this misconduct,
even though it is well-documented, including in government reports."  *Id.* ¶ 7.

These "Servicer Misconduct" plaintiffs allege that the Department's decisions to deny
them loan forgiveness were arbitrary and capricious because the Department failed to consider
that their loan servicers had "engaged in misconduct that precluded [them] from satisfying the
[forgiveness] requirements."  *Id.* ¶ 422.

**C.   This Case**

The plaintiffs filed this action on July 11, 2019.  The complaint asserts five counts.  In
Count I, Miller alleges that the Department's decision denying her forgiveness applications "was
contrary to the evidence before it," *id.* ¶ 399, and thus arbitrarily, capriciously, and unlawfully

deprived her of a federal entitlement in violation of 5 U.S.C. § 706(2)(A) of the Administrative Procedure Act (APA), *see id.* ¶¶ 395–400. She asks the Court to vacate the denial and to either remand to the Department with specific instructions to approve her application or retain jurisdiction and remand to the Department for further action consistent with the APA. *Id.* ¶ 400.

In Count II, Miller alleges that the Department's failure "to explain why [her] 120 payments did not qualify for loan forgiveness" violated the APA's requirement under 5 U.S.C. § 555(e) to provide "a brief statement of the grounds for denial." *Id.* ¶ 405. She asks the Court to vacate her denial on this alternative ground. *Id.* ¶ 406.

In Count III, Miller, the American Federation of Teachers, and Weingarten, the President of the American Federation of Teachers, allege that the Department's application processes provide applicants with neither "adequate notice of the reasons for their denial" nor "a meaningful process to contest the denial, present additional evidence of their eligibility," and ensure that the Department "will take account of its errors." *Id.* ¶ 414. They allege that these deficiencies violate the Fifth Amendment Due Process Clause's requirement "that, at a minimum, individuals receive notice and an opportunity to be heard before they are deprived of property." *Id.* ¶ 408. While Miller brings this constitutional claim on her own behalf, the American Federation of Teachers brings the claim on its behalf and its members' behalf. *Id.* ¶ 410. To remedy these alleged constitutional violations, these plaintiffs ask the Court to vacate the denial of Miller's application and order the Department to provide applicants with: "adequate notice of the grounds for denial"; "a meaningful decision-making process that minimizes the risk of erroneous determinations"; an opportunity to "contest their denial and introduce evidence rebutting [the Department's] determination"; and "a written and reasoned explanation for [the] determination within a reasonable time period." *Id.* ¶ 417.

In Count IV, the Servicer Misconduct plaintiffs allege that the Department acted arbitrarily and capriciously in violation of 5 U.S.C. § 706(2) of the APA when it failed to consider that loan servicer misconduct precluded these plaintiffs from satisfying the forgiveness requirements. *Id.* ¶ 422. They seek an order vacating their denials and remanding to the Department "with specific instructions to discharge their student loan debt pursuant to [the Department's] general discharge authority." *Id.* ¶ 423. They alternatively seek "an order retaining jurisdiction and remanding to [the Department] for further action with respect to each Servicer Misconduct [p]laintiff named herein, consistent with the APA." *Id.*

And in Count V, the Servicer Misconduct plaintiffs, the American Federation of Teachers, and Weingarten allege Due Process Clause claims that are substantially similar to those raised in Count III. *See id.* ¶¶ 424–434. They accordingly seek an order vacating the Servicer Misconduct plaintiffs' denials and an order requiring the Department to introduce additional processes that would, among other things, "account for misrepresentations" from the Department and servicers and allow applicants to demonstrate that the Department "should exercise its general discharge authority to issue forgiveness." *Id.* ¶ 434.

On October 4, 2019, the Department moved to dismiss these claims in part under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. *See* Defs.' Mot. to Dismiss at 1. They move to dismiss the American Federation of Teachers for lack of standing. *See* Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Br.") at 30, Dkt. 19-1. They move to dismiss Counts III and V as impermissible programmatic challenges. *See id.* at 16. And they move to dismiss Count IV for lack of standing and failure to state a claim. *See id.* at 29. In addition to the briefs of the parties, the Court also considered the two briefs for amici curiae filed in this case. *See* Dkts. 21, 35.

## II.      LEGAL STANDARDS

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss an action for lack of subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  Federal law empowers federal district courts to hear only certain kinds of cases, and it is "presumed that a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins.*, 511 U.S. 375, 377 (1994).  When deciding a Rule 12(b)(1) motion, the court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged, and upon such facts determine [the] jurisdictional questions."  *Am. Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal quotation marks omitted).  But the court "may undertake an independent investigation" that examines "facts developed in the record beyond the complaint" to "assure itself of its own subject matter jurisdiction."  *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (internal quotation marks omitted).  A court that lacks jurisdiction must dismiss the action. Fed. R. Civ. P. 12(b)(1); *id.* 12(h)(3).

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff's well-pleaded factual allegations are "entitled to [an] assumption of truth."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  And the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged."  *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted).

III.    **ANALYSIS**

A.    **Motion to Dismiss the American Federation of Teachers**

The Department moves to dismiss the American Federation of Teachers for lack of standing.  A federal court formed under Article III of the Constitution may decide nothing but "cases and controversies."  *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).  The "standing" doctrine "serves to identify those disputes which are appropriately resolved through the judicial process."  *Id.*  Thus, standing "is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

To satisfy Article III's standing requirement, a party must show: (1) "an injury in fact"— *i.e.*, "an invasion of a legally protected interest" that is "concrete and particularized" and is either "actual or imminent"; (2) "a causal connection between the injury and the conduct complained of"; and (3) that the injury "likely . . . will be redressed by a favorable decision."  *Id.*  A common shorthand for these three requirements is injury, causation, and redressability.  These Article III standing requirements apply to organizations as well as to individuals.  *See Equal Rights Ctr. v. Post Properties*, 633 F. 3d 1136, 1138 (D.C. Cir. 2011).

An organization may assert claims "on its own behalf" through organizational standing "or on behalf of its members" through associational standing.  *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006).  The American Federation of Teachers asserts both forms of standing but establishes neither.  The Court will therefore dismiss it and its president from this case without prejudice.

*1.    Organizational Standing*

To satisfy the injury-in-fact requirement of Article III standing, an organization "must allege more than a frustration of its purpose."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).  The D.C. Circuit "has distinguished between organizations that

allege that their activities have been impeded"—which might have suffered an injury-in-fact—and "those that merely allege that their mission has been compromised"—which have not. *Id.* Thus, for the American Federation of Teachers to establish organizational standing, "it must have 'suffered a concrete and demonstrable injury to its activities.'" *Id.* (quoting *People for the Ethical Treatment of Animals v. U.S. Dep't of Agriculture* ("*PETA*"), 797 F.3d 1087, 1093 (D.C. Cir. 2015)) (alterations adopted).

This determination turns on "a two-part inquiry—'we ask, first, whether the agency's action or omission to act injured the organization's interest and, second, whether the organization used its resources to counteract that harm.'" *Id.* (quoting *PETA*, 797 F.3d at 1094) (alterations adopted); *accord Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371 (D.C. Cir. 2017). The first step tests whether "the defendant's conduct perceptibly impaired the organization's ability to provide services." *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (internal quotation marks omitted). The D.C. Circuit has expressed this test in various ways, "but they all focus on the same point: the organization's tasks must be impeded" by the agency's action or omission. *Ctr. for Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29, 37 (D.D.C. 2018) (citing cases). The Court does not proceed to the second step—whether the organization used its resources to counteract the agency's action—unless the organization satisfies the first step. *See id.* at 40 (observing "settled law in this Circuit that an organizational plaintiff must first show that the challenged conduct made its activities more difficult").

The American Federation of Teachers tries to satisfy this inquiry by alleging that its "mission and purpose is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families, and communities, including ensuring access to affordable education for public servants." Compl. ¶ 42(a). It

further alleges that the Department's "denials of borrowers' applications for [forgiveness] and the deprivation of borrowers' property interests in [forgiveness] without due process of law directly conflict with [its] organizational mission." *Id.* ¶ 42(b).  And it alleges that the Department's "challenged actions have caused [the American Federation of Teachers] to redirect its resources from other projects to assist its members in seeking and obtaining the loan forgiveness to which they are statutorily entitled." *Id.* ¶ 42(c).

These allegations fail at step one because they do not identify any organizational activities the Department's actions have impeded directly.  The Federation's allegation that the Department's actions directly conflict with its organizational mission is plainly insufficient because organizations "that merely allege that their mission has been compromised" have not suffered an injury-in-fact.  *Food & Water Watch, Inc.*, 808 F.3d at 919 (internal quotation marks omitted).

Its allegation that it has had to redirect its resources from other projects fares no better.  Here, it "confuses the two prongs of the injury-in-fact inquiry."  *Ctr. for Responsible Sci.*, 346 F. Supp. 3d at 41.  A diversion of resources "is certainly relevant to step two"—whether the American Federation of Teachers used resources to counteract the alleged harm to its activities.  *Id.*  But step two is irrelevant unless the organization can show harm to its activities *distinct from* the diversion of resources.  "The diversion itself cannot alone constitute the harm" because an organization can divert resources to counteract harm to its activities only after there is such harm to counteract.  *Id.*  It "would be hopelessly circular" to hold that the diversion of resources itself—necessary for establishing step two—also inflicts the harm necessary for establishing step one.  *Id.*  The current complaint fails to allege that "something about the challenged action itself—rather than the organization's response to it—makes the organization's task more

difficult." *Id.* The Federation merely "directed its resources to[ward] mitigating a risk that it

thought the government should have exercised more diligence in preventing." *Id.* at 42. This

"mere diversion of resources to advance the advocacy mission of an organization is insufficient

to confer standing." *Id.* (citing cases).

For all these reasons and based on the current complaint, the American Federation of

Teachers has failed to assert organizational standing.

### 2.    Associational Standing

Though organizations may not always have standing to assert claims on their own behalf,

they can sometimes use "associational standing" to assert claims on their members' behalf. To

assert associational standing, an organization must show that "(a) its members would otherwise

have standing to sue in their own right; (b) the interests it seeks to protect are germane to the

organization's purpose; and (c) neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*,

432 U.S. 333, 343 (1977); *see also Sierra Club v. Envtl. Prot. Agency*, 754 F.3d 995, 999 (D.C.

Cir. 2014). The Department appears to concede the first two requirements and challenges only

the third. *See* Defs.' Br. at 32–34.

The American Federation of Teachers fails to show that member participation is

unnecessary to resolve the Due Process claims alleged in Counts III and V. To prevail on these

claims, it must show that the Department deprived its members of a "liberty or property interest"

in which they had a "legitimate claim of entitlement" and that "the procedures attendant upon the

deprivation were [not] constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S.

454, 460 (1989). The Federation argues that the constitutional violations here are "systemic" and

that the evidence thus would consist largely of the Department's "own internal procedures," the

organization's own "extensive surveys," and other "investigations of [the Department's] failures

in implementing the [Public Service Loan Forgiveness] program." Pls.' Opp'n at 22, Dkt. 24. Yet the Federation acknowledges that the evidence also would include "testimony from various [Federation] members . . . whose experiences evidence [the Department's] violations," thus conceding that at least some individual participation is required. *Id.*

Based on this concession, the Federation of Teachers must move the goalposts. It argues that because no "*substantial* individual participation" of its members "is required," it has "sufficiently alleged associational standing." *Id.* at 23 (emphasis added). Yet even if it is correct that less-than-substantial individual participation would not violate the member participation rule, the complaint itself demonstrates that this case requires substantial individual participation. The deficiencies alleged here are unlike the "standardized," automatically generated "form letters" at issue in *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Fed. Emergency Mgmt. Agency (FEMA)*, 463 F. Supp. 2d 26, 32 (D.D.C. 2006), which presented a uniform constitutional deficiency that the court could evaluate without member participation. Here, close to 190 paragraphs of the complaint contain detailed allegations about the distinctly different types and different amounts of process that each applicant received. *See* Compl. ¶¶ 108–152 (Miller); *id.* ¶¶ 251–394 (Servicer Misconduct plaintiffs). The Court cannot evaluate whether the Federation's members received constitutionally sufficient process without evaluating the particular, fact-specific experiences of numerous individual members. *Cf. Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Fed. Deposit Ins. Corp.,* No. 14-cv-953 (GK), 2016 WL 7376847, at *4 (D.D.C. Dec. 19, 2016).

As a fallback, the Federation suggests that because it seeks declaratory and injunctive relief, rather than damages, individual participation is not required. *See* Pls.' Opp'n at 21–22. This argument is misplaced. To start, the Federation derives this proposition from the Supreme

Court's observation that "individual participation is not normally necessary when an association seeks prospective or injunctive relief for its members." *United Food & Commercial Works Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546 (1996); *see also ACORN v. FEMA*, 463 F. Supp. 2d at 32.  But not *normally* necessary does not mean not *ever* necessary, and the Federation itself has conceded that at least some individual participation is required here even though it does not seek damages.  Pls.' Opp'n at 22.  In addition, the Supreme Court's holding in *Hunt* plainly precludes this argument because *Hunt* requires courts "to look not only at the type of relief requested but also at the nature of 'the claim asserted' to determine whether member participation is required." *Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 2016 WL 7376847, at *4 (quoting *Hunt*, 433 U.S. at 343).  Thus, although the plaintiffs seek only injunctive relief, the nature of their due process claims requires individual member participation.

For all these reasons, the American Federation of Teachers has failed to assert associational standing.  The Court accordingly will dismiss it and Weingarten from this case.

**B.    Motion to Dismiss Count IV**

The Department moves to dismiss Count IV both because the Servicer Misconduct plaintiffs lack standing to assert Count IV and because Count IV fails to state a claim.  Though the Court will not dismiss Count IV for lack of standing, it will dismiss Count IV for failure to state a claim.

*1.    Standing*

The Department concedes that the Servicer Misconduct plaintiffs can meet the injury in fact and causation standing requirements but argues that they fail to show redressability and thus lack standing to bring Count IV.  Defs.' Br. at 26.  As explained, the redressability element tests whether the plaintiff's injury "likely . . . will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560.  This element can turn on "whether a federal court has the power to grant" the relief

sought.  *Swan v. Clinton*, 100 F.3d 973, 976 (D.C. Cir. 1996).  The D.C. Circuit cautions courts to be "careful not to require too much from a plaintiff attempting to show redressability, lest it abdicate its responsibility of granting relief to those injured by illegal government action."  *Cmty. Nutrition Inst. v. Block*, 698 F.2d 1239, 1248 (D.C. Cir. 1983), *rev'd on other grounds*, 467 U.S. 340 (1984).  To remedy Count IV, the Servicer Misconduct plaintiffs request: (1) an order vacating their application denials; and (2) an order *either* (a) remanding to the Department and ordering the Secretary of Education to discharge their debt under her general discharge authority, *or* (b) retaining jurisdiction and remanding to the Department for further action consistent with the APA.  Compl. ¶ 423.

The Court has the power to grant at least some of the relief requested.  The Court cannot order the Secretary of Education to discharge these plaintiffs' debt because Congress has instructed that "no attachment, *injunction*, garnishment, or other similar process, mesne or final, shall be issued against the Secretary or property under the Secretary's control . . . ."  20 U.S.C. § 1082(a)(2) (emphasis added); *see also Bank of Am. NT & SA v. Riley*, 940 F. Supp. 348, 350 (D.D.C. 1996), *aff'd*, 132 F.3d 1480 (D.C. Cir. 1997).  But, as the Department concedes, the Court at least can vacate an arbitrary and capricious decision, declare the action unlawful, and remand to the agency for further proceedings consistent with the APA and the Court's ruling.  *See* Defs.' Reply at 19–22; *see also United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001) (recognizing a district court's "broad discretion to enter that relief it calculates will best remedy the conduct it has found to be unlawful").  And to establish redressability, a plaintiff need only show that some of the relief requested would redress some of the injuries alleged.  *Cf. Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (holding that to establish redressability a plaintiff must show only that a favorable decision is likely to redress "*an* injury," not "*every*

injury"); *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012) (observing

that "[t]he Supreme Court has rejected interpretations of the [standing] rule that demand

complete redressability").

The question then is whether a decision to vacate the plaintiffs' application denials and

remand to the agency is likely to redress the plaintiffs' alleged injuries.  The Department answers

"no" because vacatur, declaratory relief, and remand "would not serve a useful purpose."  Defs.'

Reply at 20.  This argument is unavailing.  First, the Department did not raise this "useful

purpose" argument until its reply brief, and so the Court need not consider it.  *See, e.g.*, *Russell v.*

*Harman Int'l Indus., Inc.*, 773 F.3d 253, 255 n.1 (D.C. Cir. 2014) (arguments made for the first

time in a reply brief are forfeited).

Second, *Bank of Am. NT & SA v. Riley*, the authority on which the Department relies,

makes clear that the "useful purpose" test relates not to Article III redressability but to the

doctrine of prudential mootness.  *See* 940 F. Supp. at 350; *id.* at 351 n.5 (noting that "the

discretionary nature of declaratory relief makes it appropriate to consider, *not only* the

*jurisdictional* question presented by the government's motion, *but also* whether the issuance of

declaratory relief in this case would serve a useful purpose" (emphasis added)).  And as

*Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011 (D.C. Cir. 1991), explains, the concept of

prudential mootness "is concerned, not with the court's power under Article III to provide relief,

but with the court's discretion in exercising that power."  *Id.* at 1019.  Because the Department

has not raised prudential mootness at all, let alone in its opening brief, the Court need not address

it here.  *See Russell*, 773 F.3d at 255 n.1.

But even if this issue were properly before the Court, the Department is incorrect that the

relief the Court is empowered to grant—vacatur, a declaratory judgment, and remand—would

not serve a useful purpose.  The Department argues that such relief is useless because it would require the Secretary to evaluate servicer misconduct and flout Congress's supposed conclusion that servicer misconduct should not affect loan forgiveness decisions.  Defs.' Reply at 20–21. But this argument requires the Court to assume that the plaintiffs will lose on the merits of their claim that the Secretary acted unlawfully by failing to take servicer misconduct into account in making loan forgiveness decisions.  And that assumption is backwards.  When evaluating Article III standing, "a federal court must assume, *arguendo*, the merits of [the plaintiff's] legal claim." *Estate of Boyland v. United States Dep't of Agric.*, 913 F.3d 117, 123 (D.C. Cir. 2019), *cert. denied sub nom.*, 140 S. Ct. 947, 205 L. Ed. 2d 530 (2020) (quoting *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)).  So the Court must assume that the Department erred in failing to consider servicer misconduct before denying these loan applications.  And under that assumption, vacating the denials, declaring the Department's failure arbitrary and capricious, and remanding for further proceedings consistent with the APA, surely would serve a useful purpose.

For these reasons, the Court will deny the Department's motion to dismiss Count IV for lack of standing.

### 2.    *Failure to State A Claim*

Though the Servicer Misconduct plaintiffs have standing to assert Count IV, they fail to state a claim for which relief can be granted.  Each Servicer Misconduct plaintiff concedes that he or she has not made the required 120 qualifying payments and is thus currently ineligible for loan forgiveness.  Compl. ¶¶ 420(a)-(e).  Thus, they do not contend that the Department erred in denying their loans in the first instance.  *See* Pls.' Opp'n at 36 (clarifying that any argument based on their ineligibility "wholly misses the point").  They argue instead that the Secretary's failure to take servicer misconduct into account and to consider whether to exercise her Compromise and Settlement Authority to forgive the Servicer Misconduct plaintiffs' debt was

arbitrary and capricious. *See id.* And they argue that the Department's failure to provide any explanation for the Secretary's decision not to exercise that authority was arbitrary and capricious too. *See id.*

But the Secretary's matters concerning the Secretary's Compromise and Settlement authority are presumptively unreviewable. With this authority, "the Secretary *may* . . . enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption." 20 U.S.C. § 1082(a)(6) (emphasis added). The word "may" means that this authority is discretionary. The Secretary's "decision not to exercise [such] authority, or to exercise it in a particular way, is committed to [her] absolute discretion. Such matters are not subject to judicial review," absent certain exceptions. *Balt. Gas & Elec. Co. v. F.E.R.C.*, 252 F.3d 456, 459 (D.C. Cir. 2001).

And this case presents none of those exceptions. The "substantive statute has [not] provided guidelines for the agency to follow in exercising its enforcement powers." *Heckler v. Chaney*, 470 U.S. 821, 833 (1985). The Secretary has not declined to use this authority "based solely on the belief that [she] lacks jurisdiction." *Id.* at 833 n.4. And the Department has not "consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." *Id.* (internal quotation marks omitted). The plaintiffs have not argued that any exception applies. The Court thus may not review matters concerning the Secretary's exercise or failure to exercise of her settlement authority, and the Court will therefore grant the Department's motion to dismiss Count IV.

## C.   Motion to Dismiss Counts III and V

The Department moves to dismiss Counts III and V solely because they are "broad programmatic challenges" that seek wholesale agency change. Defs.' Br. at 16. The Department asserts that Supreme Court precedent forecloses such claims. *Id.* But, as the Department

concedes, the limits it raises apply only to claims brought under the APA.  And Circuit precedent forecloses the Department's argument that a plaintiff may not bring under the Due Process Clause a claim that the plaintiff could not also bring under the APA.  Thus, the Court will deny the motion to dismiss Counts III and V.

The cases upon which the Department relies make clear that the programmatic challenge bar derives from the APA's text.  For example, in *Lujan v. Nat'l Wildlife Fed'n*, the Supreme Court considered whether the plaintiff's APA challenge had targeted "agency action" as the APA defines it in 5 U.S.C. § 551(13).  *See* 497 U.S. 871, 890 (1990).  It concluded that a plaintiff "cannot seek *wholesale* improvement of [an agency] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made."  *Id.* at 891.  But this is because "[u]nder the *terms of the APA*, [a plaintiff] must direct its attack against some particular 'agency action' that causes it harm."  *Id.* (emphasis added).  Indeed, the Court in *Lujan* recognized that statutes may displace this general rule and "permit broad regulations to serve as the 'agency action,' and thus to be the object of judicial review directly, even before the concrete effects normally required for APA review are felt."  *Id.*

The Department's other Supreme Court case, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004), reaffirms that the programmatic challenge bar comes from the APA.  There, the Supreme Court held that the phrase "failure to act" under the APA means "a failure to take an *agency action*—that is, a failure to take one of the agency actions . . . defined in § 551(13)."  542 U.S. at 62 (emphasis in original).  It added that "[a] second point central to the analysis of the present case is that the only agency action that can be compelled *under the APA* is action legally required."  *Id.* at 63 (emphasis added).  And when noting the rationales behind the programmatic

challenge bar, it explained that these purposes motivate "the *APA* limitations we have discussed."  *Id.* at 66 (emphasis added).[2]

While essentially conceding that this programmatic challenge bar applies only to APA claims, *see* Defs.' Reply at 10, the Department nonetheless maintains that if this bar would foreclose plaintiffs "from bringing their claims under Counts III and V as APA claims, they should be unable to succeed under any other vehicle," *id.* at 13.  The Department contends that holding otherwise would permit an "obvious end-run around the APA."  *Id.* at 11.

But D.C. Circuit precedent forecloses this argument.  In evaluating the waiver of sovereign immunity found at 5 U.S.C. § 702, this Circuit concluded that nothing in § 702 "restricts its waiver to suits brought under the APA."  *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006).  The Circuit determined that Congress expected the sovereign immunity "waiver to apply to nonstatutory actions, and thus not only to actions under the APA." *Id.*  Thus, § 702's sovereign immunity waiver applies "regardless of whether [the challenged action] constitutes final agency action."  *See id.* at 187 (internal quotation marks omitted). Congress expected—and expressly permitted—non-APA claims that did not satisfy the APA's limits of "final agency action."  The Department's argument that the APA's programmatic challenge bar extends to non-APA claims does not square with this conclusion.

The Department also argues that allowing Counts III and V to proceed would allow the American Federation of Teachers to skirt "the rigors of class certification and the APA's bar on programmatic challenges" and would expose "a vast hole in the limitations established by the

---

[2] *Norton* suggests that the APA derived aspects of the programmatic challenge bar from those "traditional limitations upon mandamus," such as those set forth in the All Writs Act, now codified at 28 U.S.C. § 1651(a).  *Id.* at 63, 66.  But the Department's motion raises no such limits, so the Court does not consider them here.

Federal Rules of Civil Procedure and the APA." Defs.' Reply at 13. But because the Court has concluded that the American Federation of Teachers lacks standing to pursue these claims, most of these fears are moot.

The Court thus will deny the Department's motion to dismiss Counts III and V.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the Department's Partial Motion to Dismiss. The Court dismisses Randi Weingarten and the American Federation of Techers and dismisses Count IV. A separate order consistent with this decision accompanies this Memorandum Opinion.


June 22, 2020

DABNEY L. FRIEDRICH
United States District Judge