**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

RANDI WEINGARTEN, *in her official capacity as President
of the American Federation of Teachers, AFL-CIO*,
    555 New Jersey Avenue N.W.
    Washington, D.C. 20001

AMERICAN FEDERATION OF TEACHERS, AFL-CIO,
    555 New Jersey Avenue N.W.
    Washington, D.C. 20001

CYNTHIA MILLER,
    9305 S. Oakley Avenue
    Chicago, Illinois 60643

ANASTASIYA SAVENKOVA,
    1119 Ocean Parkway, Apt. 1E
    Brooklyn, New York 11230

DEBORAH BAKER,
    12330 S. 14th Street
    Jenks, Oklahoma 74037

JANELLE MENZEL,
    14889 Nokay Lake Road
    Brainerd, Minnesota 56401

KELLY FINLAW,
    45 Overlook Terrace #3J
    New York, New York 10033

MICHAEL GIAMBONA,
    35 Tiffin Court
    Clayton, California 94517

ANDRE LORINCZ,
    P.O. Box 2456
    White Salmon, Washington 98672

PETER HUK,
    2927 Deer Trail Place
    Solvang, California 93463

Case No. 1:19-cv-02056-DLF

|  |  |
|---|---|
| Plaintiffs, | |
| v. | |
| ELISABETH DEVOS, *in her official capacity as Secretary of Education*, | |
| 400 Maryland Avenue S.W. | |
| Washington, D.C. 20202 | |
| and | |
| UNITED STATES DEPARTMENT OF EDUCATION, | |
| 400 Maryland Avenue S.W. | |
| Washington, D.C. 20202 | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Date: December 14, 2020

Mark Richard (D.C. Bar No. 1033699)
PHILLIPS, RICHARD & RIND, P.A.
9360 SW 72 Street, Suite 283
Miami, FL 33173
Telephone: (305) 412-8322
E-mail: mrichard@phillipsrichard.com

Aaron Ament (D.C. Bar No. 1602164)
Daniel A. Zibel (D.C. Bar No. 491377)
Robyn K. Bitner (D.C. Bar No. 1617036)
NATIONAL STUDENT LEGAL
DEFENSE NETWORK
1015 15th Street N.W., Suite 600
Washington, D.C. 20005
Telephone: (202) 734-7496
E-mail: aaron@defendstudents.org
        dan@defendstudents.org
        robyn@defendstudents.org

*Attorneys for Plaintiffs Weingarten & AFT*

Faith Gay (*pro hac vice*)
Caitlin Halligan (*pro hac vice*)
Maria Ginzburg (*pro hac vice*)
Yelena Konanova (*pro hac vice*)
Jessica E. Underwood (*pro hac vice*)
Shelby Rokito (*pro hac vice*)

SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 390-9000
E-mail: fgay@selendygay.com
        challigan@selendygay.com
        mginzburg@selendygay.com
        lkonanova@selendygay.com
        junderwood@selendygay.com
        srokito@selendygay.com

*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

**Pages**

NATURE OF THE ACTION ....................................................................................... 3

PARTIES ..................................................................................................................... 9

Plaintiffs .................................................................................................................... 9

Defendants ............................................................................................................... 12

JURISDICTION......................................................................................................... 12

VENUE....................................................................................................................... 18

FACTUAL ALLEGATIONS ..................................................................................... 18

ED AND FEDERAL STUDENT LOANS.................................................................. 18

THE PUBLIC SERVICE LOAN FORGIVENESS PROGRAM ................................ 22

ED'S ADMINISTRATIVE PROCESSING ERRORS................................................. 34

    Administrative Error Plaintiffs.............................................................. 37

        1.     Cynthia Miller ....................................................................... 37

        2.     Anastasiya Savenkova.......................................................... 47

ED'S DISREGARD OF SERVICER MISREPRESENTATIONS TO
BORROWERS REGARDING PSLF.................................................................... 50

    Servicer Misconduct Plaintiffs............................................................. 56

        1.     Deborah Baker ....................................................................... 56

        2.     Janelle Menzel ...................................................................... 65

        3.     Kelly Finlaw.......................................................................... 69

        4.     Michael Giambona................................................................ 73

        5.     Andre Lorincz ....................................................................... 76

        6.     Peter Huk.............................................................................. 79

CAUSES OF ACTION ............................................................................................... 82

i

COUNT I – ARBITRARY AND CAPRICIOUS AGENCY ACTION DUE TO
ADMINISTRATIVE PROCESSING ERRORS PURSUANT TO
5 U.S.C. § 706(2)(A) (ADMINISTRATIVE ERROR PLAINTIFFS
AGAINST DEFENDANTS) ............................................................. 82

COUNT II – INADEQUATE NOTICE OF DENIAL PURSUANT TO 5 U.S.C.
§ 555(e) (ADMINISTRATIVE ERROR PLAINTIFFS AGAINST
DEFENDANTS) ............................................................................... 83

COUNT III – VIOLATION OF DUE PROCESS DUE TO ADMINISTRATIVE
PROCESSING ERRORS PURSUANT TO THE FIFTH AMENDMENT
TO THE U.S. CONSTITUTION (AFT AND ADMINISTRATIVE
ERROR PLAINTIFFS AGAINST DEFENDANTS) ........................ 85

COUNT IV – ARBITRARY AND CAPRICIOUS AGENCY ACTION DUE TO
SERVICER MISCONDUCT PURSUANT TO 5 U.S.C. § 706(2)
(SERVICER MISCONDUCT PLAINTIFFS AGAINST DEFENDANTS) ...... 88

COUNT V – VIOLATION OF DUE PROCESS DUE TO SERVICER
MISCONDUCT PURSUANT TO THE FIFTH AMENDMENT TO THE
U.S. CONSTITUTION (AFT AND SERVICER MISCONDUCT
PLAINTIFFS AGAINST DEFENDANTS) ....................................... 90

PRAYER FOR RELIEF ................................................................................ 93

In 2007, a bipartisan Congress enacted the Public Service Loan Forgiveness Program ("PSLF") to help public sector workers—the people who teach our children, care for our sick and elderly, keep our streets safe, and perform countless other public services—finance their education.  As college costs have soared over recent decades, many Americans have had to take on exorbitant student loan debt; since 2003, the national student loan debt balance has grown by more than 600 percent.  Public servants have been hit especially hard, since their modest salaries simply cannot cover massive student loan debt with enough left over to pay the rent, save for retirement, or help send the next generation to college.

Spurred on by the advocacy of organizations that support public service, like the American Federation of Teachers, Congress mandated that if you work for ten years in a qualifying public service job and pay your student loans consistently along the way, the balance of your debt will be forgiven.  PSLF thus offered a road to financial stability, and many public servants and their families—including Plaintiffs here—planned their lives in anticipation of securing loan forgiveness under the program.

But under the direction of Secretary Elisabeth DeVos ("Secretary DeVos"), the U.S. Department of Education ("Department," and collectively with Secretary DeVos, "ED") broke this pact with America's public workers by failing to implement key components of PSLF and the supplemental program Congress later enacted (the Temporary Expanded Public Service Loan Forgiveness Program, or "TEPSLF").  ED and its Title IV servicers[1] failed to keep accurate records of qualifying loan payments

---

[1] "Title IV loan servicers" service loans issued under Title IV of the Higher Education Act ("HEA"), 20 U.S.C. §§ 1070 *et seq.*  They include servicers known as TIVAS (Title IV Additional Servicing) Servicers: (i) Navient Corporation ("Navient") (formerly known as SLM Corporation/Sallie Mae); (ii) Nelnet Servicing, LLC ("Nelnet") (Nelnet acquired Great Lakes Educational Loan Services); and (iii) Pennsylvania Higher Education Assistance Agency a/k/a FedLoan Servicing ("FedLoan Servicing"), as well as

and then erroneously told public servants that they were not eligible for relief.  ED failed to properly supervise loan servicers or ensure that they give borrowers accurate information about repayment options and loan forgiveness eligibility.  To make matters even worse, ED failed to set up a decision-making process that would minimize the risk of erroneous denials, give applicants a written, reasoned explanation when loan forgiveness is denied, or provide public servants with a meaningful opportunity to contest denials.

Our public servants have paid a devastating price for Secretary DeVos's callous subversion of Congress's directive.  They have been left to battle a giant bureaucracy for guidance on loan forgiveness eligibility and plead with loan servicers and ED itself to fix even the most basic mathematical errors.  Not surprisingly, almost no one has received the debt relief that Congress mandated.  As of September 2020, more than three years after the eligibility window first opened, the Department had forgiven the loans of fewer than two percent of all borrowers who applied for PSLF.[2]  Instead, our public sector workers are left to worry about how to make ends meet—now with the added challenges and risks of the COVID-19 pandemic.

These failures violate the Administrative Procedure Act ("APA") and the Due Process Clause of the Fifth Amendment.  To compel Secretary DeVos and ED to address them and make good on Congress's promise to our nation's public servants,

---

various not-for-profit servicers.  *See* U.S. Dep't of Educ., Fed. Student Aid, Loan Servicing Contracts, https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing (last visited Dec. 12, 2020).  Title IV loan servicers have a direct contractual relationship either with the Department, when servicing loans held by the Department, or with non-Departmental commercial lenders and loan holders as part of the Federal Family Education Loan ("FFEL") Program.  The Department maintains oversight authority over all Title IV servicers, regardless of whether it directly contracts with them, as explained *infra* ¶¶ 62-63.

[2] U.S. Dep't of Educ., Fed. Student Aid, *September 2020 PSLF Report* (Sept. 30, 2020), https://studentaid.gov/data-center/student/loan-forgiveness/pslf-data (last visited Dec. 12, 2020) (hereinafter "FSA, *September 2020 PSLF Report*").

Plaintiffs Randi Weingarten, in her official capacity as President of the American Federation of Teachers, and the American Federation of Teachers (collectively, "AFT"); Cynthia Miller and Anastasiya Savenkova ("Administrative Error Plaintiffs"); Deborah Baker, Janelle Menzel, Kelly Finlaw, Michael Giambona, Andre Lorincz, and Peter Huk ("Servicer Misconduct Plaintiffs," and together with Administrative Error Plaintiffs, "Individual Plaintiffs") allege the following claims against ED. This Court should enter judgment for Plaintiffs accordingly.

## NATURE OF THE ACTION

1.      PSLF, a federal entitlement guaranteed by Congress under 20 U.S.C. § 1087e(m), was enacted to provide the people who teach our children, tend to our sick, and perform countless other critical public services with much needed relief from the crushing burden of student loan debt. PSLF requires ED to "cancel the balance of interest and principal due" for qualifying loans held by public servants after ten years of timely monthly payments.

2.      But ED, particularly under Secretary DeVos, failed to deliver on that obligation. The consequences for untold numbers of public servants were quickly apparent to AFT, which has diverted substantial resources to help its members secure the debt relief that Congress promised. But those efforts alone cannot remedy the problem.

3.      As detailed below, throughout Secretary DeVos's tenure, ED has mismanaged critical aspects of the PSLF Program. ED failed to maintain accurate records of loan payments and then wrongfully denied forgiveness, relying on its own erroneous calculations. ED failed to oversee the privately run servicers to whom it contracted the task of administering student loans, despite widely publicized reports of egregious servicer misconduct, and failed to ensure that the servicers provide accurate information to the millions of borrowers who might qualify for loan

3

forgiveness.  After all that, ED then failed to give public servants a reasoned expla-nation for rejecting PSLF and TEPSLF applications, even in the face of exhaustive attempts by borrowers to get an explanation for their denials.  ED has refused to put into place any mechanism that would allow public servants to raise these errors with the Department, obtain redress for mistakes by ED or its servicers, or appeal the denial of benefits.  Even more remarkably, following this Court's decision on ED's motion to dismiss, and contrary to the position it took in briefing before this Court, ED asserted that a denial of loan forgiveness by ED's own servicer, on ED's and the servicer's joint letterhead, does not constitute "final agency action" unless ED was somehow "involved" in that denial—a fact that borrowers could never know absent litigation.  Secretary DeVos has proposed eliminating PSLF altogether.[3]

4.     ED's actions have left public servant borrowers trapped in a Sisyphean cycle.  They must apply and reapply to cure purported deficiencies in their loan for-giveness applications, getting no closer to securing the relief that Congress mandated.

5.     ED's actions suggest that the only way for virtually any borrower to ob-tain relief is to file a federal lawsuit.  Indeed, after years of attempting to get loan forgiveness under PSLF, Gloria Nolan joined this lawsuit as a plaintiff.  On December 8, 2020, she finally received a letter from ED confirming that she had made 120 on-time payments and thus qualified for TEPSLF.  ED's decision to forgive the full bal-ance of her loans in response to this litigation confirms ED can readily follow the directives Congress set forth in enacting PSLF and TEPSLF if it chooses to do so.

6.     The results of ED's failures under Secretary DeVos are appalling.  Fewer than 3,500 public servants have had the balance of their student debt forgiven

---

[3] Statement by Secretary DeVos, Secretary of Education, Before the Committee on Education and Labor, United States House of Representatives (Apr. 10, 2019), https://edlabor.house.gov/imo/media/doc/SecretaryDeVosTestimony041019.pdf.

under PSLF—an astonishingly small number, especially compared with the esti-mated 32 million borrowers making payments on potentially eligible loans in 2016.[4]

7.     In 2018, recognizing that PSLF had not meaningfully eased the crisis facing public servant borrowers, Congress enacted an extension to PSLF—the TEPSLF Program.  TEPSLF narrowly expands the qualifications for PSLF by allow-ing borrowers who made 120 payments in certain additional payment plans to receive loan forgiveness on a first-come, first-served basis.  Like PSLF, TEPSLF mandates that ED forgive loans for those who qualify.  But TEPSLF has not provided the relief that was intended:  as of September 2020, under 6% of TEPSLF applications have been approved.[5]

8.     The intended beneficiaries of PSLF and TEPSLF—individuals who have dedicated their lives to the hard work of educating students, caring for patients, and keeping communities safe—are still contending with the constant financial insecurity tied to student loan debt, and uncertainty about whether it will ever get better.  Pub-lic servants cannot effectively plan for the future; many question whether they can continue in challenging, underpaid jobs when debt relief seems all but impossible. The risk to these workers, their families, and the communities they serve is painfully obvious.

9.     AFT has long been committed to helping its members get a quality col-lege education and advanced degrees—a goal that greatly benefits America's stu-dents, as well as its teachers.  But ED's arbitrary, hapless implementation of PSLF under Secretary DeVos has made this goal much harder to achieve.

---

[4] *Id.*; *see also* Consumer Fin. Prot. Bureau, *Staying On Track While Giving Back: The Cost Of Student Loan Servicing Breakdowns For People Serving Their Communities* 20  n.34  (June 2017),  https://files.consumerfinance.gov/f/documents/201706_cfpb_ PSLF-midyear-report.pdf (hereinafter "CFPB, *Staying on Track*").

[5] FSA, *September 2020 PSLF Report*, *supra* note 2.

10.    The Individual Plaintiffs' struggles to vindicate their statutory right to loan forgiveness reveal how profoundly ED's failures have affected public servants:

- Cynthia Miller, a Chicago public school teacher, made the 120 timely payments needed to qualify for PSLF.  But her loan servicer repeatedly—and incorrectly—told her the application was incomplete, erroneously denied it for failure to make the right number of payments, and then denied her application for TEPSLF.  When Ms. Miller repeatedly asked why her application had been denied, she received 12 different responses, each one with a different—and incorrect—count of her qualifying payments.  Her servicer then sent multiple mailings with reams of indecipherable numbers and codes, before closing her inquiry.  After Ms. Miller brought this lawsuit, she received a new "Decision Letter" from ED, along with a 416-page mailing containing some—but not all—of her loan records, denying her loan forgiveness yet again.  ED's new letter suggested a new process—writing directly to ED at a previously unrevealed address—that was not part of the publicly available PSLF decisionmaking process offered by ED and the loan servicer.

- Anastasiya Savenkova, who works at the New York State Department of Financial Services, made over 120 timely loan payments.  ED denied her PSLF application, telling her she had a non-qualifying repayment plan.  Ms. Savenkova then submitted a TEPSLF application.  After nearly a year, ED denied it, but informed Ms. Savenkova that if she made just one more payment, she would qualify.  Ms. Savenkova did so, reapplied, and was denied once again.  Ms. Savenkova's servicer has not responded to her repeated requests for an explanation.

- Deborah Baker, an Oklahoma public school teacher, was assured for years by her loan servicer that she would qualify for PSLF if she continued making on-time payments on her income-driven repayment plan.  That was wrong.  After nine years of timely payments, Ms. Baker was told that she should have consolidated her loans into Direct Loans to qualify for loan forgiveness.  ED then denied her applications for PSLF and TEPSLF.

- Janelle Menzel, a Minnesota public school teacher, asked her loan servicer how to qualify for PSLF shortly after the program began. She was told to continue making payments on her existing plan.  After Ms. Menzel made timely payments for more than ten years, the servicer informed her that the plan did not qualify and that none of her payments counted for PSLF.  Ms. Menzel subsequently applied

for TEPSLF and was denied.  Her servicer told her that she should simply "give up" on obtaining loan forgiveness.

11.     These stories are just a few examples of ED's failures; more are told throughout this Amended Complaint.  Public servants deserve better—particularly at this extraordinary moment in our history, as the nation grapples with the COVID-19 pandemic and our teachers, nurses, and first responders risk so much to do their jobs.  What is more, the law demands it.  As detailed below, ED's actions are arbitrary and capricious, in violation of the APA, and ED's failure to implement a process that gives loan forgiveness applicants an adequate explanation for its denials and a meaningful process to address errors violates the Due Process Clause.  ED must be held accountable for its failures in implementing the PSLF and TEPSLF Programs.  Accordingly, Plaintiffs ask this Court to forgive the Administrative Error Plaintiffs' and Servicer Misconduct Plaintiffs' student loan debt.  Plaintiffs also ask the Court to require the Department to take the steps necessary to give all public servants a fair shot at obtaining the relief from student loan debt that Congress promised, including the following:

12.     *First*, the Court should require ED within 90 days to provide nationwide notice to all borrowers with FFEL or Direct Loans about how to obtain forgiveness under PSLF and TEPSLF.

13.     *Second*, the Court should require ED to submit a plan to this Court within 120 days that outlines what steps ED will take to:

     i.    Correct, minimize, and prevent errors in ED's own recordkeeping functions, to ensure that borrowers receive an accurate count of eligible payments;

    ii.    Inform all borrowers nationwide with FFEL or Direct Loans as to whether each of the borrower's loans and repayment plans is eligible for PSLF (including TEPSLF);

7

iii.    Implement a mechanism through which borrowers who submit Employment Certification Forms ("ECFs"), and PSLF and TEPSLF applications may contest their denials and introduce evidence rebutting ED's determinations, and through which ED shall, at a minimum, ascertain the accuracy of an applicant's qualifying payment count, including by advising the applicant of the tentative count, soliciting any response within 30 days, and providing a written response within 60 days from receipt of such response;

iv.    Provide a written and reasoned explanation for any denial of PSLF or TEPSLF relief within a reasonable period; and

v.    Provide sufficient supervision of loan servicers, including identifying specific steps to terminate contracts with servicers who fail to comply with ED's instructions regarding implementation of PSLF and TEPSLF in a timely and accurate manner.

14.    ***Third***, the Court should require ED to grant the PSLF and/or TEPSLF applications for any additional borrowers who establish, in the course of the appeal process set forth *supra*, that they satisfy the requirements for loan forgiveness under PSLF or TEPSLF.

15.    ***Finally***, the Court should require the Department to forgive the balance of student loan debt for public servants who, like the Servicer Misconduct Plaintiffs, would be eligible for PSLF or TEPSLF but for the misconduct of their loan servicers.

# PARTIES

## PLAINTIFFS

16.    Plaintiff Randi Weingarten is President of the American Federation of Teachers, AFL-CIO.   Prior to her election as President in 2008, Ms. Weingarten served for 12 years as President of the United Federation of Teachers, AFT Local 2, representing approximately 200,000 educators in the New York City public school system, home childcare providers, and other workers in health, law, and education.[6] She also served for 12 years as counsel to the AFT president, taking a lead role in lawsuits to secure adequate school funding and building conditions.[7]   President Weingarten brings this suit solely in her official capacity as President of AFT.

17.    Plaintiff AFT is a membership organization representing 1.7 million pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals.   AFT's purpose is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families, and communities.[8]

18.    AFT has taken a leading role in fighting for the financial stability of public service workers, particularly when it comes to the cost of education.

19.    A survey of AFT's members showed that eight out of every ten respondents who struggle financially consider student loan debt a "major burden or

---

[6] AFT, *Randi Weingarten*,  https://www.aft.org/about/leadership/randi-weingarten (last visited Dec. 12, 2020).

[7] *Id.*

[8] AFT, *Mission*, https://www.aft.org/about/mission (last visited Dec. 12, 2020).

challenge."[9]  Many AFT members report being unable to afford basic household needs, including food, rent, and other necessities, because of the burden of their student loans.[10]  Some members even reported suicidal tendencies related to the crushing weight of student loan debt.

20.     More than 80% of AFT respondents who submitted PSLF applications reported a denial of forgiveness, because of ineligible FFEL Loans (27%), incorrect repayment plans (27%), or failure to meet some combination of program requirements (40%).  Two-thirds of those denied PSLF said their servicer gave them incorrect information about how to qualify for PSLF (64%).  Even though nearly half of those denied forgiveness attempted to plead their case to ED or their servicer, not one had their complaints resolved.  More than four out of every five members who then applied for TEPSLF were denied yet again.  Members reported that they had no savings for emergencies, were denied credit, could not buy homes or afford to live on their own, were forced to work multiple jobs to make ends meet, and had to declare bankruptcy—all as a result of ED's failure to grant statutorily mandated loan forgiveness.

21.     Plaintiff Cynthia Miller is a public school teacher who works and resides in Illinois.  Although Ms. Miller has made at least 120 qualifying payments, ED miscounted the number of qualifying payments and denied Ms. Miller PSLF and TEPSLF.

22.     Plaintiff Anastasiya Savenkova is an employee of the New York State Department of Financial Services who works and resides in New York.  Although Ms. Savenkova has made at least 120 qualifying payments, ED miscalculated her monthly payment and denied Ms. Savenkova TEPSLF.  (Plaintiffs Miller and

---

[9] Hart Research Associates, *Effects of Debt on AFT Members Who Struggle Financially,* 3 (June 2018), https://www.aft.org/sites/default/files/ppt_aft-member-debt_hart2018.pdf.

[10] *Id.* at 3, 14.

Savenkova are referred to as the "Administrative Error Plaintiffs.")

23.    Plaintiff Deborah Baker is a public school teacher who works and resides in Oklahoma.  She has made at least 120 payments on her student loans.  Her loan servicer, Navient, incorrectly told Ms. Baker that her FFEL Loans qualified for PSLF. ED then denied Ms. Baker PSLF.

24.    Plaintiff Janelle Menzel is a public school teacher who works and resides in Minnesota.  She has made at least 120 payments on her loans.  Her loan servicer, Nelnet, processed Ms. Menzel's request for a different loan forgiveness program without informing her that she would thereby forfeit over four years of PSLF-qualifying payments.  ED denied Ms. Menzel PSLF and TEPSLF.

25.    Plaintiff Kelly Finlaw is a public school teacher who works and resides in New York.  She has made at least 120 payments on her loans.  Her loan servicer, Nelnet, falsely told Ms. Finlaw that her FFEL Loans qualified for PSLF.  When Ms. Finlaw applied, ED denied her application.  After Ms. Finlaw consolidated her loans on the advice of her servicer, she lost years of qualifying payments.

26.    Plaintiff Michael Giambona is a public school psychologist who works with at-risk students in California.  He has made at least 120 payments on his loans. His loan servicers, Sallie Mae and Navient, falsely told Dr. Giambona that his FFEL Consolidation Loan qualified for PSLF.  ED denied his application for PSLF.

27.    Plaintiff Andre Lorincz is a high school Spanish teacher working and residing in Washington.  He has made 120 on-time payments on his loans.  Mr. Lorincz's loan servicer, Direct Loan Servicing, falsely told him that his payment plan qualified for PSLF.  ED denied his applications for PSLF and TEPSLF.

28.    Plaintiff Peter Huk is a writing professor at the University of California in Santa Barbara.  He made over 120 on-time payments on his FFEL loan.  Dr. Huk's loan servicer, Sallie Mae, repeatedly—and incorrectly—advised Dr. Huk that he did not need to consolidate his FFEL Loans to qualify for PSLF.  When Dr. Huk submitted

an ECF in August of 2015, he was informed for the first time that none of his pay-ments was qualifying and that he was ineligible for PSLF. (Plaintiffs Baker, Menzel, Finlaw, Giambona, Lorincz, and Huk are referred to as the "Servicer Misconduct Plaintiffs.")

## DEFENDANTS

29. Defendant Elisabeth DeVos, in her capacity as Secretary of the Department of Education, is responsible for administering federal student loan programs, including PSLF and TEPSLF.

30. Secretary DeVos maintains an office at the Department's headquarters, located at 400 Maryland Avenue S.W., Washington, D.C. 20202.

31. Defendant United States Department of Education is a federal agency headquartered in the District of Columbia. Its principal office is located at 400 Maryland Avenue S.W., Washington, D.C. 20202.

## JURISDICTION

32. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a case arising under federal law.

33. The relief requested herein is authorized by the Administrative Procedure Act, 5 U.S.C. § 702, and the Court's authority to enjoin federal officers from violating the U.S. Constitution and federal law.

34. Congress has waived sovereign immunity as to the relief requested pursuant to 5 U.S.C. § 702, and sovereign immunity does not bar Plaintiffs from securing relief for the Fifth Amendment Due Process Clause violations alleged herein.

35. Defendants' actions complained of herein with respect to each Individual Plaintiff constitute final agency actions[11] and no further exhaustion of remedies is

---

[11] *See* 34 C.F.R. § 685.219(e)(3); *Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 19–24 (D.D.C. 2019).

required by 20 U.S.C. § 1087e(m), the Consolidated Appropriations Act of 2018, Pub. L. No. 115-141, § 315, 132 Stat. 348, 752–53, or applicable ED regulations, as each Individual Plaintiff was either denied PSLF (including TEPSLF where applicable) when he or she applied or received a determination of ineligibility for participation in the PSLF Program.[12]

36.    In addition, exhaustion is not required because it would be futile.[13]  As explained below, ED provides no meaningful process by which borrowers may cure erroneous denials.

37.    Defendants' actions give rise to an actual case or controversy within the meaning of Article III of the U.S. Constitution.

38.    AFT has organizational standing to assert claims under the Due Process Clause of the Fifth Amendment in its own right.

39.    AFT's mission and purpose is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families, and communities, including ensuring access to affordable education for public servants—the same goals that led Congress to enact PSLF. AFT's mission includes helping its public employee members, including teachers and health care workers, advance their own skills and education, which in turn benefits the nation's educational and health care systems, students, patients, and all Americans.

---

[12] *See* 34 C.F.R. § 685.219(e)(3); *see also Darby v. Cisneros*, 509 U.S. 137, 154 (1993) (exhaustion is a "prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review").

[13] *See Am. Fed'n of Gov't Emps. v. Acree*, 475 F.2d 1289, 1292 (D.C. Cir. 1973) (no requirement to exhaust administrative remedies when doing so would be "an exercise in futility").

40.    ED's unlawful actions directly conflict with AFT's organizational mission.  As a result of ED's failures and the failures of its servicers, AFT's activities have been perceptibly impaired.

41.    In 2014, AFT implemented a program to educate its members—including public school teachers and paraprofessionals; nurses and other healthcare professionals; and federal, state, and local government employees—on managing their student loan debt.  In 2015, AFT launched its first student debt clinic to educate its members on obtaining relief from their student loan burdens, including income-based repayment plans, Teacher Loan Forgiveness, Perkins Cancellation, and the PSLF Program.  When AFT first began these efforts, it provided its members with information about the requirements of these programs, including about how to qualify and apply for loan forgiveness.  (AFT had been distributing the ECF form to its members since it became available in 2013.)  AFT referred its members to their respective loan servicers to obtain additional information about qualifying for and applying for PSLF, relying on the servicers to provide accurate information about specific borrowers' circumstances.

42.    Similarly, in 2015, AFT launched its "Debt-Free Future" initiative to offer members online guidance, practical workshops, clinics, and training programs to help borrowers successfully pay off their student debt.  One such training program was a day-long course called "Unpopular Economics," which trained participants on individual student debt solutions as well as collective action strategies to tackle the issue of student debt.  AFT received so many inquiries on PSLF during this program that it was forced to entirely abandon other components of the initiative focused on other issues and was forced to refocus its efforts on providing its members with information regarding PSLF (and later, TEPSLF).

43.    As AFT continued these education and training activities, it became increasingly clear that ED was failing to supervise the servicers it designated to

administer the PSLF Program and that those servicers were providing inaccurate information (for example, by misinforming borrowers about the need to consolidate their loans or to switch repayment plans to qualify for PSLF). Servicers also confused the eligibility requirements of PSLF and Teacher Loan Forgiveness ("TLF"). It became apparent that ED's servicers were failing to keep accurate records of loan payments, leading to inaccurate denials of PSLF applications and wholly inadequate explanations of the reasons for those denials. Additionally, student loan servicers provided no information or training to public service employers, resulting in many supervisors questioning or even refusing to sign ECFs. As a result, in educating its members on how to successfully obtain student loan debt relief, AFT could no longer simply refer members to their servicers or tell its members to rely on information those servicers or ED provided.

44. ED's actions have impaired one of AFT's core activities. AFT has been forced to ramp up its student debt education efforts and refocus those efforts on the PSLF Program specifically in order to train its members on how to engage with their servicers, to the detriment of its efforts to educate its members on other student debt programs, and to educate and organize its members on other issues pertinent to higher education.

45. For example, AFT trains presenters for, and AFT staff present, nationwide student debt clinic programs that involve 90-minute training sessions, during which AFT members, leaders, and staff explain to members how to determine whether they are on-track to obtain loan forgiveness under PSLF or TEPSLF or whether they have been misled by their servicers. This information includes explaining to members how to calculate income-based repayment amounts, how to investigate payment applications and grapple with denial letters, and specific coaching on words and phrases to use with student loan servicers when talking about PSLF. AFT has now educated approximately 10,000 individuals through its student debt clinics.

15

Often, AFT leaders, members, and staff who are clinic presenters are the first to help AFT members understand that their years of loan payments—on the wrong loan types, during non-qualifying employment, in the wrong repayment plan, or for other reasons—will not qualify them for PSLF.

46.     The need to increase time devoted to educating members about PSLF and TEPSLF in light of the failures by ED and its servicers has compelled AFT to divert significant resources from other programs designed to help its members achieve their educational and financial goals via higher education.  For example, in 2008, AFT launched its "Just Ask!" program, which was focused on demystifying the college search process for members of the public and AFT members' children and grandchildren and refocusing the task of college choice on value and quality over rankings.  AFT initially distributed approximately 90,000 copies of its Just Ask! college guide, but its plans to expand the program, including by distributing its guide to each of its 215,000 higher education members, were derailed in 2015 because AFT was forced to deploy those resources on educating its members about the PSLF Program.

47.     The resources diverted from other programs have been redirected toward identifying and addressing problems with the PSLF Program.  For example, AFT now surveys its members to identify problems stemming from ED's failures to properly administer the PSLF Program.  In 2019, AFT began providing to its members fully paid access to a social enterprise application called "Summer," at a cost of approximately $500,000 per year, to assist student loan borrowers with navigating the loan repayment process.  Summer's suite of tools assists AFT members in qualifying for PSLF by helping borrowers track their loans and enroll in optimal repayment plans.  AFT provided its members with access to Summer in response to its members' difficulties in qualifying for loan forgiveness due to ED's mismanagement.

16

AFT estimates that Summer has generated future savings for its members of up to $515 million.

48.    AFT also has associational standing to assert claims under the Due Process Clause of the Fifth Amendment on behalf of its members.

49.    AFT's members have standing to bring the Fifth Amendment claims AFT brings in this action.

50.    AFT protects the constitutional rights of its members—namely their right not to be denied loan forgiveness under PSLF and TEPSLF without due process of law.  This goal is directly germane to AFT's purpose, which is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families, and communities.[14]

51.    AFT's Fifth Amendment claim for equitable relief does not require the participation of individual AFT members in the lawsuit because the requested relief will inure to the benefit of all AFT members actually injured.

52.    AFT's members, including the Individual Plaintiffs, have concrete injuries-in-fact that are fairly traceable to the challenged actions and inactions of ED and are redressable by a decision of this Court for the same reasons stated below with respect to the Individual Plaintiffs' Fifth Amendment claims.

53.    Individual Plaintiffs have Article III standing to assert APA claims and claims under the Due Process Clause of the Fifth Amendment as set forth below:

a.  ED's arbitrary and capricious denials of Individual Plaintiffs' applications for PSLF (including TEPSLF) and/or ECF applications, and the deprivation of their property interest in PSLF without due process of law, are concrete injuries-in-fact.

b.  Individual Plaintiffs have an ongoing need for loan forgiveness because their federal student loan balances remain outstanding.

---

[14] See AFT, *Mission*, *supra* note 8.

c. Should they reapply, Individual Plaintiffs are likely to be denied PSLF (including TEPSLF) in the imminent future, without sufficient process.

d. Individual Plaintiffs' concrete injuries-in-fact are fairly traceable to the challenged actions, namely ED's denials of Individual Plaintiffs' applications for PSLF (including TEPSLF) and/or their ECF applications.

e. Individual Plaintiffs' concrete injuries are redressable by a decision of this Court: (i) declaring that ED's PSLF (including TEPSLF) and ECF application denials violate the APA and the Due Process Clause; (ii) declaring that ED's PSLF (including TEPSLF and ECF) application processes deprive Plaintiffs of their constitutional right to due process; (iii) vacating ED's ECF, PSLF, and TEPSLF denials with respect to each of the Individual Plaintiffs; (iv) remanding to ED with directions to approve each of the Individual Plaintiffs' request for forgiveness, or, in the alternative, retaining jurisdiction and remanding to ED for further action consistent with the APA; (v) requiring ED to provide Individual Plaintiffs with a decision-making process that minimizes the risk of erroneous denials and ensures a meaningful opportunity to contest denials; and (vi) requiring ED to issue a written, reasoned decision to Individual Plaintiffs for any denials within a reasonable time thereafter.

54.    Plaintiffs have no adequate remedy at law because they cannot sue ED for money damages.

## **VENUE**

55.    Venue is proper in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Defendants reside.

## **FACTUAL ALLEGATIONS**

### **ED AND FEDERAL STUDENT LOANS**

56.    In signing the Higher Education Act ("HEA") of 1965, which substantially expanded access to educational borrowing, President Johnson pledged that it would "swing open a new door for the young people of America" so that a student

"anywhere in this great land of ours can apply to any college or any university in any of the 50 states and not be turned away because his family is poor."[15]

57.   Today, the Department is one of the world's largest lenders, with a "consumer loan portfolio … larger than [that of] J.P. Morgan and Bank of America."[16] As of September 2019, ED's assets totaled over $1.31 trillion, over 90% of which are federal student loan receivables.[17]

58.   Congress has directed ED's Office of Federal Student Aid ("FSA") "to improve service to students and other participants in the [federal] student financial assistance programs … , including making those programs more understandable to students and their parents," and to "increase the accountability of the officials responsible for administering the operational aspects of these programs."[18]  FSA is responsible for administering and overseeing aid programs created by Title IV of the HEA.  Under the HEA, Secretary DeVos has "responsibility for the development and promulgation of policy and regulations" relating to the student financial assistance programs.[19]

59.   ED is responsible for two federal student financial assistance programs relevant to this lawsuit—the Federal Family Education Loan Program

---

[15] President Johnson, *Remarks Upon Signing the Higher Education Act of 1965* (Nov. 8, 1965), http://www.lbjlibrary.org/mediakits/highereducation/p8.html (last visited Dec. 12, 2020).

[16] *Examining Policies and Priorities of the U.S. Dep't of Educ.: Hearing Before the House Comm. on Educ. and Labor*, 116th Cong. 5 (Apr. 10, 2019) (statement by Betsy DeVos, Secretary of Education), https://edlabor.house.gov/imo/media/doc/SecretaryDeVosTestimony041019.pdf.

[17] *See* U.S. Dep't of Educ., *FY2019 Agency Financial Report* 9 (Nov. 15, 2019), https://www2.ed.gov/about/reports/annual/2019report/agency-financial-report.pdf (hereinafter "ED, *FY2019 Agency Financial Report*").

[18] 20 U.S.C. § 1018(a)(2).

[19] 20 U.S.C. § 1018(a)(1)

("FFEL Program") and the William D. Ford Direct Student Loan Program ("Direct Loan Program").

60.    Until 1993, the overwhelming majority of federal student loans were FFEL Loans, originated and funded almost exclusively by private lenders, insured by guaranty agencies, and reinsured by the federal government.  In 1993, through the Direct Loan Program, the federal government began originating loans directly to borrowers.  The FFEL and Direct Loan Programs operated in tandem until 2010.[20] Although borrowers are still repaying FFEL Loans, no new FFEL Loans have been issued since July 1, 2010.[21]

61.    The standard repayment term for FFEL and Direct Loans is ten years, but there are various repayment plans with different eligibility requirements and terms, including graduated payment amounts, payments spread over 25 years, and income-driven repayment plans.[22]

62.    The statute establishing the FFEL Program authorizes an eligible lender or guaranty agency to "contract[] with another entity to perform any of the lender's or agency's functions [concerning loan programs], or otherwise delegate[] the performance of such functions to such other entity."[23]  Such delegation does not "relieve the Secretary of responsibility for the administration of such functions."[24]

---

[20] Eric M. Fink and Roland Zullo, *Federal Student Loan Servicing: Contract Problems and Public Solutions* 4 (June 25, 2014), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2459090.

[21] *See* ED, *FY2019 Agency Financial Report*, *supra* note 17, at 38.

[22] Income-driven repayment plans are available for both FFEL and Direct Loan borrowers.  *See* 34 C.F.R. §§ 682.209, 682.215.

[23] 20 U.S.C. § 1086(a).

[24] *Id*. § 3472.

63.    ED has oversight authority over all Title IV servicers, including servicers of commercially held FFEL Loans.[25] ED's implementing regulations "apply to [any] third-party servicer that violates any statutory provision governing the FFEL programs or any regulations, special arrangements, agreements, or limitations entered into under the authority of statutes applicable to Title IV of the HEA prescribed under the FFEL programs."[26]

64.    The statute establishing the Direct Loan Program requires ED to enter into direct contracts for "the servicing and collection of loans made or purchased."[27] Currently, ED contracts with eleven FFEL and Direct loan servicers[28] to manage its trillion-dollar student loan portfolio.[29]

65.    According to ED, student loan servicers "are responsible for collecting payments on a loan, advising borrowers on resources and benefits to better manage their federal student loan obligations, responding to customer service inquiries, and performing other administrative tasks associated with maintaining a loan on behalf of [ED]."[30]

---

[25] *See* U.S. Dep't of Educ., Fed. Student Aid, *Functional Statement*, https://www2.ed.gov/about/offices/list/om/fs_po/fsa/program.html#fiog (last visited Dec. 12, 2020) (The "Financial Institution Oversight Service Group (FIOSG) is responsible for administering a program of oversight of … servicers participating in the [FFEL] Program," "program reviews of … servicers," and "monitor[ing of] … servicers to obtain early warning and/or confirmation of issues related to program compliance….").

[26] 34 C.F.R. § 682.700(a); *see also* 34 C.F.R. § 682.203(a).

[27] 20 U.S.C. § 1087f(b)(2).

[28] U.S. Dep't of Educ., Fed. Student Aid, *Who's My Student Loan Servicer?* https://studentaid.gov/manage-loans/repayment/servicers (last visited Dec. 12, 2020).

[29] U.S. Dep't of Educ., Fed. Student Aid, *Federal Student Loan Portfolio Summary*, https://studentaid.gov/data-center/student/portfolio (last visited Dec. 12, 2020).

[30] U.S. Dep't of Educ., Fed. Student Aid, *Loan Servicing Contracts*, https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing (last visited Dec. 12, 2020).

66.     ED informs borrowers that they can rely on their servicer to help choose the optimal loan repayment option and that "[the] loan servicer will work with you on repayment options (such as income-driven repayment plans and loan consolidation) and will assist you with other tasks related to your federal student loans."[31]

67.     ED expressly requires loan servicers to assist with forgiveness programs, including PSLF and TEPSLF.[32]

## THE PUBLIC SERVICE LOAN FORGIVENESS PROGRAM

68.     Congress created the PSLF Program in 2007 to assist students who want "to pursue a career in public service and be able to take those jobs … often at lower pay" by "reliev[ing] them[] of the huge burden of debt they face."[33]

69.     As Senator Edward Kennedy remarked upon the bill's passage:

> [I]t is the desire of so many of these young people to be involved in public service and to help respond to the needs in their communities.  They want to be part of the solution, not part of the problem.  So often, because of their indebtedness, they have to choose careers in order to deal with the indebtedness.  So this legislation will open up or help us take advantage of that idealism that is out there.  We are giving them a pathway to making a difference in terms of the future of our country, and I think that is enormously important.  That is one of the most important parts of this legislation.[34]

---

[31] U.S. Dep't of Educ., Fed. Student Aid, *Loan Servicers*, https://studentaid.ed.gov/sa/repay-loans/understand/servicers (last visited Dec. 11, 2020).

[32] *See, e.g.*, Alexandra Hegji, Cong. Research Serv., No. R45389, *The Public Service Loan Forgiveness Program: Selected Issues* 23–25 (Oct. 29, 2018), https://fas.org/sgp/crs/misc/R45389.pdf.

[33] 153 Cong. Rec. S11,245 (daily ed. Sept. 7, 2007) (statement of Sen. Sherrod Brown).

[34] 153 Cong. Rec. S11,258 (daily ed. Sept. 7, 2007) (statement of Sen. Edward M. Kennedy).

70.     To accomplish this goal, Congress mandated that the Secretary "shall cancel" the remaining balance of all federal Direct Loans for borrowers who meet the designated PSLF criteria.[35]  The PSLF implementing regulations explain that "[t]he Public Service Loan Forgiveness Program is intended to encourage individuals to enter and continue in full-time public service employment."[36]

71.     At her confirmation hearing, Secretary DeVos assured members of the Senate and the American public that under her leadership, the Department would make good on PSLF's promise to America's public servants.

- Secretary DeVos promised that, "if confirmed, [she] look[ed] forward to working with Congress on ways to ensure that borrowers of Federal student loans continue to have manageable repayment options that are simple and easy to understand."[37]

- Secretary DeVos assured members of the Senate and the public that she would pursue "successful implementation of the law" and "facilitate compliance with the laws that the Department is charged to enforce."[38]

- When asked about her commitment to PSLF, Secretary DeVos testified that, "if confirmed, [she would] faithfully implement the Higher Education Act" and "ensure [ED] is appropriately answering any technical assistance request we receive from entities or individuals interested in learning more about the Public Service Loan Forgiveness program."[39]

72.     Lawmakers of both parties have enthusiastically supported PSLF, recognizing that public servants "work tirelessly and, far too often, for much less pay

---

[35] 20 U.S.C. § 1087e(m)(1).

[36] 34 C.F.R. § 685.219(a).

[37] *Nomination of Betsy DeVos to Serve as Secretary of Education: Hearing of the Comm. on Health, Education, Labor, and Pensions*, 115th Cong. 120 (Jan. 17, 2017) (hereinafter "DeVos Nomination Hearing"), https://www.govinfo.gov/content/content/pkg/CHRG-115shrg23667/pdf/CHRG-115shrg23667.pdf.

[38] *Id.* at 98.

[39] *Id.* at 120.

than they deserve."[40]

73.  ED's data shows that low-to-moderate income borrowers should benefit most significantly from PSLF.[41]  In 2016, ED reported that nearly two thirds of borrowers on income-driven repayment plans who intended to pursue PSLF earned less than $50,000 per year.[42]

74.  The College Cost Reduction and Access Act ("CCRAA") outlines the requirements for PSLF.  Section 455 of the CCRAA mandates that "[t]he Secretary shall cancel the balance of interest and principal due … on any eligible Federal Direct Loan not in default for a borrower who[:]

(A)  has made 120 monthly payments on the eligible Federal Direct Loan after October 1, 2007, pursuant to [an income-driven repayment plan or the standard repayment plan (or a plan with a monthly payment at least equal to the standard plan)] … ; and

(B)  (i)  is employed in a public service job at the time of such forgiveness; and

(ii)  has been employed in a public service job during the period in which the borrower makes each of the 120 payments described in subparagraph (A)."[43]

---

[40] Letter from Tim Kaine (D-VA) and 3 other Democratic lawmakers to the Secretary of Education, 1 (June 19, 2018), https://www.kaine.senate.gov/imo/media/doc/Kaine, %20Whitehouse,%20Duckworth,%20Hassan%20Press%20DeVos%20On%20Failure %20To%20Implement%20Public%20Service%20Loan%20Forgiveness%20Fix.pdf.

[41] *See* U.S. Dep't of Educ., *Direct Loan Public Service Loan Forgiveness* 23 (July 2016), http://fsaconferences.ed.gov/conferences/library/2016/NASFAA/2016NASFAADirect-LoanPSLF.pdf.

[42] U.S. Dep't of Educ., *Public Service Loan Forgiveness Policy and Operations* 29 (Nov. 2016), http://fsaconferences.ed.gov/conferences/library/2016/2016FSAConf Session18.ppt.

[43] CCRAA § 455 (codified at 20 U.S.C. § 1087e(m)).

75.     ED's implementing regulations establish requirements for loan forgiveness that track Section 455(m) of the CCRAA.[44]  Pursuant to these regulations, after 120 monthly qualifying payments, "[t]he Secretary forgives the principal and accrued interest that remains on all eligible loans for which loan forgiveness is requested by the borrower."[45]

76.     In the public notice-and-comment period, ED received numerous comments focusing on borrowers' access to loan forgiveness and their ability to track their eligibility status.[46]  "[M]any commenters asked [ED] to develop a clear and simple method for the borrower, the employer, or both, to determine annually the borrower's eligibility for public service loan forgiveness."[47]  In response, ED stated that it "believes that the way in which borrowers apply for and document their eligibility for the public service loan forgiveness benefit is best handled administratively.  We assure the commenters that we will continue to examine ways to assist borrowers who are interested in, or already employed in public service, to determine and document their eligibility for the loan forgiveness program."[48]

77.     While ED has designated a specific loan servicer, FedLoan Servicing, as the "PSLF servicer," ED has publicly underscored that it retains ultimate responsibility for administering PSLF.[49]

---

[44] 34 C.F.R. § 685.219.

[45] *Id*. § 685.219(d).

[46] Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 73 Fed. Reg. 63,232 (Oct. 23, 2008).

[47] *Id*. at 63,241.

[48] *Id*.

[49] *See, e.g.*, Compl. ¶ 67 and Answer ¶ 67, *Am. Bar Ass'n v. U.S. Dep't of Educ.*, No. 16-2476, Dkt. Nos. 1, 14; U.S. Dep't of Educ., Public Service Loan Forgiveness: Questions and Answers for Federal Student Loan Borrowers (Dec. 2015), *Am. Bar Ass'n v. U.S. Dep't of Educ.*, No. 16-2476, Administrative Record (hereinafter "ABA AR"), Dkt.

78.   PSLF qualification is supposed to work as follows.  *First*, at the borrower's request, the loan servicer provides an overview of eligibility requirements, an ECF, and instructions for completing the ECF.[50]

79.   *Second*, once a borrower submits an ECF, ED has FedLoan confirm whether the employer is a "qualifying public service organization" listed in ED's database.[51]  If FedLoan Servicing cannot do so,[52] it escalates the decision to ED.[53]

---

No. 34-1, at 168 (FedLoan Servicing "responsible for administering [PSLF] on behalf of ED").

[50] U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), ABA AR, Dkt. No. 34-1, at 142, 152–53.

[51] Qualifying employers include: (i) government organizations; (ii) not-for-profit organizations that are tax-exempt under Section 501(c)(3) of the Internal Revenue Code; and (iii) other not-for-profit organizations that are not tax-exempt but provide certain types of qualifying public services as their primary function; they exclude: (i) labor unions; (ii) partisan political organizations; (iii) for-profit organizations; and (iv) not-for-profit organizations that are not tax-exempt and do not provide a qualifying public service as their primary function.  *See* U.S. Dep't. of Educ., Fed. Student Aid, *Public Service Loan Forgiveness*, https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service#qualifying-employment (last visited Dec. 12, 2020).  As an example of ED's ultimate authority as to PSLF, ED has, on rare occasions, authorized FedLoan Servicing "to override judgment of public service employers, per FSA authorization and on an exception basis, to make them qualifying or not qualifying employers for the Public Service Loan Forgiveness Program."  U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), ABA AR, Dkt. No. 34-1, at 143.  If FedLoan Servicing does so, it is required to note "the FSA-authorized condition on the borrower account."  *Id.* at 143–44.

[52] *Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d at 12–13; U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 21, 2011), Appendix B (Instructions for Reviewing an Employment Certification Form for PSLF (Draft)), ABA AR, Dkt. No. 34-1, at 160.

[53] According to ED's contract with FedLoan Servicing, if an employer is not deemed to be qualifying, "a borrower may request reconsideration."  Although ED's contract with FedLoan Servicing requires it to "[d]escrib[e] the actions the borrower may take … if the employment cannot be determined to be qualifying, or to dispute a determination, and [t]he outcome of the initial review," there are no publicly available procedures governing this supposed "reconsideration."  Answer ¶ 64, *Am. Bar Ass'n v. U.S. Dep't of Educ.*, No. 16-2476, Dkt. No. 14; U.S. Dep't of Educ., *PSLF Single*

26

80.    *Third*, as required by ED, FedLoan Servicing determines whether the borrower worked the requisite number of hours in a public service job.[54]

81.    If a borrower is "on track" for PSLF—*i.e.*, is working the requisite number of hours in a public service job—that borrower's loans are transferred to FedLoan Servicing if FedLoan is not already servicing them.[55]  FedLoan Servicing must "process all forms and handle all communications regarding PSLF, as well as perform all non-PSLF related servicing functions on a borrower portfolio, as required of all federal loan servicers."[56]

82.    ED requires FedLoan Servicing to track the number of qualifying payments made by all of the borrowers it services.[57]

83.    FedLoan Servicing reviews submitted ECF forms and notifies the borrower of "the number of qualifying payments the borrower has made and the

---

*Servicer Requirements, Task Order 0005,* (Nov. 15, 2011), Amendment of Solicitation/Modification of Contract, Appendix B (Instructions for Reviewing an Employment Certification Form for PSLF) at 5.

[54] U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), Appendix B (Instructions for Reviewing a PSLF Employment Certification Form (ECF)), ABA AR, Dkt. No. 34-1, at 143, 161.

[55] *Id.* at 142, 144; U.S. Dep't of Educ., Fed. Student Aid, *Public Service Loan Forgiveness*, https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service#qualifying-employment (last visited Dec. 12, 2020).  ED modified this process in July 2018 pursuant to a change order to "stop immediately transferring borrowers to FedLoan Servicing once an ECF is submitted and qualifying employment is confirmed," and instead "[l]imit[ing]" "PSLF Transfers" "to at least 96 months of Qualified Employment."  U.S. Dep't of Educ., Amendment of Solicitation/Modification of Contract, No. 0021P00029, (July 23, 2018) at 2–3.

[56] U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 21, 2011), ABA AR, Dkt. No. 34-1, at 149; *see also supra* note 55 (describing 2018 modification to timing of transfer of borrower account to FedLoan Servicing).

[57] U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), ABA AR, Dkt. No. 34-1, at 144.

remaining number the borrower must make in order to be eligible for PSLF."[58]   If FedLoan Servicing determines that the borrower has not made any qualifying payments, FedLoan Servicing and ED jointly issue a denial letter.

84.    *Fourth*, the borrower must make 120 qualifying payments toward Direct Loans.  Any FFEL Loans must be consolidated into a Direct Consolidation Loan for payments to qualify for PSLF; any payments made prior to consolidation do not qualify.

85.    Payments on Direct Loans must have been made after October 1, 2007, under a qualifying repayment plan, for the full amount shown on the invoice, within fifteen days of the due date, and while employed full-time by a qualifying employer.[59]

86.    *Fifth*, once the borrower has made 120 qualifying payments, the borrower must complete a PSLF Application for Forgiveness and must be working full-time for a qualifying employer at the time the application is submitted and at the time the remaining balance on the loan is forgiven.[60]

87.    If the borrower meets these requirements, FedLoan Servicing forwards the application to ED for final review.[61]   According to ED's contract with FedLoan Servicing, "[o]nce [ED] determines whether all of the requirements for eligibility have been fulfilled, the balance of principal and interest due on the borrower's eligible

---

[58] U.S. Dep't of Educ., *Business Operations Change Request Form* (Sept. 30, 2011), ABA AR, Dkt. No. 34-1, at 144–46, 153.

[59] 34 C.F.R. §§ 685.219(c)(ii)(iii); *see also* U.S. Dep't of Educ., Fed. Student Aid, *PSLF*, https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service#qualify (last visited Dec. 12, 2020).

[60] FedLoan Servicing, *PSLF*, https://myfedloan.org/borrowers/special-programs/pslf (last visited Dec. 12, 2020).

[61] *See* Hegji, *supra* note 32, at 6.

Direct Loans shall be forgiven."[62]

88.    Pursuant to the PSLF implementing regulations, "[i]f the Secretary determines that the borrower does not meet the eligibility requirements for loan forgiveness under this section, the Secretary resumes collection of the loan and grants forbearance of payment on both principal and interest for the period in which collection activity was suspended.  The Secretary notifies the borrower that the application has been denied, provides the basis for the denial, and informs the borrower that the Secretary will resume collection of the loan."[63]

89.    ED retains ultimate responsibility for all steps in the process for determining eligibility for PSLF forgiveness.  As ED acknowledges, "the Department has the ultimate authority to review FedLoan Servicing's actions under its contract."[64] ED "has never delegated final decision-making authority under the PSLF Program to FedLoan Servicing or any other entity."[65]

90.    In November 2020, ED made two changes to the PSLF Program.[66] *First*, ED launched a single form for the PSLF and TEPSLF Programs.

91.    *Second*, ED launched a redesigned self-help tool that is supposed to enable borrowers to view a history of their submitted employment information, along

---

[62] U.S. Dep't of Educ., *PSLF Single Servicer Requirements, Task Order 0005,* (Nov. 15, 2011), Amendment of Solicitation/Modification of Contract, Appendix B (Instructions for Reviewing an Employment Certification Form for PSLF) at 1–2.

[63] 34 C.F.R. § 685.219(e)(3).

[64] Answer ¶ 66, *Am. Bar Ass'n v. U.S. Dep't of Educ.*, No. 16-2476 , Dkt. No. 14.

[65] Compl. ¶ 67 and Answer ¶ 67, *Am. Bar Ass'n v. U.S. Dep't of Educ.*, No. 16-2476, Dkt. Nos. 1, 14.

[66] Federal Student Aid, *Changes to the Public Service Loan Forgiveness (PSLF) Program and New, Single PSLF Form* (Oct. 28, 2020), *available at* https://ifap.ed.gov/electronic-announcements/102820ChangestoPSLFProgramNewSinglePSLFForm.

with a customized table of borrower loan information.[67]

92.     Critically, neither ED's existing procedures nor these changes provide any process for a borrower to challenge or appeal the denial of PSLF, TEPSLF, or an ECF, nor does ED have any process by which it reviews and corrects mistakes made by ED or Title IV servicers regarding PSLF.

93.     The CFPB estimates that approximately one in four U.S. workers is employed in public service[68] and that, "[b]y the end of 2016, more than 32 million borrowers were repaying loans that [we]re potentially eligible for PSLF."[69]

94.     Yet, as of September 2020, 179,371 unique borrowers had submitted 229,215 applications for PSLF, and only 5,069 applications had been "deemed eligible" by their respective servicers.[70]   Only 3,469 borrowers—fewer than 2% of unique borrowers submitting applications—have had their loans forgiven.[71]   These numbers make clear that ED has failed to fulfill its congressional mandate to administer PSLF effectively to the detriment of the Individual Plaintiffs, AFT

---

[67] On March 27, 2020, in response to the COVID-19 pandemic, Congress passed the *Coronavirus Aid, Relief, and Economic Security Act (CARES Act)*, which suspended loan payments on federally held loans, stopped collections on defaulted loans, and set interest rates to 0% through September 30, 2020.  Fed. Student Aid, *Coronavirus and Forbearance Info for Students, Borrowers, and Parents*, https://studentaid.gov/announcements-events/coronavirus (last visited Dec. 11, 2020).  This relief has since been extended until January 31, 2021.  *See* Elissa Nadworny, *Education Department Extends Student Loan Payment Freeze Through January*, NPR (Dec. 4, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/12/04/943293547/education-dept-extends-student-loan-payment-freeze-through-january (last visited Dec. 11, 2020).

The CARES Act also allows all suspended payments through December 31, 2020 to count toward any student loan forgiveness program, including PSLF, as long as all other requirements of the loan forgiveness program are met.

[68] *See* CFPB, *Staying on Track*, *supra* note 4, at 1.

[69] *See id.* at 20 n.34.

[70] FSA, *September 2020 PSLF Report*, *supra* note 2.

[71] *Id.*

members, and countless public servants across the nation.

95.     Recognizing these failures, a bipartisan group of lawmakers authorized $350 million to be available on a first-come, first-served basis as a temporary expansion of PSLF[72] for borrowers who hold Direct Loans but made some or all of their 120 payments on a nonqualifying repayment plan, and whose most recent payment and payment 12 months prior to applying for TEPSLF were greater or equal to what they would have paid on an income-driven repayment plan.[73]  This expansion requires forgiveness if the statutory qualifications are met.[74]

96.     Initially, FedLoan Servicing and ED instructed borrowers to apply for TEPSLF by preparing an e-mail to FedLoan Servicing requesting that ED reconsider their eligibility for PSLF.  Now, borrowers may apply for PSLF and TEPSLF using the same application.  ED, through FedLoan Servicing, then reviews the application and determines whether to grant TEPSLF.[75]

97.     ED's "process" provides no opportunity for a borrower to challenge or appeal the denial of TEPSLF, nor does ED have any process by which it reviews and corrects mistakes made by ED or the Title IV servicers regarding TEPSLF.

98.     Although Congress intended TEPSLF to facilitate the forgiveness of certain public employee loan debt, as of the end of September 2020, only 2,180

---

[72] Consolidated Appropriations Act of 2018, Pub. L. No. 115-141, 132 Stat. 424, Div. H, tit. III, § 315 (2018), 405–06, https://www.congress.gov/115/bills/hr1625/BILLS-115hr1625enr.pdf.

[73] *Id.*

[74] *Id.*  ED implemented TEPSLF through a new information collection under the Paperwork Reduction Act of 1995.  *See* Notice, Agency Information Collection Activities; Comment Request; Temporary Expansion of Public Service Loan Forgiveness (TEPSLF), 83 Fed. Reg. 24,091 (May 24, 2018).

[75] U.S. Dep't of Educ., Fed. Student Aid, *TEPSLF*, https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service/temporary-expanded-public-service-loan-forgiveness (last visited Dec. 11, 2020).

requests out of 37,242 requests considered—less than 6%—were approved for TEPSLF, accounting for $87,448,286 in debt relief.[76]  ED's administration of TEPSLF is also a failure.

99.    Flouting Congress's mandate, Secretary DeVos and the Department she leads have done little to remedy the ways in which PSLF and TEPSLF have been mismanaged, despite documented knowledge of these widespread and systemic failures.

100.    ED has the authority to compromise or waive any title or claim through its Compromise and Settlement authority.  This power allows ED to settle with student loan borrowers who are not eligible for forgiveness because, for example, ED or the Title IV servicers have given the borrower incorrect information about how to qualify.

101.    ED's Compromise and Settlement authority for FFEL Loans is set forth in the HEA, 20 U.S.C. § 1082(a)(6), which allows the Secretary to "enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption."  ED maintains the same authority over the Direct Loan Program.[77]

102.    A regulation promulgated in 1988, 34 C.F.R. § 30.70, provided that "the Secretary may compromise a debt in any amount, or suspend or terminate collection of a debt in any amount, if the debt arises under the [FFEL Program or the Direct Loan Program]."[78]

103.    In 2016, ED amended this regulation to specify that the Secretary has authority, "[s]ubject to [the requirement to consult with the Department of Justice on

---

[76] FSA, *September 2020 PSLF Report*, *supra* note 2.

[77] 20 U.S.C. § 1087a(b)(2).

[78] 34 C.F.R. § 30.70(e)(1) (1988).

compromise of a claim over $1 million]," to "compromise a debt in any amount, or suspend or terminate collection of a debt in any amount, if the debt arises under the Federal Family Education Loan Program authorized under the" FFEL Loan or Direct Loan programs.[79]  The current regulation also provides that the Secretary "uses the standards in the [Federal Claims Collection Standards], 31 CFR part 902, to determine whether compromise of a debt is appropriate if the debt arises under a program administered by the Department, unless compromise of the debt is subject to paragraph (b) of this section," which relates only to "debts arising because a recipient of a grant or cooperative agreement … has spent … funds in a matter that is not allowable."[80]

104.   ED has provided internal guidelines[81] regarding its Compromise and

---

[79] 34 C.F.R. 30.70(e) (eff. July 1, 2017) ("(1) Subject to paragraph (e)(2) of this section, under the provisions of 31 CFR part 902 or 903, the Secretary may compromise a debt in any amount, or suspend or terminate collection of a debt in any amount, if the debt arises under the Federal Family Education Loan Program authorized under title IV, part B, of the HEA, the William D. Ford Federal Direct Loan Program authorized under title IV, part D of the HEA, or the Perkins Loan Program authorized under title IV, part E, of the HEA. (2) The Secretary refers a proposed compromise, or suspension or termination of collection, of a debt that exceeds $1,000,000 and that arises under a loan program described in paragraph (e)(1) of this section to the Department of Justice for review. The Secretary does not compromise, or suspend or terminate collection of, a debt referred to the Department of Justice for review until the Department of Justice has provided a response to that request.").

[80] 34 C.F.R. § 30.70(a)(1), (b).

[81] According to ED, "[s]pecific guidance related to settlements and compromises is confidential, given that publicizing this information is not in the best interest of the government as it could enable borrowers to reduce their repayments below the amount they can legitimately afford."  U.S. Dep't of Educ., Fed. Student Aid, Loan Servicing and Collection—Frequently Asked Questions, SETC-A1 (2018), https://getoutofdebt.org/wp-content/uploads/2018/06/IFAP-Loan-Servicing-and-Collection-FAQ_new.pdf.

Settlement authority to the agencies that guaranty FFEL Loans,[82] as well as to private collection agencies ("PCAs") charged with collecting defaulted FFEL and Direct Loans.

105. For instance, ED issued Standard Compromise and Write-Off Procedures in 1993 to the agencies that guarantee FFEL Loans, which allow for a waiver of collection costs and up to 30% of the principal and interest.[83] ED's manual of procedures for PCAs makes clear that ED maintains authority to enter into discretionary compromises and cancel any student loan.[84]

## ED'S ADMINISTRATIVE PROCESSING ERRORS

106. Even though borrowers must make 120 qualifying payments to be eligible for PSLF, ED has done nothing to ensure that borrowers' payments are

---

[82] *See* U.S. Dep't of Educ., Fed. Student Aid, *FFEL Program Lender and Guaranty Agency Reports*, https://studentaid.ed.gov/sa/about/data-center/lender-guaranty (last visited Dec. 11, 2020).

[83] *See* National Consumer Law Center, *No Way Out: Student Loans, Financial Distress, and the Need for Policy Reform* 18 (June 2006) (hereinafter "NCLC, *No Way Out*"), https://www.studentloanborrowerassistance.org/wp-content/uploads/2013/05/nowayout.pdf (citing Letter from Jean Frohlicher, President of the Council of Higher Education Loan Programs, Inc., re: Compromise and Write-Off Procedures (Nov. 7, 1993), with attached approval by Robert W. Evans, Director, Division of Policy Development (Nov. 24, 1993), and attached Standardized Compromise and Write-Off Procedures). ED has not publicly indicated whether these guidelines are still in existence or have been modified. *See* Natalie Korman, *Is it Possible to Settle Student Debt for Less than You Owe?*, The College Investor (May 23, 2019), https://thecollegeinvestor.com/20332/settle-student-debt/ (last visited Dec. 11, 2020); Student Loan Borrower Assistance, *Settlement*, https://www.studentloanborrowerassistance.org/loan-cancellation/settlement/ (last visited Dec. 11, 2020); *see also* NCLC, *No Way Out* at 18.

[84] U.S. Dep't of Educ., Fed. Student Aid, *PCA Procedures Manual* 55 (May 10, 2016), https://www.studentloanborrowerassistance.org/wp-content/uploads/2013/05/pca-manual.pdf; U.S. Dep't of Educ., Fed. Student Aid, *PCA Procedures Manual: 2009 ED Collections Contract* 72 (Sept. 2009), https://www.studentloanborrowerassistance.org/wp-content/uploads/2007/03/2009-pca-procedures.pdf; *see also* Student Loan Borrower Assistance, *Settlement*, https://www.studentloanborrowerassistance.org/loan-cancellation/settlement/ (last visited Dec. 11, 2020).

counted correctly despite documented knowledge of repeated errors, as a September 2018 report by the Government Accountability Office ("GAO") confirms.[85] According to the GAO, ED "has not provided [FedLoan Servicing] with a comprehensive source of guidance and instructions on how to operate the [PSLF] program, raising the risk that [FedLoan Servicing] may improperly approve or deny borrowers' certification requests and forgiveness applications."[86]   When FedLoan Servicing makes mistakes or keeps poor records, those errors lead ED to deny PSLF or TEPSLF to borrowers who in fact qualify for loan forgiveness.

107.   For example, the GAO found that ED has not given FedLoan Servicing and borrowers sufficient information to determine whether an employer qualifies for PSLF, leaving FedLoan Servicing's assessments as to public service employment "vulnerable to inconsistencies" and fostering "uncertainty for borrowers."[87]

108.   The GAO found similar "inconsistencies in the information used for counting borrowers' qualifying loan payments," "rais[ing] the risk of errors" in the PSLF application review process.[88]   In reviewing PSLF applications, FedLoan Servicing must "examine the borrower's prior loan payment information to determine which prior payments count towards the 120 needed to qualify for loan forgiveness."[89] If FedLoan Servicing receives the borrower's account from another servicer (as is often the case), the initial servicer must transfer loan payment information to FedLoan Servicing so that the borrower's earlier payments are counted.  The GAO's

---

[85] U.S. Gov't Accountability Office, GAO-18-547, Public Service Loan Forgiveness: Education Needs to Provide Better Information for the Loan Servicer and Borrowers 24 (Sept. 2018) (hereinafter "GAO, *Public Service Loan Forgiveness Report*"), https://www.gao.gov/assets/700/694304.pdf.

[86] *Id.*

[87] *Id.*

[88] *Id.* at 25.

[89] *Id.* at 21.

investigation found that this process of transferring information is replete with errors, and ED has done nothing to correct it, thus "increasing the risk of inaccurate qualifying payment counts."[90]

109.    These findings mirror a 2017 CFPB report, which concluded that "[borrowers'] previous qualifying payments may not be reflected in the payment histories maintained by [FedLoan Servicing]."[91]

110.    ED has acknowledged that more work is required to "ensure borrowers receive sufficiently detailed information regarding counts of qualifying payments and their repayment history" and claims that it is "reviewing all PSLF borrower communications to improve content and clarity."[92]  Yet Secretary DeVos has failed to direct ED to make the necessary improvements.

111.    Similar problems plague the TEPSLF application process, as a number of U.S. Senators noted in a letter to Secretary DeVos.[93]  Yet ED has not taken "any significant action to make it easier for borrowers who had ended up in the wrong repayment plans to qualify for the loan forgiveness opportunity that was created for them."[94]

---

[90] *Id.* at 25.

[91] *See* CFPB, *Staying on Track*, *supra* note 4, at 40.

[92] Questions Submitted by Sen. Patty Murray Regarding PSLF Outreach and Compliance with Congressional Directive 8 (undated), https://www.help.senate.gov/imo/media/doc/SenMurrayQFRresponses32819LHHShearing.pdf.

[93] Letter from Tim Kaine (D-VA) and 3 other Democratic lawmakers to the Secretary of Education (June 19, 2018), https://www.kaine.senate.gov/imo/media/doc/Kaine,%20Whitehouse,%20Duckworth,%20Hassan%20Press%20DeVos%20On%20Failure%20To%20Implement%20Public%20Service%20Loan%20Forgiveness%20Fix.pdf.

[94] Letter from Tim Kaine (D-VA) and Sheldon Whitehouse (D-RI) to the Secretary of Education (Apr. 25, 2019), https://www.kaine.senate.gov/press-releases/kaine-and-whitehouse-call-on-devos-to-fix-missteps-with-implementation-of-tepslf-program (last visited Dec. 11, 2020).

112.    The GAO concluded that this breakdown in ED's review of PSLF and TEPSLF applications has caused, and continues to cause, public servants "to make more payments than necessary before receiving loan forgiveness,"[95] if they receive it at all.

**Administrative Error Plaintiffs**

113.    The Administrative Error Plaintiffs are just two among many victims of ED's widespread failure in administering PSLF and TEPSLF.

### 1.    Cynthia Miller

114.    Plaintiff Cynthia Miller took out two FFEL Loans in 1995 to pay for her undergraduate degree and consolidated the loans in 1998 under the Direct Loan Program.    Ms. Miller then took out two Direct Loans in 2003 to complete her undergraduate degree.

115.    On May 7, 2018, after making at least 120 qualifying payments, Ms. Miller submitted a PSLF application to her Title IV loan servicer, FedLoan Servicing.  On May 29, 2018, Ms. Miller received a letter from FedLoan Servicing stating that Section 3 of her application, which provides employer information, was incomplete.  The letter did not specify what was missing or whether any additional documents were required; it simply stated:  "Have your employer contact us."

116.    On May 31, 2018, Ms. Miller's employer faxed an updated version of Section 3 to FedLoan Servicing.   On June 1, 2018, Ms. Miller called FedLoan Servicing to check whether it had been received.  A FedLoan Servicing customer service representative confirmed receipt, informed Ms. Miller that no further information was missing, and told her the application would be approved or denied in ten business days.

117.    Seventeen days later, on June 18, 2018, Ms. Miller called FedLoan

---

[95] GAO, *Public Service Loan Forgiveness Report*, *supra* note 85, at 25.

Servicing about the status of her application.  A FedLoan Servicing customer service representative again stated that her application was incomplete due to missing information in Section 3.  After Ms. Miller asked the agent to look again, the agent located the additional information sent on May 31, 2018 and informed Ms. Miller that her application was in fact complete and that a decision would be forthcoming in a few days.

118.   After hearing nothing for another two days, Ms. Miller again called FedLoan Servicing about the status of her application on June 20, 2018.  This time, a representative told Ms. Miller that her application had been denied on June 19, 2018, because it was incomplete.  The representative stated that Ms. Miller would need to resubmit Section 1 of her application, which she had already included with her original submission on May 7, 2018.   When Ms. Miller informed the representative that FedLoan Servicing representatives had twice told her that her application was complete, the representative responded that the other representatives had been incorrect.  The representative instructed Ms. Miller to resend two pages of her original application.  Ms. Miller did so the same day.

119.   ED denied Ms. Miller's PSLF application by letter dated August 14, 2018, on the ground that Ms. Miller had "not yet made the required 120 qualifying payments."  The letter stated that Ms. Miller had made one qualifying payment on each of her four Direct Loans, had 119 payments remaining, and that her estimated date of eligibility for loan forgiveness was May 9, 2028.

| Loan Sequence | Disbursement Date | Loan Program | Qualifying Payments (Total) | Outstanding Balance | Qualifying Payments (Remaining) | Estimated Eligibility Date |
|---|---|---|---|---|---|---|
| 0001 | 10/05/1998 | DLSCNS | 1 | $4,119.13 | 119 | 05/09/2028 |
| 0002 | 10/05/1998 | DLUCNS | 1 | $4,940.99 | 119 | 05/09/2028 |
| 0003 | 02/09/2003 | DLSTFD | 1 | $513.78 | 119 | 05/09/2028 |
| 0004 | 02/09/2003 | DLUNST | 1 | $1,056.84 | 119 | 05/09/2028 |

120.   On August 22, 2018, Ms. Miller applied for TEPSLF.

121.   On September 11, 2018, Ms. Miller received another letter from

FedLoan Servicing with "information regarding [her] eligibility for public service loan forgiveness." This letter stated that Ms. Miller had made zero qualifying payments on each of her four Direct Loans and that she had 120 payments remaining on each loan to become eligible for loan forgiveness. The letter stated that her estimated date of eligibility for forgiveness was June 8, 2028.

| Loan Sequence | Disbursement Date | Loan Program | Qualifying Payments (Total) | Qualifying Payments (Remaining) | Estimated Eligibility Date |
|---|---|---|---|---|---|
| *0001 | 10/05/1998 | DLSCNS | 0 | 120 | 06/08/2028 |
| Employer Name | | | Qualifying Employment Begin Date | Qualifying Employment End Date | Qualifying Payments |
| BOARD OF ED CHICAGO PUBLIC SCHOOLS | | | 08/05/2001 | 05/07/2018 | 0 |

122. On October 4, 2018, FedLoan Servicing and ED indicated that Ms. Miller was being considered for TEPSLF.

123. ED denied Ms. Miller forgiveness under TEPSLF in a letter dated December 27, 2018, which stated that she had made zero PSLF qualifying payments, and either 32 or 33 TEPSLF qualifying payments, on each of her four loans.

| Loan Sequence | Loan Program | Disbursement Date | PSLF Qualifying Payment Count | TEPSLF Qualifying Payment Count |
|---|---|---|---|---|
| 1 | DLSCNS | 10/05/1998 | 0 | 33 |
| 2 | DLUCNS | 10/05/1998 | 0 | 33 |
| 3 | DLSTFD | 02/09/2003 | 0 | 33 |
| 4 | DLUNST | 02/09/2003 | 0 | 32 |

124. In both February and March of 2019, FedLoan Servicing automatically charged Ms. Miller via direct debit for each of her loans. Both the March and February bills stated that she had made zero qualifying payments on each of her loans.

125. After reapplying for PSLF, on March 19, 2019, Ms. Miller contacted FedLoan Servicing by e-mail, inquiring why her PSLF and TEPSLF applications had been denied, given that she had been teaching in Chicago public schools since 2007.

126. On April 3, 2019, a FedLoan Servicing agent informed her by e-mail that her PSLF application "was denied due to missing information. It is missing your

employment status such as full time or part time."  The e-mail informed Ms. Miller that the "agency received your e-mail to be considered for TEPSLF, however you have not made 120 qualifying payments.  Due to deferment and forbearance periods, you have not been in repayment for ten years."  According to FedLoan Servicing, Ms. Miller had been in forbearance for over ten years from 2003-2013, which was incorrect, as Ms. Miller had only requested a forbearance for one year.

127.   Ms. Miller replied to this e-mail the same day, reiterating that she had already submitted a corrected PSLF application containing her employment information on June 23, 2018, followed by a TEPSLF application on August 22, 2018, and that both had been denied.  Ms. Miller asked that FedLoan Servicing review the message she sent on March 19, 2019.

128.   Ms. Miller received a letter, dated April 6, 2019, with "an update to [her] account regarding [her] progress in the Public Service Loan Forgiveness (PSLF) Program."  It stated that "[a]s a result of a review of [her] account records, an adjustment was made to the number of qualifying payments in our system" resulting in "an overall increase to the number of qualifying payments … credited to [her] loan(s)."  The letter stated that she had made one PSLF qualifying payment on each of her two consolidated loans, 33 qualifying payments on her Direct subsidized loan, and 32 qualifying payments on her Direct unsubsidized loan.

| Loan Sequence | Disbursement Date | Loan Program | Qualifying Payments (Total) | Qualifying Payments (Remaining) | Estimated Eligibility Date |
|---|---|---|---|---|---|
| 0001 | 10/05/1998 | DLSCNS | 1 | 119 | 05/09/2028 |
| 0002 | 10/05/1998 | DLUCNS | 1 | 119 | 05/09/2028 |
| 0003 | 02/09/2003 | DLSTFD | 33 | 87 | 01/08/2026 |
| 0004 | 02/09/2003 | DLUNST | 32 | 88 | 02/08/2026 |

129.   On April 12, 2019, FedLoan Servicing and ED sent Ms. Miller a letter indicating that her previous PSLF application was being reviewed for eligibility under the TEPSLF Program and requested income and family size information.

130.   ED denied Ms. Miller TEPSLF for a second time by a letter dated April 17, 2019.  The letter stated that she had "not made 120 qualifying payments" on her loans, making her "ineligible for the TEPSLF opportunity," and that she had made 34 TEPSLF qualifying payments on each of her two consolidated loans, 33 qualifying payments on her Direct subsidized loan, and 32 qualifying payments on her Direct unsubsidized loan.

131.   On April 17, 2019, Ms. Miller called FedLoan Servicing to ask again why her applications for PSLF and TEPSLF had been denied.  Ms. Miller spoke with a customer service representative who said there was "a lot going on" with her loans, that there were over 128 qualifying payments visible on her account, and that her PSLF and TEPSLF applications had been denied due to "too many forbearances," which Ms. Miller contested—and which is factually incorrect.  Ms. Miller asked whether it would assist the review of her application if she uploaded information to her FedLoan Servicing account relating to only those forbearances she had requested. The representative said that it was "worth trying."

132.   On April 22, 2019, Ms. Miller uploaded documentation to her FedLoan Servicing account explaining the circumstances of the prior forbearances she had requested.

133.   On April 24, 2019, Ms. Miller contacted FedLoan Servicing by e-mail to ask if anyone had received this information.  FedLoan Servicing did not respond.

134.   ED denied Ms. Miller PSLF yet again by letter dated April 30, 2019, which stated that she had "not yet made the required 120 qualifying payments necessary to be eligible for PSLF."  The letter further stated that she had made one qualifying payment on each of her two consolidated loans, 38 qualifying payments on her Direct subsidized loan, and 37 qualifying payments on her Direct unsubsidized loan.  But Ms. Miller had made *over* 120 qualifying payments.

**PSLF Qualifying Payment Details**

| Loan Sequence | Disbursement Date | Loan Program | Qualifying Payments (Total) | Outstanding Balance | Qualifying Payments (Remaining) | Estimated Eligibility Date |
|---|---|---|---|---|---|---|
| 0001 | 10/05/1998 | DLSCNS | 1 | $3,859.73 | 119 | 05/16/2029 |
| 0002 | 10/05/1998 | DLUCNS | 1 | $4,629.83 | 119 | 05/16/2029 |
| 0003 | 02/09/2003 | DLSTFD | 38 | $339.08 | 82 | 02/22/2026 |
| 0004 | 02/09/2003 | DLUNST | 37 | $698.24 | 83 | 03/22/2026 |

135.  Ms. Miller received a letter from FedLoan Servicing and ED dated May 1, 2019, stating:  "In your recent ECF submission, you included additional employment information that may now enable you to qualify for the TEPSLF opportunity.  However, to be reconsidered for the TEPSLF opportunity you must submit a new TEPSLF request."

136.  On May 2, 2019, Ms. Miller submitted a message to FedLoan Servicing through the "Contact Us" function on the FedLoan Servicing website, requesting that it be escalated to a supervisor.  Ms. Miller asked again for confirmation that the documentation she uploaded to her FedLoan Servicing account on April 22, 2019 had been received and requested an update as to her TEPSLF application.  Ms. Miller also asked why she had received notices that her account was overdue, despite having received a previous notice that her loans were in administrative forbearance.

137.  On May 3, 2019, Ms. Miller submitted a complaint to ED through its online FSA Feedback Center.  Once again, Ms. Miller asked for confirmation that the documents she uploaded on April 22, 2019 had been received and asked why she had received overdue payment notices while in forbearance.  Ms. Miller also asked for confirmation of her student loan balance, which had been reported inconsistently in documentation she had received from FedLoan Servicing.  She asked that ED "advise on what documentation" it wanted her to provide.

138.  On May 7, 2019, ED sent Ms. Miller a form e-mail from a FedLoan Servicing e-mail address, thanking her for "reaching out to us through the Federal Student Aid Feedback Center about your student loan account[.]"  The e-mail stated

that a letter detailing why she did not qualify for PSLF and TEPSLF had been mailed to her.

139.    ED also sent Ms. Miller an e-mail on May 7, 2019 stating that "a thorough review of [her] account ha[d] been completed" and that "[her] case [wa]s closed."

140.    The same day, Ms. Miller called the ED representative who had sent her the e-mail telling her that her case had been reviewed and closed.  That person told Ms. Miller that her loans did not qualify for PSLF or TEPSLF because they were "standard – grandfathered" and "automatic fixed."  Ms. Miller had never heard those phrases and asked the representative to describe how her loans differed from those that qualify for PSLF or TEPSLF.  The ED representative stated that she could not do so.

141.    A few days later, Ms. Miller received two large envelopes of documents

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| A | 8/20/12 | 1:44:39 | C99 | L | A000 B000 C000 D000 | EFNDBATCH | SLX0XFK |
| A | 8/20/12 | 1:44:39 | C99 | L | LN=1, S&C=11, PMT=28, APD=0, TT=1, DLA=08/20/12. | EFNDBATCH | SLX0XFK |
| B | 8/20/12 | 1:44:39 | C99 | L | LN=2, S&C=11, PMT=57, APD=0, TT=1, DLA=08/20/12. | EFNDBATCH | SLX0XFK |
| C | 8/20/12 | 1:44:39 | C99 | L | LN=3, S&C=11, PMT=74, APD=0, TT=1, DLA=08/20/12. | EFNDBATCH | SLX0XFK |
| D | 8/20/12 | 1:44:39 | C99 | L | LN=4, S&C=11, PMT=89, APD=0, TT=1, DLA=08/20/12. | EFNDBATCH | SLX0XFK |
| A | 9/17/12 | 2:04:10 | C99 | L | A000 B000 C000 D000 | EFNDBATCH | SLX0XFK |
| A | 9/17/12 | 2:04:10 | C99 | L | LN=1, S&C=11, PMT=28, APD=0, TT=, DLA=09/17/12. | EFNDBATCH | SLX0XFK |
| B | 9/17/12 | 2:04:10 | C99 | L | LN=2, S&C=11, PMT=57, APD=0, TT=, DLA=09/17/12. | EFNDBATCH | SLX0XFK |
| C | 9/17/12 | 2:04:10 | C99 | L | LN=3, S&C=11, PMT=74, APD=0, TT=, DLA=09/17/12. | EFNDBATCH | SLX0XFK |
| D | 9/17/12 | 2:04:10 | C99 | L | LN=4, S&C=11, PMT=89, APD=0, TT=, DLA=09/17/12. | EFNDBATCH | SLX0XFK |
| A | 10/22/12 | 2:34:59 | C99 | L | A000 B000 C000 D000 | EFNDBATCH | SLX0XFK |
| A | 10/22/12 | 2:34:59 | C99 | L | LN=1, S&C=11, PMT=28, APD=0, TT=, DLA=10/22/12. | EFNDBATCH | SLX0XFK |
| B | 10/22/12 | 2:34:59 | C99 | L | LN=2, S&C=11, PMT=57, APD=0, TT=, DLA=10/22/12. | EFNDBATCH | SLX0XFK |
| C | 10/22/12 | 2:34:59 | C99 | L | LN=3, S&C=11, PMT=74, APD=0, TT=, DLA=10/22/12. | EFNDBATCH | SLX0XFK |
| D | 10/22/12 | 2:34:59 | C99 | L | LN=4, S&C=11, PMT=89, APD=0, TT=, DLA=10/22/12. | EFNDBATCH | SLX0XFK |
| A | 11/19/12 | 2:06:20 | C99 | L | A000 B000 C000 D000 | EFNDBATCH | SLX0XFK |
| A | 11/19/12 | 2:06:20 | C99 | L | LN=1, S&C=11, PMT=28, APD=0, TT=, DLA=11/19/12. | EFNDBATCH | SLX0XFK |
| B | 11/19/12 | 2:06:20 | C99 | L | LN=2, S&C=11, PMT=57, APD=0, TT=, DLA=11/19/12. | EFNDBATCH | SLX0XFK |
| C | 11/19/12 | 2:06:20 | C99 | L | LN=3, S&C=11, PMT=74, APD=0, TT=, DLA=11/19/12. | EFNDBATCH | SLX0XFK |
| D | 11/19/12 | 2:06:20 | C99 | L | LN=4, S&C=11, PMT=89, APD=0, TT=, DLA=11/19/12. | EFNDBATCH | SLX0XFK |
| A | 12/17/12 | 2:39:39 | C99 | L | A000 B000 C000 D000 | EFNDBATCH | SLX0XFK |
| A | 12/17/12 | 2:39:39 | C99 | L | LN=1, S&C=11, PMT=28, APD=0, TT=, DLA=12/17/12. | EFNDBATCH | SLX0XFK |
| B | 12/17/12 | 2:39:39 | C99 | L | LN=2, S&C=11, PMT=57, APD=0, TT=, DLA=12/17/12. | EFNDBATCH | SLX0XFK |
| C | 12/17/12 | 2:39:39 | C99 | L | LN=3, S&C=11, PMT=74, APD=0, TT=, DLA=12/17/12. | EFNDBATCH | SLX0XFK |
| D | 12/17/12 | 2:39:39 | C99 | L | LN=4, S&C=11, PMT=89, APD=0, TT=, DLA=12/17/12. | EFNDBATCH | SLX0XFK |

dated May 8, 2019.  As demonstrated by the screenshot below, the envelopes contained over 160 pages of numerical figures, densely printed code, and undefined abbreviations.  The package included a two-sentence cover letter stating, "Why we are contacting you:  To provide you with the documentation you requested," and contained no instructions for how to interpret the included documents.

142.   On   May   22,   2019,   Ms. Miller   sent   an   e-mail   to studentaidfeedback@ed.gov explaining that she did not know how to interpret the 160 pages of data that she was sent and asking for "some clarification on why I received the large batches of documents and what they are intended for."  She also asked when she could expect the letter "detailing the results of [her account's] review," which she had been promised in the May 7, 2019 e-mail from ED.

143.   The same day, Ms. Miller also sent another e-mail to FedLoan Servicing explaining her eligibility for TEPSLF and stating that she had previously provided relevant information to FedLoan Servicing that it had failed to consider in reviewing her application for TEPSLF.

144.   On June 14, 2019, Ms. Miller sent another e-mail to FedLoan Servicing asking for a reply to her inquiry about whether she was still being considered for TEPSLF and when she could expect an outcome.

145.   On June 17, 2019, FedLoan Servicing sent Ms. Miller an e-mail instructing her to "change [her] repayment terms to qualify for PSLF."

146.   That same day, Ms. Miller spoke to a FedLoan Servicing customer service representative who stated that a "special letter was sent to [her] in the mail on June 14, 2019 regarding case resolution," but the representative could not see it, and Ms. Miller would need to speak to a "PSLF specialist."

147.   When Ms. Miller was transferred to a PSLF specialist, she asked for information regarding the June 14, 2019 letter.  The PSLF specialist informed her that "I wish they would make this easier to see – I'm sorry – it's not you."  The PSLF specialist advised Ms. Miller that she did not need to change her repayment terms to qualify for TEPSLF.  Moreover, the PSLF specialist also stated that she could "see 139 payment periods" on Ms. Miller's account and that Ms. Miller should simply "wait it out to see what happens."

148.  On June 20, 2019, FedLoan Servicing requested via e-mail that Ms. Miller provide income and family size documentation to be considered for TEPSLF.  Ms. Miller provided that information the same day.

149.  On June 27, 2019, ED denied Ms. Miller's TEPSLF application, claiming that she had made 41 TEPSLF qualifying payments on two of her loans and 38 or 37 TEPSLF qualifying payments on her other two loans.

| Loan Sequence | Loan Program | Disbursement Date | PSLF Qualifying Payment Count | TEPSLF Qualifying Payment Count* |
|---|---|---|---|---|
| 1 | DLSCNS | 10/05/1998 | 1 | 41 |
| 2 | DLUCNS | 10/05/1998 | 1 | 41 |
| 3 | DLSTFD | 02/09/2003 | 38 | 38 |
| 4 | DLUNST | 02/09/2003 | 37 | 37 |

150.  Ms. Miller has reached out to ED and FedLoan Servicing numerous times to ask how her qualifying payments for PSLF and TEPSLF had been calculated and why her applications were denied.  She sought answers through nearly every possible avenue, including telephone calls and e-mails to ED and FedLoan Servicing, questions submitted via the "Contact Us" form on the FedLoan Servicing website and ED's online FSA Feedback Center, letters to ED and FedLoan Servicing sent via U.S. Postal Service Priority Mail, and documents uploaded to her FedLoan Servicing online account.  ED and FedLoan Servicing either failed to respond directly to these inquiries at all, or, at best, provided Ms. Miller with inconsistent and contradictory answers.

151.  On July 17, 2019, Ms. Miller, along with the other plaintiffs, brought this lawsuit against ED and Secretary DeVos.  Then, on November 13, 2020,

45

Ms. Miller received a new "Decision Letter" from ED, along with a 416-page collection of records containing some (but not all) of Ms. Miller's loan records, correspondence, and other documents.

152.    The Decision Letter informed Ms. Miller that she is ineligible for PSLF because she "ha[s] not been on a qualifying repayment plan for most of the repayment period on [her] loans."   ED's Decision Letter included a chart entitled "Qualifying Monthly Payment Detail" that showed that she had made nine PSLF qualifying payments as of November 2013.  For the first time, ED's November 13 Decision Letter informed Ms. Miller that it considered *none* of her payments from December 2013 to March 2020 to be qualifying payments.

153.    Prior PSLF denials sent to Ms. Miller on April 30, 2019 and August 28, 2020 did not inform her that none of her payments between December 2013 and March 2020 was considered PSLF-qualifying.  Instead, FedLoan told her merely that she had "not yet" made the required 120 payments.  These letters also contained other inaccurate and contradictory information.  The April 30, 2019 letter stated that she had made one qualifying payment, whereas ED's most recent PSLF denial, on November 13, 2020, states that, as of 2014, she had made nine qualifying payments. The August 28, 2020 letter informed her that she had made nine qualifying payments, but did not inform her that those payments took place prior to 2014.  Confusingly, another letter from FedLoan on the same date, August 28, 2020, informed her that she had made fifteen qualifying payments.

154.    ED's recent Decision Letter to Ms. Miller told her that she could, again, continue to apply for forgiveness under PSLF and TEPSLF.  The letter also suggested that, should Ms. Miller believe ED's decision was incorrect, she could write to ED directly at a particular, previously unrevealed address to submit further information. ED has provided no information about what process such follow-up would initiate (if any), nor has any such process been outlined by either ED or FedLoan as part of the

46

PSLF/TEPSLF procedure.

155.    Working as a public school teacher is a passion for Ms. Miller.  Since 2007, Ms. Miller has taught in a low-income public high school with over 98% of the students on free and reduced-price lunch.  Each year, she spends substantially more on her students than the $250 income tax deduction she is permitted to claim.

156.    Ms. Miller has had to put her own goals for a graduate degree on hold due to her student debt and the need to provide for her own children's education.  She now believes that the PSLF Program gave her false hopes for greater financial security.

157.    ED failed, repeatedly, to institute an adequate process for considering Ms. Miller's application for loan forgiveness that would have ensured that ED identified and accounted for the errors made by ED in determining Ms. Miller's eligibility for loan forgiveness.

158.    ED's denial of Ms. Miller's application for loan forgiveness is arbitrary and capricious because it failed to account for its payment counting errors and inconsistencies and provides no meaningful explanation of the reasons why it did not count her payments as qualifying.

159.    Ms. Miller is eligible for PSLF.

### 2.    Anastasiya Savenkova

160.    Plaintiff Anastasiya Savenkova took out Direct Loans from 1999 through 2004 to finance her undergraduate degree and took out FFEL Loans in 2007 and 2008 to finance her graduate degree.  On November 20, 2008, Ms. Savenkova consolidated these loans into Direct Consolidation Loans and began repayment on the Extended Graduated Repayment plan, which is a qualifying repayment plan for TEPSLF but not for PSLF.  At that time, Ms. Savenkova's servicer was Nelnet.

161.    In August 2011, Ms. Savenkova took out a Direct Stafford Subsidized

Loan and a Direct Stafford Unsubsidized Loan to finance her second graduate degree.[96]

162.   Ms. Savenkova has been continuously employed by New York State, which is a PSLF qualifying employer, since 2004 as an insurance examiner and regulator.

163.   Ms. Savenkova applied for PSLF on April 26, 2019, after having made over 120 on-time payments on her Direct Consolidation Loans while working for a qualifying employer.  Her loans were transferred to FedLoan Servicing.

164.   ED denied Ms. Savenkova's application for PSLF on the grounds that Ms. Savenkova's payments were made on a non-qualifying repayment plan.

165.   After receiving notice that her PSLF application had been denied, Ms. Savenkova applied for loan forgiveness under TEPSLF on May 1, 2019.

166.   On December 16, 2019, FedLoan Servicing sent Ms. Savenkova a letter informing her that it needed additional information to respond to her TEPSLF application.  She provided the requested information.

167.   Later that month, Ms. Savenkova called FedLoan Servicing to ask about the TEPSLF application process.   The representative Ms. Savenkova spoke to informed her that FedLoan Servicing would look at all of Ms. Savenkova's payments from each of the twelve months prior to her TEPSLF application to determine her eligibility.

168.   That statement was incorrect.  In evaluating borrowers for TEPSLF eligibility, a servicer need only consider two payments—the most recent payment made before submitting a TEPSLF application and the payment made twelve months prior to that.  Accordingly, a borrower with Direct Loans who works for a qualifying

---

[96] Ms. Savenkova has not yet made 120 payments on those loans.  The PSLF and TEPSLF application process currently does not provide any way for borrowers to indicate which loans they wish to exclude from their applications.

employer is entitled to TEPSLF if those two payments are greater than or equal to the monthly income-driven repayment amount.

169.   On February 20, 2020, FedLoan Servicing notified Ms. Savenkova that her request for TEPSLF had been denied because neither her most recent payment nor the payment twelve months prior to that payment exceeded her monthly income-driven repayment amount, which FedLoan Servicing allegedly calculated to be $650.95.  This was incorrect.[97]

170.   Upon receiving the rejection, Ms. Savenkova called FedLoan Servicing to ask for more information.  FedLoan Servicing informed her that she would qualify for TEPSLF if she made one more payment greater than or equal to the monthly income-driven repayment amount provided by FedLoan Servicing.

171.   Relying on FedLoan Servicing's advice, Ms. Savenkova did exactly what FedLoan Servicing advised her:  she made the requested payment and reapplied for TEPSLF on March 24, 2020.

172.   On July 1, 2020, FedLoan Servicing notified Ms. Savenkova her request for TEPSLF had *again* been denied, because neither her most recent payment nor the payment twelve months prior to that payment exceeded her monthly income-driven repayment amount, which FedLoan Servicing allegedly recalculated to be $378— $272 less than its prior income-driven repayment calculation.   This was also incorrect.

173.   Following these denials, Ms. Savenkova contacted FedLoan Servicing to ask why she had not been granted loan forgiveness after following its advice. Ms. Savenkova was unable to obtain an explanation as to which payments FedLoan Servicing had considered for TEPSLF and why those payments had not qualified.

---

[97] Ms. Savenkova's student loan account was in paid-ahead status for April 2018 and she did not have a payment due that month.

FedLoan Servicing was also unable to explain the change in Ms. Savenkova's calculated income-driven repayment amount between her February 20, 2020 TEPSLF denial and her July 1, 2020 TEPSLF denial.

174.   ED failed to institute an adequate process for considering Ms. Savenkova's application for loan forgiveness that would have ensured that ED identified and accounted for the errors it made in determining Ms. Savenkova's eligibility for loan forgiveness.

175.   ED's denial of Ms. Savenkova's application for loan forgiveness is arbitrary and capricious in that it fails to take into account its payment counting errors.  Moreover, ED's denial provided no meaningful explanation of the reasons why it did not count her payments as qualifying.

176.   Ms. Savenkova has made over 120 qualifying payments on her Direct Consolidation Loans.  Her most recent payment before her May 1, 2019 TEPSLF application and her payment twelve months prior each exceeded her income-driven repayment amount.  Ms. Savenkova is eligible for TEPSLF.

## ED'S DISREGARD OF SERVICER MISREPRESENTATIONS TO BORROWERS REGARDING PSLF

177.   ED knows of—but completely disregards—repeated misrepresentations made by Title IV servicers to borrowers who are attempting to qualify for PSLF or TEPSLF, resulting in unwarranted denials of loan forgiveness.

178.   In a September 2020 report, ED disclosed that two of the most common reasons for denials of PSLF are failures to make 120 payments under a qualifying repayment plan (56% of rejections) and noneligible loans (14%).[98]  Both grounds for denial are, in many instances, attributable to erroneous information that Title IV servicers provided to borrowers.

---

[98] FSA, *September 2020 PSLF Report*, *supra* note 2.

179.   As noted above, ED is responsible for and obligated to address Title IV servicers' misconduct that harms borrowers who want to apply for PSLF.  ED's Inspector General acknowledged in testimony to Congress that "[ED] must effectively monitor performance [of its loan servicers] to ensure that it receives the correct quantity and quality of products or services for which it is paying."[99]  ED's contracts with those servicers recognize this too, specifying that servicers "shall provide [ED's FSA Office] the ability to monitor phone calls remotely," "shall support quarterly monitoring reviews completed by FSA," and "shall support annual program compliance reviews done by FSA, or by an agent of FSA."[100]  Secretary DeVos has also assured Congress that ED "will continue to monitor the servicers to make sure they are upholding the agreements that they have made on behalf of the students."[101]

180.   ED is well aware of the widespread misrepresentations that Title IV servicers have made to borrowers regarding eligibility for PSLF.  As discussed above, the GAO has documented not only the existence of rampant servicer misconduct, but also ED's awareness of such misconduct.[102]   And yet, under Secretary DeVos's

---

[99] *Management Challenges Facing the U.S. Dep't of Educ.: Hearing Before the Subcomm. on Labor, Health, and Human Servs., Educ., and Related Agencies*, 113th Cong. 4 (Mar. 19, 2013) (testimony of Kathleen S. Tighe, Inspector General) at 4, https://www2.ed.gov/about/offices/list/oig/auditrpts/testimony03192013.pdf.

[100] U.S. Dep't of Educ., *Additional Servicer—Intermediate Requirements,* Attachment A-2 (June 17, 2009), at 11.

[101] *Examining Policies and Priorities of the U.S. Dep't of Educ.: Hearing Before the H. Comm. on Educ. and Labor*, 116th Cong. (Apr. 10, 2019) at 00:37:38 (testimony of Betsy DeVos, Secretary of Education), https://www.c-span.org/video/?459644-1/education-policy-hearing-secretary-devos (last visited Dec. 11, 2020).

[102] *See generally* GAO, *Public Service Loan Forgiveness Report, supra* note 85; U.S. Dep't of Educ., Office of Inspector Gen., ED-OIG/A05Q0008, Federal Student Aid: Additional Actions Needed to Mitigate the Risk of Servicer Noncompliance with Requirements for Servicing Federally Held Student Loans (Mar. 5, 2019), https://www2.ed.gov/about/offices/list/oig/auditreports/fy2019/a05q0008.pdf  (hereinafter "OIG, Federal Student Aid").

leadership, ED has failed to correct the problem or take it into account in administering PSLF. Due to this abdication of responsibility, Title IV servicers continue to mislead public servants and the magnitude of the problem continues to worsen.

181. ED's Office of Inspector General ("OIG") issued its own report in early 2019, echoing the GAO's conclusions about misconduct by ED and Title IV servicers. In an audit of ED's FSA office, OIG found that "[f]rom January 1, 2015 through September 30, 2017, 61 percent … of [the] reports on FSA's oversight activities identified instances of servicer noncompliance with Federal loan servicing requirements."[103] As a result of these violations, servicers placed borrowers on nonqualifying repayment plans or incorrectly calculated the number of monthly payments borrowers owe on their federal loans.

182. Like the GAO, the OIG found that while ED is fully aware of these problems, it has done nothing to remedy them.[104] The OIG report found that "FSA had not established policies and procedures that provided reasonable assurance that the risk of servicer noncompliance with requirements for servicing federally held student loans was mitigated."[105] An analysis of nearly 350 FSA monitoring reports revealed that over 60% of them documented servicer noncompliance with federal requirements, including those "relevant to forbearances, deferments, income-driven repayment, interest rates, due diligence, and consumer protection."[106]

183. Although "FSA's oversight activities regularly identified instances of servicers not servicing federally held student loans in accordance with Federal requirements, … FSA management rarely used available contract accountability

---

[103] OIG, Federal Student Aid, *supra* note 102, at 2.

[104]*Id.* at 2, 9–10, 17.

[105] *Id.* at 2.

[106] *Id.* at 4.

provisions to hold servicers accountable for instances of noncompliance."[107]

184.   The OIG further concluded that because ED "rarely hold[s] servicers accountable for instances of noncompliance with Federal loan servicing requirements, FSA is not providing servicers with incentive to take actions to mitigate the risk of continued noncompliance that harms students and their families."[108]   ED's lack of enforcement as to noncompliant loan servicers indicates that ED is failing to carry out Congress's mandate of ensuring that borrowers have access to the PSLF entitlement.

185.   Numerous lawsuits have been filed against Title IV servicers, alleging widespread misconduct.[109]   Rather than addressing the servicer misconduct detailed in those lawsuits, ED has tried to prevent these suits from going forward by taking

---

[107] *Id*. at 2.

[108] *Id*. at 17.

[109] *See, e.g.*, Dkt. 182, *Hyland v. Navient Corp.*, No. 1:18-cv-09031 (S.D.N.Y. Oct. 9, 2020) (approving settlement), *appeal filed,* (2d Cir. Nov. 3, 2020); *Lawson-Ross v. Great Lakes Higher Educ. Corp.*, No. 1:17-cv-00253, 2018 WL 5621872 (N.D. Fla. Sept. 20, 2018), *vacated and remanded*, 955 F.3d 908 (11th Cir. 2020); *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, No. 3:17-cv-00183, 2017 WL 6501919 (S.D. Ill. Dec. 19, 2017), *vacated and remanded*, 928 F.3d 639 (7th Cir. 2019); *Davis v. Navient Corp.*, No. 1:17-cv-00992, 2018 WL 1603871 (W.D.N.Y. Mar. 12, 2018); *Daniel v. Navient Sols., LLC*, 328 F. Supp. 3d 1319 (M.D. Fla. 2018); *Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d 529 (M.D. Pa. 2018), *aff'd* 967 F.3d 273 (3d Cir. 2020); *Travis v. Navient Corp.*, 460 F. Supp. 3d 269 (E.D.N.Y. 2020); *Demyanenko-Todd v. Navient Corp.*, No. 3:17-cv-00772 (M.D. Pa.) (filed May 1, 2017); *Consumer Fin. Prot. Bureau v. Navient Corp.*, No. 3:17-cv-00101 (M.D. Pa.) (filed May 1, 2017); *California v. Navient Corp.*, No. 18-567732 (Cal. Super. Ct.) (filed June 29, 2018); *Illinois ex rel. Madigan v. Navient Corp.*, No. 17 CH 00761 (Ill. Cir. Ct., Cook Cty.) (filed Jan. 18, 2017); *Massachusetts v. Pa. Higher Educ. Assistance Agency*, No. 1784-cv-02682-BLS2 (Mass. Super. Ct.) (filed Aug. 23, 2017); *Mississippi v. Navient Corp.*, No. 1:18-cv-00982 (Miss. Chan. 1st Dist. Ct.) (filed July 17, 2018); *Washington v. Navient Corp.*, No. 17-2-01115-1 (Wa. Super. Ct.) (filed Jan. 18, 2017).

the position[110]—largely rejected by courts[111]—that any state laws were preempted.

186.    Moreover, the Department has taken measures to prevent the CFPB—the agency responsible for protecting consumers of financial services—from obtaining information necessary to oversee and police the Title IV servicers.

187.    The CFPB has authority to examine Title IV servicers and ascertain their compliance with federal law.[112]   In a letter to Senator Elizabeth Warren, the head of the CFPB revealed that "[s]ince December 2017, student loan servicers have declined   to   produce   information   requested   by   the   Bureau   for   supervisory

---

[110] Notice of Interpretation, *Federal Preemption and State Regulation of Federal Student Loan Programs and Federal Student Loan Servicers*, 83 Fed. Reg. 10619 (Mar. 12, 2018).

[111] *See, e.g.*, *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639 (7th Cir. 2019).

[112] The CFPB conducts reviews of student loan servicers pursuant to its statutory function to "collect[], research[], monitor[], and publish[] information relevant to the functioning of markets for consumer financial products and services to identify risks to consumers and the proper functioning of such markets." 12 U.S.C. § 5511(c)(3); *see also* CFPB, *Request for Information Regarding Student Loan Servicing*, 80 Fed. Reg. 29,302-01 (May 21, 2015) (relying on authority granted by 12 U.S.C. § 5511(c)).  The CFPB is specifically empowered to appoint a student loan ombudsman who may "prepare an annual report" and "make appropriate recommendations" to the Secretary of Education regarding student loans.  12 U.S.C. § 5535.  As relevant here, the CFPB "[d]etermine[s] whether the servicer has procedures, and whether the servicer follows its procedures, for circumstances where the borrower informs the servicer that a borrower is working in public service, including whether phone representatives assess the borrower's current circumstances and disclose the availability of any cancellation or loan forgiveness options reasonably believed to be the most appropriate to the borrower (e.g., PSLF, …)" and further "whether the servicer processes requests for borrower benefits, including benefits or protections … (e.g., PSLF …), in a timely and accurate manner."  Consumer Fin. Prot. Bureau, *Education Loan Examination Procedures* 33 (June 2017), https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/201706_cfpb_Education-Loan-Servicing-Exam-Manual.pdf.   The CFPB has filed suit against one student loan servicer—Navient—pursuant to its statutory authority to enforce federal consumer financial laws.  *See Consumer Fin. Prot. Bureau v. Navient Corp.*, No. 3:17-cv-00101 (M.D. Pa.) (filed Jan. 18, 2017); *see also* 12 U.S.C. §§ 5564(a), (b); 15 U.S.C. §§ 1681s(b)(1)(H), 1692*l*(b)(6).

examinations related to Direct Loans and [FFEL] [L]oans held by the Department based on the Department's guidance."[113]  The CFPB asserts that it "is trying to do its job protecting student borrowers and supervising loan servicing companies, but [ED] is getting in the way."[114]

188.   As a number of U.S. Senators recognized in letters sent to federal student loan servicers, this "disturbing news … reveals that the Department, under Secretary DeVos, has removed the most potent weapon"—the CFPB's supervisory examination authority—"from the CFPB's arsenal to fight illegal behavior and mistreatment of borrowers by student loan servicers, and that federal student loan servicers, who are paid by the federal government, are ignoring federal regulators' requests for information."[115]

189.   Despite clear evidence of widespread errors by the servicers, ED has refused to exercise its oversight responsibilities, obstructed attempts by agencies like the CFPB to rein in servicer misconduct, failed to institute a process that allows borrowers to raise servicer misconduct in their PSLF, TEPSLF, and/or ECF applications, and refused to account for Title IV servicers' misrepresentations in the PSLF review process.

---

[113] Letter from Kathleen L. Kraninger to Elizabeth Warren at 2 (Apr. 23, 2019), https://www.warren.senate.gov/imo/media/doc/2019.04.23%20KK%20to%20Warren_student%20loan%20industry.pdf.

[114] Chris Arnold, *CFPB Chief Says Education Department Is Blocking Student Loan Oversight*, National Public Radio (May 16, 2019), https://www.npr.org/2019/05/16/723568597/cfpb-chief-says-education-department-is-blocking-student-loan-oversight (last visited Dec. 11, 2020).

[115] Letters from Senators Warren, Brown, Gillibrand, Durbin, and Whitehouse to Navient Solutions, LLC, Nelnet, Inc., and Pa. Higher Educ. Assistance Agency (May 14, 2019), https://www.npr.org/documents/2019/may/letters-to-servicers.pdf.

## Servicer Misconduct Plaintiffs

### 1.    Deborah Baker

190.    Between 1996 and 1999, Deborah Baker took out student loans under the FFEL Program to finance her undergraduate degree.  She consolidated her loans into a FFEL Consolidation Loan in 2000, but she was unable to afford the standard student loan payment amount.  When she asked her Title IV servicer, Sallie Mae, about more affordable repayment options, she was incorrectly told there was no option besides forbearance.  Ms. Baker remained in forbearance until 2004.

191.    Throughout this period, Ms. Baker continued to inquire about more affordable payment options and informed Sallie Mae of the payment amount that she would be able to afford.  She also repeatedly informed Sallie Mae that she was a public school teacher and sent documentation of her salary along with her teacher contracts.

192.    Sallie Mae continued to inform her that her only options were to make monthly payments that represented the majority of her income or to take repeated economic hardship forbearances.

193.    In 2004, after again consolidating her FFEL Loans, Ms. Baker started repayment, but once more told Sallie Mae that she was concerned about her ability to afford the high monthly payments.  The servicer finally offered a more affordable option where Ms. Baker would pay only the interest on her loans.

194.    In March 2005, Ms. Baker called Sallie Mae again to ask about options for a more affordable monthly payment.  Though Ms. Baker had FFEL Loans, her servicer sent her a booklet about repayment options for Direct Loans.

195.    On July 11, 2005, Ms. Baker submitted an income certification form for income-driven repayment and began paying her loans on an income-driven repayment plan.  Ms. Baker continued to certify her income every year and make on-time payments.  In 2009, she switched to another income-driven repayment plan.

56

196.    Ms. Baker learned about PSLF in 2007 and called Sallie Mae for details. Sallie Mae informed Ms. Baker that to qualify for PSLF, she would need to be on an income-driven repayment plan and to make ten years of payments.  The servicer did not inform Ms. Baker that none of her loans would qualify for PSLF because they were FFEL Loans.

197.    After that conversation, Ms. Baker discussed her intention to qualify for PSLF on countless occasions with Sallie Mae and with Navient, her successor Title IV servicer.  In virtually every conversation, she stated that she was a public school teacher seeking loan forgiveness under the PSLF Program.  Navient told Ms. Baker to continue making payments on her existing loans, even though Navient knew she had nonqualifying FFEL Loans.

198.    Among the myriad papers, websites, and statements containing information about Ms. Baker's loans, there were multiple indications that she had Direct Loans, and indeed, Ms. Baker believed that she had Direct Loans.

199.    For example, Navient's online portal displaying Ms. Baker's "Loan Details," as shown below, says nothing about FFEL Loans.  Instead, it states that Ms. Baker's loans are "SmartLoan Direct Repay-Adsm" and "Consolidated."



200.    Because she believed that her loans were Direct Loans (due in part to the reference to "Direct" in the online description), Ms. Baker checked the boxes on

her income certification forms for income-driven repayment, indicating that she held Direct Loans (in at least 2013, 2014, and 2015).  Navient processed her request despite this error, never informing her that she had FFEL Loans.

201.    Additional mistakes by both Title IV servicers, Sallie Mae and Navient, led to delays in Ms. Baker's income certification and caused her to make additional payments that did not qualify.

202.    On June 16, 2009, a Sallie Mae representative told Ms. Baker that she should delay filing her income recertification form until July 1 due to potential student loan interest rate changes.  That was incorrect, as Ms. Baker's loans had a fixed rate and would not be impacted by interest rate changes.  When Ms. Baker followed this direction and submitted her income certification form on July 1, she received a notice that her certification had not been received in time and that her income-driven repayment period had ended.

203.    After Ms. Baker submitted her income certification form in July 2009, Sallie Mae repeatedly sent the incorrect forms to the IRS to obtain Ms. Baker's tax information.  The resulting delay in recertifying Ms. Baker's income caused her monthly payments to revert back to the standard repayment plan.  On multiple phone calls with Sallie Mae, Ms. Baker stated that she was pursuing PSLF.  When Sallie Mae informed Ms. Baker that she had the option of receiving a forbearance and accruing interest while Sallie Mae was sorting out the mistake with her income-driven repayment plan recertification, Ms. Baker responded that she did not want to miss a payment because she wanted to continue qualifying for PSLF.  The Sallie Mae representative told Ms. Baker that she could simply make the same payments she had been making on her prior plan while the forbearance was in effect.  That was wrong.  Payments made during a forbearance period do not count towards PSLF.

204.    In August 2013, when Ms. Baker submitted her income certification forms, Sallie Mae again sent the incorrect forms to the IRS to obtain Ms. Baker's tax

information.  In Ms. Baker's conversations with Sallie Mae about these mistakes, she stated multiple times that she was pursuing PSLF and could not miss a payment.

205.    On June 15, 2015, Ms. Baker noticed that her student loan payment, which she had made by check, had posted to her account but then disappeared.  When Ms. Baker called to inquire about the payment, she explained to a Navient representative (Navient now servicing the loans previously serviced by Sallie Mae) that she was trying to qualify for PSLF and wanted to make sure her payment was on time.  The Navient representative told Ms. Baker that she would waive the fee for making the payment over the phone so that it would post the same day.  Again, this representative did not inform Ms. Baker that her payment would not qualify for PSLF because she did not have Direct Loans.

206.    On June 16, 2016, Ms. Baker filled out an electronic income-driven repayment application with ED.  On this application, Ms. Baker checked a box indicating that she was pursuing PSLF.

207.    In anticipation of receiving forgiveness in the fall of 2017, Ms. Baker submitted an ECF to FedLoan Servicing on June 21, 2017.  On July 25, 2017, Ms. Baker received a notice from FedLoan Servicing stating that her ECF could not be accepted because she did not have Direct Loans.

208.    The same day, Ms. Baker called FedLoan Servicing to ask for information about why her loans were not "qualifying loans."  FedLoan Servicing told Ms. Baker that it was "unfortunate" that Sallie Mae and Navient had not informed her that her FFEL Loans did not qualify for PSLF.

209.    The same day, Ms. Baker called Navient to request further information as to why she had not been given correct information about qualifying for PSLF.  Navient apologized to Ms. Baker and told her that Navient was unable to help her and was "sorry" that it had not given her the right information.

210.    On July 26, 2017, Ms. Baker filed a complaint with the CFPB describing the misrepresentations made by Sallie Mae and Navient regarding PSLF and characterizing the documentation and advice she received from them as "intentionally misleading."

211.    On August 2, 2017, Ms. Baker filed a complaint with the Oklahoma Attorney General's Consumer Protection Unit, again describing the years of misinformation she received from Sallie Mae and Navient.  She stated that "[t]he documentation from SLMA/Navient is intentionally misleading and meant to keep borrowers uninformed of rules for loan forgiveness or reduction programs."  Ms. Baker said she "anticipate[d] a public outcry as people around the country learn that their loans don't qualify for this program" and requested that Oklahoma join the fight against Navient's abusive and predatory lending practices.

212.    In response to Ms. Baker's complaint to the Oklahoma Attorney General, Navient stated "[w]e have … verified that although Ms. Baker incorrectly selected that she had Direct Loans on the IBR form, it would not be a reason for denial as we were still able to complete the processing with the information she provided."  Thus, Navient acknowledged that it knew Ms. Baker had the wrong type of loans to qualify for PSLF and nevertheless failed to inform her.

213.    In September 2017, Ms. Baker consolidated her loans into Direct Loans after being told that this was the only way to qualify for PSLF.

214.    Ms. Baker wrote to ED's Ombudsman Group on September 20, 2017 to request assistance.

215.    ED's website explains that the Ombudsman Group is "a neutral, informal, and confidential resource" that is supposed to help resolve disputes about federal student aid.[116]

216.    Ms. Baker's letter detailed the years of mistakes and misinformation from Sallie Mae and Navient—entities tasked by ED with providing Ms. Baker with accurate information and servicing her loans in accordance with applicable laws and regulations.  Ms. Baker explained that despite years of faithfully making on-time payments on her loans and serving her community as a public school teacher, she had been informed that she was not eligible for loan forgiveness.

217.    The Ombudsman Group indicated that it might be able to have some of her payments count toward PSLF if Ms. Baker sent in relevant documentation.  Ms. Baker spent an entire night organizing and sending documents to the Ombudsman Group.  The Ombudsman Group did not cause any of Ms. Baker's payments to be counted for PSLF.

218.    Ms. Baker also sent a letter to her U.S. Senator detailing the misrepresentations she received from Sallie Mae and Navient.  Senator James Lankford's office responded that he "regret[s] that this matter could not be resolved in your favor."

219.    Ms. Baker applied for PSLF on March 28, 2018.

220.    ED denied Ms. Baker's application for PSLF on April 12, 2018 on the ground that she had not made 120 qualifying payments.  At that point, she had only made five qualifying payments on her Direct Consolidation Loans.

221.    Ms. Baker also wrote a letter to President Donald Trump regarding her concerns.  The White House forwarded the letter to ED, and ED responded on May 2, 2018 that TEPSLF "may provide you an ability to qualify for loan forgiveness if you

---

[116] U.S. Dep't of Educ., Fed. Student Aid, *Getting Prepared Before Seeking Help*, https://studentaid.ed.gov/sa/repay-loans/disputes/prepare (last visited Dec. 11, 2020).

otherwise meet the requirements for PSLF and meet other, new requirements." ED failed to acknowledge any of the servicer misconduct Ms. Baker had alleged.

222.   Per ED's instructions, Ms. Baker applied for TEPSLF by e-mailing ED on May 23, 2018.  ED denied Ms. Baker TEPSLF on August 29, 2018, on the ground that she had not been in repayment for at least ten years on her Direct Consolidation Loans.

223.   Since receiving this notice, Ms. Baker has continued to faithfully make payments every month on her student loans.  Ms. Baker also submits an ECF every few months to ensure that her Title IV servicer, FedLoan Servicing, has correctly counted all of her PSLF-qualifying payments.

224.   On March 27, 2020, Ms. Baker's loans were placed in administrative forbearance under the CARES Act.

225.   On May 28, 2020, Ms. Baker submitted an ECF signed by her employer, Jenks Public Schools, a PSLF-qualifying employer.

226.   On August 18, 2020, FedLoan Servicing sent Ms. Baker a letter listing her PSLF-qualifying payments.  The letter indicated that Ms. Baker had not received credit for any payments between May 5, 2020 and May 28, 2020, the time period covered by her May 28, 2020 ECF.  Due to the CARES Act, Ms. Baker was not required to make a payment between May 5, 2020 and May 28, 2020, and her nonpayment on May 25, 2020 should have counted for PSLF and TEPSLF.

227.   Ms. Baker wrote to FedLoan Servicing to ask why her May 25, 2020 nonpayment was not being counted.  On September 1, 2020, FedLoan responded that, "If no end date is provided on the Employment Certification Form (ECF), the end date for the qualifying payments is the day that the application was signed by your employer."  But Ms. Baker's ECF *was* signed by her employer on May 28, 2020, three days after her nonpayment on May 25, 2020.  Thus, Ms. Baker should have received PSLF credit for that nonpayment.

228.   On September 9, 2020, Ms. Baker submitted an ECF for her new employer, Bixby Public Schools.  Her ECF listed her employment start date as August 10, 2020, and indicated that she was employed at Bixby Public Schools on a full-time basis.

229.   On September 29, 2020, FedLoan Servicing sent Ms. Baker a letter outlining her PSLF-qualifying payment counts.  This letter still showed no qualifying payment for the period between May 5 and May 28, 2020 (omitting her May 25, 2020 nonpayment), but did show that her September 9, 2020 ECF had been approved and that she had received credit for one qualifying payment since August 10, 2020.

230.   On November 13, 2020, over a year after filing this lawsuit, Ms. Baker received a "Decision Letter" from ED, along with a 345-page collection of records containing some (but not all) of Ms. Baker's loan records, correspondence, and other documents.

231.   The Decision Letter from ED informed Ms. Baker that she does not qualify for PSLF because she has not yet made 120 payments on her Direct Consolidation Loans and because her prior payments on her FFEL Loans do not count toward PSLF.

232.   The records included with Ms. Baker's Decision Letter include numerous communications from and on behalf of Ms. Baker detailing how Ms. Baker's servicer provided her with untrue and misleading information about PSLF, which led her to make nearly ten years of non-qualifying payments.  However, the Decision Letter contains no discussion or acknowledgement of these facts.

233.   The Decision Letter from ED includes a list of Ms. Baker's payments on her Direct Loans and, for each, an indication of whether she received credit for PSLF for each monthly payment, and whether her employment was approved as qualifying for PSLF purposes.

234.   This list of payments differs from the list of payments contained in the letter Ms. Baker received from FedLoan on September 29, 2020, only one month

earlier.  The Decision Letter indicates that Ms. Baker has received PSLF credit for her May 2020 nonpayment, while the letter from FedLoan Servicing did not.  The Decision Letter also indicates that Ms. Baker's employment was not approved for the month of August 2020 and denies her PSLF credit for that month.  However, the letter from FedLoan Servicing shows that Ms. Baker's ECF for her work as a teacher from August 10, 2020 through September 9, 2020 was approved and that she has a qualifying nonpayment during that time.

235.   Thus, in the last three months alone, ED and FedLoan Servicing have provided Ms. Baker with two different sets of qualifying payment and employment period calculations, both of which incorrectly fail to count Ms. Baker's qualifying non-payments during the CARES Act forbearance period.

236.   ED's November 13, 2020 Decision Letter does not provide Ms. Baker with much more than a recitation of the requirements for PSLF.  The Decision Letter contains no consideration of the misconduct by Ms. Baker's servicers that led her to believe for years that her payments met those requirements.  Instead, it simply points out that Ms. Baker had non-qualifying loans until September 2017 and therefore has not yet made 120 qualifying monthly payments.  Furthermore, the inconsistent qual-ifying payment counts provided in the Decision Letter by ED and in correspondence from FedLoan Servicing have left Ms. Baker with even less certainty about her qual-ifying payments than she had before.

237.   For over ten years, Ms. Baker made regular monthly student loan pay-ments so that she could earn loan forgiveness under PSLF, which was an integral component of her family's financial plans.  After Ms. Baker learned that she had spent ten years diligently making payments on the "wrong" type of loan and that she still had to make at least a decade of payments to be eligible for loan forgiveness, she experienced extreme stress that led to repeated hospitalizations for anxiety and heart palpitations.

238.   ED failed to institute an adequate process for considering Ms. Baker's application for loan forgiveness that would have allowed ED to identify and take into account the repeated misrepresentations the Title IV servicers made to Ms. Baker.

239.   ED's denial of Ms. Baker's application for loan forgiveness is arbitrary and capricious in that it fails to take into account the Title IV servicers' misrepresentations.

240.   But for the Title IV servicers' misconduct, Ms. Baker would have made 120 payments qualifying for PSLF; ED should therefore grant Ms. Baker loan forgiveness.

### 2.   Janelle Menzel

241.   Janelle Menzel took out Direct Loans to finance her undergraduate education.  She began repaying her student loans in 2004 after consolidating them into Direct Consolidation Loans.

242.   Ms. Menzel learned about PSLF in February 2008 and planned to apply after ten years of payments.  When her loans were transferred to a Title IV servicer, Nelnet, for servicing in 2010, Ms. Menzel confirmed with Nelnet how to qualify for PSLF.  Nelnet told Ms. Menzel that she was on track for PSLF.

243.   Ms. Menzel also asked Nelnet in or around 2010 about the TLF program, which forgives a portion of student loans for teachers working in eligible low-income schools for five years.  Nelnet informed Ms. Menzel that she could not apply for TLF until she had worked in the same school for five years.  That was false.  TLF is available after five years of teaching in qualifying schools, regardless of whether a teacher remains at the same school, and Ms. Menzel could have applied for TLF for years 2004 to 2009.

244.     Due to this misrepresentation, Ms. Menzel delayed submitting her TLF application and did not receive TLF until September 2011, covering the years 2006 to 2011.

245.     Nelnet also did not inform Ms. Menzel that any qualifying payments toward TLF could not also qualify for PSLF, and thus, that she would lose payments made between 2006 and 2011 as PSLF-qualifying payments and have to start the 120-payment count anew when she received the TLF award.

246.     Had Nelnet informed Ms. Menzel that she could have submitted her application for TLF after working in multiple qualifying schools for five years, Ms. Menzel would have been able to minimize the impact of TLF on her PSLF-qualifying payments by applying earlier and thus avoiding any overlap between TLF-qualifying payments and PSLF-qualifying payments, or she could have chosen to forgo TLF entirely in order to qualify for PSLF more quickly.  Instead, Ms. Menzel only learned that Nelnet had misinformed her seven years after she applied for TLF.  By that time, Ms. Menzel had lost years of qualifying PSLF payments due to Nelnet's misrepresentations.

247.     After speaking to Nelnet in or around 2010 about her continued desire to pursue PSLF, Ms. Menzel tracked her progress toward PSLF forgiveness.  Every time Ms. Menzel logged into her Nelnet account, she saw a link under her "Account Snapshot" that read "View Loan Benefits and Details," like the one depicted below.[117]

---

[117] The below screenshot is not taken from Ms. Menzel's account but depicts the same link Ms. Menzel used to attempt to obtain accurate information regarding her qualifying payments.



248.    Clicking on this link led Ms. Menzel to a chart titled "Qualifying Payments."   Every month, the number of qualifying payments would increase when Ms. Menzel made a payment.   Based on her conversation with Nelnet and this monthly chart of "Qualifying Payments," Ms. Menzel believed she was making progress towards PSLF with each loan payment she made.

249.    On October 24, 2016, Ms. Menzel contacted her servicer and inquired about her progress toward PSLF.   Ms. Menzel was verbally advised by her servicer that she needed to make only nine more qualifying payments to obtain PSLF.

250.    At or around the same time, Ms. Menzel submitted an ECF in anticipation of applying for PSLF the following year.

251.    After her employment was certified, Ms. Menzel's loans were transferred to another Title IV servicer, FedLoan Servicing.

252.    Ms. Menzel then waited for nearly a year to hear back from FedLoan Servicing about the status of her qualifying payments.   Ms. Menzel called FedLoan Servicing multiple times to inquire about the status of her ECF and was told each time that a response was forthcoming.

253.    Ms. Menzel applied for PSLF on June 14, 2018.

254.    On June 27, 2018, ED denied Ms. Menzel PSLF, informing her that despite her years of repayment, she was "not eligible yet" and had made zero qualifying

payments for PSLF, despite having been informed by her servicer almost two years earlier that she had made 111 qualifying payments.

255.   Ms. Menzel immediately applied for TEPSLF.

256.   ED also denied Ms. Menzel's TEPSLF application.  Ms. Menzel called FedLoan Servicing to ask why she was not eligible for TEPSLF and was told for the first time that, as a result of her TLF program award in 2011, five years of her payments did not qualify for TEPSLF.  FedLoan Servicing told her that with these years excluded, she should "give up" on TEPSLF because the limited amount of money available for the program would likely be gone by the time she was eligible.

257.   After ED denied her PSLF and TEPSLF, Ms. Menzel continued repaying her student loans.

258.   On November 13, 2020, in connection with this action, Ms. Menzel received a "Decision Letter" from ED informing her that she was not eligible for PSLF because she had been making payments under a repayment schedule that does not qualify for the PSLF Program.  ED's letter stated that Ms. Menzel had made zero qualifying payments for PSLF and 58 qualifying payments toward TEPSLF.

259.   ED further stated in its November 13 Decision Letter that Ms. Menzel's payments for the period from August 29, 2006 to June 6, 2011 did not count toward PSLF, because Ms. Menzel had received TLF relief for that period.  ED stated that "this restriction is included in the 'Important Information About PSLF' section of the ECF."  But Ms. Menzel was not told this information at the time it mattered—when she applied for TLF after also inquiring about PSLF.

260.   At points during her career, Ms. Menzel considered a career outside of education that would have paid a higher salary.  She never sought those opportunities, in part because of the promise of loan forgiveness under PSLF.

261.   In fact, Ms. Menzel thought that if she obtained PSLF, she would be able to save for her children's educational expenses so that they could graduate with

minimal student loan debt—something her parents were unable to do for her. Instead, by the time Ms. Menzel will have fully paid off her student loans, she will be preparing to send her eldest child to college.

262.    ED has failed to institute any adequate process to consider Ms. Menzel's application for loan forgiveness that identifies and takes into account Nelnet's misrepresentations to Ms. Menzel about qualifying for PSLF.

263.    ED's denial of Ms. Menzel's application for loan forgiveness is arbitrary and capricious in that it fails to take into account the Title IV servicer's misrepresentations.

264.    But for servicer misconduct, Ms. Menzel would have made 120 qualifying payments for PSLF; ED should therefore grant Ms. Menzel loan forgiveness.

### 3.    Kelly Finlaw

265.    Kelly Finlaw took out FFEL Loans to finance her undergraduate degree and took out Direct Loans to finance her graduate degree.

266.    Ms. Finlaw consolidated her FFEL Loans into a FFEL Consolidation Loan in February 2007 and began repayment at that time. Her Title IV loan servicer for her FFEL Consolidation Loan was Nelnet.

267.    Ms. Finlaw began repayment on her Direct Loans in November 2013. Her Title IV servicer for her Direct Loans was Navient.

268.    Ms. Finlaw informed Nelnet that she intended to apply for PSLF. Nelnet told Ms. Finlaw that she needed to wait until she had made 120 payments on her student loans. But Nelnet did not inform Ms. Finlaw that even if she made 120 payments on her student loans, she would not be able to obtain PSLF unless she consolidated her FFEL Loan into a Direct Consolidation Loan and made 120 qualifying payments on that loan.

269.   Ms. Finlaw continued paying her loans, unaware that her FFEL Loan was ineligible for PSLF.

270.   In 2016, Ms. Finlaw received a notice from FedLoan Servicing stating that she had loans that would be eligible for PSLF after having made monthly payments for ten years.  Ms. Finlaw immediately contacted Nelnet to ask for details about how to apply for loan forgiveness through PSLF.

271.   Nelnet falsely informed Ms. Finlaw that she would qualify for PSLF in October 2017.  When Ms. Finlaw asked how many qualifying payments she had made, Nelnet advised her that her payment history was available on her online account.  Nelnet advised Ms. Finlaw to simply continue repaying her loans and then submit a PSLF application.  That information was wrong.  Ms. Finlaw's FFEL Loan was not eligible for PSLF, and Ms. Finlaw's Direct Loans had not been in repayment long enough to qualify for PSLF.

272.   Nelnet also falsely informed Ms. Finlaw that she should cease paying her loans because she would be "wasting" her money paying her loans back after they were eligible for forgiveness.

273.   This information was also wrong.  As Ms. Finlaw was not eligible for PSLF in October 2017, going into forbearance in fact caused her loans to accrue interest, which was capitalized after her forbearance ended.

274.   On May 26, 2017, Ms. Finlaw submitted an ECF signed by her employer.

275.   On June 28, 2017, FedLoan Servicing contacted Ms. Finlaw to inform her that her employment had been approved for PSLF and that her Direct Loans would be transferred from Nelnet to FedLoan Servicing.

276.   On August 1, 2017, FedLoan Servicing contacted Ms. Finlaw to inform her that FedLoan Servicing was now servicing her federally owned student loans.

277.   In the fall of 2017, Ms. Finlaw submitted an application for PSLF and requested an administrative forbearance pending a decision on her PSLF application.

70

278. Several months later, ED denied Ms. Finlaw's PSLF application on the ground that her FFEL Loan did not qualify for PSLF.

279. After being denied PSLF, Ms. Finlaw contacted Nelnet to request an explanation and to inquire about why she did not qualify for PSLF.

280. A Nelnet representative told Ms. Finlaw that Nelnet had received many similar calls from borrowers who were led to believe that they qualified for PSLF. The Nelnet representative referenced news articles regarding the low PSLF acceptance rate and told Ms. Finlaw that PSLF is a faulty program and a "scam."

281. The Nelnet representative also told Ms. Finlaw that she had made enough payments for PSLF, and that she only needed to consolidate all of her loans into a Direct Consolidation Loan to qualify.

282. That information was wrong. Ms. Finlaw had been in repayment on her Direct Loans on a qualifying repayment plan for nearly five years at that point and would have been eligible for forgiveness of those loans after five more years of payments. The Nelnet representative did not inform Ms. Finlaw that by consolidating all of her loans, Ms. Finlaw would lose the qualifying payments she had already made on her Direct Loans.

283. Relying on the Nelnet representative's statements, Ms. Finlaw consolidated her loans into a Direct Consolidation Loan in February 2018 in order to qualify for PSLF. By doing so, Ms. Finlaw lost almost five years of qualifying payments on her existing Direct Loans.

284. In April 2018, Ms. Finlaw applied for TEPSLF. ED denied Ms. Finlaw's TEPSLF application, this time due to insufficient payments on her new Direct Consolidation Loan.

285. On February 24, 2020, Ms. Finlaw submitted an ECF signed by her employer showing she had been employed there on a full-time basis since January 27, 2007.

286.   On March 25, 2020, Ms. Finlaw received a letter from FedLoan Servicing stating that her employment was approved.  The letter stated that within a few weeks, Ms. Finlaw would be provided with information about her qualification for PSLF, including the number of qualifying payments she had made and her expected forgiveness date.  The letter also stated that within a few weeks, Ms. Finlaw's loans would be transferred to FedLoan Servicing, if they were not serviced by FedLoan Servicing already.

287.   Ms. Finlaw never received any of the PSLF qualifying information described in this letter, including a count of qualifying payments.  Ms. Finlaw has not received any information about when her loan servicing will be transferred to FedLoan Servicing.

288.   In connection with this lawsuit, on November 13, 2020, Ms. Finlaw received a "Decision Letter" from ED dated October 30, 2020.  The Decision Letter stated that Ms. Finlaw did not qualify for PSLF or TEPSLF because she had not made the required 120 payments on her Direct Loan.  The letter repeated what Ms. Finlaw already knew: she had made years of non-qualifying payments on FFEL Loans and then lost all qualifying payments she made on her Direct Loans after consolidating. The Decision Letter did not discuss or acknowledge the misconduct by Ms. Finlaw's servicers that caused Ms. Finlaw to lose those qualifying payments.

289.   The Decision Letter stated that any payments made by Ms. Finlaw between January 28, 2008 and March 4, 2014 could not have counted towards PSLF, because Ms. Finlaw received TLF for her work during that period.  However, the Administrative Record included with the Decision Letter does not include any record of Ms. Finlaw receiving TLF, and Ms. Finlaw has been unable to locate any records of receiving TLF.

290.   For the past 10 years, Ms. Finlaw has diligently pursued PSLF relief, including attending town halls hosted by AFT about student debt, and using the

Summer application to which she was provided access by AFT. But Ms. Finlaw has been unable to obtain forgiveness, and as a result, has been unable to save for the future or to buy a home in the neighborhood she has served for so many years.

291.   ED failed to institute an adequate process for considering Ms. Finlaw's application for loan forgiveness that would have allowed ED to identify and take into account the Title IV servicer's repeated misrepresentations.

292.   ED's denial of Ms. Finlaw's application for loan forgiveness is arbitrary and capricious in that it fails to take into account the Title IV servicer's misrepresentations.

293.   But for servicer misconduct, Ms. Finlaw would have made 120 qualifying payments for PSLF; therefore, ED should grant Ms. Finlaw loan forgiveness.

### 4.   Michael Giambona

294.   Michael Giambona took out student loans under the Direct Loan Program to finance his undergraduate and graduate degrees. In June 2006, Dr. Giambona consolidated his loans into a FFEL Consolidation Loan and began repaying his loan on the graduated repayment plan.

295.   When Dr. Giambona learned about PSLF in 2008, he asked the Title IV servicer of his loan for information about how to qualify. The servicer assured him that he would qualify for loan forgiveness in ten years so long as he continued working in public service and making his loan payments in full and on time. The servicer also instructed him to call back in two years when more information about PSLF would be available.

296.   In fact, because Dr. Giambona's Direct Loans had been consolidated into a FFEL Consolidation Loan in 2006, his loans did not qualify for PSLF. For his loans to qualify, Dr. Giambona needed to reconsolidate them into a Direct Consolidation Loan and enroll in an income-driven repayment plan. Instead, after being assured

by the Title IV servicer that he would qualify after ten years of payments, Dr. Giambona continued making payments on his FFEL Consolidation Loan.

297.    As instructed, Dr. Giambona called his servicer again in 2010 to request further information about PSLF.

298.    The Title IV servicer assured him that since he had federal student loans and worked in a public service position, he would be eligible for loan forgiveness after ten years of payments.  The servicer instructed him to call back again in a few years when he was closer to the ten-year mark in order to obtain information about how to apply.

299.    For the next six years, Dr. Giambona made every payment, on time and in full.

300.    As instructed, Dr. Giambona called his loan servicer, now Navient, in 2016 to obtain information about PSLF.  Navient told him that since he had not missed a single payment since PSLF was instituted, he would be eligible for loan forgiveness in 2017 so long as he continued making payments and working for a qualifying employer.  Navient told Dr. Giambona that he should contact Navient or ED to obtain the PSLF application form in late 2017 when he would be eligible for forgiveness.

301.    As instructed, in late 2017, after making 120 payments, Dr. Giambona obtained the PSLF Application for Forgiveness from ED's website and submitted it to FedLoan Servicing.

302.    In October 2017, ED denied Dr. Giambona's application for PSLF.

303.    Dr. Giambona contacted FedLoan Servicing to ask why his PSLF application had been denied.  FedLoan Servicing did not explain that his FFEL Loan did not qualify for PSLF and instead told Dr. Giambona to change his graduated repayment plan to an income-driven repayment plan.

304.    In 2018, when Dr. Giambona learned that TEPSLF could provide loan forgiveness for public servants who were denied PSLF because their payments were made on a nonqualifying payment plan, he applied immediately.

305.    On June 6, 2018, ED denied Dr. Giambona's TEPSLF application for failure to apply for PSLF.

306.    Dr. Giambona sent another PSLF application to ED and was sent a notice on June 15, 2018 that his application had been received.

307.    Shortly thereafter, ED denied Dr. Giambona's PSLF application.

308.    Dr. Giambona reapplied for TEPSLF on July 6, 2018.

309.    On August 30, 2018, ED denied Dr. Giambona's TEPSLF application because he did not have any Direct Loans.

310.    Dr. Giambona called FedLoan Servicing to ask why his loans were not eligible for TEPSLF.

311.    For the first time, FedLoan Servicing informed Dr. Giambona that his Direct Loans had been consolidated into a FFEL Loan in 2006, making his payments on those loans ineligible for PSLF.

312.    In connection with this lawsuit, on November 13, 2020, Dr. Giambona received a "Decision Letter" from ED along with a 38-page collection of records containing some (but not all) of Dr. Giambona's loan records, correspondence, and other documents.

313.    The "Decision Letter" contained no discussion or acknowledgement of the misleading statements Dr. Giambona brought to ED's attention but merely repeated that he is ineligible for PSLF because he holds FFEL Loans, not Direct Loans.

314.    Dr. Giambona has dedicated his entire career to serving his community. But with nearly $100,000 in federal student debt still hanging over his head after ten years of misinformation from Title IV servicers, Dr. Giambona's plans for his family's financial future are uncertain.

315.   ED has failed to institute an adequate process for considering Dr. Giambona's application for loan forgiveness that would have allowed ED to identify and take into account the repeated misrepresentations Title IV servicers made to Dr. Giambona.

316.   ED's denial of Dr. Giambona's application for loan forgiveness is arbitrary and capricious in that it fails to take into account the Title IV servicers' misrepresentations.

317.   But for servicer misconduct, Dr. Giambona would have made 120 qualifying payments for PSLF; ED should therefore grant Dr. Giambona loan forgiveness.

### 5.   Andre Lorincz

318.   Andre Lorincz took out Direct Loans to finance his undergraduate and graduate degrees. In March 2003, after graduating with his master's degree, Mr. Lorincz consolidated his Direct Loans into a Direct Consolidation Loan and began making payments on the graduated repayment plan.

319.   Mr. Lorincz learned about PSLF shortly after the program was created and asked his Title IV servicer, Direct Loan Servicing, for more information about how to qualify for PSLF.

320.   Direct Loan Servicing told Mr. Lorincz that he was qualified for PSLF and simply needed to keep making payments for ten more years while working as a teacher, at which point the balance of his loans would be forgiven. This was incorrect; Mr. Lorincz was on a graduated repayment plan, and making payments on this plan would not qualify him for PSLF. To become eligible for PSLF, Mr. Lorincz had to switch his loans to an income-driven repayment plan.

321.   Relying on his servicer's assurances, Mr. Lorincz continued paying every month on the graduated repayment plan and did not switch payment plans.

322.    Mr. Lorincz periodically asked Direct Loan Servicing and his subsequent Title IV servicer MOHELA whether he was "on track" for PSLF.  Each time, Mr. Lorincz was told the same thing that Direct Loan Servicing had initially told him: that he should simply keep doing what he was doing and his loans would be forgiven after ten years.

323.    Mr. Lorincz's loan servicers did not inform him that they were in fact unable to confirm that he was "on track" for PSLF; only FedLoan Servicing could confirm how many qualifying payments a borrower had made.  Had Mr. Lorincz's servicers explained that he should submit an ECF to FedLoan Servicing to confirm his PSLF eligibility, Mr. Lorincz would have learned that his payments did not qualify.

324.    In April 2019, Mr. Lorincz completed the PSLF Application for Forgiveness and requested an administrative forbearance while his application was being processed.

325.    In June 2019, ED denied Mr. Lorincz's PSLF application on the grounds that his payment plan did not qualify for PSLF.  Despite several calls to his servicers asking if he was doing everything he needed to do to qualify for PSLF, this was the *first time* Mr. Lorincz learned that none of his payments had qualified.  Mr. Lorincz then immediately applied for an income-driven repayment plan and enrolled in the REPAYE plan.

326.    Shortly after Mr. Lorincz's PSLF application was denied, he received an e-mail from ED informing him of TEPSLF and explaining that he could still qualify for PSLF if his most recent payment and the payment he made 12 months prior to applying for TEPSLF were at least as much as they would have been on an income-driven repayment plan.  Mr. Lorincz promptly applied for TEPSLF.

327.    In August 2019, ED denied Mr. Lorincz's TEPSLF application on the grounds that his most recent payment and the payment he made 12 months prior to

applying for TEPSLF were lower than they would have been on an income-driven repayment plan.   ED did not inform Mr. Lorincz how his income-driven payment amount was calculated, which repayment plan it had used in this determination, or what information ED used as Mr. Lorincz's "information on file," nor did ED provide a process through which Mr. Lorincz could submit information relevant to his income-driven repayment determination or contest the calculation.

328.   Had Mr. Lorincz received truthful and accurate information about his PSLF status when he asked his Title IV servicers whether he was on track for loan forgiveness, he would have immediately switched to an income-driven repayment plan.   Indeed, there were times when Mr. Lorincz may even have paid less on an income-driven repayment plan than he did on the non-qualifying repayment plan in which he was enrolled.

329.   Unsure of what to do next and discouraged that he still had tens of thousands of dollars in debt that he had for years been assured would be forgiven, Mr. Lorincz has continued to keep his loans in forbearance.

330.   Recently, Mr. Lorincz, like nearly every other teacher in the United States, was suddenly faced with the challenges of remote teaching when schools closed because of the COVID-19 pandemic.   He has worked long hours to adapt his entire curriculum so that his students could learn online.

331.   ED failed to institute an adequate process for considering Mr. Lorincz's application for loan forgiveness that would have allowed ED to identify and take into account the repeated misrepresentations that Title IV servicers made to Mr. Lorincz.

332.   ED failed to provide Mr. Lorincz with adequate notice of the reasons for his PSLF and TEPSLF applications' denial, including the evidence upon which ED relied in reaching its decisions.

333.    ED's denial of Mr. Lorincz's application for loan forgiveness is arbitrary and capricious in that it fails to take into account the Title IV servicers' misrepresentations.

334.    But for servicer misconduct, Mr. Lorincz would have made 120 qualifying payments for PSLF; ED should therefore grant Mr. Lorincz loan forgiveness.

### 6.    Peter Huk

335.    Peter Huk took out FFEL Loans beginning in 1988 to finance his undergraduate and graduate degrees.

336.    In February 2003, Dr. Huk consolidated his graduate and undergraduate loans into a FFEL Consolidation Loan, and began repayment in March 2003. Since March 2007, Dr. Huk has been in repayment continuously, except for a one-month forbearance in 2017.

337.    In approximately 2006, Dr. Huk learned from a California Federation of Teachers (an AFT affiliate) newsletter that Congress was considering a loan forgiveness program for public servants.  In January and February 2007, Dr. Huk spoke with Sallie Mae about the possibility of loan forgiveness legislation and the best way for him to prepare for forgiveness.  Sallie Mae advised him to change to an income-driven repayment plan, which he did.  Dr. Huk has been enrolled in income-driven repayment plans since that time.

338.    At or around this time, Dr. Huk also asked Sallie Mae if he needed to re-consolidate his loans in order to benefit from the proposed PSLF Program.  Instead of explaining that the program would only apply to Direct Loans or admitting its lack of knowledge about a program that had not yet been finalized, Sallie Mae told Dr. Huk that he would not need to consolidate his loans again in order to benefit from PSLF.  Based on this advice and subsequent assurances from Sallie Mae, Dr. Huk

believed that he would not need to consolidate his FFEL Loan in order to qualify for PSLF.

339.    Between 2007 and 2009, Dr. Huk called Sallie Mae again to ask about PSLF and whether there was any paperwork he could submit to ensure he was on the right track for forgiveness.  Sallie Mae informed Dr. Huk that he would not need to submit any paperwork until he was closer to making 120 payments.  Sallie Mae did not inform Dr. Huk that he could not qualify for PSLF after 120 payments on his current loan because he had a FFEL Loan.

340.    In January 2009, Dr. Huk called Sallie Mae to verify that his payments on the income-driven repayment plan qualified for PSLF and to discuss other PSLF-qualifying repayment plans.  Sallie Mae assured Dr. Huk that he was on a qualifying income-driven repayment plan for PSLF.  This was false—only income-driven repayment plans for Direct Loans qualify for PSLF.  Because Dr. Huk had a FFEL Loan, none of his payments qualified for PSLF.

341.    Between 2009 and 2012, Dr. Huk periodically spoke with Sallie Mae about his options for income-driven repayment plans.  Each time, Dr. Huk asked Sallie Mae to confirm that the repayment plan he sought to enroll in was a qualifying repayment plan for PSLF.  Each time, Sallie Mae told him that his chosen repayment plan qualified for PSLF.  This advice was false.  For borrowers with FFEL Loans, no repayment plan qualifies for PSLF.

342.    On August 14, 2015, Dr. Huk submitted an ECF signed by his employer to FedLoan Servicing.  On October 29, 2015, Dr. Huk received a notice from FedLoan Servicing that he was ineligible for PSLF because he had no eligible loans.

343.    In early November 2015, Dr. Huk called FedLoan Servicing to ask about the denial of his ECF.  Dr. Huk informed FedLoan Servicing that he had been misled by Sallie Mae into believing that he was making qualifying payments for PSLF.

344.    FedLoan Servicing informed Dr. Huk that his only option for PSLF would be to consolidate his FFEL Consolidation Loan into a Direct Consolidation Loan and make 120 payments on an income-driven repayment plan.

345.    The FedLoan Servicing representative reviewed Dr. Huk's loan history and informed him that it was not worth pursuing PSLF. The representative advised Dr. Huk to switch to the standard repayment plan in order to pay off his loan within ten years instead of pursuing PSLF.

346.    Dr. Huk subsequently called Navient, the successor to Sallie Mae, and told the Navient representative what he had told the FedLoan Servicing representative. The Navient representative also told Dr. Huk that it was not worth pursuing PSLF at that point and advised him to switch to the standard repayment plan to pay off his loan in ten years.

347.    Dr. Huk did not consolidate his FFEL Loan into a Direct Loan to qualify for PSLF. Dr. Huk also remained on an income-driven repayment plan because he could not afford the higher payments on the standard repayment plan.

348.    In June 2017, a few months before Dr. Huk had expected to qualify for PSLF, Dr. Huk called Navient again to discuss the incorrect and misleading information he had received from Sallie Mae about consolidation and PSLF between 2003 and 2012. Dr. Huk asked Navient to look into the matter. Navient informed him again that his only option for PSLF was to consolidate his loan into a Direct Consolidation Loan and start over in attempting to make qualifying payments.

349.    Since that time, Dr. Huk has been making payments on his FFEL Consolidation Loan on an income-driven repayment plan.

350.    ED has failed to institute an adequate process for considering Dr. Huk's ECF applications that would have allowed ED to identify and take into account the repeated misrepresentations Title IV servicers made to Dr. Huk.

351.   ED's denial of Dr. Huk's ECF applications is arbitrary and capricious in that it fails to take into account the Title IV servicers' misrepresentations.

352.   But for servicer misconduct, Dr. Huk would have made 120 qualifying payments for PSLF; ED should therefore grant Dr. Huk loan forgiveness.

## CAUSES OF ACTION

## COUNT I – ARBITRARY AND CAPRICIOUS AGENCY ACTION DUE TO ADMINISTRATIVE PROCESSING ERRORS PURSUANT TO 5 U.S.C. § 706(2)(A) (ADMINISTRATIVE ERROR PLAINTIFFS AGAINST DEFENDANTS)

353.   Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 352 (and all subparts thereto) as if set forth fully herein.

354.   ED's decisions with respect to the Administrative Error Plaintiffs' PSLF (including TEPSLF) applications constituted final agency action.

355.   No further exhaustion is necessary, and, in any event, attempts at further exhaustion would be futile.

   a. Ms. Miller has repeatedly contested her qualifying payment count for PSLF (including TEPSLF), and ED continues to fail to acknowledge its payment counting errors.

   b. Ms. Savenkova has repeatedly attempted to correct the denial of her TEPSLF application and has been unable to obtain a response.

356.   ED's decisions with respect to the Administrative Error Individual Plaintiffs' PSLF (including TEPSLF) applications were arbitrary and capricious, in that ED failed to consider an important aspect of the problem and made clear errors in judgment.

357.   ED's denials of the Administrative Error Plaintiffs' PSLF (including TEPSLF) applications were arbitrary and capricious because those denials involved clear errors in judgment by ED based on arbitrary errors in the processing of Ms. Miller's and Ms. Savenkova's applications.   Specifically, ED rendered decisions

on their applications for PSLF (including TEPSLF) that were contrary to the evidence before it:

    a.  Ms. Miller has been in repayment since 2007 and has made 120 or more qualifying payments; however, ED incorrectly claims that she was in forbearance for six years of that time period, preventing her from being eligible for PSLF. After several attempts to correct her qualifying payment amount, Ms. Miller has only received inconsistent and incorrect information about her status and no help from ED.

    b.  Ms. Savenkova has been in repayment since 2008 and has made 120 or more income-driven payments while employed for a qualifying employer; however, ED incorrectly claims that she is ineligible for TEPSLF because she failed to pay the necessary income-driven payment amounts. Ms. Savenkova has received inconsistent and incorrect information from her servicer regarding her qualification for TEPSLF and has received no help from ED.

358. ED's arbitrary and capricious PSLF and TEPSLF determinations violated the APA and unlawfully deprived the Administrative Error Plaintiffs of a federal entitlement. Accordingly, Plaintiffs request an order vacating the Administrative Error Plaintiffs' PSLF (including TEPSLF) denials and remanding to ED with specific instructions to approve their PSLF and/or TEPSLF applications as required under 20 U.S.C. § 1087e(m) or, in the alternative, an order retaining jurisdiction and remanding to ED for further action with respect to each Administrative Error Plaintiff named herein, consistent with the APA.

## COUNT II – INADEQUATE NOTICE OF DENIAL PURSUANT TO 5 U.S.C. § 555(E) (ADMINISTRATIVE ERROR PLAINTIFFS AGAINST DEFENDANTS)

359. Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 358 (and all subparts thereto) as if set forth fully herein.

360. ED's decisions with respect to the Administrative Error Plaintiffs' PSLF (including TEPSLF) applications constituted final agency action.

361.    No further exhaustion is necessary, and, in any event, attempts at further exhaustion would be futile.

   a.  Ms. Miller has repeatedly contested her qualifying payment count for PSLF (including TEPSLF), and ED continues to fail to acknowledge its payment counting errors.

   b.  Ms. Savenkova has repeatedly attempted to correct the denial of her TEPSLF application and has been unable to obtain a response.

362.    The APA provides that "[p]rompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding."  5 U.S.C. § 555(e).  "Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial."  *Id.*

363.    ED's denials with respect to the Administrative Error Plaintiffs' PSLF (including TEPSLF) applications violated 5 U.S.C. § 555(e) of the APA, which requires, at a minimum, "a brief statement of the grounds for denial," because ED failed to explain why the Administrative Error Plaintiffs' respective 120 payments did not qualify for loan forgiveness.

   a.  Ms. Miller has been in repayment since 2007 and has made 120 or more qualifying payments, entitling her to PSLF or TEPSLF.  ED denied Ms. Miller PSLF and TEPSLF without providing an explanation as to why her payments purportedly were not qualifying.

   b.  Ms. Savenkova has been in repayment since 2008 and has made 120 or more income-driven payments while employed by a qualifying employer; however, ED incorrectly claims that she is ineligible for TEPSLF because she failed to pay the necessary income-driven payment amounts.  ED denied Ms. Savenkova's PSLF and TEPSLF applications without providing an explanation as to why her payments purportedly were not qualifying.

364.    ED's PSLF (including TEPSLF) denials with respect to the Administrative Error Plaintiffs violated the APA by omitting any explanation as to why ED determined that the 120 payments each Administrative Error Plaintiff made were not

qualifying, thereby failing to provide a basis upon which to conclude that the denials were the product of reasoned decision-making.  Accordingly, Plaintiffs request an order vacating the Administrative Error Plaintiffs' PSLF (including TEPSLF) denials.

## COUNT III – VIOLATION OF DUE PROCESS DUE TO ADMINISTRATIVE PROCESSING ERRORS PURSUANT TO THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION (AFT AND ADMINISTRATIVE ERROR PLAINTIFFS AGAINST DEFENDANTS)

365.   Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 364 (and all subparts thereto) as if set forth fully herein.

366.   The Fifth Amendment provides:  "No person shall … be deprived of life, liberty, or property, without due process of law."  Due process requires that, at a minimum, individuals receive notice and an opportunity to be heard before they are deprived of property.

367.   Plaintiff AFT has organizational standing to bring this Fifth Amendment claim on its own behalf and associational standing to bring this claim on behalf of its members who have standing to bring the claim, including Plaintiffs Miller and Savenkova, and Plaintiff Weingarten has standing to bring this claim in her official capacity as President of AFT.

368.   The Administrative Error Plaintiffs have constitutionally protected property interests in a government benefit to which they are legitimately entitled, namely their statutory interests in PSLF (including TEPSLF) benefits.

369.   20 U.S.C. § 1087e(m)(1) contains mandatory language that ED "shall cancel the balance of interest and principal due" for borrowers who qualify for PSLF. Thus, 20 U.S.C. § 1087e(m) creates a cognizable property interest for applicants in PSLF benefits.  By enacting TEPSLF, the Consolidated Appropriations Act of 2018 created an additional statutory pathway to reach the property interest of PSLF benefits.

370.    The Administrative Error Plaintiffs were each deprived of a property interest in PSLF benefits when ED denied their applications for PSLF (including TEPSLF) due to ED's own processing errors.  ED denied these Administrative Error Plaintiffs their right to PSLF (including TEPSLF) without adequate process.

    a.  ED has failed to institute an adequate process to identify and account for errors ED and Title IV servicers made in determining Ms. Miller's eligibility for loan forgiveness.  After several attempts to correct her qualifying payment count, Ms. Miller has received inconsistent and incorrect information about the number of qualifying payments she has made.  After ED denied Ms. Miller's PSLF application and she requested additional information as to the reason for the denial, Ms. Miller received only densely printed records in code with no information about how to read them.  Ms. Miller e-mailed ED to ask about the status of the promised letter detailing the results of FedLoan Servicing's review of her file and to ask for additional information about the documents they had sent her.  ED never responded.

    b.  ED has failed to institute an adequate process to identify and account for errors ED and Title IV servicers made in determining Ms. Savenkova's eligibility for loan forgiveness.  Instead, ED, through FedLoan Servicing, informed Ms. Savenkova that, after being denied PSLF, to qualify for TEPSLF she only needed to make one additional payment above the monthly income-driven payment amount calculated for her by FedLoan Servicing.  Ms. Savenkova did so, but when she reapplied for TEPSLF, her application was denied once again without adequate explanation.

371.    The Due Process Clause requires ED to implement a process that gives applicants for PSLF (including TEPSLF) adequate notice of the reasons for its denials of PSLF and TEPSLF applications and a meaningful process to identify and account for issues related to applicants' eligibility for this statutory entitlement to PSLF (including TEPSLF) benefits, including payment counting issues.

372.    ED's current PSLF (including TEPSLF) application processes do not provide applicants with adequate notice of the reasons for their denials, including the evidence upon which ED relied in reaching its decisions.  Nor do ED's current

application processes provide applicants a meaningful process to contest the denial, to present additional evidence of their eligibility for PSLF (including TEPSLF), and to ensure that ED will take account of its errors.

373.    Due process requires ED to adopt PSLF (including TEPSLF) processes that allow applicants to raise issues and be heard as to their eligibility, including allowing them to identify ED's errors.  Such additional process is reasonable in light of the importance of the private interests affected—the PSLF (including TEPSLF) benefit around which millions of borrowers have organized their lives.

374.    Borrowers are at risk of arbitrary and erroneous deprivation absent additional procedural safeguards.  Such process would place only limited additional burden on ED relative to the importance of providing borrowers with their statutory entitlement to PSLF (including TEPSLF) benefits.

375.    To remedy these Due Process violations, AFT, on behalf of itself and its members, and the Administrative Error Plaintiffs request:  (i) an order vacating ED's PSLF and TEPSLF denial actions with respect to each Administrative Error Plaintiff; (ii) an order requiring ED to provide: (a) PSLF and TEPSLF applicants with adequate notice of the grounds for their denial, including the specific reasons for the denial, including but not limited to information concerning the dates of alleged missed or disqualifying payments and the reason ED did not count those payments, as well as the evidence ED relied upon in denying the application; (b) a meaningful decision-making process that minimizes the risk of erroneous determinations, and includes a meaningful opportunity to identify and account for errors made by ED and/or Title IV servicers, through which applicants may contest their denial and introduce evidence rebutting ED's determination; and (c) a written and reasoned explanation for its determination within a reasonable time period.

**COUNT IV – ARBITRARY AND CAPRICIOUS AGENCY ACTION DUE TO
SERVICER MISCONDUCT PURSUANT TO 5 U.S.C. § 706(2) (SERVICER
MISCONDUCT PLAINTIFFS AGAINST DEFENDANTS)**

376.   Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 375 (and all subparts thereto) as if set forth fully herein.

377.   ED's decisions with respect to the Servicer Misconduct Plaintiffs' PSLF (including TEPSLF) applications and/or ECF applications constitute final agency action.

378.   No further exhaustion is necessary and, in any event, attempts at further exhaustion would be futile.

a.   Because Ms. Baker had FFEL Loans until 2017, while Title IV servicers repeatedly informed her she was on track for PSLF, her further attempts to apply for PSLF at this point would be futile as she has not made 120 qualifying payments on Direct Loans.

b.   Because Ms. Menzel spent years on the wrong repayment plan while her Title IV servicer informed her she was making progress toward PSLF, her further attempts to apply for PSLF at this point would be futile as she has not made 120 payments on a qualifying repayment plan.

c.   Because Ms. Finlaw had a FFEL Loan until 2018, while her Title IV servicer informed her she was on track for PSLF, her further attempts to apply for PSLF at this point would be futile as she has not made 120 qualifying payments on Direct Loans.

d.   Because Dr. Giambona had a FFEL Loan, while Title IV servicers informed him he was on track for PSLF, his further attempts to apply for PSLF at this point would be futile as he has not made 120 qualifying payments on Direct Loans.

e.   Because Mr. Lorincz spent years on the wrong repayment plan while his Title IV servicer informed him he was making progress toward PSLF, his further attempts to apply for PSLF at this point would be futile, as he has not made 120 payments on a qualifying repayment plan.

f.   Because Dr. Huk has a consolidated FFEL Loan, his further attempts to submit ECF applications or apply for PSLF at this point would be futile, as he has not made 120 qualifying payments on

Direct Loans.

379.   As set forth in paragraphs 177 through 189, ED knows about Title IV servicers' widespread misrepresentations, which preclude borrowers from qualifying for loan forgiveness, but disregards those misrepresentations in denying applications for PSLF (including TEPSLF).

380.   With respect to the Servicer Misconduct Plaintiffs, ED's denial of PSLF (including TEPSLF) applications was arbitrary and capricious because ED failed to consider that the Servicer Misconduct Plaintiffs' Title IV servicers engaged in misconduct that precluded Plaintiffs from satisfying the PSLF (including TEPSLF) requirements.

a.   ED failed to consider that Title IV servicers told Ms. Baker she was on track for PSLF, and that, but for those misrepresentations, Ms. Baker would have consolidated her FFEL Loans into Direct Loans in 2007 and would have been eligible for PSLF.

b.   ED failed to consider that the Title IV servicer told Ms. Menzel she was on track for PSLF and provided Ms. Menzel with a qualifying payment count on its website every month, and that, but for the servicer's misrepresentations, Ms. Menzel would have switched to a qualifying repayment plan and would have been eligible for PSLF.

c.   ED failed to consider that the Title IV servicer advised Ms. Finlaw to make ten years of payments and then she would be eligible for forgiveness, and that but for the servicer's misrepresentations, she would have consolidated her FFEL Loan into a Direct Loan and would have been eligible for PSLF.

d.   ED failed to consider that Title IV servicers told Dr. Giambona to make ten years of payments and then he would be eligible for forgiveness, and that, but for the servicers' misrepresentations, he would have consolidated his FFEL Consolidation Loan into a Direct Loan and would have been eligible for PSLF.

e.   ED failed to consider that Title IV servicers told Mr. Lorincz he was on track for PSLF, and that, but for those misrepresentations, Mr. Lorincz would have switched to a qualifying repayment plan and would have been eligible for PSLF.

f. ED failed to consider that Title IV servicers told Dr. Huk that he was on track for PSLF, even though he had a FFEL Loan, and that, but for those misrepresentations, Dr. Huk would have consolidated his FFEL Loans into Direct Loans in 2007 and would have been eligible for PSLF.

381.   ED's arbitrary and capricious PSLF (including TEPSLF and ECF) determinations violated the APA and unlawfully deprived these individuals of a federal entitlement.  Accordingly, Plaintiffs request an order vacating the Servicer Misconduct Plaintiffs' PSLF (including TEPSLF) and ECF denials and remanding to ED with specific instructions to discharge their student loan debt or, in the alternative, an order retaining jurisdiction and remanding to ED for further action with respect to each Servicer Misconduct Plaintiff named herein, consistent with the APA.

## COUNT V – VIOLATION OF DUE PROCESS DUE TO SERVICER MISCONDUCT PURSUANT TO THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION (AFT AND SERVICER MISCONDUCT PLAINTIFFS AGAINST DEFENDANTS)

382.   Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 381 (and all subparts thereto) as if set forth fully herein.

383.   The Fifth Amendment provides: "No person shall … be deprived of life, liberty, or property, without due process of law."  Due process requires that, at a minimum, individuals receive notice and an opportunity to be heard before they are deprived of property.

384.   As explained above, Plaintiff AFT has organizational standing to bring this Fifth Amendment claim on its own behalf and associational standing to bring this claim on behalf of its members who have standing to bring the claim.  Plaintiff Weingarten has standing to bring this claim in her official capacity as President of AFT.

385.   Servicer Misconduct Plaintiffs have constitutionally protected property interests in a government benefit to which they are legitimately entitled, namely their statutory interests in PSLF (including TEPSLF) benefits.

386.   20 U.S.C. § 1087e(m) contains mandatory language requiring ED to cancel the balance of interest and principal due from borrowers who qualify for PSLF. Thus, 20 U.S.C. § 1087e(m) creates a cognizable property interest for applicants in PSLF benefits.  By enacting TEPSLF, the Consolidated Appropriations Act of 2018 created an additional statutory pathway to reach the property interest in PSLF benefits.

387.   The Servicer Misconduct Plaintiffs were each deprived of a property interest in PSLF benefits when ED denied their applications for PSLF (including TEPSLF and ECF applications), even though their ineligibility was due to misrepresentations made by Title IV servicers.  ED denied these Individual Plaintiffs their right to PSLF (including TEPSLF) benefits without adequate process.

    a.  In determining Ms. Baker's eligibility for loan forgiveness, ED failed to institute an adequate process to account for misrepresentations made to Ms. Baker by Title IV servicer(s).

    b.  In determining Ms. Menzel's eligibility for loan forgiveness, ED failed to institute an adequate process to account for misrepresentations made to Ms. Menzel by Title IV servicer(s).

    c.  In determining Ms. Finlaw's eligibility for loan forgiveness, ED failed to institute an adequate process to account for misrepresentations made to Ms. Finlaw by Title IV servicer(s).

    d.  In determining Dr. Giambona's eligibility for loan forgiveness, ED failed to institute an adequate process to account for misrepresentations made to Dr. Giambona by Title IV servicer(s).

    e.  In determining Mr. Lorincz's eligibility for loan forgiveness, ED failed to institute an adequate process to account for misrepresentations made to Mr. Lorincz by Title IV servicer(s).

    f.  In determining Dr. Huk's eligibility for loan forgiveness, ED failed to institute an adequate process to account for misrepresentations made to Dr. Huk by Title IV servicer(s).

388.   The Due Process Clause requires ED to implement a process that gives PSLF (including TEPSLF) applicants adequate notice of the reasons for its denials of

their applications and a meaningful process to identify and account for issues related to applicants' eligibility for this statutory entitlement to PSLF (including TEPSLF) benefits, including misinformation provided by Title IV servicers.

389.   ED's current PSLF (including TEPSLF and ECF) application processes do not provide applicants with adequate notice of the reasons for its denials of their applications, including the evidence upon which ED relied in reaching its decisions. Nor do ED's current application processes provide applicants a meaningful opportunity to contest the denial, to present additional evidence of their eligibility for PSLF (including TEPSLF), and to ensure that ED will take account of Title IV servicers' misconduct.

390.   Due process requires ED to adopt PSLF (including TEPSLF and ECF) processes that allow applicants to raise issues and be heard as to their eligibility, including allowing them to identify the Title IV servicers' misconduct.   Such additional process is reasonable in light of the importance of the private interests affected—the PSLF (including TEPSLF) benefits around which millions of borrowers have organized their lives.

391.   Borrowers are at risk of erroneous and arbitrary deprivation absent additional procedural safeguards.  Such process would place only limited additional burden on ED relative to the importance of providing borrowers with the statutory entitlement to PSLF (including TEPSLF) benefits.

392.   To remedy these Due Process violations, AFT, on behalf of itself and its members, and the Servicer Misconduct Plaintiffs request: (i) an order vacating ED's PSLF, TEPSLF, and ECF denial actions with respect to each Servicer Misconduct Plaintiff; (ii) an order requiring ED to provide (a) PSLF, TEPSLF, and ECF applicants with adequate notice of the grounds for their denials, including the specific reasons for the denials, including but not limited to, the evidence ED relied upon in denying the applications; (b) a meaningful decision-making process to identify and

account for misrepresentations made by ED and/or Title IV servicers, through which applicants may contest their denials and introduce evidence rebutting ED's determinations and/or demonstrate that ED should issue forgiveness; and (c) a written and reasoned determination within a reasonable time period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief as follows:

*First*, a declaration that ED's denials of the Individual Plaintiffs' PSLF (including TEPSLF) and/or ECF applications violate the Administrative Procedure Act and violate the Fifth Amendment's Due Process Clause.

*Second*, a declaration that ED's PSLF (including TEPSLF and ECF) application processes deprive Plaintiffs of their constitutional right to due process by depriving them of a protected property right in PSLF (including TEPSLF) benefits.

*Third*, with respect to Counts I, II, and IV, an order vacating ED's PSLF (including TEPSLF and ECF) denial actions with respect to each Individual Plaintiff named herein.

*Fourth*, with respect to Counts I and IV, an order remanding to ED with directions for ED to approve each of the Individual Plaintiffs' requests for forgiveness, or, in the alternative, an order retaining jurisdiction and remanding to ED for further action with respect to each Individual Plaintiff named herein, consistent with the APA.

*Fifth*, with respect to Counts III and V, an order vacating ED's PSLF (including TEPSLF and ECF) denial actions with respect to each Administrative Error Plaintiff or Servicer Misconduct Plaintiff named herein.

*Sixth*, with respect to Counts III and V on behalf of AFT, an order requiring ED to provide notice within 90 days to all borrowers nationwide with FFEL or Direct Loans about how to obtain forgiveness under PSLF and TEPSLF.

*Seventh*, with respect to Counts III and V on behalf of AFT, an order requiring ED to submit a plan to this Court within 120 days that outlines what steps ED will take to:

  i. Correct, minimize, and prevent errors in ED's own recordkeeping functions to ensure that borrowers receive an accurate count of eligible payments;

  ii. Inform all borrowers nationwide with FFEL or Direct Loans as to whether each of the borrower's loans and repayment plans is eligible for PSLF (including TEPSLF);

  iii. Design and implement a mechanism through which ECF, PSLF, and TEPSLF applicants may contest their denials and introduce evidence rebutting ED's determinations, under which ED shall, at a minimum, ascertain the accuracy of an applicant's qualifying payment count, including by advising the applicant of the tentative count, soliciting any response within 30 days, and providing a written response within 60 days from receipt of such response;

  iv. Provide a written and reasoned explanation for any denial of PSLF or TEPSLF relief within a reasonable period; and

  v. Provide sufficient supervision of loan servicers, including identifying specific steps to terminate contracts with servicers who fail to comply with ED's instructions regarding implementation of PSLF and TEPSLF in a timely and accurate manner.

*Eighth*, an order requiring ED to provide the Court with a status report detailing steps taken to comply with this Court's order, including copies of all instructions, guidelines, or other information sent to Title IV servicers as part of ED's compliance efforts.

*Ninth*, on behalf of AFT, an order retaining jurisdiction and enjoining ED from denying PSLF and TEPSLF applications until the Court has approved ED's proposed procedures to cure the violations alleged herein.

*Tenth*, such other and further relief as the nature of the case may require or as may be determined proper by this Court.

Dated:  December 14, 2020                              Respectfully submitted,
         New York, NY
                                                        SELENDY & GAY PLLC


                                                  By:   */s/ Faith Gay*

Mark Richard (D.C. Bar No. 1033699)                     Faith Gay (*pro hac vice*)
PHILLIPS, RICHARD & RIND, P.A.                          Caitlin Halligan (*pro hac vice*)
9360 SW 72 Street, Suite 283                            Maria Ginzburg (*pro hac vice*)
Miami, FL 33173                                         Yelena Konanova (*pro hac vice*)
Telephone: (305) 412-8322                               Jessica E. Underwood (*pro hac vice*)
E-mail: mrichard@phillipsrichard.com                    Shelby Rokito (*pro hac vice*)

*Attorneys for Plaintiffs Weingarten &*                 SELENDY & GAY PLLC
*AFT*                                                   1290 Avenue of the Americas
                                                        New York, NY 10104
Aaron Ament (D.C. Bar No. 1602164)                      Telephone: (212) 390-9000
Daniel A. Zibel (D.C. Bar No. 491377)                   E-mail: fgay@selendygay.com
Robyn K. Bitner (D.C. Bar No. 1617036)                          challigan@selendygay.com
NATIONAL STUDENT LEGAL                                          mginzburg@selendygay.com
DEFENSE NETWORK                                                 lkonanova@selendygay.com
1015 15th Street N.W., Suite 600                                junderwood@selendygay.com
Washington, D.C. 20005                                          srokito@selendygay.com
Telephone: (202) 734-7496
E-mail: aaron@defendstudents.org
        dan@defendstudents.org
        robyn@defendstudents.org                        *Attorneys for Plaintiffs*

*Attorneys for Plaintiffs Weingarten &*
*AFT*